**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| PHOENIX LIGHT SF LIMITED, BLUE HERON FUNDING II LTD., BLUE HERON FUNDING V LTD., BLUE HERON FUNDING IX LTD., KLEROS PREFERRED FUNDING V PLC, SILVER ELMS CDO PLC, SILVER ELMS CDO II LIMITED, C-BASS CBO XIV LTD., and C-BASS CBO XVII LTD., | : : : : : : : : : : | Index No. 14-cv-10102<br><br>Hon. Richard M. Berman<br><br>**<u>SECOND AMENDED<br>COMPLAINT</u>** |
| Plaintiffs, | : : | **DEMAND FOR JURY TRIAL** |
| -against- | : : | |
| WELLS FARGO BANK, N.A., | : : | |
| Defendant. | : x | |

## TABLE OF CONTENTS

**Page**

NATURE OF ACTION ...........................................................................................1

PARTIES ...............................................................................................................6

PLAINTIFFS' ACQUISITION OF CERTIFICATES AND STANDING TO SUE ....................8

JURISDICTION AND VENUE ...............................................................................14

FACTUAL ALLEGATIONS ...................................................................................14

    I.     THE SECURITIZATION PROCESS.......................................................14

    II.    WELLS FARGO'S DUTIES AND OBLIGATIONS .................................16

        A. Wells Fargo's Duties Pertaining to the Delivery of Mortgage Files ...............18

        B. Wells Fargo Had a Duty to Provide Notice of Defaults and
           Enforce Repurchase Obligations Triggered by Such Notice ................................23

        C. Wells Fargo's Duty to Act Prudently
           Upon the Occurrence of an Event of Default..........................................................24

        D. Wells Fargo Had a Duty to Address the
           Servicers' Failure to Meet Prudent Servicing Standards .......................................26

        E. Wells Fargo Is Liable for Negligence in Performing Its Duties ..........................28

    III.   WELLS FARGO BREACHED ITS
          CONTRACTUAL, FIDUCIARY AND STATUTORY DUTIES ............................30

        A. Wells Fargo Failed to Provide Notice of the Sponsors'
           and Originators' Pervasive Representation and Warranty Breaches ....................30

               1. The Originators' and Sponsors' Pervasive
                   Breaches of Representations and Warranties..............................................37

        B. Wells Fargo Failed to Act Prudently
           Upon the Occurrence of Events of Default..........................................................40

               1. Events of Default Under the PSAs Relating to
                   Document Delivery Failures in the Covered Trusts .................................41

               2. Events of Default Under the IMH Trust .............................................45

3. Wells Fargo Received Written Notice of Representation and Warranty Violations Which Ripened into Events of Default ...................46

4. Events of Default Concerning False Servicer Certifications ...................47

C.  Wells Fargo Failed to Address the Servicers' Looting of Trust Assets................49

IV.    WELLS FARGO SUFFERED FROM CONFLICTS OF INTEREST.......................52

V.    WELLS FARGO'S CONDUCT INJURED PLAINTIFFS........................................55

CAUSES OF ACTION...............................................................................................................57

FIRST CAUSE OF ACTION (Violations of the TIA) ...............................................................57

SECOND CAUSE OF ACTION (Breach of Contract)...............................................................59

THIRD CAUSE OF ACTION (Breach of Fiduciary Duty) .......................................................60

FOURTH CAUSE OF ACTION (Negligence) ..........................................................................61

FIFTH CAUSE OF ACTION (Violation of the Streit Act)........................................................62

SIXTH CAUSE OF ACTION (Breach of the Covenant of Good Faith) ....................................63

PRAYER FOR RELIEF .............................................................................................................64

Phoenix Light SF Limited, Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., Blue Heron Funding IX Ltd., Kleros Preferred Funding V PLC, Silver Elms CDO PLC, Silver Elms CDO II Limited, C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd., as holders of residential mortgage-backed securities ("RMBS") issued by certain Covered Trusts (defined below) (collectively, "Plaintiffs"), by and through their attorneys, bring this action against Defendant Wells Fargo Bank, N.A. ("Wells Fargo" or the "Trustee"), and allege as follows:

## NATURE OF ACTION

1.      This action arises out of Wells Fargo's role as trustee for 13 securitization trusts (the "Covered Trusts"), identified in Exhibit A, and asserts claims against Wells Fargo for breaches of its contractual and fiduciary duties, and its duties under the federal Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. § 77aaa, *et seq.*, and New York's Streit Act, N.Y. Real Property Law § 124, *et seq.* (the "Streit Act").

2.      The Covered Trusts were created to facilitate RMBS transactions introduced to investors from 2005 to 2007.  Three of the RMBS transactions were sponsored by Carrington Securities, LP (the "Carrington Trusts"), two were sponsored by Sutton Funding LLC (the "Sutton Trusts"), one was sponsored by Ameriquest Mortgage Company (the "Ameriquest Trust"), one was sponsored by Bank of America, N.A. (the "BOA Trust"), one was sponsored by EMC Mortgage Corporation (the "EMC Trust"), one trust, consisting of loans acquired by First Franklin Financial Corporation, was sponsored by Lehman Brothers Holdings Inc. (the "First Franklin Trust"), one was sponsored by Impac Funding Corporation (the "IFC Trust"), one was sponsored by Impac Mortgage Holdings, Inc., (the "IMH Trust"), one was sponsored by Merrill Lynch Mortgage Lending Inc. (the "Merrill Lynch Trust") and one was sponsored by Option One Mortgage Corporation (the "Option One Trust") (Carrington

Securities, LP, Sutton Funding LLC, Ameriquest Mortgage Company, Bank of America, N.A., EMC Mortgage Corporation, Impac Funding Corporation, Impac Mortgage Holdings, Inc., Lehman Brothers Holdings Inc., Merrill Lynch Mortgage Lending Inc. and Option One Mortgage Corporation are referred to collectively as the "Sponsors").

3.      Plaintiffs purchased, and currently hold, RMBS certificates with an original face value of $402 million issued by the Covered Trusts identified in Exhibit B (the "Certificates").

4.      The Certificates represent interests in the cash flows associated with the mortgage loans deposited into the Covered Trusts by the Sponsors and their affiliates or business partners.  The certificateholders are the beneficiaries of the Covered Trusts.  The performance of the RMBS depended on the Sponsors depositing properly underwritten mortgage loans having complete documentation into the Covered Trusts.  The quality of the mortgage loans is critical, and numerous provisions of the governing agreements assure that only qualifying loans would be deposited into the Covered Trusts.  Similarly, because the securities were to be "mortgage-backed," numerous other provisions seek to assure that complete documentation for each loan, including an original mortgage note and a properly assigned mortgage, would be delivered to the Trustee.

5.      The certificateholders, however, did not receive any loan or mortgage files that they could check to make certain that their contractual rights were being protected. Rather, such investors were dependent upon their trustee representative, Wells Fargo, to police the deal and protect their contractual and other legal rights.

6.      As trustee for the Covered Trusts, Wells Fargo owes the Plaintiffs and the other certificateholders certain contractual and common law duties, as well as duties under

2

the TIA and the Streit Act with respect to the mortgage loans owned by the Covered Trusts. Wells Fargo and the relevant servicers (the "Servicers")[1] were required to provide notice of breaches of representations and warranties by the Sponsors and the parties who originated the mortgage loans underlying the Covered Trusts (the "Originators") concerning key attributes of the mortgage loans underlying the Covered Trusts, including the origination guidelines applicable to those loans and adherence to state laws regarding predatory lending. Wells Fargo had a duty to enforce the obligations of the responsible parties (typically the Sponsors and their affiliates that served as the depositors (the "Depositors")) or the Originators to repurchase loans that breached representation and warranty provisions or were missing required documentation.  Wells Fargo was also required to address defaults by the Servicers who were required to engage in prudent loss mitigation practices.

7.     Wells Fargo was actively involved in many aspects of the process of securitizing mortgage loans and typically had very close business relationships with the Sponsors, Originators and Depositors.  Nevertheless, as trustee, Wells Fargo was obligated to act against the financial interest of the Sponsors when demanded by the circumstances. Wells Fargo, however, abandoned its obligations to protect the rights of investors.

8.     Wells Fargo's breaches of its contractual, fiduciary and statutory duties give rise to six distinct legal claims.

9.     <u>Breach of Contract</u>.  Wells Fargo's contractual duties are set forth in governing agreements, generally identified as pooling and servicing agreements ("PSAs").[2]

---

[1] Some of the Trusts employ a "Master Servicer" while others refer to the lead servicing entity as a Servicer. References herein to the Servicer include the Master Servicer, and any successor Servicers or Master Servicers, to the extent applicable.

[2] One of the Covered Trusts (IMM 2005-6) was structured using an indenture, servicing agreement and trust agreement, which together are the functional equivalent of a PSA.  One of the Covered Trusts (FFML 2006-FFA) was structured using a trust agreement, mortgage loan sale and assignment agreement and securitization servicing

Wells Fargo breached the PSAs by failing to: (i) provide notice of representation and warranty violations by the Sponsors and Originators; (ii) provide notice of the Servicers' failure to give notice of those same representation and warranty violations; (iii) cause the responsible parties to repurchase or substitute loans that were subject to a breach of representation or warranty or missing documentation required to be delivered under the PSAs; and (iv) exercise all rights and remedies available to the Trustee under the PSAs upon the occurrence of an Event of Default.

10.  <u>Breach of Fiduciary Duty</u>. Under common law, after an "Event of Default" an indenture trustee has a duty to act as a prudent person would in the exercise of his own affairs to protect the rights of certificateholders.  This duty continues until the Event of Default is cured.  Wells Fargo failed to meet its fiduciary duties because it was aware Events of Default had occurred, but failed to take action to force the responsible parties to repurchase loans with representation and warranty violations or missing documentation and address breaches by the Servicers.  Wells Fargo also owed a duty of loyalty that it breached by failing to avoid conflicts of interest.

11.  <u>Violations of the TIA</u>. The TIA requires the trustee to provide certificateholders with notice of defaults under the operative indentures within 90 days of becoming aware of such defaults and to act prudently to protect the rights of certificateholders during the period in which the default remains uncured.  Wells Fargo violated these provisions by failing to provide notice of defaults it was aware of and failing to act prudently to protect the certificateholders' interests by exercising all rights and

---

agreement, which together are the functional equivalent of a PSA.  Unless expressly noted herein, when the term PSA is used it is also referring to the aforementioned governing agreements executed in connection with those securitizations.

remedies available to Wells Fargo under the PSAs.

12.     Violation of the Streit Act. Wells Fargo violated the Streit Act by failing to "use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs" to protect the rights of certificateholders during the pendency of an "event of default."  The Streit Act applies to the extent a PSA is not "qualified" under the TIA.  Thus, to the extent the TIA is deemed to not apply to any particular "mortgage investments," the Streit Act provides a similar protection and remedy.

13.     Negligence. Wells Fargo had an extra-contractual duty to perform ministerial acts with due care and to avoid conflicts of interest.  Wells Fargo negligently performed ministerial acts by failing to provide notices of the numerous defaults that it was aware of under the PSAs.  Wells Fargo violated its duty of independence by failing to take action against the Sponsors, Originators, Depositors and Servicers because if Wells Fargo acted, it would have exposed systemic origination and servicing misconduct and would have jeopardized future lucrative engagements.

14.     Breach of Covenant of Good Faith and Fair Dealing.  Wells Fargo violated the covenant of good faith and fair dealing by failing to give notice of defaults and failing to take action to cause the responsible parties to repurchase loans that violated representation and warranty provisions or were missing required documentation.

15.     By failing to perform these duties, Wells Fargo caused Plaintiffs to suffer over $230 million of damages.

## PARTIES

16.    Plaintiff Phoenix Light SF Limited ("Phoenix Light") is a private limited company incorporated and existing under the laws of Ireland, with its principal place of business in Dublin, Ireland.  Phoenix Light brings this action first in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts and pursuant to rights assigned to Phoenix Light by the relevant Indenture Trustee (defined below) to bring claims in the name of Kleros Preferred Funding V PLC and Silver Elms CDO PLC.

17.    Plaintiff Blue Heron Funding II Ltd. is an exempted limited liability company incorporated and existing under the laws of the Cayman Islands, with its principal place of business in Grand Cayman, Cayman Islands.  Blue Heron Funding II Ltd. brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

18.    Plaintiff Blue Heron Funding V Ltd. is an exempted limited liability company incorporated and existing under the laws of the Cayman Islands, with its principal place of business in Grand Cayman, Cayman Islands.  Blue Heron Funding V Ltd. brings this action in its own right as CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

19.    Plaintiff Blue Heron Funding IX Ltd. is an exempted limited liability company incorporated and existing under the laws of the Cayman Islands, with its principal place of business in Grand Cayman, Cayman Islands.  Blue Heron Funding IX Ltd. brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

20.    Plaintiff C-BASS CBO XIV Ltd. is an exempted limited liability company incorporated and existing under the laws of the Cayman Islands, with its principal place of business in Grand Cayman, Cayman Islands.  C-BASS CBO XIV Ltd. brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

21.    Plaintiff C-BASS CBO XVII Ltd. is an exempted limited liability company incorporated and existing under the laws of the Cayman Islands, with its principal place of business in Grand Cayman, Cayman Islands.  C-BASS CBO XVII Ltd. brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

22.    Plaintiff Kleros Preferred Funding V PLC is a special purpose public limited company incorporated and existing under the laws of Ireland, with its principal place of business in Dublin, Ireland.  Kleros Preferred Funding V PLC brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

23.    Plaintiff Silver Elms CDO PLC is a special purpose public limited company incorporated and existing under the laws of Ireland, with its principal place of business in Dublin, Ireland.  Silver Elms CDO PLC brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

24.    Plaintiff Silver Elms CDO II Limited is a special purpose private limited company incorporated and existing under the laws of Ireland, with its principal place of business in Dublin, Ireland.  Silver Elms CDO II Limited brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

25.     Each Plaintiff is a corporate entity with separate legal existence and with a board of directors that controls its operations, akin to a corporation formed under U.S. law.  Each Plaintiff entity was organized for the purpose of investing in RMBS and other securities and has investors holding debt and income securities.

26.     Defendant Wells Fargo is a national banking association organized and existing under the laws of the United States.  Wells Fargo does business throughout the United States, with its main office located in South Dakota and its principal place of business in San Francisco, California.  It serves as the trustee for the Covered Trusts.  For each of the Covered Trusts, Wells Fargo signed Certificates incorporating the PSAs.  As the trustee for the Covered Trusts, Wells Fargo owed certificateholders certain statutory, contractual and fiduciary duties with respect to the mortgage loans owned by the Covered Trusts, which it violated.

### PLAINTIFFS' ACQUISITION OF CERTIFICATES AND STANDING TO SUE

27.     Plaintiffs held the Certificates identified in Exhibit B and suffered damages as a result of Wells Fargo's breaches.

28.     Plaintiffs acquired ownership to the Certificates in multiple ways.

29.     Each of the Plaintiffs, with the exception of Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., and Blue Heron Funding IX Ltd., acquired Certificates pursuant to an asset purchase agreement or similar agreement with third-parties, including WestLB AG ("WestLB"), Harrier Finance Limited ("Harrier"), Kestrel Funding PLC ("Kestrel") and Greyhawk Funding, LLC ("Greyhawk"), and have held these Certificates continuously since the date of acquisition identified in Exhibit B.  Each of these sellers transferred all of their right, title and interest in the Certificates to the Plaintiffs without retaining any rights whatsoever with respect to the Certificates.

8

30.     With the exception of certain of the agreements pursuant to which Phoenix Light acquired two Certificates, the asset purchase agreements had express New York choice of law provisions.  Exhibit B identifies Certificates that were acquired pursuant to asset purchase agreements incorporating New York law and those acquired pursuant to agreements incorporating German law.

31.     Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., Blue Heron Funding IX Ltd., Kleros Preferred Funding V PLC, and Silver Elms CDO PLC also acquired Certificates through direct purchases made after the CDO closing.  Exhibit B identifies which Certificates were acquired through such market purchases.  Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., Blue Heron Funding IX Ltd., Kleros Preferred Funding V PLC, and Silver Elms CDO PLC have held these Certificates continuously since the date of acquisition identified in Exhibit B.

32.     Plaintiffs have suffered an injury in fact because they are certificateholders and were damaged as a result of Wells Fargo's breaches as described herein.  Accordingly, they have standing to sue under Article III of the Constitution of the United States.

33.     Plaintiffs also have contractual standing to pursue the claims set forth herein.

34.     Each of the Plaintiffs other than Phoenix Light (*i.e.*, Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., Blue Heron Funding IX Ltd., Kleros Preferred Funding V PLC, Silver Elms CDO PLC, Silver Elms CDO II Limited, C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd.) entered into Indentures (the "CDO Indentures") with a CDO Trustee.  The CDO Trustees are: (i) Deutsche Bank Trust Company Americas ("Deutsche Bank") for Kleros Preferred Funding V PLC and Silver Elms CDO PLC; (ii) The Bank of New York Trust Company, National Association ("BNY Trust Co."), in its own right or as successor trustee to

JPMorgan Chase Bank, for Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., and Blue

Heron Funding IX Ltd. and as trustee for C-BASS CBO XIV Ltd. and C-BASS CBO XVII

Ltd.; and (iii) Wells Fargo Bank, N.A. ("Wells Fargo Bank") for Silver Elms CDO II Limited.

35.     The Granting Clauses of the CDO Indentures convey to the CDO Trustees a

security interest in the underlying collateral for the benefit of Secured Parties (defined below).

For example, the CDO Indenture for Silver Elms CDO II Limited provides:

> The Issuer hereby Grants to the Trustee, for the benefit and security
> of the Secured Parties, all of its right, title and interest in, to and
> under, in each case, whether now owned or existing, or hereafter
> acquired or arising, all accounts, chattel paper, commercial tort
> claims, deposit accounts, documents, general intangibles, goods,
> instruments, investment property and letter-of-credit rights,
> including but not limited to the . . . the Collateral Debt Securities . .
> . . Such Grants are made to the Trustee to hold in trust, to secure the
> Secured Notes.

The other CDO Indentures contain substantially similar grants.

36.     The "Secured Parties" under each of the CDO Indentures include the senior

noteholders.  Phoenix Light holds more than 50% of the senior notes and, thus, is the

Controlling Party and/or the Majority for, each of (i) Blue Heron Funding II Ltd.; (ii) Blue

Heron Funding V Ltd.; (iii) Blue Heron Funding IX Ltd.; (iv) Kleros Preferred Funding V

PLC; (v) Silver Elms CDO PLC; (vi) Silver Elms CDO II Limited; (vii) C-BASS CBO XIV

Ltd.; and (viii) C-BASS CBO XVII Ltd. under the CDO Indentures.

37.     Because only a security interest was conveyed to the CDO Trustees for the benefit

of the CDO senior noteholders and other Secured Parties, the CDO Issuers retained their right to

bring claims.

38.     Nevertheless, the CDO Trustees have each assigned any right they have to bring

the claims herein to Plaintiffs to the extent that such an assignment is deemed necessary.

Phoenix Light directed them to do so on December 12, 2014.  Because these entities suffer from conflicts of interest by virtue of the fact that they are being sued by Plaintiffs, the CDO Trustees wrongfully refused to act until beginning in April 2015.

39.     On April 16, 2015, Deutsche Bank and Phoenix Light entered into a written assignment agreement whereby Deutsche Bank assigned to Phoenix Light as controlling noteholder "any and all rights that the Trustee may have to pursue and enforce the claims set forth" in this action on behalf of Kleros Preferred Funding V PLC and Silver Elms CDO PLC "including any claims which may be added to the Lawsuits by virtue of an amendment to the Complaints or otherwise."  Accordingly, if Deutsche Bank as CDO Trustee was the only party that could bring claims on behalf of, and in the name of, Kleros Preferred Funding V PLC and Silver Elms CDO PLC, Phoenix Light now has such authority.  Alternatively, if Kleros Preferred Funding V PLC and Silver Elms CDO PLC retained the ability to bring claims, they do so in their own right here as they are parties to this action.

40.     On June 19, 2015, BNY Trust Co., Phoenix Light, C-BASS CBO XIV Ltd., C-BASS CBO XVII Ltd., Blue Heron Funding II Ltd., Blue Heron Funding V Ltd. and Blue Heron Funding IX Ltd. (among others) entered into a written assignment agreement whereby BNY Trust Co. assigned to Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., Blue Heron Funding IX Ltd., C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd. "all right, title and interest in, to and under, in each case, that the Trustee may have with respect to the claims asserted or which may hereafter be asserted on behalf" of these entities in this action. Accordingly, to the extent BNY Trust Co. as CDO Trustee obtained the exclusive right to assert claims on behalf of Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., Blue Heron Funding IX Ltd., C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd., that right has been

assigned back to Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., Blue Heron

Funding IX Ltd., C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd.  Alternatively, if

Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., Blue Heron Funding IX, C-BASS

CBO XIV Ltd. and C-BASS CBO XVII Ltd. retained the ability to bring claims, they do so

in their own right here as they are parties to this action.

41.     On June 26, 2015, Wells Fargo Bank, Phoenix Light and Silver Elms CDO II

Limited (among others) entered into a written assignment agreement whereby Wells Fargo

Bank assigned to Silver Elms CDO II Limited "all right, title and interest that [Wells Fargo]

may have, if any, with respect to the claims asserted by each CDO Issuer or which may hereafter

be asserted by each CDO Issuer" in this action.  Accordingly, to the extent that Wells Fargo

Bank as CDO Trustee obtained the exclusive right to assert claims on behalf of Silver Elms CDO

II Limited, that right has been assigned back to Silver Elms CDO II Limited.  Alternatively, if

Silver Elms CDO II Limited retained the ability to bring claims, it does so in its own right

here as it is a party to this action.

42.     Phoenix Light is structured differently than the other Plaintiffs and did not

enter into an Indenture with a CDO trustee.  Instead, Phoenix Light entered into a Trust

Agreement that provided to Deutsche Bank as Phoenix Light Trustee a security interest in

the collateral by pledging in Section 3.2 of the Trust Agreement "all its present and future,

actual and contingent claims and rights" with respect to the collateral.  Section 3.5 provides

that the "pledges pursuant to Clause 3.2 are granted for the purpose of securing the Trustee

Claim."

43.     Section 3.7 of the Phoenix Light Trust Agreement expressly authorizes the

Issuer (*i.e.,* Phoenix Light) to take actions with respect to the pledged collateral as that

section provides: "The Issuer shall be authorised (*ermächtigt*) to collect or have collected in the ordinary course of business or otherwise exercise or deal with (which terms shall, for the avoidance of doubt, include the enforcement of any security) the rights pledged under Clause 3.2."

44.     Phoenix Light also entered into an Amended Security Agreement with Deutsche Bank as Phoenix Light Trustee, which applies only to assets acquired from Harrier and Kestrel, including the RMBS conveyed to Phoenix Light pursuant to the asset purchase agreements identified in Exhibit B.  Section 2.1 of that agreement provides for a "Grant of Security Interest" providing "the Issuer hereby Grants to the Trustee, for the benefit of the Transaction Creditors, all of the Issuer's right, title and interest in and to the" assets acquired from Harrier and Kestrel.  The term "grant" is defined as not including any of the "obligations" of the Issuer with respect to the collateral, including those obligations set forth in the Phoenix Light Trust Agreement.  The "obligations" of the Issuer include the obligation to protect the collateral found in Section 9.8 of the Phoenix Light Trust Agreement.  This provision expressly contemplates that Phoenix Light will act if there are breaches of covenants or obligations with respect to the collateral, including by enforcing rights as it is authorized to do under Section 3.7.  Accordingly, Phoenix Light clearly has contractual standing to bring claims with respect to the RMBS it holds directly as identified in Exhibit B.

45.     To the extent Deutsche Bank as Phoenix Light Trustee obtained any rights to bring the claims asserted herein, on June 17, 2015, Deutsche Bank assigned "all rights that [Deutsche Bank] may have to pursue and enforce the claims set forth in" this action "including any claims which may be added to the [action] by virtue of an amendment to the"

13

complaints or otherwise.  As a result, to the extent that Deutsche Bank as Phoenix Light Trustee obtained the exclusive right to assert claims on behalf of Phoenix Light that right has been assigned back to Phoenix Light.

## JURISDICTION AND VENUE

46.     This Court has jurisdiction over the common law claims asserted in this matter and the TIA claims asserted in this matter under 15 U.S.C. § 77v.  This Court has jurisdiction over the other claims asserted under 28 U.S.C. § 1367.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

47.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 77v as Wells Fargo resides and transacts business in this District and a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this District.

48.     This court has personal jurisdiction over Wells Fargo because a substantial part of the administration of the Covered Trusts, out of which the claims asserted herein arise, is performed in New York.  Additionally, the majority of the Covered Trusts are New York trusts, with the majority of their governing agreements governed by New York law and, in many of the PSAs and other governing agreements, Wells Fargo expressly consented to this Court's jurisdiction.

## FACTUAL ALLEGATIONS

## I.     THE SECURITIZATION PROCESS

49.     The process through which RMBS are created and sold is known as mortgage loan securitization.  In broad terms, mortgage loans are acquired from mortgage originators

and pooled together in a trust, which issues securities representing interests in the cash flow from principal and interest payments on the pool of loans after certain costs and fees are deducted.

50.     The first step in each securitization is generally the acquisition of mortgage loans by a sponsor (or "seller"), such as Impac Funding Corporation, and the sale of a large pool of such loans by the sponsor to a depositor, typically a special-purpose affiliate of the sponsor.

51.     The depositor then conveys the pool of loans to a trustee, such as Wells Fargo, pursuant to a PSA that establishes various prioritized tranches of interests in payments made by borrowers on the loans.  The trust issues certificates representing those tranches; the certificates are sold to an underwriter; and the underwriter re-sells the certificates at a profit to investors.  The sponsor (through its affiliated depositor) earns a profit on the excess of the proceeds of the sale of certificates to the underwriter over the cost of purchasing the mortgage loans.  Here, Wells Fargo acted as the trustee in connection with the relevant RMBS transactions.

52.     Pursuant to the PSA for each trust, a servicer is appointed to manage the collection of payments on the mortgage loans in return for a monthly fee.  The servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation, and managing and selling foreclosed properties.

53.     The trustee delivers monthly remittance reports to holders of certificates describing the performance of underlying loans and compliance with the PSA.  The servicer provides data to the trustee to include in these remittance reports.

54.     Each tranche in a loan securitization has a different level of risk and reward, and its own rating issued by a nationally recognized credit-rating agency such as Standard & Poor's or Moody's.  The most senior tranches generally receive the highest ratings, AAA or AA.  Junior tranches receive lower ratings, but offer higher potential returns.  Senior tranches are generally entitled to payment in full ahead of junior tranches, and shortfalls in principal and interest payments are generally allocated first to junior tranches.  This division of cash flows and losses is referred to as the waterfall.

55.     Because the cash flow from payments made by mortgage borrowers on the underlying mortgage loans is the sole source of funds to pay holders of a mortgage-backed security, the credit quality of the security turns on the credit quality of, and the trust assets securing, the underlying loans, which often number in the thousands.

56.     Wells Fargo earned fees in connection with its role as trustee, typically an annual fee based on the percentage of principal outstanding on the loans underlying the RMBS.  Wells Fargo also received significant benefits from the interest-free deposits maintained in its accounts when the servicing payments were remitted to its accounts.  Wells Fargo maintained accounts for numerous trusts and earned sums from the aggregate balances of these accounts.  The RMBS trustee engagements further deepened Wells Fargo's business relationships with the sponsors and underwriters of the RMBS, leading to more lucrative future engagements.

## II.     WELLS FARGO'S DUTIES AND OBLIGATIONS

57.     Wells Fargo's duties and obligations as the trustee for the Covered Trusts are spelled out in the PSAs, or, as was the case for the IMH Trust, an Indenture, and under applicable state and federal laws.  These agreements govern the parties' respective rights

and responsibilities in connection with the Covered Trusts.  Wells Fargo entered into the

PSAs or Indentures with:

(A) For the Ameriquest Trust: (i) Park Place Securities Inc., as Depositor; and (ii) Litton Loan Servicing LP, as Servicer;

(B) For the BOA Trust: (i) Asset Backed Funding Corporation, as Depositor; and (ii) Option One Mortgage Corporation, as Servicer;

(C) For two of the Carrington Trusts (CARR 2006-NC3 and CARR 2006-NC4): (i) Stanwich Asset Acceptance Company, L.L.C., as Depositor; and (ii) New Century Mortgage Corporation, as Servicer;

(D) For one of the Carrington Trusts (CARR 2007-FRE1): (i) Stanwich Asset Acceptance Company, L.L.C., as Depositor; and (ii) EMC Mortgage Corporation, as Servicer;

(E) For the EMC Trust: (i) Structured Asset Mortgage Investments II Inc., as Depositor; and (ii) EMC Mortgage Corporation, as Servicer, Sponsor and company;

(F) For the First Franklin Trust: A Trust Agreement with (i) Structured Asset Securities Corporation, as Depositor; (ii) Aurora Loan Services LLC, as Master Servicer; and (iii) Clayton Fixed Income Services Inc., as Credit Risk Manager;

(G) For the IFC Trust: (i) Impac Secured Assets Corp., as Depositor; and (ii) Impac Funding Corporation, as Master Servicer;

(H) For the IMH Trust: An Indenture with the trust, as Issuer;

(I) For the Merrill Lynch Trust: (i) Merrill Lynch Mortgage Investors, Inc., as Depositor; and (ii) Litton Loan Servicing LP, as Servicer;

(J) For the Option One Trust: (i) Option One Mortgage Acceptance Corporation, as Depositor; and (ii) Option One Mortgage Corporation, as Servicer;

(K) For one of the Sutton Trusts (SABR 2006-FR2): (i) Securitized Asset Backed Receivables LLC, as Depositor; (ii) Fremont Investment & Loan, as Responsible Party; (iii) HomEq Servicing Corporation, as Servicer; and (iv) OfficeTiger Global Real Estate Services Inc., as Loan Performance Advisor; and

(L) For one of the Sutton Trusts (SABR 2006-WM2): (i) Securitized Asset

17

Backed Receivables LLC, as Depositor; (ii) WMC Mortgage Corporation, as Responsible Party; (iii) HomEq Servicing Corporation, as Servicer; and (iv) OfficeTiger Global Real Estate Services Inc., as Loan Performance Advisor.

**A.      Wells Fargo's Duties Pertaining to the Delivery of Mortgage Files**

58.      Each PSA sets forth a process for conveying the mortgage loans to the Covered Trusts.  Typically, the Sponsor conveyed the loans to the Depositor for the Covered Trusts.  Then the Depositor conveyed the mortgage loans to Wells Fargo in its capacity as the Trustee for the Covered Trusts to hold for the benefit of certificateholders.  This process is set forth in Section 2.01 ("Conveyance of Mortgage Loans") of the IFC PSA,[3] which provides in relevant part:

> The [Depositor], as of the Closing Date, and concurrently with the execution and delivery hereof, does hereby assign, transfer, sell, set over and otherwise convey to the Trustee without recourse all the right, title and interest of the [Depositor] in and to the Mortgage Loans identified on the Mortgage Loan Schedule (exclusive of any prepayment fees and late payment charges received thereon) and all other assets included or to be included in the Trust Fund for the benefit of the Certificateholders . . . .

The PSAs for the Ameriquest, BOA, Carrington, EMC, First Franklin, IMH, Merrill Lynch, Option One and Sutton Trusts set forth a substantially similar process.  *See* Ex. C § I.

59.      In addition, Section 2.02 of the IFC PSA ("Acceptance of the Trust Fund by the Trustee") provides that the Trustee, or a custodian on behalf of the Trustee, is required to take physical possession of the mortgage loans and the accompanying mortgage files for the exclusive use and benefit of all current and future certificateholders.  It provides:

> The Custodian, with respect to the Mortgage Files held by it, ***acknowledges receipt*** (subject to any exceptions noted in the Initial Certification described below) on behalf of the Trustee, of

---

[3] Quotations to the IFC PSA herein are to the PSA executed in connection with the IMSA 2005-2 securitization. The other trusts in this action were issued pursuant to PSAs with substantially similar language and any differences are immaterial to the issues addressed in this Second Amended Complaint.  The relevant provisions of the governing agreements for each trust are set forth in Exhibit C hereto and are substantially similar.

the documents referred to in Section 2.01 above and all other assets included in the definition of "Trust Fund" and declares that it holds and will hold such documents and the other documents delivered to it constituting the Mortgage Files, and that it holds or will hold such other assets included in the definition of "Trust Fund" (to the extent delivered or assigned to the Trustee), in trust for the exclusive use and benefit of all present and future Certificateholders.

(Emphasis added.) The PSAs for the Ameriquest, BOA, Carrington, EMC, First Franklin, IMH, Merrill Lynch, Option One and Sutton Trusts set forth a substantially similar process. *See* Ex. C § II.

60.     Section 2.01 of the IFC PSA also specifically sets forth the operative documents that must be contained in the mortgage file for the mortgage loans.  It provides:

In connection with such transfer and assignment, ***the [Depositor] has caused the Seller to deliver to, and deposit with the Custodian, as described in the Mortgage Loan Purchase Agreement, with respect to each Mortgage Loan, the following documents or instruments***:

(i)    the ***original Mortgage Note endorsed*** without recourse in blank or to, "Wells Fargo Bank, N.A., as trustee under the Pooling and Servicing Agreement relating to Impac Secured Assets Corp., Mortgage Pass-Through Certificates, Series 2005-2" with all intervening endorsements showing an unbroken chain of endorsements from the originator to the Person endorsing it to the Trustee or, with respect to any Mortgage Loan as to which the original Mortgage Note has been permanently lost or destroyed and has not been replaced, a Lost Note Affidavit;

(ii)    ***the original recorded Mortgage***, noting the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan, with evidence of recording indicated thereon or, if the original Mortgage has not been returned from the public recording office, a copy of the Mortgage certified by the Seller or the public recording office in which such Mortgage has been recorded to be a true and complete copy of the original

19

Mortgage submitted for recording;

(iii)   unless the Mortgage Loan is registered on the MERS® System, *a duly executed original Assignment of the Mortgage*, without recourse in blank or to, in recordable form to Wells Fargo Bank, N.A., as trustee," or to "Wells Fargo Bank, N.A., as trustee for holders of Impac Secured Assets Corp., Mortgage Pass-Through Certificates, Series 2005-2"

(iv)   *the original recorded Assignment or Assignments of the Mortgage showing an unbroken chain of assignment from the originator thereof to the Person assigning it in blank or to the Trustee* (or to MERS, if the Mortgage Loan is registered on the MERS® System and noting the presence of a MIN) or, if any such Assignment has not been returned from the applicable public recording office, a copy of such Assignment certified by the Seller to be a true and complete copy of the original Assignment submitted to the title insurance company for recording;

(v)   *the original title insurance policy*, or, if such policy has not been issued, any one of an original or a copy of the preliminary title report, title binder or title commitment on the Mortgaged Property with the original policy of the insurance to be delivered promptly following the receipt thereof;

(vi)   a copy of the related hazard insurance policy; and

(vii)   a true and correct copy of any assumption, modification, consolidation or substitution agreement.

(Emphasis added.)  The PSAs for the Ameriquest, BOA, Carrington, EMC, First Franklin,

IMH, Merrill Lynch, Option One and Sutton Trusts set forth a substantially similar process.

*See* Ex. C § III.

61.   Physical possession of these documents by Wells Fargo was necessary to

transfer the ownership rights to the mortgage loans from the Sponsors and Depositors to the

Covered Trusts.

62.     Wells Fargo, or a custodian working on its behalf, had a contractual obligation under the PSAs to review each of the mortgage files for the mortgage loans and certify that the documentation for each of the loans was accurate and complete.

63.     After a designated period, Wells Fargo, or a custodian on its behalf, was required to issue a final certification and exception report that identified mortgage files that were missing documentation required under the PSA.  *See* Ex. C § IV.  When a custodian fulfilled this role, it acted as an agent on behalf of the Trustee.  For example, the IFC PSA provides that the custodian will act "on [Wells Fargo's] behalf."  The PSAs for the Ameriquest, BOA, Carrington, EMC, First Franklin, IMH, Merrill Lynch, Option One and Sutton Trusts set forth a substantially similar process.  *See* Ex. C § XIV.

64.     The "Form of Custodian Final Certification," which was attached to the IFC PSA as Exhibit D, provides:

> Ladies and Gentlemen:
>
> In accordance with Section 2.02 of the above-captioned Pooling and Servicing Agreement, ***the undersigned, as Custodian, hereby certifies that as to each Mortgage Loan listed in the Mortgage Loan Schedule . . . it has received the documents set forth in Section 2.01.***
>
> The Custodian has made no independent examination of any documents contained in each Mortgage File beyond the review specifically required in the above-referenced Pooling and Servicing Agreement. The Custodian makes no representation that any documents specified in clause (vi) of Section 2.01 should be included in any Mortgage File. The Custodian makes no representations as to and shall not be responsible to verify: (i) the validity, legality, sufficiency, enforceability, due authorization, recordability or genuineness of any of the documents contained in each Mortgage File of any of the Mortgage Loans identified on the Mortgage Loan Schedule, (ii) the collectability, insurability, effectiveness or suitability of any such Mortgage Loan or (iii) the existence of any assumption, modification, written assurance or

21

substitution agreement with respect to any Mortgage File if no such documents appear in the Mortgage File delivered to the Custodian.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the above-captioned Pooling and Servicing Agreement.

(Emphasis added.)  The PSAs for the Ameriquest, BOA, Carrington, EMC, First Franklin, IMH, Merrill Lynch, Option One and Sutton Trusts set forth a substantially similar process. *See* Ex. C § V.

65.     The Final Certification is the key certification that Wells Fargo (or a custodian on its behalf) was required to prepare for the Covered Trusts.  In this document, Wells Fargo certified that (i) there was full and complete loan documentation in accordance with the requirements of the PSAs for those loans specifically identified on the mortgage loan schedule; and (ii) Wells Fargo had not obtained complete required documentation for those loans identified on the document exception report.

66.     If there was a defect with any mortgage file, then Wells Fargo and/or the Servicer was obligated to demand that the Sponsor cure the defect leading to the exception (typically within 60 or 90 days) or repurchase or substitute the defective loans.  This is set forth in Section 2.02 of the IFC PSA, which provides:

> *If in the process of reviewing the Mortgage Files and preparing the certifications referred to above the Custodian finds any document or documents constituting a part of a Mortgage File to be missing or defective in any material respect, the Custodian shall promptly notify the Seller, the Master Servicer, the Certificate Insurer, the Trustee and the Company.* The Trustee shall promptly notify the Seller of such defect and request that the Seller cure any such defect within 60 days from the date on which the Seller was notified of such defect, and if the Seller does not cure such defect in all material respects during such period, request on behalf of the Certificateholders that the Seller purchase such Mortgage Loan from the Trust Fund at the Purchase Price within 90 days after the date on which the Seller

> was notified of such defect; provided that if such defect would
> cause the Mortgage Loan to be other than a "qualified mortgage"
> as defined in Section 860G(a)(3) of the Code, any such cure or
> repurchase must occur within 90 days from the date such breach
> was discovered . . . .

(Emphasis added.)  The PSAs for the Ameriquest, BOA, Carrington, EMC, First Franklin,

IMH, Merrill Lynch, Option One and Sutton Trusts contain substantially similar

requirements.  *See* Ex. C § VI.

67.     Under all of the PSAs, and applicable tax laws governing REMICS, the

responsible party could not cure a document defect by substitution after a specified period,

typically two years from Closing.  *See* Ex. C § VI.

**B.     Wells Fargo Had a Duty to Provide Notice of Defaults and
         Enforce Repurchase Obligations Triggered by Such Notice**

68.     Wells Fargo had an obligation pursuant to the PSAs to provide notice to all

parties of the Servicers', Sponsors' or Originators' breaches of representations and

warranties under the PSAs or the mortgage loan purchase agreements ("MLPAs").  For

example, Section 2.04 of the IFC PSA provides:

> Upon the discovery by the [Sponsor], the Master Servicer . . . or the
> Trustee of a breach of any of the representations and warranties
> made in the Mortgage Loan Purchase Agreement in respect of any
> Mortgage Loan which materially and adversely affects the interests
> of the Certificateholders or the Certificate Insurer in such Mortgage
> Loan, the party discovering such breach shall give prompt written
> notice to the other parties. The Trustee shall promptly notify the
> Seller of such breach and request that the Seller shall, within 90 days
> from the date that the Seller was notified or otherwise obtained
> knowledge of such breach, either (i) cure such breach in all material
> respects or (ii) purchase such Mortgage Loan from the Trust Fund
> at the Purchase Price and in the manner set forth in Section 2.02;
> provided that if such breach would cause the Mortgage Loan to be
> other than a 'qualified mortgage' as defined in Section 860G(a)(3)
> of the Code, any such cure or repurchase must occur within 90 days
> from the date such breach was discovered.

The PSAs for the Ameriquest, BOA, Carrington, EMC, First Franklin, IMH, Merrill Lynch, Option One and Sutton Trusts contain substantially similar requirements.  *See* Ex. C § VI.

69.     In addition, after the occurrence of an Event of Default, the Trustee assumes the same duties as a common law trustee, which includes, among other things, providing beneficiaries notice of all defaults under the operative trust documents, which include the PSAs here.

70.     Congress also enacted the TIA to ensure, among other things, that investors in certificates, bonds and similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees.  15 U.S.C. § 77bbb.

71.     Under Section 315(b) of the TIA, Wells Fargo was required to give certificateholders notice of a default under the PSAs within ninety days of learning of such default.  15 U.S.C. § 77ooo(b).

72.     As set forth below in Section III, Wells Fargo failed to give notice of numerous defaults and breaches of representations and warranties or covenants as required under the PSAs, common law and the TIA.

**C.     Wells Fargo's Duty to Act Prudently
         Upon the Occurrence of an Event of Default**

73.     Under the PSAs and applicable law, Wells Fargo owed a fiduciary duty to certificateholders upon the occurrence of an Event of Default.  Wells Fargo's post-default fiduciary duty is described in Section 8.01 of the IFC PSA, which provides in relevant part, "[i]f an Event of Default occurs . . . the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs."  The PSAs for the Ameriquest, BOA, Carrington, EMC, First Franklin, IMH, Merrill

Lynch, Option One and Sutton Trusts impose substantially similar obligations on Wells Fargo.  See Ex. C § VII.

74.     In addition, Section 315(c) of the TIA provides that upon the occurrence of a "default" the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.  15 U.S.C. § 77ooo(c).

75.     The Streit Act provides that upon the occurrence of an event of default, an indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

76.     After an Event of Default, Wells Fargo was a fiduciary of the certificateholders.  And prior to an Event of Default (and after), Wells Fargo had a duty of loyalty requiring it to avoid conflicts of interest.

77.     A prudent trustee would have taken appropriate steps to ensure all mortgage loan documentation was completely and accurately transferred to the trusts.  A prudent trustee also would have ensured that the appropriate parties were receiving notification of breaches of representations and warranties from servicers and enforced the responsible parties' obligations with respect to breaching mortgage loans.  As set forth in Sections III and IV hereof, Wells Fargo failed to act prudently to maximize recoveries for certificateholders upon the occurrence of Events of Default and comply at all times with its duty of loyalty.

### D.   Wells Fargo Had a Duty to Address the
###        Servicers' Failure to Meet Prudent Servicing Standards

78.     Each PSA requires the Servicers to service the loans underlying the Covered

Trusts prudently.

79.     For example, Section 3.01 of the IFC PSA provides:

> The Master Servicer shall supervise, or take such actions as are
> necessary to ensure, the servicing and administration of the
> Mortgage Loans and any REO Property in accordance with this
> Agreement and its normal servicing practices, which generally
> shall conform to the standards (i) of the Servicing Guide, if
> Impac Funding Corporation is Master Servicer, or (ii) if Impac
> Funding Corporation is not the Master Servicer, of an institution
> prudently servicing mortgage loans for its own account and shall
> have full authority to do anything it reasonably deems
> appropriate or desirable in connection with such servicing and
> administration.

The PSAs for the Ameriquest, BOA, Carrington, EMC, First Franklin, IMH, Merrill Lynch,

Option One and Sutton Trusts contain substantially similar requirements.  *See* Ex. C § VIII.

80.     The PSAs provide that failure to meet prudent servicing standards is an Event

of Default if left uncured for a designated period of time after notice of the default.  For

example, Section 7.01(ii) of the IFC PSA provides that an Event of Default is triggered by:

> any failure on the part of the Master Servicer duly to observe or
> perform in any material respect any other of the covenants or
> agreements on the part of the Master Servicer contained in the
> Certificates or in this Agreement (including any breach of the
> Master Servicer's representations and warranties pursuant to
> Section 2.03(a) which materially and adversely affects the
> interests of the Certificateholders) which continues unremedied
> for a period of 60 days after the date on which written notice of
> such failure, requiring the same to be remedied, shall have been
> given to the Master Servicer by the Trustee, the Certificate
> Insurer or to the Master Servicer, the Certificate Insurer and the
> Trustee by the Holders of Certificates entitled to at least 25% of
> the Voting Rights . . . .

The PSAs for the Ameriquest, BOA, Carrington, EMC, First Franklin, IMH, Merrill Lynch,

Option One and Sutton Trusts contain substantially similar provisions. *See* Ex. C § IX.

81.    Further, the PSAs for the Ameriquest and Sutton Trusts provide that the

failure to follow prudent servicing standards is an Event of Default 45 days after a Servicing

Officer becomes aware of such breach and the PSAs for the Carrington and Option One

Trusts provide that failure to follow prudent servicing standards is an Event of Default 30

days after a Servicing Officer becomes aware of such breach, each without regard to

whether notice was provided.  *See* Ex. C § IX.

82.    Upon a Servicer default or Event of Default, the Trustee was obligated to act.

Wells Fargo had a duty to provide notice when it became aware of breaches of the PSAs by

the Servicers.  If the defaults were not cured within the grace period, or if the Trustee failed

to give notice, the Trustee was required to take action to address the defaults.  For example,

the IFC PSA provides that once a Servicer Event of Default occurred, the Trustee had the

authority and obligation to "terminate all of the rights and obligations (but not the liabilities)

of the Master Servicer,"  IFC PSA § 7.01 (*see also* Ex. C § X), and "be the successor in all

respects to the Master Servicer in its capacity as Master Servicer under this Agreement and

the transactions set forth or provided for herein and shall be subject thereafter to all the

responsibilities, duties and liabilities relating thereto placed on the Master Servicer."  IFC

PSA § 7.02.  The PSAs for the Ameriquest, BOA, Carrington, EMC, First Franklin, IMH,

Merrill Lynch, Option One and Sutton Trusts impose substantially similar obligations on

Wells Fargo.  *See* Ex. C § X.  More generally, Wells Fargo, as Trustee, had a duty to exercise

all rights available under the PSAs to protect certificateholders' interests and do so with due

care.

83.    For trusts issued in 2006 and later, Wells Fargo and the Servicers had a duty

27

under Rules 13a-18 and 15d-18 of the Exchange Act of 1934 and Item 1122 of Regulation

AB to provide annually an assessment as to compliance of applicable servicing criteria.

Wells Fargo was required to confirm, among other things, that policies and procedures were

in place that were sufficient to monitor performance triggers and events of default, servicing

by third parties, and that pool assets, along with related documentation, were safeguarded in

accordance with provisions of the PSAs.  The PSAs required these certifications to be

provided annually without regard to whether the Covered Trust was required to file public

reports with the United States Securities and Exchange Commission. *See* Exhibit C § XIII.

84.    As set forth below in Section III, Wells Fargo breached its statutory, fiduciary

and contractual duties by failing to take actions to address Servicer defaults and Events of

Default and to provide accurate certifications concerning compliance with applicable

servicing standards.

**E.    Wells Fargo Is Liable for Negligence in Performing Its Duties**

85.    Section 8.01 of the IFC PSA provides in relevant part:

> *No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct; provided, however, that:*
>
> > (i)    Prior to the occurrence of an Event of Default, and after the curing or waiver of all such Events of Default which may have occurred, the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee and, in the absence of bad faith on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and

> conforming to the requirements of this Agreement;
>
> (ii)      The Trustee shall not be liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless ***it shall be proved that the Trustee was negligent in ascertaining the pertinent facts***….

(Emphasis added.)  The PSAs for the Ameriquest, BOA, Carrington, EMC, First Franklin, IMH, Merrill Lynch, Option One and Sutton Trusts contain substantially similar provisions. *See* Ex. C § VII.

86.      Every trustee also has a non-waivable duty to exercise due care in the performance of ministerial acts required to be undertaken in the course of the administration of the trust.  Wells Fargo can be held liable for its own negligence in failing to perform its requisite ministerial acts, which includes, among other things, its responsibilities to: (i) give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' widespread practice of including in securitization trusts loans that breached such representations and warranties; (ii) provide notices of servicing related breaches known to the Trustee; and (iii) provide accurate annual certifications under Regulation AB affirming compliance with applicable servicing criteria.

87.      Every trustee—including Wells Fargo—has an absolute duty to avoid conflicts of interest and a duty of undivided loyalty to trust investors.  This duty is non-waivable and arises independently of the PSAs.  As set forth in Section IV, Wells Fargo violated this duty.

### III.   WELLS FARGO BREACHED ITS
### CONTRACTUAL, FIDUCIARY AND STATUTORY DUTIES

#### A.   Wells Fargo Failed to Provide Notice of the Sponsors'
#### and Originators' Pervasive Representation and Warranty Breaches

88.   Wells Fargo failed to give notice of defaults that occurred when the Sponsors or Originators breached representation and warranty provisions providing that all loans met applicable loan origination guidelines.  In reality, during the 2005 to 2007 time period, the Sponsors and Originators regularly disregarded their underwriting guidelines and the representations and warranties made to securitization trusts.

89.   For example, for the IFC Trust, Impac Funding Corp. represented and warranted the following:

> (i) the information set forth in the Mortgage Loan Schedule hereto is true and correct in all material respects;
>
> (ii) the terms of the Mortgage Note and the Mortgage have not been impaired, waived, altered or modified in any respect, except by written instruments, (i) if required by law in the jurisdiction where the Mortgaged Property is located, or (ii) to protect the interests of the Trustee on behalf of the Certificateholders;
>
> (iii) the Mortgage File for each Mortgage Loan contains a true and complete copy of each of the documents contained in such Mortgage File, including all amendments, modifications and, if applicable, waivers and assumptions that have been executed in connection with such Mortgage Loan;
>
> (iv) immediately prior to the transfer to the Purchaser, the Seller was the sole owner of beneficial title and holder of each Mortgage and Mortgage Note relating to the Mortgage Loans and is conveying the same free and clear of any and all liens, claims, encumbrances, participation interests, equities, pledges, charges or security interests of any nature and the Seller has full right and authority to sell or assign the same pursuant to this Agreement. . . .;
>
> (viii) as of the Cut off Date, (i) no Mortgage Loan had been 30 days or more delinquent more than once during the preceding 12 months, (ii) no Mortgage Loan had been delinquent for 60 days or more

during the preceding 12 months and (iii) to Seller's knowledge, there was no delinquent tax or assessment lien against the property subject to any Mortgage, except where such lien was being contested in good faith and a stay had been granted against levying on the property. . . .;

(xiv) (i) the Loan-to-Value Ratio of each Mortgage Loan at origination was not more than 100.00%; (ii) except with regard to [___]% of the Mortgage Loans, each Mortgage Loan with a Loan-to-Value Ratio at origination in excess of 80.00% will be insured by one of the following: (a) a Primary Insurance Policy issued by a private mortgage insurer or (b) a Radian Lender-Paid PMI Policy. . . .;

(xv) at the time of origination, each Mortgaged Property was the subject of an appraisal which conforms to the Seller's underwriting requirements, and a complete copy of such appraisal is contained in the Mortgage File;

(xvi) on the basis of a representation by the borrower at the time of origination of the Mortgage Loans, at least [___]% of the Mortgage Loans (by aggregate principal balance) will be secured by Mortgages on owner occupied primary residence properties. . . .

(xlix) none of the Mortgage Loans is a "high cost home loan" as defined in the Georgia Fair Lending Act, as amended (the "Georgia Act"), the New York Predatory Lending Law, codified as N.Y. Banking Law §6 I, N.Y. Gen. Bus. Law §771 a, and N.Y. Real Prop. Acts Law §1302 (together, the "New York Act"), the Arkansas Home Loan Protection Act, as amended (the "Arkansas Act"), or Kentucky Revised Statutes §360.100, as amended (the "Kentucky Act"); and all the Mortgage Loans that are subject to the Georgia Act, the New York Act, the Arkansas Act and the Kentucky Act comply with the requirements of each such act. Each Mortgage Loan for which the related Mortgaged Property is located in the State of Georgia was originated prior to October 1, 2002, or on or after March 9, 2003.

IFC PSA Exhibit I.  The PSAs for the Ameriquest, BOA, Carrington, EMC, First Franklin,

IMH, Merrill Lynch, Option One and Sutton Trusts contain substantially similar provisions.

*See* Ex. C § XI.

90.    As noted above in Section II(B), each party, including Wells Fargo, had an

obligation to provide notice of breaches of these representations and warranties and such notice triggered the Sponsors' or Originators' obligation to repurchase or substitute the defective loan. *See also* Ex. C § VI.

91. Wells Fargo knew that the Sponsors and Originators regularly disregarded their underwriting guidelines and representations and warranties made to securitization trusts long before certificateholders learned of such problems.

92. Wells Fargo served as trustee of hundreds, if not thousands, of RMBS trusts from 2004 to 2007 including many transactions involving the Sponsors and Originators. In the course of administering these trusts, Wells Fargo learned that the Sponsors and Originators had departed from their underwriting guidelines, engaged in predatory lending and failed to ensure mortgage loans complied with state and federal laws.

93. For example, while serving as trustee for various RMBS trusts, Wells Fargo was presented with a large number of defaulted loans that were originated by the Sponsors and Originators, and foreclosures were commenced often in Wells Fargo's name.

94. Indeed, Wells Fargo commenced foreclosure actions from 2005 to the present for numerous loans in which the Sponsors or Originators were at issue, including, for example, foreclosure actions in which:

> (a)  Argent Mortgage Company, LLC served as Originator. *See, e.g.*, *Wells Fargo Bank, N.A. as Trustee v. Devore*, 2006-06-4092 (C.P. Summit Cnty. 2006); *Wells Fargo Bank, N.A. as Trustee v. Kisner*, 2007-03-2316 (C.P. Summit Cnty. 2006); *Wells Fargo Bank, N.A. as Trustee v. Gilbert*, 05-0133 (C.P. Montgomery Cnty. 2005); *Wells Fargo Bank, N.A. as Trustee v. Fleming*, 05-0069 (C.P. Montgomery Cnty. 2005).

> (b)  New Century Mortgage Corporation served as Originator. *See e.g.*, *Wells Fargo, N.A. v. Bauer* No. 2007-09-6764 (C.P. Summit Cnty. 2007); *Wells Fargo, N.A. v. Jaeger* No. 2007-01-0468 (C.P. Summit Cnty. 2007); *Wells Fargo, N.A. v. Wilson* No. 2007-01-0911 (C.P. Summit Cnty. 2007).

  (c)  Option One Mortgage Corporation served as Originator. *See, e.g., Wells Fargo Bank, N.A. v. Heath*, No. 108,383, 280 P.3d 328 (Sup. Ct. Okla. 2012) (underlying foreclosure commenced in 2008); *Wells Fargo Bank, N.A. v. Bohatka*, 112 So. 3d 596 (Fla. 1st DCA 2013).

  (d)  WMC Mortgage Corporation served as Originator.  *See, e.g.*, *Wells Fargo Bank, N.A. as Trustee v. Papai, et al.*, 2005-10-6312 (C.P Summit Cnty. 2005); *Wells Fargo Bank, N.A. as Trustee v. Brown*, 100518/2010 (N.Y. Sup. Ct., 2010).

95.  Sometimes the defaults and foreclosures occurred just months after the loan was originated or securitized.  In each foreclosure, Wells Fargo was the named plaintiff and real party in interest as it allegedly held title to the notes and mortgages as trustee for the benefit of the certificateholders. As the real party in interest it had knowledge of the contents of the foreclosure filings.

96.   Through its review of these filings, Wells Fargo discovered that borrowers either (i) did not qualify for the loans because they did not have the ability to repay the loans; (ii) were victims of predatory lending; or (iii) were given a loan that did not comply with state or federal law.

97.  Beginning in 2009 or 2010, facts began to emerge publicly demonstrating that the Sponsors and Originators had violated the representations and warranties provided in connection with the Covered Trusts.  These facts, some of which are detailed in Exhibit F, demonstrate that the Sponsors and Originators regularly included loans in securitizations that did not comply with applicable underwriting guidelines, made predatory loans, and failed to meet state and federal lending guidelines.  While investors such as Plaintiffs lacked the ability to determine whether the publicly reported misconduct by the Sponsors and Originators impacted specific loans backing the Covered Trusts, Wells Fargo had knowledge of specific problems with specific loans as well as access to the mortgage loan files.  At a minimum, in its role as trustee to hundreds of RMBS trusts, Wells Fargo was privy to

information that would have provided the "scent" of a problem with the loans underlying the Covered Trusts. Having caught wind of the problem, Wells Fargo had statutory and common law duties requiring them to "nose to the source."

98.    Wells Fargo was aware that repurchase actions against the Sponsors or Originators at issue here were instituted by a "Special Trustee" appointed by Wells Fargo because it admittedly had a conflict of interest that prevents it from pursuing such claims. For example, at the direction of certain certificateholders, Law Debenture Trust Company commenced actions against WMC Mortgage Corp. to compel repurchase of loans that breached representations and warranties it originated in SABR 2006-WM2—one of the Covered Trusts at issue here. *See, e.g.*, Compl., *Law Debenture Trust Co. of New York v. WMC Mortg. LLC*, No. 12-cv-01538 (D. Conn. Oct. 2012). In a similar repurchase action, Law Debenture Trust Company, acting by Wells Fargo's appointment, through a forensic review determined the existence of "rampant breaches of representations and warranties" for loans originated, and sold into RMBS, by EMC Mortgage LLC, formerly known as EMC Mortgage Corp.—the Sponsor of one of the Covered Trusts at issue. *Bear Stearns Funding Trust 2007-AR4 v. EMC Mortg. LLC*, 2014 WL 494219, *5 (Del. Ch. 2014) (forensic review found breaches of representations and warranties in approximately 86 percent of the Mortgage Loans reviewed); *see also*, *Bear Stearns Mortg. Funding Trust 2006-AR1 v. EMC Mortg. LLC*, 2012 WL 2602942, ¶ 44 (Del. Ch. 2012) (same).

99.    Wells Fargo also received written notice of systemic, widespread Sponsor breaches from monoline insurers. Monoline insurance is a form of credit enhancement that involves purchasing insurance to cover losses from any defaults. Many RMBS trusts were insured by monoline insurers. Sponsors of the mortgage loans made representations and

warranties concerning the underwriting standards of the loans in the governing agreements for the insured RMBS.  The governing agreements for the insured RMBS transactions have a repurchase procedure through which the monoline insurers must provide notice of a breach of representation and warranty to the responsible mortgage loan Sponsor and the parties to the agreement, including the trustee.

100.    Monoline insurers have filed many complaints against Sponsors and Originators for breaches of their representations and warranties in other RMBS trusts for which Wells Fargo served as RMBS trustee. *See, e.g.,* Compl., *Ambac Assurance Corp. v. EMC Mortg. LLC*, No. 651013/2012 (N.Y. Sup. Ct. 2012).

101.    Prior to filing suit against the mortgage loan sponsors, the monoline insurers were often able to obtain and carry out a forensic loan level review of the loans at issue and informed Wells Fargo of the results.

102.    Because these monoline insurers' findings from loan level reviews set forth in their breach notices reflected these common mortgage sellers' pervasive violations of underwriting and securitization guidelines, Wells Fargo discovered that these same defective underwriting and securitization practices applied equally to the Covered Trusts containing loans originated and securitized by these same Originators and Sponsors.

103.    In addition, on April 10, 2012, Wells Fargo, in its capacity as servicer, received a letter from Deutsche Bank National Trust Company, the trustee of a trust not at issue in this litigation, regarding hundreds of loans in breach of WMC's representations and warranties.  This letter advised Wells Fargo that "[b]ased on the number of material breaches of Representations in the statistically representative sample, we have determined a breach rate of 99.7%."

104.    Apart from the multiple, highly-publicized RMBS lawsuits and the numerous government investigations on both a state and federal level and the non-public information that Wells Fargo received through its role as trustee, there are various other indications that the Covered Trusts' loan pools included large numbers of mortgage loans that materially breached the responsible parties' representations and warranties.  For example, the Sponsors' and Originators' systemic abandonment of underwriting guidelines has had a devastating effect on the performance of the Covered Trusts.  Many of the Certificates acquired by Plaintiffs were triple-A or double-A rated at the time of purchase.  *See* Ex. D.  Now most are "junk" bonds that do not qualify for any investment grade rating.  *See id*.  These downgrades were prompted by the alarming rate of defaults and delinquencies of the mortgage loans backing the Covered Trusts and the information that has emerged concerning the Sponsors' and Originators' systemic abandonment of underwriting guidelines.  *See* Ex. E.  A summary of the Covered Trusts' high default and delinquency rates is attached as Exhibit E.  Wells Fargo was aware of the high level of defaults and should have carefully investigated these issues, notified certificateholders, including Plaintiffs, of the issues, and taken action to address these issues.

105.    As set forth in Section IV, Wells Fargo also obtained information concerning the Sponsors' and Originators' widespread breaches of representations and warranties through its own participation as a major originator of residential loans and sponsor of RMBS securitizations**.**

106.    If Wells Fargo had provided the required notices, it would have forced the Sponsors or Originators to repurchase, or substitute if within the period specified in the PSAs, the relevant loans, and the Sponsors would not have been able to issue additional fraudulent RMBS certificates.  Wells Fargo had a continuing duty to provide such notice but

failed to do so throughout its tenure as trustee.  Indeed, Wells Fargo let the statute of

limitations to bring repurchase claims lapse by failing to provide notice or take other action

within six years of the closing of each Covered Trust.

> **1.**    **The Originators' and Sponsors' Pervasive
> Breaches of Representations and Warranties**

107.    Either the Sponsor or Originator, and sometimes both, provided

representations and warranties to the Covered Trusts.

108.    The failure of the parties to the PSAs to provide notice of their breaches of

representations and warranties constituted a default that would have ripened into an Event of

Default had Wells Fargo provided notice of the default.

109.    The chart below identifies each of the entities disclosed to be the Sponsors,

Originators and obligors of the loans included in the Covered Trusts.

|  | **Trust** | **Sponsor** | **Originators** | **Obligors** |
|---|---|---|---|---|
| 1 | ABFC 2006-OPT2 | Bank of America, N.A. | Option One Mortgage Corporation | Option One Mortgage Corporation; Bank of America, N.A. |
| 2 | BSMF 2006-AR3 | EMC Mortgage Corporation | Bear Stearns Residential Mortgage Corporation; EMC Mortgage Corporation | EMC Mortgage Corporation |
| 3 | CARR 2006-NC3 | Carrington Securities, LP | New Century Mortgage Corporation; Home123 Corporation | Carrington Securities, LP; NC Capital Corporation |
| 4 | CARR 2006-NC4 | Carrington Securities, LP | New Century Mortgage Corporation; Home123 Corporation | Carrington Securities, LP; NC Capital Corporation |

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| 5 | CARR 2007-FRE1 | Carrington Securities, LP | Fremont Investment & Loan | Carrington Securities, LP; Fremont Investment & Loan |
| 6 | FFML 2006-FFA | Lehman Brothers Holdings Inc. | First Franklin Financial Corporation | Lehman Brothers Holdings Inc.; First Franklin Financial Corporation |
| 7 | IMM 2005-6 | Impac Mortgage Holdings, Inc. | Impac Mortgage Holdings, Inc. | Impac Mortgage Holdings, Inc. |
| 8 | IMSA 2005-2 | Impac Funding Corporation | Impac Funding Corporation | Impac Funding Corporation |
| 9 | OOMLT 2007-3 | Option One Mortgage Corporation | Option One Mortgage Corporation | Option One Mortgage Corporation; Option One Mortgage Capital Corporation |
| 10 | OWNIT 2006-2 | Merrill Lynch Mortgage Lending Inc. | Ownit Mortgage Solutions, Inc. | Ownit Mortgage Solutions, Inc.; Merrill Lynch Mortgage Lending Inc. |
| 11 | PPSI 2005-WLL1 | Ameriquest Mortgage Company | Argent Mortgage Company; Olympus Mortgage Company | Ameriquest Mortgage Company |
| 12 | SABR 2006-FR2 | Sutton Funding LLC | Fremont Investment & Loan | Fremont Investment & Loan |
| 13 | SABR 2006-WM2 | Sutton Funding LLC | WMC Mortgage Corporation | WMC Mortgage Corporation |

110.    As detailed in Exhibit F, in 2009 and 2010 facts began to emerge that demonstrated that the Sponsors and Originators systematically abandoned applicable underwriting guidelines and therefore breached representations and warranties in all securitizations.

111.    The Sponsors and Originators have been the subject of numerous investigations and lawsuits alleging systematic abandonment of underwriting guidelines in the pursuit of

profits.  *See, e.g.,* Compl., *Cambridge Place v. Morgan Stanley & Co.*, 10-2741 (Sup Ct. Mass. June 9, 2010) (alleging claims concerning systemic abandonment of underwriting guidelines by Option One Mortgage Corporation in ABFC 2006-OPT2 and New Century Mortgage Corporation in CARR 2006-NC4—two of the Covered Trusts at issue here).  These investigations and lawsuits contain ample evidence available to Wells Fargo that mortgage loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.

112.    Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans.  For example, in *FHFA v. Bank of America*, No. 11-cv-06195 (S.D.N.Y. 2011), the Federal Housing Finance Agency ("FHFA") conducted a review of ABFC 2006-OPT2.  The FHFA's review of this Covered Trust revealed that Bank of America's representations regarding the true percentage of non-owner occupied loans within the loan pool were materially inaccurate, understating the percentage of non-owner occupied properties by between 7-10 percent.  The forensic review also revealed that the mortgage loans for each securitization had misrepresented loan-to-value ("LTV") ratios between 10-20 percent of the mortgages.

113.    Further, these lawsuits and investigations demonstrate that the Originators originated mortgage loans with the goal of increasing volume, rather than evaluating the mortgagor's ability to repay the loan, and regularly made exceptions to underwriting guidelines in the absence of sufficient compensating factors.  For example ABFC 2006-OPT2 contained a loan for $560,000 that Option One Mortgage Corp. provided to a borrower who was unemployed, and had stated debt payments (which did not include borrower's monthly expenses

for things such as taxes, utilities, groceries, health care, and transportation) far in excess of monthly income.

114.    These lawsuits, in conjunction with the poor performance of the underlying loans (which Wells Fargo was aware of as it issued regular reports regarding performance) and the public information concerning widespread issues among Originators, were more than sufficient to provide Wells Fargo with notice that large numbers of loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.

115.    Wells Fargo was aware of these reports, investigations and lawsuits, and it also had additional information concerning representation and warranty violations it learned in the course of administering the Covered Trusts.  It also had access to non-public information regarding the Covered Trusts that would have confirmed the representation and warranty violations if it had conducted even a limited investigation.  Thus, Wells Fargo was aware of the defaults, but failed to provide the required notice and pursue repurchase claims.

### B.    Wells Fargo Failed to Act Prudently Upon the Occurrence of Events of Default

116.    When Wells Fargo learned that the Servicers failed to provide notice of numerous breaches of representation and warranty provisions as required under the PSAs, Wells Fargo should have acted like a prudent person would in the exercise of its own affairs and (i) taken action against the Servicers; (ii) taken steps to require the Sponsors or Originators to repurchase or substitute the loans; and (iii) notified certificateholders of the Servicers' defaults and the breaches of representation and warranty provisions.  During the period that an Event of Default was in existence, Wells Fargo had a continuing duty to maximize recoveries for certificateholders.  As such, it should have, at a minimum, reviewed all defaulted loans as they defaulted and determined whether a responsible party

40

was required to repurchase such loans.  Wells Fargo continually failed to do so and let the statute of limitations to bring repurchase claims lapse or otherwise failed to fulfill its obligation to seek repurchases by failing to take sufficient action within six years of the closing of each Covered Trust.

117.    Although certain Events of Default require formal notice and an opportunity to cure, the Trustee cannot escape its duty of care by failing to provide the required notice. As set forth in Section III(A), Wells Fargo discovered that the Servicers, Depositors, Sponsors, and the Trustee itself, failed to provide notice of the Sponsors' and Originators' representation and warranty violations that occurred in the Covered Trusts.  Wells Fargo, however, did not provide notice of such breaches as it was required to do.  Because these would have seasoned into Events of Default if notice had been provided, Wells Fargo had a duty to act prudently to enforce repurchase provisions once it learned of such defaults.

118.    As described below, additional Events of Default occurred under the terms of the PSAs.  Wells Fargo has engaged in repeated breaches of its duty to exercise due care throughout the life of the Covered Trusts.

### 1.    Events of Default Under the PSAs Relating to Document Delivery Failures in the Covered Trusts

119.    As discussed above in Section II(A), Wells Fargo, or a custodian acting on its behalf, had a duty to identify in final certifications and exception reports mortgage files that were missing documentation required to be delivered under the PSAs, which typically included documents sufficient to prove ownership of the note and mortgage or otherwise protect title.  Wells Fargo knew of numerous instances where it did not receive: (i) the original mortgage note with all intervening endorsements showing a complete chain of endorsement from the Originator to the Sponsor or Depositor, or a lost mortgage note

41

affidavit and a duly executed assignment of mortgage for each loan that was not a MERS loan; (ii) the original recorded mortgage for each loan that was not a MERS loan; (iii) the original mortgage for those loans that were MERS loans; (iv) the original recorded assignment or assignment of the mortgage together with all interim recorded assignments; or (v) the title policy.

120.    When Wells Fargo prepared the final exception reports, it provided them to the Sponsors, Depositors, and Servicers indicating many of these missing documents.  When the custodian prepared such reports, it provided them to Wells Fargo, the Sponsors, Depositors, and Servicers, and the reports similarly showed many documents that were required to be delivered under the PSAs were not delivered.  Wells Fargo was aware that affected loans were not repurchased or substituted.

121.    Rather than take action to ensure the responsible parties cured such defects (during the cure period) or substituted or repurchased the affected loans, Wells Fargo stood by while the Sponsors and Servicers of the Covered Trusts engaged in so called "robo-signing" on a widespread basis when the missing documents were needed to foreclose on properties underlying the Covered Trusts.

122.    Wells Fargo and the Sponsors and Servicers of the Covered Trusts have been implicated in numerous governmental reports, court orders, and press reports regarding servicing misconduct and the massive cover up of the failure to deliver documentation concerning securitized mortgage loans known as the "robo-signing" scandal.  This is powerful evidence of the systemic document delivery failures and Wells Fargo's knowledge of such failures.

123.    For example, on April 13, 2011, the Federal Reserve issued a Consent Order

42

finding that GMAC Mortgage LLC, formerly known as GMAC Mortgage Corp., a servicer for IMM 2005-6 and IMSA 2005-2, failed to document mortgage loans properly and attempted to cover-up this failure.  *In re Ally Fin. Inc., Ally Bank & GMAC Mortg., LLC*, Consent Order, 11-20-B-HC, 11-020-B-DEO (Apr. 13, 2011), *available at* https://www.fdic.gov/bank/individual/enforcement/2011-04-77.pdf.

124.   A Texas state jury determined that Wells Fargo had knowledge of fraudulent documents being used to support a foreclosure brought in its capacity as trustee, and the improper foreclosure resulted in the borrowers being awarded nearly $5.4 million.  "Wells Fargo Must Pay $5.4M In Robosigning Foreclosure Row", Law 360, Nov. 12, 2015, *available at* http://www.law360.com/articles/726312/wells-fargo-carrington-must-pay-5m-in-foreclosure-row.

125.   Section III(C) contains a chart of the relevant Sponsors and Servicers for the Covered Trusts.  Wells Fargo's and the relevant Sponsors' and Servicers' involvement in the robo-signing scandal is summarized in Exhibit G.

126.   Events of Default occurred shortly after the final exception reports were delivered for each of the Covered Trusts under multiple provisions of the PSAs.  These Events of Default triggered a continuing duty to review defaulted loans to determine if such loans should be repurchased.

127.    Each PSA requires that the Servicers' failure to adhere to prudent servicing standards ripens into an Event of Default if left uncured within a specified period after notice of such breach.  For example, Section 7.01 of the IFC PSA provides that an Event of Default occurs if the Servicer fails to prudently service the mortgage loans and such breach is not remedied within 60 days of notice of the breach.  The PSAs for the Ameriquest, BOA,

Carrington, EMC, First Franklin, IMH, Merrill Lynch, Option One and Sutton Trusts contain similar provisions. *See* Ex. C § IX.  The PSAs for the Ameriquest, Carrington, Option One, and Sutton Trusts provide that the Servicers' failure to perform the covenant to prudently service the mortgage loans ripened into a Servicer Event of Default if left uncured for a specified period (45 days for the Ameriquest and Sutton Trusts and 30 days for the Carrington and Option One Trusts) after a Servicing Officer learned of such failures.  *See* Ex. C § IX.

128.    As set forth above, and in Exhibit G, when borrowers defaulted and the Servicers were required to commence foreclosures, they fabricated the documents necessary to foreclose rather than cause the Sponsor, Depositor, or Originator to repurchase or substitute the affected loan.  The Trustee was aware of this fact as it was aware of the contents of the document exception reports and that loans with exceptions had defaulted and not been repurchased or substituted.  Both the Servicers and Trustee were aware that these loans were not put back to the Sponsors or Originators and, instead, as described in Exhibit G, the Servicers robo-signed the documentation required to foreclose in proceedings instituted in the name of Wells Fargo.  These acts of robo-signing were breaches of the applicable prudent servicing standard, as a prudent servicer would have insisted that the loans be repurchased.  Having failed to provide notice, the Trustee had an obligation to act prudently to address all defaults.

129.    These Events of Default triggered Wells Fargo's duty to act prudently to protect the interests of the certificateholders in all respects, and such duty continues to this day because the document defects were not cured within the required period and the affected loans were not repurchased.  Wells Fargo had a continuing obligation to seek repurchase of

loans missing required documentation throughout its tenure as Trustee, including as loans on the final exception report defaulted.  Wells Fargo also had a duty to determine whether other defaulted loans should be put back to the responsible parties based on representation and warranty violations because an Event of Default had occurred.  Wells Fargo has repeatedly breached these duties throughout its tenure as Trustee.

### 2. Events of Default Under the IMH Trust

130.    As noted, the IMH Trust was documented using an Indenture rather than a PSA. While the same type of Events of Default occurred under the Indenture as described in Section III(B)(1), the relevant provisions are slightly different in that the Issuer's (*i.e.,* the Trust's) breach of the Indenture gives rise to an Event of Default rather than the Servicers' breaches.

131.    Section 3.06(a) of the IMM 2005-6 Indenture provides in relevant part, "The Issuer will . . . take such other action necessary or advisable to: . . . (iii) cause the Issuer or Master Servicer to enforce any of the rights to the Mortgage loans; or (iv) preserve and defend title to the Trust Estate and the rights of the Indenture Trustee, the Bond Insurer and the Bondholders in such Trust Estate against the claims of all Persons and parties."

132.    The failure to do so is an Event of Default.  For example, the Indenture for IMM 2005-6 provides that an Event of Default includes:

> The occurrence of a default in the observance or performance of any covenant or agreement of the Issuer made in the Indenture . . . and such default shall continue or not be cured . . . for a period of 30 days after there shall have been given, by registered or certified mail, to the Issuer by the Indenture Trustee or to the Issuer and the Indenture Trustee by the Bond Insurer, or if a Bond Insurer Default exists, the Holders of at least 25% of the aggregate Bond Principal Balance of the Outstanding Bonds, a written notice specifying such default or incorrect representation or warranty and requiring it to be remedied and stating that such notice is a notice of default hereunder.

133.    As discussed above, Wells Fargo provided written notice that the mortgage files were incomplete.  The Issuer under the IMH Trust failed to protect the trust assets, a fact Wells Fargo was well aware of.  As a result, an Event of Default occurred under the IMH Trust in the first year of its existence.

134.    As detailed in Section III(A), Wells Fargo became aware of public information indicating that the Issuer failed to protect the trust assets by enforcing the Sponsors' or Originators' repurchase obligations triggered by representation and warranty violations.  Events of Default occurred as a result.  This triggered a continuing obligation to act prudently to protect the interests of certificateholders that Wells Fargo breached throughout its tenure as Trustee.

### 3.    Wells Fargo Received Written Notice of Representation and Warranty Violations Which Ripened into Events of Default

135.    In addition to the Events of Default discussed above, on July 21, 2011, the Association of Mortgage Investors ("AMI") notified all major RMBS trustees, (including Wells Fargo) that "substantial evidence [] has emerged of abuses in the servicing and monitoring of" RMBS.  The letter set forth in detail the publicly available evidence demonstrating that there was widespread evidence, including some of the evidence referenced in this Complaint, that loan Originators had systemically breached representations and warranties provided to securitization trusts, and that the parties servicing loans underlying securitization trusts had systemically breached their obligations under applicable servicing agreements.  The letter cautioned, "[y]ou cannot be negligent in ascertaining the pertinent facts regarding the underlying collateral;" "[u]pon discovery of representation or warranty breaches, you have to notify the appropriate parties;" and "you must comply with your obligations . . . to take action to remedy the servicer Events of Default in the best interests of the certificateholders."

136.    Further, on or about December 16, 2011, Wells Fargo received instructions from a

group of institutional investors in hundreds of RMBS trusts asking Wells Fargo to open

investigations into large numbers of ineligible mortgages in the loan pools securing those trusts

and deficient servicing of those loans (the "JPMorgan Putback Initiative").  The JPMorgan

Putback Initiative identified and sought to compel the repurchase of large quantities of loans

originated by many of the same lenders that also originated large quantities of the loans

underlying securitization trusts, including one of the Covered Trusts (BSMF 2006-AR3), and

sought recovery of losses relating to servicing deficiencies by many of the same major servicers

of loans backing the Covered Trusts.  On October 1, 2014, Wells Fargo accepted the settlement

with JPMorgan (including with respect to BSMF 2006-AR3) despite that the settlement would

reimburse the trusts for only a small fraction of the losses caused by JPMorgan's misconduct.

*See* Compl. ¶¶ 9–10, *Blackrock Allocation Target Shares v. Bank of N.Y.*, No 651866/2014 (N.Y.

Sup. Ct. June 18, 2014); Dawn Kopecki & Alexis Leondis, *JP Morgan Sets Tentative $45 Billion

Accord for Mortgage Bonds*, Bloomberg (Nov. 16, 2013 12:00 AM),

http://www.bloomberg.com/news/2013-11-15/jpmorgan-reaches-4-5-billion-mortgage-bond-

deal-with-investors.html; List of Accepting Trusts and Loan Groups, *available at*

http://www.rmbstrusteesettlement.com/docs/List_of_Accepting_Trusts_and

_Loan_Groups.pdf.

137.   Wells Fargo has not acted prudently to ensure that certificateholders' interests

are protected as it was required to do in response to these Events of Default.

### 4.   Events of Default Concerning False Servicer Certifications

138.   Each PSA obligated the Servicer to certify annually that it met its obligations

under the PSAs and applicable federal regulations. For example, Section 3.19 of the IFC PSA

requires the Servicer to certify, among other things, that:

     (i)      a review of the activities of the Master Servicer during the preceding calendar year and of performance under this Agreement has been made under such officers' supervision, and

     (ii)     to the best of such officers' knowledge, based on such review, the Master Servicer has fulfilled all its obligations under this Agreement for such year, or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officer and the nature and status thereof including the steps being taken by the Master Servicer to remedy such default.

The PSAs for the Ameriquest, BOA, Carrington, EMC, First Franklin, IMH, Merrill Lynch, Option One and Sutton Trusts contain substantially similar requirements.  *See* Ex. C § XII.  As discussed above in Section II(D), for the Covered Trusts issued in 2006 and later, the Servicers also had a duty to provide annual certifications under federal law attesting to compliance with servicing criteria specified in Regulation AB.

139.    The failure to provide conforming certifications is an Event of Default under each of the PSAs (and an Event of Default without regard to notice under the Ameriquest, Carrington, Option One, and Sutton Trusts, since the Servicing Officers for those respective trusts and the Trustee were aware of such failures).  *See* Ex. C §§ IX, XII.  Wells Fargo was not entitled to rely on certifications that it knew to be false, and thus, Wells Fargo's failure to provide notice of breaches relating to false Servicer certifications triggered its post-Event of Default duties.

140.    Wells Fargo received certifications that it knew to be false because the Servicers were not in fact meeting their obligations under the PSAs, and/or Regulation AB, and failed to disclose numerous representation and warranty violations.  As discussed in Sections III(B)(1) and III(C), the Servicers breached the PSAs in many ways including by attempting to foreclose on defective loans rather than tendering loans for repurchase or substitution and by looting trust

assets through multiple servicing scams.  As discussed in Section III(A), the Trustee was also

aware of numerous representation and warranty violations that were not disclosed in the

required Servicer certifications.  The Trustee was aware of these breaches, and therefore, knew

the required Servicer certifications did not conform because they were false.  The PSAs only

allowed the Trustee to rely upon the certifications if it had a good faith basis to believe the

certifications were true.  Events of Default were triggered as a result and Wells Fargo had a

continuing duty to act prudently to protect the certificateholders' interests.

141.   In addition, for each of the Covered Trusts, the Servicers provided a

representation and warranty that all reports provided under the PSA, including servicing

compliance certifications, were accurate and complete.  For example, Section 2.03(ix) of the

IFC PSA provides: "No information, certificate of an officer, statement furnished in writing or

report delivered to the Company, any affiliate of the Company or the Trustee by the Master

Servicer in its capacity as Master Servicer, and not in its capacity as a Seller hereunder, will, to

the knowledge of the Master Servicer, contain any untrue statement of a material fact."  The

Ameriquest, BOA, Carrington, EMC, First Franklin, IMH, Merrill Lynch, Option One, and

Sutton PSAs contain substantially similar provisions.  *See* Ameriquest PSA Exhibit J-3; Bank

of America PSA § 2.05(viii); Carrington PSA Exhibit I-1; EMC PSA Exhibit Q-1; First

Franklin Securitization Servicing Agreement § 6.01(i); IMH Servicing Agreement Exhibit C-1;

Merrill Lynch PSA § 2.09(b); Option One PSA § 2.05(viii); Sutton PSA Exhibit N.  These

representations and warranties were false and an Event of Default occurred as a result.

### C.   Wells Fargo Failed to Address the Servicers' Looting of Trust Assets

142.   In addition to the servicing related defaults and Events of Default described

above, the Servicers have engaged in a variety of schemes to overcharge borrowers in default.

These scams have dramatically increased loss severities on defaulted mortgages and, as a result, dramatically increased Plaintiffs' losses.

143.    The chart below identifies each of the entities disclosed to be the Sponsors, Servicers, and Master Servicers of the loans included in the Covered Trusts.

| | **Trust** | **Sponsor** | **Servicer** | **Master Servicer** |
|---|---|---|---|---|
| 1 | ABFC 2006-OPT2 | Bank of America, N.A. | Option One Mortgage Corporation | |
| 2 | BSMF 2006-AR3 | EMC Mortgage Corporation | EMC Mortgage Corporation | |
| 3 | CARR 2006-NC3 | Carrington Securities, LP | New Century Mortgage Corporation | |
| 4 | CARR 2006-NC4 | Carrington Securities, LP | New Century Mortgage Corporation | |
| 5 | CARR 2007-FRE1 | Carrington Securities, LP | EMC Mortgage Corporation | |
| 6 | FFML 2006-FAA | Lehman Brothers Holdings Inc. | National City Home Loan Services, Inc. | Aurora Loan Services LLC |
| 7 | IMM 2005-6 | Impac Mortgage Holdings, Inc. | GMAC Mortgage Corporation; Midland Loan Services, Inc. | Impac Funding Corporation |
| 8 | IMSA 2005-2 | Impac Funding Corporation | GMAC Mortgage Corporation | Impac Funding Corporation |
| 9 | OOMLT 2007-3 | Option One Mortgage Corporation | Option One Mortgage Corporation | |
| 10 | OWNIT 2006-2 | Merrill Lynch Mortgage Lending Inc. | Litton Loan Servicing LP | |
| 11 | PPSI 2005-WLL1 | Ameriquest Mortgage Company | Litton Loan Servicing LP | |

| | Trust | Sponsor | Servicer | Master Servicer |
|---|---|---|---|---|
| 12 | SABR 2006-FR2 | Sutton Funding LLC | HomEq Servicing Corporation | |
| 13 | SABR 2006-WM2 | Sutton Funding LLC | HomEq Servicing Corporation | |

144.    From 2005 until today, the Servicers have cheated borrowers and the Covered Trusts after default by, *inter alia*, charging improper and excessive fees (including without limitation, fees for property maintenance prior to foreclosure), failing to properly oversee third-party vendors, failing to adhere to industry benchmarks for foreclosure proceedings, and procuring insurance policies for properties that were already insured.

145.    When a defaulting borrower's home is foreclosed upon and sold, the Servicer deducts its fees (which defaulting borrowers are in no position to pay themselves) and any servicing advances from sale proceeds before any funds are transferred to the securitization trust that purportedly owned the mortgage loan and thus was entitled to the net sale proceeds.

146.    These overcharges are unlawful and resulted in breaches under the PSAs because they do not meet the prudent servicing standards and were not disclosed in annual certifications provided by the Servicers.  As noted in Sections III(B)(1) and III(B)(4), servicing related defaults known to the Trustee triggered the Trustee's duty to act prudently. Wells Fargo was aware of these servicing scams, which have been the subject of high profile government investigations, lawsuits, and press coverage, including articles in banking industry publications like the *American Banker*.

147.    Further, Wells Fargo was aware of these servicing scams as it engaged in the same servicing misconduct itself and has been subject to settlements with government

regulators similar to those of the Servicers of the Covered Trusts.  *See, e.g.,*  Press Release, U.S. Dep't of Just., Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at* http://www.justice.gov/opa/pr/2012/February/ 12-ag-186.html.  (Wells Fargo was one of the five servicers who settled allegations relating to their servicing misconduct).

148.    Exhibit H summarizes servicing misconduct involving the relevant Servicers.

## IV.    <u>WELLS FARGO SUFFERED FROM CONFLICTS OF INTEREST</u>

149.    Wells Fargo failed and unreasonably refused to take action to protect the Covered Trusts and certificateholders against Originator and Sponsor breaches and Servicer violations because it would have exposed that Wells Fargo was engaged in the same misconduct in its role as Originator and Servicer for other mortgages and RMBS trusts.

150.    Wells Fargo sponsored hundreds of RMBS trusts from 2004 through 2008, many of which contained loans originated by Wells Fargo affiliates and entities. Widespread evidence exists demonstrating violations of representations and warranties in Wells Fargo-sponsored and originated trusts.

151.    For example, in an interview before the Financial Crisis Inquiry Commission Darcy Parmer, a former Wells Fargo underwriter and quality assurance analyst from 2004 until 2007, testified that despite her objections, "at least half the loans she flagged for fraud were nevertheless funded" and that she was aware of "hundreds and hundreds and hundreds of fraud cases" in Wells Fargo's home equity loan division.  *See* Financial Crisis Inquiry Comm'n, Final Report of the National Commission on the Causes of the Financial and Economic

Crisis in the United States 162 (2010), *available at* https://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

152.   Wells Fargo was also sued in its capacity as originator for making false statements and certifications to the United States Department of Housing and Urban Development ("HUD") regarding the eligibility of loans for HUD mortgage insurance and "engag[ing] in a regular practice of reckless origination and underwriting" from May 2001 through October 2005. Compl. ¶2, *United States v. Wells Fargo Bank, N.A.*, No. 12-cv-07527 (S.D.N.Y. Oct. 9, 2012).  Wells Fargo announced a $1.2 billion settlement with the U.S. government to settle the claims.  Evan Weinberger, *Wells Fargo Reaches $1.2B FHA Mortgage Settlement*, Law360 (Feb. 3, 2016), http://www.law360.com/articles/754555/wells-fargo-reaches-1-2b-fha-mortgage-settlement.

153.   During the fourth quarter of 2010, banking regulators reviewed the adequacy of controls and governance over Wells Fargo's foreclosure processes.  The reviews uncovered significant problems in Wells Fargo's foreclosure processing, including "critical weaknesses" in Wells Fargo's foreclosure practices and oversight of default services vendors.  *See* Interagency Review of Foreclosure Policies and Practices (Apr. 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf.

154.   In July 2011, the Federal Reserve Board issued a consent cease and desist order, and assessed an $85 million civil money penalty against Wells Fargo & Co. (the parent company of Wells Fargo Bank) and Wells Fargo Financial, Inc.  Press Release, Federal Reserve Board (July 20, 2011), *available at* http://www.federalreserve.gov/newsevents/press/enforcement/20110720a.htm.  At the time, this was the largest penalty assessed by the Federal Reserve Board in a consumer-protection enforcement action.  The order addressed allegations

that Wells Fargo had falsified income information in mortgage applications.  These practices were allegedly fostered by Wells Fargo's incentive compensation and sales quota programs and the lack of adequate controls to manage the risks resulting from these programs.  *Id.*

155.    In addition, the Office of the Comptroller of the Currency entered into consent orders with Wells Fargo and several other servicers (the "OCC Consent Orders").  The OCC Consent Order with Wells Fargo discussed how Wells Fargo was among the largest servicers of residential mortgages in the United States, and serviced a portfolio of 8.9 million residential mortgage loans.  In the OCC Consent Order with Wells Fargo, the Office of the Comptroller of Currency found that there were "deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings."  Further, Wells Fargo filed false or otherwise defective affidavits in connection with foreclosure proceedings and failed to exercise adequate oversight, internal controls, policies and procedures, compliance risk management, internal audit, third-party management, and training for its foreclosure-related services.  *See In re Wells Fargo Nat'l Ass'n*, Consent Order, AA-EC-11-19 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47j.pdf.

156.    Further, municipalities have brought actions alleging that predatory lending with respect to mortgage loans originated by Wells Fargo resulted in significant levels of foreclosures, which caused "urban blight" as the properties fell into disrepair.  *See, e.g.,* Compl., *City of Baltimore v. Wells Fargo Bank, N.A.*, L08-cv-062 (D. MD. Jan. 1, 2008).

157.    Wells Fargo has acknowledged that it has been unable to pursue mortgage-repurchase claims because of conflicts of interest as a result of Wells Fargo's servicing activities, and, in some instances, has transferred its repurchase duties to other companies.

Jody Shenn, *Wells Fargo Seeks to End Mortgage-Repurchase Duties as Trustee*, Bloomberg Business (Feb. 24, 2012), http://www.bloomberg.com/news/articles/2012-02-24/wells-fargo-seeks-to-hand-off-its-mortgage-repurchase-duties-as-trustee.  However, Wells Fargo has not done so for all but one of the Covered Trusts and in that trust it has not taken action to address Events of Default triggered by the Servicers' breaches under the PSA.

158.    Because Wells Fargo was engaging in the same illicit and improper acts as the Originators, Sponsors and Servicers for the Covered Trusts, Wells Fargo failed to enforce the Originator or Servicer violations, or even alert the certificateholders to the Originators', Sponsors' and Servicers' misconduct in order to not expose its own similar misconduct.

## V.    **WELLS FARGO'S CONDUCT INJURED PLAINTIFFS**

159.    Wells Fargo's breaches of its contractual, statutory and fiduciary duties have caused Plaintiffs hundreds of millions of dollars of losses.

160.    If Wells Fargo had performed its duties as trustee, it would have enforced the obligations of the Sponsors and Originators and caused them to buy back, or replace with non-defective loans, the vast majority, if not all, of the loans that ultimately defaulted and caused Plaintiffs' losses.  Further, if Wells Fargo had enforced these repurchase or substitution obligations, as it was required to do, the Certificates would have retained their market value, as highly rated bonds with similar coupon rates are now trading at a very significant premium.

161.    Wells Fargo's failure to address the Servicers' failure to adhere to prudent servicing practices also dramatically increased the loss severities (*i.e.*, the amount of principal loss caused by defaults) on defaulted loans dramatically.  The extended foreclosure timelines that resulted from document delivery failures and the robo-signing scandal resulted in

increased servicing fees, increased property tax and utility expenditures, which were borne by the Covered Trusts, a decline in value of the underlying properties, and ultimately less sale proceeds for the Covered Trusts and certificateholders.  The overcharging for default-related services and forced-placed insurance further increased loss severities as those overcharges were collected by the Servicers from foreclosure sale proceeds.

162.    If Wells Fargo had met its contractual, statutory and fiduciary duties to accept delivery of notes and mortgage loans files, inspect them, give notice as required and issue accurate certifications, it would have caused the Sponsors or Originators to substitute or repurchase all loans where the Servicers, Sponsors, Depositors and Originators failed to deliver required documentation to the Trustee or breached representations and warranties regarding the mortgage loans.  This would have included numerous loans that had already defaulted or would ultimately default.  Moreover, Wells Fargo's failure to accept delivery of complete note and mortgage files or adequately inspect them has placed a cloud over title and has limited the Covered Trusts' ability to efficiently foreclose on properties underlying the Covered Trusts that has impacted the market value of the Certificates.  Additionally Wells Fargo's failure to commence damages actions against the Servicers caused further losses and emboldened these parties to continue their lucrative servicing scams.

163.    Wells Fargo's failure to meet its contractual, fiduciary, statutory and common law duties once it became aware of defaults relating to the numerous representation and warranty breaches by the Sponsors or Originators further caused harm.  If Wells Fargo had provided notice of representation and warranty violations and defaults and acted with due care as it was required to do upon the occurrence of a default or Event of Default, it would have

caused the Sponsors or Originators to repurchase loans as they were required to do and required the Servicers to replace the assets they looted from the Covered Trusts.

164.    Many, if not all, of the repurchase or substitution claims described above have lapsed due to Wells Fargo's inaction as courts have held that the underlying representation and warranty claims that Wells Fargo failed to pursue accrued for statute of limitations purposes on the date of the closing of the relevant securitization.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### (Violations of the TIA)[4]

165.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

166.    The PSAs underlying and establishing the Covered Trusts are "indentures," and Wells Fargo is an "indenture trustee," under the TIA.  15 U.S.C. § 77aaa(7), (10).

167.    As certificateholders, Plaintiffs are trust beneficiaries entitled to the protections afforded under the TIA.

168.    The TIA applies to the PSAs and the related Certificates. 15 U.S.C. § 77ddd(a)(1).

169.    Wells Fargo violated the TIA in at least three ways.

170.    First, TIA Section 315(b) provides that the indenture trustee must notify certificateholders of "all defaults known to the trustee, within ninety days after the occurrence thereof."  15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)).  As set forth above, Wells

---

[4] Plaintiffs include a claim under the TIA with respect to the IMH Trust, which utilizes an Indenture.  Plaintiffs further assert claims with respect to the PSA trusts, but concede that those claims are not viable under Second Circuit precedent.  Those claims are asserted to the extent there are any further developments in the law and for purposes of preserving any rights on appeal.

Fargo failed to carefully investigate serious, known issues with the loans in the Covered Trusts, or to notify certificateholders of numerous defaults, including the failure of the responsible parties to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of representations and warranties.

171.   Second, in the case of defaults (as that term is defined in the indenture), the TIA requires that the trustee exercise its rights and powers under the governing agreement as a "prudent man would exercise or use [them] under the circumstances in the conduct of his own affairs."  15 U.S.C. § 77ooo(c).  Here, as set forth above, Wells Fargo did not act prudently after learning of numerous serious issues related to material breaches of representations and warranties and servicer defaults and Events of Default.  A prudent person would have taken action to investigate these issues carefully, pursue repurchase remedies, and cure defective mortgage loans.  In addition, a prudent person would have taken action against the responsible parties for the failure to properly execute and deliver mortgage file documents.

172.   Finally, the TIA states that "[n]otwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security . . . shall not be impaired or affected without the consent of such holder."  15 U.S.C. § 77ppp(b).  Wells Fargo has impaired the ability of the Covered Trusts, and consequently the certificateholders, to receive payment in connection with defective mortgage loans for which it failed to take action to correct.  In addition, Wells Fargo has impaired the ability of the Covered Trusts, and consequently the certificateholders, to receive payment by failing to enforce the repurchase remedy.

173.    These breaches materially and adversely affected the interests of the certificateholders, including Plaintiffs, because they resulted in the trusts being burdened with large numbers of defective loans that should have been put back to the responsible parties.

174.    Wells Fargo is liable to Plaintiffs for damages incurred as a result of its violations of the TIA in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

175.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

176.    The PSAs are valid and binding contracts entered into between Wells Fargo, each Covered Trust, the Sponsors, the Master Servicers, the Servicers and Depositors.

177.    The PSAs provide, among other things, the terms under which Wells Fargo acts as Trustee for the Covered Trusts.

178.    As current holders of Certificates or Notes issued by each Covered Trust, Plaintiffs are express, intended third party beneficiaries under the PSAs entitled to enforce the performance of the Trustee.

179.    While Plaintiffs submit they have no legal obligation to do so, Plaintiffs have received authorization to sue from the registered Holder, Cede & Co. for ABFC 2006-OPT2 M6, FFML 2006-FFA A4 and M1, IMM 2005-6 1A1 and OOMLT 2007-3 M3, Covered Trusts identified as containing so-called Negating Clauses that Wells Fargo has previously argued limit the parties who may enforce the PSA.

180.    Wells Fargo breached several obligations that it undertook on behalf of Plaintiffs as certificateholders including, without limitation, to:

    (a) take steps to cause the Sponsors or Originators to repurchase loans eligible for

59

repurchase;

(b) investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

(c) make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

(d) provide notice of and take steps to remedy the Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and

(e) enforce the repurchase obligations of the Sponsors and/or Originators.

181.    The specific provisions breached by Wells Fargo are further detailed herein and in the Exhibits hereto.

182.    Wells Fargo's breach of its duties set forth in the PSAs, as described above, caused Plaintiffs' losses on their Certificates and diminished their value.

183.    Plaintiffs have performed their obligations under the PSAs.

184.    Wells Fargo is liable to Plaintiffs for the losses they suffered as a direct result of Wells Fargo's failure to perform its contractual obligations under the PSAs.

## THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty)

185.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

186.    As set forth in detail above, Wells Fargo owed certificateholders, including Plaintiffs, a duty of loyalty, a duty to avoid conflicts of interest, and a duty to exercise all powers under the PSAs prudently to protect certificateholders' rights once an Event of Default occurred or payments to certificateholders became impaired.  This included, without limitation,

60

duties to protect the interests of the beneficiaries of the Covered Trusts, make prudent decisions concerning the exercise of appropriate remedies following Events of Default, and enforce the repurchase obligations of the Sponsors and/or Originators.

187.   As set forth in detail above, Wells Fargo breached its fiduciary obligations by failing to perform these obligations and by failing to exercise due care and avoid conflicts of interest.

188.   The violations by Wells Fargo of its fiduciary obligations impaired certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Plaintiffs' Certificates.

## FOURTH CAUSE OF ACTION
### (Negligence)

189.   Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

190.   Wells Fargo owed certificateholders, including Plaintiffs, extra-contractual duties to perform ministerial acts with due care, and avoid conflicts of interests.  As described above, Wells Fargo performed or failed to perform its responsibilities in a grossly inadequate and negligent manner.

191.   In addition, for all Trusts closed in 2006 or later, Wells Fargo owed an extra-contractual duty to provide annual assessments certifying that the servicing criteria specified in Regulation AB had been complied with.  Wells Fargo provided certifications annually that incorrectly attested to adherence with the relevant criteria and failed to disclose that there were inadequate policies and procedures in place for monitoring servicing, performance triggers, and events of default and that the mortgage files were not adequately safeguarded.

192.    Wells Fargo's negligence and gross negligence impaired certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Plaintiffs' Certificates.

### FIFTH CAUSE OF ACTION
**(Violation of the Streit Act)**

193.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

194.    As certificateholders, Plaintiffs are trust beneficiaries entitled to the protections afforded under the Streit Act.  The Streit Act was enacted to provide for the proper administration of mortgage trusts and requires that the trustee must exercise due care in performing its obligations.

195.    The Certificates are "mortgage investments" subject to the Streit Act.  N.Y. Real Prop. Law § 125(1).

196.    The PSAs underlying and establishing the Covered Trusts are "indentures," and Wells Fargo is a "trustee" under the Streit Act.  N.Y. Real Prop. Law § 125(3).

197.    Section 126(1) of the Streit Act provides that upon an "event of default" the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in its exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

198.    As set forth above, Wells Fargo failed to exercise its rights under the PSAs upon the occurrence of "events of default" by failing to:

> (a) take steps to cause the Sponsors or Originators to repurchase loans eligible for repurchase;

> (b) investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it

discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

(c) make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

(d) provide notice of and take steps to remedy the Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and

(e) enforce the repurchase obligations of the Sponsors and/or Originators.

199.    Wells Fargo is liable to Plaintiffs for damages incurred as a result of its violations of the Streit Act.

### SIXTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith)

200.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

201.    At all relevant times, Wells Fargo owed Plaintiffs, as express, intended third party beneficiaries under the PSAs, a duty of good faith and fair dealing pursuant to the PSAs that required Wells Fargo to ensure that it did not, by act or omission, injure the rights of the Plaintiffs to receive the benefits and protections provided for under the PSAs.

202.    By the conduct described above, Wells Fargo breached its duty of good faith and fair dealing under the PSAs.

203.    Wells Fargo's breaches are material.

204.    As a result of these breaches, Plaintiffs have suffered damages and will continue to suffer damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A.       Awarding compensatory damages and/or equitable relief in favor of Plaintiffs against Wells Fargo for breaches of its statutory, contractual and fiduciary duties, its gross negligence, ordinary negligence and its negligent misrepresentations in an amount to be proven at trial, including interest thereon;

B.       Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

C.       Such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues triable by jury.


Dated:  February 23, 2016

Respectfully submitted,

  /s/    David H. Wollmuth
David H. Wollmuth
Randall R. Rainer
Michael C. Ledley
Steven S. Fitzgerald
Niraj J. Parekh
Sean P. McGonigle
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
rrainer@wmd-law.com
mledley@wmd-law.com
sfitzgerald@wmd-law.com
nparekh@wmd-law.com
smcgonigle@wmd-law.com

*Attorneys for Plaintiffs for All Claims
Except to the Extent they Relate to FFML
2006-FAA*

George A. Zelcs
John A. Libra
Matthew C. Davies
Max C. Gibbons
KOREIN TILLERY LLC
205 North Michigan Plaza
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9750
Fax: (312) 641-9760
gzelcs@koreintillery.com
jlibra@koreintillery.com
mdavies@koreintillery.com
mgibbons@koreintillery.com

Stephen M. Tillery
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525
stillery@koreintillery.com

*Attorneys for Plaintiffs*