# Exhibit 3

to the Declaration of Kurt M. Gosselin in  Support of
Wells Fargo Bank, N.A.'s Motions to Exclude the Opinions of
Plaintiffs' Proferred Experts (Mar. 13, 2020) in
*Commerzbank AG v. Wells Fargo Bank, N.A.*, Case No. 15-cv-10033-KPF-SN, and
*Phoenix Light SF Ltd., et al. v. Wells Fargo Bank, N.A.*, No. 14-cv-10102-KPF-SN (S.D.N.Y.)

HIGHLY CONFIDENTIAL

# Expert Report of Ingrid Beckles

Commerzbank AG,

vs.

Wells Fargo Bank N.A.

United States District Court

Southern District of New York

Case No. 1:15-cv-10033

November 28, 2018

HIGHLY CONFIDENTIAL

# Contents

I.  Assignment ........................................................................................................... 1

II.  Qualifications ..................................................................................................... 1

III.  Definitions ........................................................................................................ 2

    A.  Securitization and Servicing Terms ........................................................... 2

    B.  Documentation Terms ............................................................................... 5

IV.  Summary of Opinions ....................................................................................... 7

V.  Servicing in RMBS Transactions and Industry Standards Defining "Prudent Servicing" ........... 8

    A.  Securitization and Servicing Process Overview ....................................... 8

    B.  Standards Defining Prudent Servicing ..................................................... 9

    C.  Prudent Loss Mitigation Practices ......................................................... 16

        1.  Early Outreach and Collection .................................................... 17

        2.  Foreclosure Alternatives .............................................................. 18

        3.  Foreclosures ................................................................................. 21

        4.  REO Property Maintenance Standards ........................................ 24

        5.  Allowable Fees and Expenses ...................................................... 25

VI.  The Trusts' Servicers Did Not Prudently Service the Loans .......................... 25

    A.  The Servicers Failed to Cure and Routinely Ignored Missing and Materially Defective Documents .......... 26

    B.  The Servicers Employed Improper Foreclosure Practices ...................... 29

        1.  The Servicers' Improper Foreclosure Practices were Systemic ........... 29

        2.  Attestations ................................................................................. 30

        3.  Wells Fargo Knew the Servicers Were Not Following Prudent Servicing Practices ........ 33

        4.  The Servicers Routinely Exceeded Industry Standard Foreclosure Benchmarks ........... 36

        5.  Foreclosure Actions Reflect Examples of the Servicers' Improper Foreclosure Practices ........ 40

    C.  Wells Fargo Knew its Servicers did not Properly Maintain REO Properties ........... 42

Appendix A: Documents Relied Upon .........................................................................

Appendix B: Resume of Ingrid Beckles .......................................................................

Appendix C: Initial Servicers for Trusts at Issue ........................................................

HIGHLY CONFIDENTIAL

Appendix D: Wells Fargo Knew that the Trust Servicers Engaged in Improper Foreclosure
Practices...................................................................................................................................

    A.    Ocwen Loan Servicing ....................................................................................... D-1

    B.    Countrywide Home Loans Servicing LP and BAC Home Loan Servicing.................. D-4

    C.    JPMorgan Chase Bank, N.A. ............................................................................ D-6

    D.    Saxon Mortgage Services .............................................................................. D-10

    E.    Select Portfolio Servicing............................................................................... D-12

HIGHLY CONFIDENTIAL

## I.   Assignment

1.   I have been retained by counsel for Commerzbank AG ("Plaintiff") to offer testimony and opinions concerning the servicing of residential mortgage loans in the Residential Mortgage-Backed Security ("RMBS") trusts at issue in this matter (the "Trusts").

2.   I have been asked by counsel to explain the role of the Servicer in an RMBS transaction and describe the industry standards that define what constitutes prudent servicing. Because the servicing guidelines issued by The Federal Home Loan Mortgage Corporation ("Freddie Mac") and The Federal National Mortgage Association ("Fannie Mae"), together the Government Sponsored Enterprises ("GSEs"), effectively define industry-accepted prudent servicing practices, my opinions will further address the servicing practices and standards issued by the GSEs.

3.   I have also been asked to provide opinions as to the quality of the servicing of loans underlying the at-issue Trusts based upon my review of key servicing metrics, including time to foreclosure, REO disposition management, and records produced by Wells Fargo or third parties.

4.   In formulating my opinions, I have relied upon my personal knowledge, prior experience, formal education, and training. In addition, I have reviewed case materials including the complaint, the Governing Agreements (capitalized terms are defined below in Section III) for the at-issue Trusts, mortgage loan performance records, foreclosure related records, publicly available articles and reports, and documents produced by the parties in discovery. Appendix A lists all documents that I relied upon in preparing this report. I understand that discovery is not completed and, therefore, reserve the right to supplement my report based on any additional facts presented to me.  I also reserve the right to respond to any opinions submitted by Wells Fargo.

5.   My compensation in this case is at the rate of $350 per hour for analysis and $490 per hour for deposition and testimony.  I have been assisted by staff from The Brattle Group who have worked under my direction. Neither my compensation nor that of The Brattle Group is contingent on my findings or on the outcome of this proceeding.

## II.   Qualifications

6.   I have more than 32 years of experience in mortgage banking and loan servicer oversight. Presently, I am the principal of The Beckles Collective LLC, where I provide strategic, operations, compliance, and governance advisory services for mortgage operations.

7.   Prior to that, I was a Senior Vice President and head of the Default Asset Management ("DAM") division for Freddie Mac, where I was responsible for the staff, processes, controls, and systems that supported Freddie Mac's $127 billion national delinquent loan portfolio, $21 billion national real estate owned ("REO") inventory, and $15 billion credit

HIGHLY CONFIDENTIAL

enhancement portfolio. Freddie Mac generally served in the capacity of Master Servicer for the loans in the DAM portfolios.

8.  As head of Freddie Mac's DAM division, I oversaw management of the non-performing loan servicing, default fees and claims, REO property disposition, and settlement departments. The non-performing loan department managed Servicer performance, foreclosure alternative evaluations, loan loss mitigation, foreclosures, bankruptcy implications, Servicer Guide policy and maintenance, workout settlements, default reporting, expense thresholds and reimbursements, credit enhancements, servicer training, and specialty Servicer outsourcing. The REO department conducted property intake and evaluation, disposition strategy, management and execution, and vendor quality assessments. My staff also conducted onsite evaluation of Servicers and benchmarked their performance against a selected control group portfolio.

9.  Prior to my position with Freddie Mac I was Vice President and head of the Credit Policy Division at PNC Mortgage Corp. In that position, I was responsible for developing and maintaining mortgage and loss mitigation credit policies, risk management, Servicer acquisition due diligence, automated underwriting, system integration, quality control, appraisal tools, policies and processes, Fair Lending, policies and reviews, investor purchase relations, and field underwriting management. My duties also included developing market evaluation tools for product development.

10. I also was president and co-founder of Velocity Capital Defense, where I advised clients on capital preservation strategies to mitigate credit losses, and implement more effective credit loss forecasting techniques.

11. A copy of my CV is attached as Appendix B to this report.


## III.  Definitions

### A.  SECURITIZATION AND SERVICING TERMS

12. Mortgage loan securitization involves issuing an ownership interest in financial instruments that are backed by a dedicated cash flow from mortgage payments. The following terms are used throughout this report in the discussion of mortgage loan securitization and servicing:

   i.   Borrower: The individual homeowner who is the obligor of the related mortgage note.

   ii.  Bailee Letter: Any communication submitted in lieu of a Mortgage Note indicating that the notes are i) pledged to a third party; ii) subject to a security interest or lien held by a third party; iii) owned by, or titled in the name of, a third party (for example, mortgages that are subject to a sale and repurchase arrangement); or iv) subject to some other claim or interest held by a third party that would, if it were not released, result in the buyer, or the at-issue Trust, acquiring less than clear, unencumbered, and exclusive title to the mortgage notes.

2

HIGHLY CONFIDENTIAL

iii.  <u>Certificate</u>: A document that entitles the holder to a share of principal and interest payments made on the pool of loan assets.

iv.  <u>Certificateholder</u>: The individual or entity that purchases and holds certificates that represent interests in the cash flows associated with the mortgage loans deposited into a trust. Certificateholders are the investors and beneficiaries of the trust.

v.  <u>Custodian</u>: An institution that accepts delivery of, verifies, and maintains the original Mortgage Notes, Assignments of the security instruments, and other critical loan documentation that represents the collateral underlying the trust.

vi.  <u>Depositor</u>: Typically, a special purpose entity of the Seller that aggregates the mortgage loans into groups or "pools" according to the specifications outlined in the Governing Agreements.

vii.  <u>Event of Default</u>: As it pertains to a Servicer's responsibility, an Event of Default can be caused by i) the failure of the Servicer to observe or perform in any material respect any of the covenants or agreements required by the Servicer as contained in the Governing Agreements, or ii) any breach of representation or warranty that is not remedied within the time allowed by the Governing Agreements.[1]

viii.  <u>Governing Agreements</u>: The documents evidencing or governing the various parties' duties and obligations in the administration of the mortgage loans that are pooled into an RMBS, including, as applicable, the Pooling and Servicing Agreement ("PSA") or Indenture, the Sale and Servicing Agreement or Master Servicing Agreement, the Trust Agreement, the Mortgage Loan Purchase Agreement, the Custodial Agreement, the Prospectus Supplement, and any other similar document, however denominated.

ix.  <u>Government Sponsored Entities ("GSEs")</u>: Financial service corporations (Federal National Mortgage Association "Fannie Mae" and Federal Home Loan Mortgage Corporation "Freddie Mac") established by the United States Congress to provide liquidity and stability to the mortgage market. Both GSEs operate in various capacities such as Guarantor, Trustee and Master Servicer. They do not lend to Borrowers directly but provide a constant flow of funds to the front-line lenders, providing the originators with liquidity to create home mortgages. They replenish their funds by packaging (pooling) and selling the mortgages they buy to investors through a process known as Securitization. They are the largest issuers of mortgage debt outstanding. They are privately owned but publicly chartered and carry an "implicit guarantee" that the government will not allow them to fail.

x.  <u>Loan Schedule</u>: A list of all loans included in a Trust, along with certain characteristics of each loan, such as origination date, maturity date, original principal amount, interest rate, among others.

---

[1]  *See, e.g.,* GPMF 2006-AR1 PSA, Section 8.01.

3

HIGHLY CONFIDENTIAL

xi.   <u>Master Servicer</u>: The entity, in certain RMBS, that is the lead Servicer charged with monitoring Servicer performance and with enforcing the Servicer's duties and obligations. The initial Master Servicers for the at-issue Trusts are listed in Appendix C.

xii.   <u>Mortgage Electronic Registration System ("MERS")</u>: A national electronic database that tracks changes of beneficial ownership interests in loans secured by residential mortgages. MERS acts as an agent for the owner of the loan but possesses no beneficial interest in the note.

xiii.   <u>Originator</u>: The entity that works with the Borrower to create a mortgage loan.

xiv.   <u>Real Estate Owned ("REO")</u>: A condition that exists when a Servicer, on behalf of the Trust, acquires ownership of / title to a property through a deed-in-lieu of foreclosure process or through a failed foreclosure sale. The delinquent mortgage note creating the indebtedness against said property cannot be resolved through Borrower reinstatement or by third-party acquisition at the foreclosure sale. The delinquent mortgage is extinguished at transition to REO status, or, for Redemption states, at the conclusion of the prescribed post-REO redemption period.

xv.   <u>Residential mortgage backed Security ("RMBS")</u>: A security comprised of a pool of residential mortgages, with cash flowing from homeowners to security-holders (investors or Certificateholders).

xvi.   <u>Securitization</u>: The practice of aggregating various types of contractual debt that generate receivables, such as residential mortgages, and selling their related cash flows to third-party investors as securities.

xvii.   <u>Security</u>: A claim on the principal and interest payments made by Borrowers on the loans in a pool.

xviii.   <u>Servicer</u>: The entity that manages the collection of scheduled payments on a mortgage loan and the distribution of payments to the appropriate Trust accounts. Servicers are required to advance payments for loans where the Borrowers have not made their required monthly payment in return for a monthly fee. Servicers must also manage delinquent accounts, loss mitigation activities, tax and insurance payments, foreclosure activity, REO strategy and disposition, and all related administrative expenses and functions. The initial Servicers for the at-issue Trusts are listed in Appendix C.

xix.   <u>Seller</u>: The entity that originates or acquires the mortgage loans to be pooled and placed into the Trust. Sometimes the term Sponsor and Seller are used interchangeably, but I will use the term Seller for the purpose of this report.

xx.   <u>Trust</u>: A structure established to hold, safeguard, and administer certain assets of one entity (seller or depositor) for the benefit of a third party, the beneficiary or, in the case of an RMBS, the Certificateholder.

HIGHLY CONFIDENTIAL

xxi.   <u>Trustee</u>: The entity assigned to administer and manage the assets of a Trust for the benefit of the Trust's beneficiaries, the Certificateholders.

## B.   DOCUMENTATION TERMS

i.   <u>Assignment</u>: A document transferring the ownership of and rights under the mortgage, including the right to foreclose, from the prior owner to the purchaser as an additional security for a loan.[2]

ii.   <u>Allonge:</u>  A sheet of paper permanently attached to a Mortgage Note for the purposes of documenting endorsements.

iii.   <u>Consolidation, Extension, and Modification Agreement ("CEMA")</u>:  A type of loan available only to New Yorkers seeking to i) refinance a condo, house, or townhouse to avoid paying full taxes on the subsequent home loan; or ii) purchase a condo, house or townhouse where the seller has one or more mortgages and the buyer seeks to consolidate them into one new purchase money mortgage.  The purchaser pays taxes only on the gap between the aggregate of the consolidated mortgages versus the principal balance of the new purchase money mortgage. CEMA mortgages follow the same recoding and assignment requirements as for regular mortgages in NY.

iv.   <u>Deed of Trust ("DOT")</u>: Also referred to as a "Security Instrument," a DOT is a debt instrument between a lender, a borrower and a trustee, secured by the collateral of specified real estate property, that the borrower is obliged to pay back with a predetermined set of payments. The DOT establishes a lien on the collateral property thereby allowing the owner of the Mortgage, thru the trustee acting as their agent, to sell the collateral to pay off the debt in the event the borrower defaults on the debt or otherwise fails to honor the mortgage terms.  The first lien DOT takes priority over the borrower's other creditors' claims to the real estate.  Typically, DOT is the required Security Instrument in non-judicial foreclosure states.

v.   <u>Endorsement</u>: A signature on a negotiable paper or document such as a promissory note that has the effect of transferring all the rights represented by the negotiable instrument to another entity. The ordinary manner in which an individual endorses a note is by placing his or her signature on the note. When so indicated in the Governing Agreements, a facsimile signature is also acceptable.  Endorsements may be housed in an Allonge that is permanently affixed to a Mortgage Note.

vi.   <u>Grant Deed</u>: A type of property deed transferring the ownership interest in real property from one entity to another. Grant Deeds do not warrant unencumbered title.[3]

---

[2]   "Collateral Assignment," Business Dictionary, accessed April 30, 2018, http://www.businessdictionary.com/definition/collateral-assignment.html.

[3]   Elizabeth Weintraub, *Property Deeds: Warranty, Grant and Quitclaim*, https://www.thebalance.com/property-deeds-warranty-grant-and-quitclaim-1799225, July 22, 2017.

HIGHLY CONFIDENTIAL

vii. <u>Intervening Assignment</u>: A document that transfers the ownership of a Mortgage Loan between entities prior to the Person endorsing the Mortgage Loan to the trust. Intervening Assignments must create an unbroken chain from the Originator through the entity endorsing to the trustee.

viii. <u>Mortgage</u>: Also referred to as a "Security Instrument," a Mortgage is a debt instrument between a lender and a borrower and secured by the collateral of specified real estate property, that the borrower is obliged to pay back with a predetermined set of payments. The Mortgage establishes a lien on the collateral property thereby allowing the owner of the Mortgage to take possession of and sell the collateral to pay off the debt in the event the borrower defaults on the debt or otherwise fails to honor the mortgage terms. A first lien mortgage takes priority over the borrower's other creditors' claims to the real estate. Typically, Mortgages are the required Security Instruments in judicial foreclosure states.

ix. <u>Mortgage File</u>: The documentation required to have a perfected mortgage, as well as any other documents required to protect the interest therein, typically defined in Article II of the Governing Agreements.

x. <u>Note</u>: A promise to pay negotiable document that (as a part of a mortgage agreement) states the amount and duration of the loan, the applicable rate of interest, any adjustment specifications, payment amounts and frequency, and makes the signatory personally liable for repayment of the full loan amount according to the terms of the agreement and any associated addenda or riders.[4]

xi. <u>Power of Attorney ("POA")</u>: A legal document authorizing another person to act on one's behalf. A power of attorney can grant complete authority or it can be limited to certain acts and/or certain periods of time.  The POA must be notarized, recorded at the real property records for the county in which the mortgage will be recorded, valid and durable at the time of signing, and reference the subject property.

xii. <u>Quitclaim Deed</u>: A deed operating as a release, which is intended to pass any title, interest or claim which the grantor may have in the property, without warranty.

xiii. <u>Rider</u>: An appendix or addendum to a mortgage or a promissory note that houses the non-standard requirements and conditions not contained in the standard mortgage or note template. Riders complete the related mortgage or note and are critical collateral documents.

---

[4]   "Mortgage Note," Business Dictionary, accessed April 30, 2018,
      http://www.businessdictionary.com/definition/mortgage-note.html.

HIGHLY CONFIDENTIAL

xiv.   <u>Security instrument</u>: A mortgage deed or trust deed (unlike a promissory note or other credit instrument) that evidences pledging of an asset or property as security for a promissory note.[5]

xv.   <u>Title Policy</u>: An insurance policy that is issued by a title insurance company, protecting against loss from any defect in the title to real property existing prior to the issuance of the policy and loan closing. Intermediate and temporary forms of title insurance are housed in the title commitment binders.

xvi.   <u>Warranty Deed</u>: A type of property deed transferring ownership interest in real property from one entity to another. The grantor must warrant and defend the title against claims of all persons. This means that the grantor is guaranteeing the grantee that the title is free of any defects that may affect the title, even if the defect was caused by a prior owner.[6]

## IV.  Summary of Opinions

13.   Section V describes the role of the Servicer in an RMBS transaction, the Trusts, and the concept of prudent servicing. Section V discusses the standards referenced in the Governing Agreements for the Trusts and the standards for administrating mortgage loans promulgated by the GSEs, which define the industry standard for prudent servicing of residential mortgage loans.

14.   Section VI provides the results of my analysis of servicing records in this case.

i.   My review of the custodial records for the at-issue Trusts shows that a significant number of documents, which were required by the Governing Agreements to be part of the Mortgage File for each loan, were never delivered or were otherwise defective. This deficiency persisted well past the allowable cure periods identified in the Governing Agreements. On average, the Seller failed to cure document exceptions for approximately 25%[7] of the loans underlying the at-issue Trusts. In my opinion, a prudent Servicer would not have had to liquidate these loans at a loss. Instead, a prudent Servicer would have cured the defect in a timely fashion, *i.e.*, within the periods prescribed in the Governing Agreements, or put them back to the relevant Seller whenever possible. The records show that over 5,200 loans in the at-issue Trusts were liquidated even though they had uncured document exceptions. This was a failure by all of the parties to the Governing Agreements for the at-issue Trusts, including both the Servicer and the Trustee.

---

[5]   "Security Instrument," Business Dictionary, accessed April 30, 2018, http://www.businessdictionary.com/definition/security-instrument.html.

[6]   Elizabeth Weintraub, "Property Deeds: Warranty, Grant and Quitclaim," The Balance, July 22, 2017, accessed 4/30/2018, https://www.thebalance.com/property-deeds-warranty-grant-and-quitclaim-1799225.

[7]   25% = 22,295 loans with uncured document exceptions / 87,978 loans.

HIGHLY CONFIDENTIAL

ii.   My review of documents, that were either publicly available or produced in this action and made available to me, show the Servicers engaged in imprudent servicing practices, including filing foreclosure actions without the original mortgage and/or Note, filing foreclosure actions without properly executed Assignments, failing to properly comply with rules and procedures to properly foreclose on delinquent loans, and failing to properly prosecute foreclosures. As a result of these imprudent servicing practices, the at-issue Trusts incurred unnecessary fees, which have needlessly exacerbated their losses.[8]

iii.  My review of servicing records for the at-issue Trusts shows that the Servicers routinely exceeded prudent industry standard foreclosure timelines. My analysis shows that, on average, the Trust Servicers exceeded relevant benchmarks by more than 350 days, which in my opinion is inconsistent with prudent servicing guidelines and unacceptable. As a result of these excessive foreclosure timelines, the at-issue Trusts incurred unnecessary fees and excessive losses.

iv.   Finally, I reviewed documents related to communication between Wells Fargo, Servicers, third parties, and government entities that indicated that the Servicers failed to properly maintain REO properties. As a result, the at-issue Trusts suffered diminished recoveries from the mismanaged REO properties.

## V.   Servicing in RMBS Transactions and Industry Standards Defining "Prudent Servicing"

### A.   SECURITIZATION AND SERVICING PROCESS OVERVIEW

15.   The Securitization process starts with the Seller, a financial institution that originates or acquires mortgage loans and groups them together to form a pool. The pool of loans is then sold by the Seller to a Depositor who then conveys the pool of loans to a Trust. Certificates are then sold to investors.

16.   The Seller appoints a mortgage loan Servicer to administer the loans in the trust. The Servicer's duties are described in the Governing Agreements. The terms of these agreements require the Servicers to perform their duties in accordance with all applicable laws, regulations, and accepted industry servicing guidelines.

17.   Generally, Servicer responsibilities include collecting and processing monthly payments from the Borrowers, maintaining records of payments and balances, compiling loan-level information, remitting principal and interest payments to the Trust, which in turn remits to Certificateholders, and paying taxes and insurance from escrowed funds.

---

[8]   *See, e.g.*, examples of prolonged foreclosures processes in Section VI.B.5.

HIGHLY CONFIDENTIAL

18. Also, the Servicer is responsible for monitoring delinquencies, communicating with delinquent Borrowers, inspecting delinquent properties at the required intervals, executing foreclosures, securing and maintaining abandoned properties during the foreclosure period, and developing and deploying appropriate maintenance, remediation, and disposition strategies for acquired properties.

19. In return for executing their duties, Servicers receive compensation in the form of a servicing fee. The servicing fee is a monthly remuneration based upon the unpaid principal balance. It is deducted from the cash flow from each loan serviced. The servicing fee rate is typically 25 to 50 basis points and it is a first priority payment in an RMBS trust.[9]

20. Servicers also can earn "float" income. Float income is the investment income earned on payments collected from Borrowers but not yet remitted to the trust, taxing entities and/or insurers.

21. Servicers are generally permitted to retain ancillary fees they can collect from Borrowers, including late fees.[10]

22. When Servicers do not perform their duties according to the accepted industry standards, especially in the administration of the delinquent loan population, financial losses to the trust, and ultimately the Certificateholders, are generally exacerbated.[11]

### B.   STANDARDS DEFINING PRUDENT SERVICING

23. Prudent lending institutions that service loans held in their own portfolio take care to ensure that loans are properly serviced. For example, for performing loans, this means at minimum, ensuring that payments are collected, properly credited, and deposited into the correct accounts, and that collateral documentation is properly maintained and safeguarded. For non-performing loans, the prudent Servicer will take steps to minimize the loss resulting from such loans.

24. Article III of most Governing Agreements requires that a Servicer must service loans held in trust for Certificateholders with the same care it uses to service its own loans, in accordance with the Governing Agreements, and in accordance with usual standards of practice of prudent mortgage servicers. For example, Section 3.01 of the ABFC 2006-OPT2 PSA states:

---

[9]   *See, e.g.,* ABFC 2006-OPT2 PSA, Article I: Definitions, in which the servicing fee rate ranges from 0.30% to 0.65%, depending on the timing. *See also* Definition Sections in either Article I, Appendix A, or Section 1.01 in all of the Governing Agreements.

[10]   Adam J. Levitin, "*Problems in Mortgage Servicing from Modification to Foreclosure, written testimony before the Senate Committee on Banking, Housing, and Urban Affairs,*" Nov. 16, 2010, pp. 7-8.

[11]   For example, see paragraphs 116 and 117 below.

HIGHLY CONFIDENTIAL

> The Servicer, as independent contract servicer, shall service and administer the Mortgage Loans in accordance with this Agreement and the normal and usual standards of practice of prudent mortgage servicers servicing similar mortgage loans and, to the extent consistent with such terms, in the same manner in which it services and administers similar mortgage loans for its own portfolio, and shall have full power and authority, acting alone, to do or cause to be done any and all things in connection with such servicing and administration which the Servicer may deem necessary or desirable and consistent with the terms of this Agreement.[12]

25. The Governing Agreements also typically provide that the Master Servicer or Servicer shall service and administer the loans, and any REO properties, in the best interests of the Certificateholders.[13]  The agreements also typically require that the servicer be a GSE approved servicer in good standing.[14]

26. The industry standard of prudent servicing is fundamentally defined by the standards announced by the GSEs.

27. These standards are codified in the Seller/Servicer Guides (the "Seller/Servicer Guides") issued by the GSEs. The Seller/Servicer Guides detail the procedures a prudent Servicer should follow.

28. Among other requirements, the Seller/Servicer Guides provide timelines that Servicers should adhere to when foreclosing on properties. The foreclosure timelines provide a benchmark, by State, for the acceptable amount of time between the due date of the last payment made and the foreclosure sale date.

29. The Seller/Servicer Guides are reviewed annually, at minimum, and adjusted to consider contemporaneous industry and economic developments, including natural disasters.

---

[12]  For other examples see ABFC 2005-HE2 PSA, Section 3.01; ABFC 2005-OPT1 PSA, Section 3.01; ABFC 2006-OPT1 PSA, Section 3.01; ABSHE 2005-HE5 PSA, Section 3.01; BOAMS 2006-B PSA, Section 3.01; CMLTI 2005-OPT4 PSA, Section 3.01; GPMF 2005-AR4 PSA, Section 3.01; GPMF 2006-AR1 PSA, Section 3.01; GPMF 2006-AR2 PSA, Section 3.01; GPMF 2006-AR3 PSA, Section 3.01; HVMLT 2007-3 PSA, Section 3.01; MSAC 2005-WMC2 PSA, Section 3.01(a); MSAC 2005-WMC3 PSA, Section 3.01(a); MSAC 2005-WMC5 PSA, Section 3.01(a); MSAC 2006-HE1 PSA, Section 3.01(a); and OOMLT 2006-2 PSA, Section 3.01.

[13]  The ABFC 2006-OPT2 PSA, Section 3.13(b) provides: "The Servicer shall manage, conserve, protect and operate each REO Property for the Certificateholders…" For examples regarding prudent REO maintenance, see footnote 20.

[14]  *See, e.g.*, ABFC 2006-OPT2 PSA, Section 2.05(iii): "The Servicer is an approved seller/servicer of conventional residential mortgage loans for Fannie Mae or Freddie Mac… and no event has occurred… which would make the Servicer unable to comply with Fannie Mae or Freddie Mac eligibility requirements…"

HIGHLY CONFIDENTIAL

30. The Seller/Servicer Guides are accepted in the industry as prudent, industry standards for several reasons:

    i. A Servicer's role is the same regardless of whether it services a GSE or non-agency loan, so the standards in the Seller/Servicer Guides apply equally to GSE or to non-agency RMBS;

    ii. The standards in the Seller/Servicer Guides are detailed, available to Servicers, and universally known in the industry;

    iii. The GSEs' ownership and loss position of the mortgage debt outstanding ("MDO") gives them continuous performance feedback and strong incentives to develop, measure and enforce prudent servicing standards;

    iv. Many of the Servicers who service loans in non-agency RMBS also service GSE loans and therefore are knowledgeable about GSE standards. Staff at many non-agency RMBS Servicers are trained on GSE servicing standards, and their internal servicing systems are set up to service loans according to the standards set forth in the Seller/Servicer Guide.

31. A Servicer should service loans in a prudent manner that maximizes recoveries to Certificateholders regardless of any potential conflicts of interest arising from such things as Servicers' affiliation with the Seller or Originator; ownership of competing property; or the compensation level under the Governing Agreements.[15]

32. In addition to the duty to prudently service loans, the Governing Agreements set forth several other Servicer duties. For example, the Governing Agreements contain provisions addressing the following for most of the at-issue trusts:

    i. Collecting monthly payments from the Borrower;[16]

---

[15] *See id.; see also* ABFC 2006-OPT2 PSA, Section 3.03: "In the event that any payment due under any Mortgage Loan is not paid when the same becomes due and payable, or in the event the Mortgagor fails to perform any other covenant or obligation under the Mortgage Loan and such failure continues beyond any applicable grace period, the Servicer shall take such action as it shall deem to be in the best interest of the Certificateholders."

[16] ABFC 2006-OPT2 PSA, Section 3.02 provides: "Continuously from the date hereof until the principal and interest on all Mortgage Loans are paid in full or as long as the Mortgage Loan remains subject to this Agreement, the Servicer will diligently collect all payments due under each Mortgage Loan when the same shall become due and payable and shall, to the extent such procedures shall be consistent with this Agreement and Applicable Regulations, follow such collection procedures as it follows with respect to mortgage loans comparable to the Mortgage Loans and held for its own account." For other examples see ABFC 2005-HE2 PSA, Section 3.02; ABFC 2005-OPT1 PSA, Section 3.02; ABFC 2006-OPT1 PSA, Section 3.02; ABSHE 2005-HE5 PSA, Section 3.07(a); BOAMS 2006-B PSA, Section 3.08(a); CMLTI 2005-OPT4 PSA, Section 3.07; GPMF 2005-AR4 PSA, Section 3.01; GPMF 2006-AR1 PSA, Section 3.01; GPMF 2006-AR2 PSA, Section 3.01; GPMF 2006-AR3 PSA, Section 3.01; MSAC 2005-WMC2

Continued on next page

HIGHLY CONFIDENTIAL

ii.    Remitting principal and interest payments or advancing principal and/or interest to the trust as required by the Governing Agreements;[17]

iii.   Reviewing delinquent loans to determine the most effective loss mitigation strategy;[18]

iv.    Prudently foreclosing on delinquent loans;[19]

---

Continued from previous page

PSA, Section 3.07(a); MSAC 2005-WMC3 PSA, Section 3.07(a); MSAC 2005-WMC5 PSA, Section 3.07(a); MSAC 2006-HE1 PSA, Section 3.07(a); and OOMLT 2006-2 PSA, Section 3.07.

[17]   ABFC 2006-OPT2 PSA, Section 3.04(a) provides: "The Servicer shall deposit or cause to be deposited on a daily basis and in no event more than one Business Day after receipt thereof in the clearing account (which must be an Eligible Account) in which it customarily deposits payments and collections on mortgage loans in connection with its mortgage loan servicing activities, and shall thereafter deposit in the Collection Account, in no event more than one Business Day after deposit of such funds in the clearing account, and retain therein, the following payments and collections received or made by it…[including] (i) all payments on account of principal, including Principal Prepayments, on the Mortgage Loans; (ii) all payments on account of interest on the Mortgage Loans adjusted to the Mortgage Interest Rate less the Servicing Fee Rate and any Prepayment Interest Excess…" For other examples see ABFC 2005-HE2 PSA, Section 3.04(a); ABFC 2005-OPT1 PSA, Section 3.04(a); ABFC 2006-OPT1 PSA, Section 3.04(a); ABSHE 2005-HE5 PSA, Section 3.10(a); BOAMS 2006-B PSA, Section 3.08(b); CMLTI 2005-OPT4 PSA, Section 3.10(a); GPMF 2005-AR4 PSA, Section 4.01(a); GPMF 2006-AR1 PSA, Section 4.01(a); GPMF 2006-AR2 PSA, Section 4.01(a); GPMF 2006-AR3 PSA, Section 4.01(a); HVMLT 2007-3 PSA, Section 4.01(b); MSAC 2005-WMC2 PSA, Section 3.10(a); MSAC 2005-WMC3 PSA, Section 3.10(a); MSAC 2005-WMC5 PSA, Section 3.10(a); MSAC 2006-HE1 PSA, Section 3.10(a); and OOMLT 2006-2 PSA, Section 3.10(a).

[18]   ABFC 2006-OPT2 PSA, Section 3.01 provides: "Consistent with the terms of this Agreement, the Servicer may waive, modify or vary any term of any Mortgage Loan or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to any Mortgagor if in the Servicer's reasonable and prudent determination such waiver, modification, postponement or indulgence is not materially adverse to the Certificateholders; provided, however, that the Servicer shall not make future advances and, except as set forth in the following sentence or Section 3.03, the Servicer shall not permit any modification with respect to any Mortgage Loan that would (i) change the Mortgage Interest Rate, defer or forgive the payment thereof of any principal or interest payments, reduce the outstanding principal amount (except for actual payments of principal) or extend the final maturity date with respect to such Mortgage Loan… In the event that the Mortgagor is in default with respect to the Mortgage Loan or such default is, in the judgment of the Servicer, reasonably foreseeable, the Servicer may permit a modification of such Mortgage Loan to reduce the Principal Balance thereof and/or extend the term, but not beyond the latest maturity date of any other Mortgage Loan." For other examples see ABFC 2005-HE2 PSA, Section 3.01; ABFC 2005-OPT1 PSA, Section 3.01; ABFC 2006-OPT1 PSA, Section 3.01; ABSHE 2005-HE5 PSA, Section 3.07(a); BOAMS 2006-B PSA, Section 3.08(a) and 3.21; CMLTI 2005-OPT4 PSA, Section 3.07; GPMF 2005-AR4 PSA, Section 3.01; GPMF 2006-AR1 PSA, Section 3.01; GPMF 2006-AR2 PSA, Section 3.01; GPMF 2006-AR3 PSA, Section 3.01; MSAC 2005-WMC2 PSA, Section 3.07(a); MSAC 2005-WMC3 PSA, Section 3.07(a); MSAC 2005-WMC5 PSA, Section 3.07(a); MSAC 2006-HE1 PSA, Section 3.07(a); and OOMLT 2006-2 PSA, Section 3.07.

[19]   ABFC 2006-OPT2 PSA, Section 3.03 provides: "In the event that any payment due under any Mortgage Loan is not paid when the same becomes due and payable, or in the event the Mortgagor fails to perform any other covenant or obligation under the Mortgage Loan and such failure continues beyond any applicable grace period, the Servicer shall take such action as it shall deem to be in the best interest of the

Continued on next page

HIGHLY CONFIDENTIAL

    v.     Prudently maintaining REO properties;[20]

    vi.    Modifying loans;[21]

    vii.   Disclosing breaches relating to servicing in annual certifications;[22]

---

Continued from previous page

    Certificateholders. … In connection with a foreclosure or other conversion, the Servicer shall exercise such rights and powers vested in it hereunder and use the same degree of care and skill in its exercise as prudent mortgage servicers would exercise or use under the circumstances in the conduct of their own affairs and consistent with Applicable Regulations and the Servicing Standards…" For other examples see ABFC 2005-HE2 PSA, Section 3.03; ABFC 2005-OPT1 PSA, Section 3.03; ABFC 2006-OPT1 PSA, Section 3.03; ABSHE 2005-HE5 PSA, Section 3.16; BOAMS 2006-B PSA, Section 3.14; CMLTI 2005-OPT4 PSA, Section 3.16; GPMF 2005-AR4 PSA, Section 3.13; GPMF 2006-AR1 PSA, Section 3.13; GPMF 2006-AR2 PSA, Section 3.13; GPMF 2006-AR3 PSA, Section 3.13; MSAC 2005-WMC2 PSA, Section 3.15; MSAC 2005-WMC3 PSA, Section 3.15; MSAC 2005-WMC5 PSA, Section 3.15; MSAC 2006-HE1 PSA, Section 3.15; and OOMLT 2006-2 PSA, Section 3.16.

[20]    ABFC 2006-OPT2 PSA, Section 3.13 provides: "The Servicer shall manage, conserve, protect and operate each REO Property for the Certificateholders and the Trust Fund solely for the purpose of its prompt disposition and sale in a manner which does not cause such REO Property to fail to qualify as 'foreclosure property'…" For other examples see ABFC 2005-HE2 PSA, Section 3.13; ABFC 2005-OPT1 PSA, Section 3.13; ABFC 2006-OPT1 PSA, Section 3.13; ABSHE 2005-HE5 PSA, Section 3.23; BOAMS 2006-B PSA, Section 3.14; CMLTI 2005-OPT4 PSA, Section 3.23; GPMF 2005-AR4 PSA, Section 3.15; GPMF 2006-AR1 PSA, Section 3.15; GPMF 2006-AR2 PSA, Section 3.15; GPMF 2006-AR3 PSA, Section 3.15; MSAC 2005-WMC2 PSA, Section 3.17(b); MSAC 2005-WMC3 PSA, Section 3.17; MSAC 2005-WMC5 PSA, Section 3.17; MSAC 2006-HE1 PSA, Section 3.17; and OOMLT 2006-2 PSA, Section 3.23.

[21]    ABFC 2006-OPT2 PSA, Section 3.01 provides: "Consistent with the terms of this Agreement, the Servicer may waive, modify or vary any term of any Mortgage Loan or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to any Mortgagor if in the Servicer's reasonable and prudent determination such waiver, modification, postponement or indulgence is not materially adverse to the Certificateholders." For other examples see ABFC 2005-HE2 PSA, Section 3.01; ABFC 2005-OPT1 PSA, Section 3.01; ABFC 2006-OPT1 PSA, Section 3.01; ABSHE 2005-HE5 PSA, Section 3.07; CMLTI 2005-OPT4 PSA, Section 3.07; GPMF 2005-AR4 PSA, Section 3.07; GPMF 2006-AR1 PSA, Section 3.01; GPMF 2006-AR2 PSA, Section 3.01; GPMF 2006-AR3 PSA, Section 3.01; MSAC 2005-WMC2 PSA, Section 3.01(c); MSAC 2005-WMC3 PSA, Section 3.01(c); MSAC 2005-WMC5 PSA, Section 3.01(c); MSAC 2006-HE1 PSA, Section 3.01(c); and OOMLT 2006-2 PSA, Section 3.07.

[22]    ABFC 2006-OPT2 PSA, Section 3.19 provides: "The Trustee and the Servicer shall deliver, and shall cause each Additional Servicer engaged by it to deliver, or otherwise make available to the Depositor, the NIMS Insurer, the Trustee and each Rating Agency, no later than March 15th of each calendar year beginning in 2007, an officer's certificate… stating, as to the signor thereof, that (a) a review of the activities of such party during the preceding calendar year or portion thereof and of the performance of such party under this Agreement, or, in the case of an Additional Servicer, such other applicable agreement, has been made by such officer or under such officer's supervision, and (b) to the best of such officers' knowledge, based on such review, such party has fulfilled all of its obligations under this Agreement, or, in the case of an Additional Servicer, such other applicable agreement in all material respects throughout such year or portion thereof, or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status

Continued on next page

HIGHLY CONFIDENTIAL

viii.   Noticing breaches of representations and warranties;[23] and

ix.   Working with the trustee to enforce the Seller's obligation to repurchase loans.[24]

---

Continued from previous page

thereof." For other examples see ABFC 2005-HE2 PSA, Section 3.19; ABFC 2005-OPT1 PSA, Section 3.19; ABFC 2006-OPT1 PSA, Section 3.19; ABSHE 2005-HE5 PSA, Section 3.20; BOAMS 2006-B PSA, Section 3.18; CMLTI 2005-OPT4 PSA, Section 3.20; GPMF 2005-AR4 PSA, Section 3.16; GPMF 2006-AR1 PSA, Section 3.16; GPMF 2006-AR2 PSA, Section 3.16; GPMF 2006-AR3 PSA, Section 3.16; HVMLT 2007-3 PSA, Section 3.04; MSAC 2005-WMC2 PSA, Section 3.22; MSAC 2005-WMC3 PSA, Section 3.22; MSAC 2005-WMC5 PSA, Section 3.22; MSAC 2006-HE1 PSA, Section 3.22; and OOMLT 2006-2 PSA, Section 3.20.

[23]   ABFC 2006-OPT2 PSA, Section 2.02 provides: "upon the discovery by the Originator, the Seller, the Depositor, the NIMS Insurer, the Trustee or the Servicer (or upon receipt by the Trustee of written notification of such breach) of a breach of any of the representations and warranties made by the Originator in the Mortgage Loan Sale Agreement or the Seller in the Mortgage Loan Purchase Agreement in respect of any Mortgage Loan which materially adversely affects such Mortgage Loan or the interests of the related Certificateholders in such Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties." For other examples see ABFC 2005-HE2 PSA, Section 2.02; ABFC 2005-OPT1 PSA, Section 2.02; ABFC 2006-OPT1 PSA, Section 2.02; ABSHE 2005-HE5 PSA, Section 2.02; BOAMS 2006-B PSA, Section 2.04; CMLTI 2005-OPT4 PSA, Section 2.02; GPMF 2005-AR4 PSA, Section 2.03(b); GPMF 2006-AR1 PSA, Section 2.03(b); GPMF 2006-AR2 PSA, Section 2.03(b); GPMF 2006-AR3 PSA, Section 2.03(b); MSAC 2005-WMC2 PSA, Section 2.03(e); MSAC 2005-WMC3 PSA, Section 2.03(d); MSAC 2005-WMC5 PSA, Section 2.03(d); MSAC 2006-HE1 PSA, Section 2.03(e); and OOMLT 2006-2 PSA, Section 2.02.

[24]   CMLTI 2005-OPT4, Section 2.03(a) provides: "Upon discovery or receipt of notice of any materially defective document in, or that a document is missing from, a Mortgage File or of the breach by the Originator or the Seller of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement (including any representation, warranty or covenant regarding the Prepayment Charge Schedule) in respect of any Mortgage Loan that materially adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify the Originator, the Seller and the Servicer of such defect, missing document or breach and request that the Originator or the Seller, as applicable, deliver such missing document or cure such defect or breach within 90 days from the date the Originator or the Seller, as applicable, was notified of such missing document, defect or breach, and if the Originator or the Seller, as applicable, does not deliver such missing document or cure such defect or breach in all material respects during such period, the Servicer, to the extent it is not the Originator, the Seller or an Affiliate of the Seller, and otherwise the Trustee, in accordance with Section 3.02(b), shall enforce the obligations of the Originator or the Seller, as applicable, under the Mortgage Loan Purchase Agreement to repurchase such Mortgage Loan from REMIC I at the Purchase Price within 90 days after the date on which the Originator or the Seller, as applicable, was notified (subject to Section 2.03(c)) of such missing document, defect or breach, if and to the extent that the Originator or the Seller, as applicable, is obligated to do so under the Mortgage Loan Purchase Agreement." For other examples see ABFC 2005-HE2 PSA, Section 2.03; ABFC 2005-OPT1 PSA, Section 2.03(a); ABFC 2006-OPT1 PSA, Section 2.03; ABFC 2006-OPT2 PSA, Section 2.03; ABSHE 2005-HE5 PSA, Section 2.03(a); BOAMS 2006-B PSA, Section 2.04; GPMF 2005-AR4 PSA, Section 2.02; GPMF 2006-AR1 PSA, Section 2.02; GPMF 2006-AR2 PSA, Section 2.02; GPMF 2006-AR3 PSA, Section 2.02; HVMLT 2007-3 PSA, Sections 2.02, 2.03; MSAC 2005-WMC2 PSA, Section 2.03(f); MSAC 2005-WMC3 PSA, Section 2.03(e); MSAC 2005-WMC5 PSA, Section 2.03(e); MSAC 2006-HE1 PSA, Section 2.03(f); and OOMLT 2006-2 PSA, Section 2.03(a).

Continued on next page

HIGHLY CONFIDENTIAL

33. In a Trust with a pool of loans that is performing ("performing loans"), the main Servicer duties involve processing payments from Borrowers who pay on time. Servicing performing loans is straightforward: the Servicer collects the scheduled principal, interest, and ancillary payments from the Borrower and forwards it to the Trust, which in turn remits to the Certificateholders.

34. Servicers use automated servicing and banking systems to process the flow of payments, monitor loan status, and send notices to Borrowers. They collect and maintain relevant data for reporting, and to perform risk management activities. Servicers also initiate call campaigns to Borrowers in the early stages of delinquency.

35. The first step in servicing is to populate the system with the mortgage loan data. This loan-level information is provided by the Seller and the entering of this data is considered the transfer of servicing from the Seller to the Servicer.

36. The data uploaded to the servicing systems will generally include the information housed in the Loan Schedule such as record of payments, amounts due and owed, late charges and assessments, homeowner information, insurance information, escrow information, status of loan, loss mitigation activities underway, payment initiation and maturity dates, operative interest rate and any interest rate adjustments and calculations, interest rate change dates, and interest rate change notification dates.

37. The servicing of performing loans is highly automated and requires relatively few daily loan-level tactical decisions by operations personnel. For mortgages where the Borrowers are making their scheduled principal, interest, tax, and insurance payments (when escrowed), a Servicer's interactions with Borrowers and Trustees of RMBS are generally low-touch, low-cost, and highly automated.

38. Loans where the Servicer does not receive the payment on time are considered non-performing or delinquent loans. These loans require significantly more effort to service. For delinquent loans, the Servicer's responsibility shifts from merely collecting, posting, and passing through scheduled payments, to a high-touch process focused on maximizing the net present value ("NPV") of the cash flows coming into the trust, with the objective of reducing losses resulting from Borrower non-payment.

39. Servicers also use the automated platform to manage delinquent loans by triggering automated and manual collection calls; sending out Borrower assistance information; issuing Borrower default notices; triggering legal filings; monitoring transition rates; tracking bankruptcy filings and flags; evaluating the loss mitigation options; initiating and managing loan modification, forbearance, and repayment plans; recording the commencement of a short sale, or a deed-in-lieu of foreclosure action; transmitting

---

Continued from previous page

Note that most of these PSAs lay the responsibility of enforcing the Seller's obligation to repurchase on the Trustee, rather than on the Servicer. Based on my experience, in these cases, the Servicer will work with the Trustee to enforce this obligation.

HIGHLY CONFIDENTIAL

foreclosure referrals to counsel; monitoring foreclosure and REO timelines against applicable industry standards; tracking and paying costs; and populating operational and credit loss accounting systems.

### C. PRUDENT LOSS MITIGATION PRACTICES

40. Servicing of delinquent loans requires specific expertise, manpower, and structured processes to ensure consistency. The Servicers should employ prudent loss mitigation practices for the benefit of Certificateholders as if the servicers themselves owned the loans.[25] They cannot refrain from doing so merely because doing so requires significant effort and cost, with no subsequent financial benefit to themselves.

41. Based on my own experience overseeing loan Servicers, a Servicer engaging in prudent loss mitigation will have a default or non-performing loan servicing department, populated with well-trained and dedicated staff. The staff should possess appropriate levels of expertise to ensure proper and sufficient deployment of knowledge, proper segregation of duties and escalation capabilities, and sufficient authority at each level to effectively and efficiently manage the life cycle of a delinquent mortgage loan.

42. Once a Borrower fails to make payments, delinquent loan servicing obligations are initiated. The process should proceed as follows:

   i.   The Servicer will make early and frequent attempts to reach a Borrower who has missed a payment. Such contact is essential to stemming a deeper level of delinquency.

   ii.  Early and successful contact with a delinquent Borrower may also lead to non-reinstatement options, should it be determined that the Borrower cannot or does not wish to retain the home.

   iii. Should the early intervention actions prove unsuccessful, the Servicer will typically initiate the foreclosure process around day 120 of the delinquency.

   iv.  The Servicer must ensure that the proper notifications, as required by the Mortgage and other governing entities, are given to the Borrower and appropriately filed within the required timeframes.

   v.   The Servicer must ensure, to the extent possible, the safety and soundness of the physical collateral securing each loan by conducting the required property inspections at the prescribed intervals.

   vi.  Should a property fail to sell at the foreclosure sale, the Servicer acquires the underlying property on behalf of the Trustee and classifies it as REO.

---

[25]   Levitin, testimony on "Problems in Mortgage Servicing," pp. 5, 7.

HIGHLY CONFIDENTIAL

vii.   The Servicer is then responsible for securing and maintaining the REO property, determining a disposition strategy, making repair decisions, setting the pricing and marketing strategy for a sale, and managing vendors and quality to liquidate the property.

viii.  Throughout both the delinquent loan servicing process and the REO process, the Servicer is responsible for managing the field vendors and resultant expenses.

ix.    Throughout both the delinquent loan servicing process and the REO process, the Servicer will maintain and execute an internal quality assurance program to safeguard against risks, detect errors and omissions in a timely manner, and remediate and adjust to prevent error recurrence.

43.   The following discussion concerns loss mitigation practices and standards that are consistent with the Seller/Servicer Guides, which are the prevailing standards and applied by national and regional mortgage Servicers. These practices detail just some of the basic requirements of prudent loan servicing.

### 1.   Early Outreach and Collection

44.   Once a Borrower fails to make a payment, delinquent loan servicing activities should be initiated. It is essential that the Servicer make contact early on to determine whether the Borrower can make outstanding payments, or if some form of forbearance, repayment plan, or modification would be appropriate to enable the Borrower to resume payments, and thus reinstate the mortgage loan.

45.   Communications with Borrowers are critical for understanding the reason for non-payment and whether the issue is permanent or temporary. Having a channel of communication open helps the Servicer determine the Borrower's ability to repay and provides an opportunity for the Servicer to counsel the Borrower on potential foreclosure alternatives. Delays in reaching out to the Borrower often result in a longer timeline to resolve the delinquency, which inevitably results in greater servicing fees and other financial losses to the Certificateholders.

46.   Prudent servicing standards require this proactive outreach activity within specified timelines. For example, the 2012 Seller/Servicer Guide requires that the Servicer initiate contact attempts no later than the 36th day of delinquency, and make a minimum number of attempts to contact the Borrower.[26]

---

[26]  Freddie Mac also specifies that "the Servicer must, at a minimum, be readily available to the Borrower to offer financial counseling and advice on curing the Delinquency and explaining alternatives to foreclosure; make personal contact with the Borrower as early and often as necessary to promptly cure the Delinquency and continue to contact the Borrower if satisfactory arrangements have not been made to cure the Delinquency or until the Servicer determines foreclosure is appropriate." *See* "Section 64.5: Collection efforts," *Freddie Mac Single-Family Seller/Servicer Guide*, Volume 2, December 18, 2012.  Similarly, Fannie Mae also specifies that the servicer must "apply the requirements of a borrower

Continued on next page

HIGHLY CONFIDENTIAL

47. The standards also call for altering the timing of outreach calls with the objective of preventing the Servicer from falling into a set call pattern, which may not be successful in actually reaching the Borrower.[27]

48. Once contact with the Borrower is established, a prudent Servicer should evaluate the Borrower's ability to resume repaying the mortgage. The Servicer should also attempt to elicit from the Borrower the status and condition of the property.

### 2. Foreclosure Alternatives

49. In my experience, distressed Borrowers often mistrust a Servicer associated with "the bank." They are not aware of resolution options, *i.e.*, foreclosure avoidance alternatives that are available to them, and are therefore reluctant to proactively connect with the servicing department for fear of immediate home loss. Early agreements to a viable and prudently administered foreclosure avoidance plan can lead to loan reinstatement, which is a much less costly outcome for the Certificateholders. A prudent Servicer will always consider such options.[28]

50. Foreclosure alternatives fall into two categories—loan reinstatement and liquidation. The Servicer may use automated valuation tools to estimate the current value of the property so that it can work more effectively with the Borrower to determine the best option for both the Borrower and the Certificateholders. A prudent Servicer will use an approach

---

Continued from previous page

Delinquency Management Model that allows a borrower to contact one individual or a dedicated team of individuals in the servicer's organization to obtain accurate information on the various foreclosure prevention alternatives available to the borrower." *"Section A4-2.1: Establishing Default Management Strategies," Servicing Guide: Fannie Mae Single Family*, May 10, 2017, pp. 242-43.

[27] Freddie Mac's Servicer Guidelines specify that, between the 31st and 35th days of delinquency, "Servicers must send the first Borrower Solicitation Package to the Borrower," unless the Borrower is determined to be of low risk to become 60+ days delinquent. "Section 64.6: Evaluation hierarchy, Borrower solicitation and communication," *Freddie Mac Single-Family Seller/Servicer Guide*, Volume 2, December 18, 2012; additionally, it specifies that the servicer must, at minimum, initiate telephone contact as early as the 3rd and no later than the 35th day of delinquency, with late notices and/or reminder letters mailed by the 17th day of delinquency. While these are from the 2012 Freddie Mac Servicing Guide, these requirements are consistent with the guidelines issued in prior years with the philosophical framework driving towards early outreach and contact.

[28] "Section 9201.1 Rationale for Servicer loss mitigation activities (03/02/16)," *Freddie Mac Single-Family Seller/Servicer Guide*, April 25, 2018. ("Freddie Mac wants the Servicer to pursue alternatives to foreclosure whenever possible, because they benefit not only the Borrower, but also the Servicer, Freddie Mac and other interested parties in the Mortgage…Even after the Servicer has initiated foreclosure, it should still pursue alternatives to foreclosure to mitigate potential credit losses, whenever possible."); "Section E0-3.1: Foreclosure Proceedings in General," *Servicing Guide, Fannie Mae Single Family*, May 10, 2017, p. 611; *see also* "Chapter 1: Foreclosures," *Fannie Mae 2010 Servicing Guide Update*, *Part VIII*, April 28, 2010: "The servicer must make every reasonable effort to conduct a personal face-to-face interview with the borrower and to cure the delinquency through Fannie Mae's special relief provisions or foreclosure prevention alternatives."

HIGHLY CONFIDENTIAL

that optimizes affordability and sustainability for the Borrower, and maximizes the NPV outcome for the Trust.[29]

### a. *Loan reinstatement*

51.   A delinquent loan is considered to be reinstated when the amount in arrears and related expenses are paid in full and the Borrower resumes the scheduled monthly mortgage payment. Reinstatement can be accomplished through a lump sum repayment, a successfully completed repayment plan, or a "cap-to-reinstate" modification.

52.   If the Borrower's reason for delinquency stems from temporary circumstances, an effective Servicer will confirm that the Borrower is willing and able to cure the delinquency thereby reinstating the mortgage. The prudent Servicer will then confirm that the Borrower wishes to and has the ability to retain the property through resuming mortgage payments. The Servicer will then devise a repayment plan with the Borrower that ideally will facilitate the delinquency cure over a six-month period, at the conclusion of which the mortgage loan will be reinstated.[30]

53.   If the Borrower's reason for delinquency stems from temporary circumstances that will persist for a while longer, the Servicer may also consider a temporary forbearance giving the Borrower an opportunity to recover.[31] An example of this type of hardship could be a sudden prolonged illness or hospitalization where the primary wage-earner's income is temporarily reduced while on leave or short-term unemployment.

54.   At the expiration of the forbearance period, the Servicer typically offers a cap-to-reinstate modification. This type of modification capitalizes the amount in arrears and allowable expenses accumulated during the forbearance period into the unpaid principal balance of the loan allowing the Borrower to bring their mortgage current.[32] Capitalization mitigates

---

[29]   Freddie Mac requires Servicers to pursue alternatives to foreclosure in accordance with an evaluation hierarchy that consists of reinstatement or relief option, HAMP modification, Freddie Mac Standard modification, Short Sale and Deed-in-Lieu of Foreclosure.

[30]   In my experience, repayment plans established for greater than 6 months have an approximate 50% likelihood of failure due to the heavy manual requirements needed to properly manage the repayment plans.

[31]   A forbearance is the cessation of the contractual monthly payment for 3 months or a significant reduction of the contractual monthly mortgage payment for 6 months. "Section 9203.17: What is a long-term forbearance? (03/02/2016)," *Freddie Mac Single-Family Seller/Servicer Guide*, April 25, 2018. Freddie Mac also offers long-term forbearance options for some properties impacted by natural disasters as well as under the following circumstances: the property or the Borrower's place of employment has been damaged by a natural or man-made disaster; a lawsuit that may jeopardize Freddie Mac's lien position is pending; the Borrower is deceased and the estate is in probate; or the Borrower is experiencing a hardship due to the long-term or permanent disability or serious illness of a Borrower/co-Borrower or dependent family member.

[32]   *See* "Section C65.6: Underwriting the Borrower (08/21/12)," *Freddie Mac Seller/Servicer Guide*, December 18, 2012.

HIGHLY CONFIDENTIAL

financial shock to the Borrower and enables them to reinstate at a scheduled payment that is equal to or slightly higher than their scheduled payment prior to the onset of the hardship. Modifications are discussed more fully in the next section.

### b. *Modifications*

55. A loan modification restructures the mortgage loan with revised terms that are affordable for the delinquent Borrower's current circumstances. This restructuring may take the form of an interest rate reduction, a capitalization of the amounts past due and allowable expenses accumulated during the delinquency, a principal forbearance, a principal curtailment, extending the term of the mortgage, or some combination of the preceding alterations.[33]

56. A chief consideration for a prudent Servicer is whether a loan modification is the optimal loss mitigating option for the Certificateholders. The Making Home Affordable Program's Home Affordable Modification Program ("HAMP") published an NPV model that allows for a comparison of the discounted value of the expected cash flows for a modified loan to the discounted value of the expected cash flows if the loan is left unmodified.[34] If the NPV of the expected cash flows of the modified loan is reduced by more than $5,000 relative to the NPV of the expected cash flows of the unmodified loan, the HAMP modification should be avoided by prudent Servicers.[35] A prudent Servicer should have determined whether a loan in default qualified for modifications under HAMP.[36]

i. HAMP offered Servicer incentives for successful modification under the program and provides Borrower incentives in the form of principal reduction payments every year they remain current on their mortgage post HAMP modification. These types of incentives, while a reward for the Borrower for timely payments, ultimately are an added tangible benefit to Certificateholders over mere reinstatement or use of proprietary modification programs.

ii. Under HAMP, homeowners who made timely payments on their modified loans are eligible to have incentive payments made on their behalf to lenders/investors. Each month that a homeowner makes a mortgage payment on time, the homeowner accrues an amount toward a pay-for-performance success payment. A payment of the accrued

---

[33] Amy Crews Cutts and William A. Merrill, "*Interventions in Mortgage Default: Policies and Practices to Prevent Home Loss and Lower Costs*," Joint Center for Housing Studies, Harvard University (March 2008), pp. 5, 13, 14.

[34] "Home Affordable Modification Program Base Net Present Value (NPV) Model Specifications," Home Affordable Modification Program, June 11, 2009.

[35] *See* "Section C65.6: Underwriting the Borrower (08/21/12)," *Freddie Mac Seller/Servicer Guide*, December 18, 2012.

[36] HAMP provides incentive compensations to Servicers, Borrowers, and Certificateholders. The program expired on December 31, 2016.

HIGHLY CONFIDENTIAL

amounts is made annually, to reduce the principal balance on the homeowner's mortgage loan. Homeowners can receive principal reductions of up to $1,000 per year for up to five years, subject to a *de minimis* threshold.[37]

### c.   *Non-foreclosure liquidation options*

57.   If no workable home retention arrangement can be made and the Borrower's inability to pay persists, the Servicer should consider non-foreclosure liquidation alternatives. Short sale and a deed-in-lieu of foreclosure are examples of such alternatives.

58.   A short sale means the property is sold for an amount less than the unpaid balance of the mortgage. Under this arrangement, the Servicer accepts the proceeds from the sale in exchange for releasing the lien on the property.

59.   A deed-in-lieu of foreclosure occurs when the Borrower transfers the ownership of the property to the Trust in exchange for a release from the defaulted loan.

### 3.   Foreclosures

60.   If the Servicer determines that the Borrower will not be able or willing to comply with a re-payment plan, or that a modification or other forbearance arrangement would be inappropriate, the Servicer needs to engage in timely loss mitigation procedures while executing a foreclosure. The Servicer is responsible for managing and monitoring all aspects of the foreclosure process in order to maximize financial recoveries on behalf of the Certificateholders.

61.   The prudent Servicer must also ensure the proper notifications are given to the Borrower and appropriately filed within the required timeframes. Additionally, the Servicer must ensure, to the extent possible, the safety and soundness of the physical collateral securing each loan by conducting the required property inspections at the prescribed intervals. Failure to do so can result in deterioration and/or damage that increase final liquidation losses.

62.   A prudent Servicer will conduct a pre-foreclosure review process and adhere to industry acceptable foreclosure timelines. It will endeavor to minimize servicing fees and expenses during the foreclosure process. A prudent Servicer also will properly maintain the property during the delinquency period as well as in the event that the property does not sell at foreclosure and enters the Servicer's REO inventory.

---

[37] "Internal Revenue Bulletin No. 2009-28," Internal Revenue Service, July 13, 2009, last accessed May 2, 2018, https://www.irs.gov/pub/irs-irbs/irb09-28.pdf.

HIGHLY CONFIDENTIAL

### a. *Pre-foreclosure review*

63. As noted above, a prudent Servicer performs a review of the loss mitigation alternatives prior to foreclosure. The GSEs require the review to be completed 15 days before the Servicer refers the mortgage loan to foreclosure.[38]

64. During this process, the Servicer must ensure that a thorough property inspection takes place before it initiates the foreclosure.[39] With a few exceptions, a property inspection is an exterior inspection to evaluate:

  i.    condition of the property;

  ii.   if there is any waste, deterioration, or vandalism;

  iii.  occupancy status;

  iv.   whether the property is abandoned;

  v.    if the property is listed for sale;

  vi.   if there are obvious environmental hazards;

  vii.  if there are deferred maintenance or health/safety problems; and

  viii. if visible asset preservation is needed.[40]

65. Failure to inspect the property can result in property deterioration and/or damage that increases the final liquidation losses to the Certificateholders.

66. It is prudent for the Servicer to work with the Trustee to enforce a cure, substitution, or a repurchase obligation in order to avoid a loss to the Certificateholders. As part of their general quality control review and when a loan becomes delinquent, the Servicer should re-review the file to determine if there are any document defects or any breaches of representations and warranties or covenants that provide a basis for repurchasing the mortgage loan.[41]

---

[38] *See* "Section 9301.4: Pre-foreclosure referral account review (02/14/2018)," *Freddie Mac Single-Family Seller/Servicer Guide*, March 28, 2018; "Section E0-3.2, Initiating and Processing Foreclosure Proceedings," *Servicing Guide, Fannie Mae Single Family*, accessed May 10, 2018, p. 614.

[39] *See* "Section 9301.4: Pre-foreclosure referral account review (02/14/2018)," *Freddie Mac Single-Family Seller/Servicer Guide*, March 28, 2018.

[40] *See* "Section 9202.10: What is a property inspection? (03/02/2016)," *Freddie Mac Single-Family Seller/Servicer Guide,* April 25, 2018.

[41] *See* "Section 57.2: Prevention and detection (01/01/15)," *Freddie Mac Single-Family Seller/Servicer Guide*, March 17, 2015.

HIGHLY CONFIDENTIAL

67. This quality control process involves a thorough review of the loan file for missing or materially defective key documents or indications of fraud.

68. Under the Governing Agreements and in accordance with industry standards for prudent servicing, a Servicer needs to examine the documents required to proceed with foreclosure and validate that they are complete and in an acceptable form. These documents include, among others, the Note, Title Policy, Endorsements, Assignments and Security Instruments.

69. If the defects were not cured by the Sellers as required by the Governing Agreements, within the required period, the Servicer should work with the Trustee to enforce repurchase obligations as part of its duty to act prudently on behalf of Certificateholders.

70. A prudent Servicer should work with the Trustee to require the Sellers to repurchase or substitute (within the allowable timeframe) the loans that have missing or materially defective documents, as required by the Governing Agreement's provisions, instead of proceeding with foreclosure.

71. Additionally, as part of its pre-referral to foreclosure review, a prudent Servicer will review the account history to ensure it has complied with all of the required Borrower outreach and solicitations and to ensure there is no approved payment arrangement or pending foreclosure alternative offer for which the Borrower's response period has not expired.[42]

### b. *Foreclosure timelines*

72. Foreclosure timeline limits are published by the GSEs and constitute the industry standard for GSE and non-agency mortgage loans alike. A prudent Servicer is expected to adhere to these industry-standard timelines when executing foreclosures.

73. Academic literature and industry studies alike find that extending the foreclosure process subjects Certificateholders to excessive costs and the potential for significant losses resulting from depreciation of property values.[43]

74. These foreclosure timelines are state-specific and specify the allowable number of days to complete the foreclosure process. They are measured from the due date of the last payment made to the date of the foreclosure sale.[44]

---

[42]  *See* "Section 66.9: Pre-referral account review (10/31/12)," *Freddie Mac Single-Family Seller/Servicer Guide*, December 18, 2012.

[43]  Larry Cordell, Liang Geng, Laurie S. Goodman, and Lidan Yang, "The Cost of Foreclosure Delay," *Real Estate Economics* (43)4 (2015); "Mortgage Foreclosures: Documentation Problems Reveal Need for Ongoing Regulatory Oversight," United States Government Accountability Office Report to Congressional Requesters (May 2011).

[44]  *See* "Section 66.30: State foreclosure time lines (10/01/11)," *Freddie Mac Single Family Seller/Servicer Guide,* December 18, 2012. *See also* "Ex. 83: Freddie Mac State Foreclosure Timelines (09/01/16),"

Continued on next page

23

HIGHLY CONFIDENTIAL

75.  Freddie Mac and Fannie Mae allow for foreclosure timeline delays created by certain uncontrollable situations, *e.g.*, bankruptcy, provided they are properly explained and documented by the Servicer.

76.  The GSEs issue moratorium delays for natural disasters that generally follow the federal government's pronouncement of areas as disaster areas.

77.  The GSEs review, update, and re-publish their foreclosure timelines, at a minimum annually, to incorporate the impacts of legislative, regulatory, economic, and environmental factors on the time it takes to foreclose.

78.  For GSE loans, if the length of foreclosure exceeds the maximum number of allowable days without a reasonable explanation, or the explanation does not meet the requirements for an "allowable" delay, then the Servicer is required to pay a fee.[45]

### 4.  REO Property Maintenance Standards

79.  Finally, if a delinquent loan fails to sell in a foreclosure sale, or the Borrower agrees to surrender title to the property through a Deed-in-Lieu of Foreclosure process, the Servicer ensures that title to the underlying property is transferred to the Trust for the benefit of the Certificateholders, and classifies it as an REO property.

80.  The Servicer is then responsible for securing and maintaining the REO property, determining a disposition strategy including repair decisions, marketing strategy, value and price points, and managing vendors to ensure the highest possible dollar recovery through liquidation.

81.  REO properties are often in poor condition. They will require maintenance and, often, repairs, both to satisfy property upkeep laws and to prepare the property for sale. A prudent Servicer must preserve and maintain REO properties in such a manner as to maximize sale proceeds for the Certificateholders.[46] To assist with an informed disposition of the property, the Servicer should order periodic broker price opinions.

---

Continued from previous page

*Freddie Mac Single-Family Seller/Servicer Guide*, September 14, 2016, which provides - for each state - the "expected Servicer performance in calendar days from the Due Date of Last Paid Installment (DDLPI) to foreclosure sale." The Fannie Mae and Freddie Mac guidelines provide essentially identical required foreclosure timelines. For the analysis conducted in this report, I relied on the Freddie Mac guidelines, which consistently defined the timeline as DDLPI to foreclosure sale over the relevant time period.

[45]  Examples of reasonable explanations, as listed by Fannie Mae and Freddie Mac in 2017 include bankruptcy, probate, contested foreclosure, and the like. "Section 9301.46: Allowable Delays in completing a foreclosure (10/01/2017)," *Freddie Mac Single-Family Seller/Servicer Guide*, March 28, 2018. Compensatory fees assessed according to the performance methodology are laid out in "Section 9301.47: State foreclosure timeline performance assessment (12/13/2017)," *Freddie Mac Single-Family Seller/Servicer Guide*, March 28, 2018.

[46]  *See* "Section 9603.1: General servicer requirements for REO properties (12/13/2017)," *Freddie Mac Single-Family Seller/Servicer Guide*, March 28, 2018, which specifies that, when a property is in REO,

Continued on next page

HIGHLY CONFIDENTIAL

82. The Servicer typically hires a specialized property preservation / disposition company to protect the property from damage and vandalism while it is REO. The preservation / disposition company should perform any required and authorized maintenance and repairs and may change the locks, board up the doors and windows, winterize the home, etc., as needed. The Servicer (or the preservation company on behalf of the Servicer) is required to perform regular on-site inspections to monitor the property.

83. The Servicer should ensure the property is current on property tax payments, home owner association fees, and property insurance.

84. Throughout the delinquent loan servicing during the REO process, the Servicer is responsible for managing the field vendors (including the property preservation / disposition company, if any) and the resultant expense. When the original mortgage is also covered by any form of credit enhancement, the Servicer must ensure proper coordination with the coverage entity to ensure the coverage remains in effect and claimable.

### 5.  Allowable Fees and Expenses

85. The Servicer advances fees and expenses accumulated during the delinquency, foreclosure, and REO periods. For example, a prudent Servicer makes advance payments for legal fees, broker price opinions, property taxes, and various disposition costs.

86. Servicers are only allowed to advance reasonable costs as required and allowed during the delinquency, or as part of the REO disposition strategy.

## VI.  The Trusts' Servicers Did Not Prudently Service the Loans

87. Based on my analysis of servicing records produced in this action and documents relating to foreclosure proceedings involving loans underlying the at-issue Trusts, I have identified servicing failures by at-issue Trust Servicers that fall into three general categories.

 i. The Trust Servicers failed to cure, and routinely ignored, missing and materially defective documents as well as breaches of representations and warranties;

 ii. The Trust Servicers failed to adhere to prudent foreclosure timelines applicable to loans underlying the at-issue Trusts; and

---

Continued from previous page

"the Servicer's responsibilities include, but are not limited to, the following: 1. Securing the property, including locked doors and windows to avoid potential vandalism, trespassing and/or injury to individuals[;] 2. Maintaining the property by performing monthly on-site property inspections to monitor condition and occupancy, reporting to Freddie Mac any potential vandalism and claimable property damage and winterizing the property, as needed[;] 3. Making advances to superior lienholders (when applicable)."

HIGHLY CONFIDENTIAL

iii.    The Trust Servicers failed to properly maintain REO properties.

88.    In addition to my analysis of the data and documents pertaining to the at-issue Trust loans, the improper servicing practices of the at-issue Trust Servicers are well-documented in the public domain. Appendix D to this report provides a summary of public source material describing the improper and imprudent servicing practices of some of the Trust Servicers, which includes robo-signing, charging excessive fees, failing to maintain REO properties, document-related foreclosure misconduct, and failing to comply with prudent foreclosure timelines.

## A.    THE SERVICERS FAILED TO CURE AND ROUTINELY IGNORED MISSING AND MATERIALLY DEFECTIVE DOCUMENTS

89.    Complete documentation ensures that the Servicer, on behalf of the Trusts, can properly foreclose on a loan if it becomes seriously delinquent. If some of the critical mortgage documents are missing or defective, the process of foreclosing on the property may be delayed causing unnecessary losses to the Trust.

90.    These documents, more fully defined in Section III.B above, include the Security Instrument (*i.e.*, deed of trust or mortgage), the Note, Title Policy, Assignments (for non-MERS loans), Intervening Assignments, and other documents depending on the collateral type (*e.g.*, various parts of any co-op agreements). Each of these documents has a specific purpose.

91.    For RMBS transactions, the documents to be delivered are identified in the Governing Agreements, typically in Section 2.01 of the PSA. The Governing Agreements further set forth a process by which the Trustee, or a Custodian on its behalf, reviews the Mortgage File, and identifies missing or defective documents. The Trustee then acknowledges receipt of documents, subject to identified exceptions, in a final certification.  The Seller is given an opportunity to cure document defects and the Governing Agreements address when and under what circumstances the Seller must repurchase loans with uncured defects.[47]

---

[47]    ABFC 2006-OPT2 PSA, Section 2.03(a) provides in discussing Mortgage Loans with missing or uncured document exceptions, "the Trustee shall promptly notify the Originator or the Seller, as the case may be, the Servicer and the NIMS Insurer of such defect, missing document or breach and request that, in the case of a defective or missing document, the Seller cure such defect or deliver such missing document within 120 days from the date the Seller was notified of such missing document or defect… If the Seller does not deliver such missing document or cure such defect or if the Originator or the Seller, as applicable, does not cure such breach in all material respects during such period, the Trustee shall enforce the Originator's or the Seller's obligation, as the case may be, under the Mortgage Loan Sale Agreement or the Mortgage Loan Purchase Agreement, as applicable, and cause the Originator or the Seller, as applicable, to repurchase such Mortgage Loan from the Trust Fund at the Purchase Price…" For other examples see ABFC 2005-HE2 PSA, Section 2.03(a); ABFC 2005-OPT1 PSA, Section 2.03(a); ABFC 2006-OPT1 PSA, Section 2.03(a); ABSHE 2005-HE5 PSA, Section 2.03(a); BOAMS 2006-B PSA, Section 2.02; CMLTI 2005-OPT4 PSA, Section 2.03(a); GPMF 2005-AR4 PSA, Section 2.02; GPMF 2006-AR1 PSA, Section 2.02; GPMF 2006-AR2 PSA, Section 2.02; GPMF 2006-AR3 PSA, Section 2.02; HVMLT 2007-3

Continued on next page

HIGHLY CONFIDENTIAL

92. The impact of incomplete documentation is highlighted by the Government Accountability Office in a report to Congress, which stated that, "foreclosure documentation problems have slowed the pace of foreclosures across the United States…."[48] The report also found that foreclosure delays exacerbate "crime, blight, and declining property values."[49]

93. I have been asked to assess the quality of the Mortgage Files associated with the at-issue Trusts. I did this by comparing the final certification reports for each of the at-issue Trusts with the cure and trailing exception reports that were sent out at a later time reflecting the status of the exceptions.

94. When performing the analysis summarized below in Table 1, I did not include exceptions that I considered immaterial. For exceptions related to missing documents, I considered if the missing document was of the type necessary to prove ownership in the mortgage loan, assert a security interest, or protect title. If the document was defective, I considered whether the nature of the defect negatively impacted the ability to prove ownership of the mortgage loan, assert a security interest, protect title, or impair the value to Certificateholders. Missing documents and defects of this type are considered material in the industry and impact that value and salability of the loan.

95. I understand that the Governing Agreements for the at-issue Trusts require the Depositor, Originator, or the Seller to repurchase or substitute loans if a document required to be delivered was missing or materially defective and such defect was not cured within the specified cure period. For example, Article II of the PSA for ABFC 2006-OPT2 states "Upon discovery or receipt of written notice of any materially defective document in, or that a document is missing from, a Mortgage File … the Trustee shall promptly notify the Originator or the Seller, as the case may be, the Servicer and the NIMS Insurer of such defect, [or] missing document. … If the Seller does not deliver such missing document or cure such defect … during [the specified cure] period … the Trustee shall enforce the Originator's or the Seller's obligation to repurchase such Mortgage Loan from the Trust Fund at the Purchase Price…."[50]

96. Furthermore, foreclosing on defaulted loans with uncured exceptions can be imprudent servicing when there is a repurchase or substitution obligation that has not been

---

Continued from previous page

PSA, Sections 2.02, 2.03; MSAC 2005-WMC2 PSA, Section 2.03(f); MSAC 2005-WMC3 PSA, Section 2.03(e); MSAC 2005-WMC5 PSA, Section 2.03(e); MSAC 2006-HE1 PSA, Sections 2.03(f) and 2.03(g); and OOMLT 2006-2 PSA, Section 2.03(a).

[48] United States Government Accountability Office, May 2011, "*Mortgage Foreclosures: Documentation Problems Reveal Need for Ongoing Regulatory Oversight*," https://www.gao.gov/products/GAO-11-433.

[49] *Id.*

[50] ABFC 2006-OPT2 PSA, Section 2.03. As I mentioned above, in Footnote 24, a Servicer would work with the Trustee to enforce the Seller's repurchase obligation.

HIGHLY CONFIDENTIAL

considered, because foreclosure is typically more expensive, and it does not maximize recoveries for the Trust.

97.  A prudent servicer would work with the transaction parties, including the trustee, to facilitate the repurchase of the loan in question, rather than liquidate at a loss to the Trust. A repurchase demand could be made in parallel with the foreclosure under appropriate circumstances.

98.  Table 1 shows that 63,204 out of the 87,978 loans in the at-issue Trusts had document exceptions. Further, Table 1 shows that 22,295 loans in the at-issue Trusts have document exceptions that were never corrected or were left "uncured." This is a high percentage of loans with uncured document exceptions, 35%.[51] Even more concerning, there were 5,286 loans with uncured document exceptions that liquidated through foreclosure or REO.[52] A full list of loans with document exceptions is included in my workpapers. In my opinion it was imprudent of the Servicers and the Trustee to permit the REO (and incur the related costs) of the 3,010[53] loans for which they could have sought repurchase or substitution. It was incumbent upon the Servicers and Trustee to seek repurchase or substitution of these loans before liquidating them.

### Table 1: Document Exceptions

| | Trust | Loans | Loans with Document Exceptions | | | Loans with Uncured Document Exceptions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Count | % | | Count | % | Repurchased | Liquidated | REO | Liquidated or REO | Liquidated Loss Amount |
| | [1] | [2] | [3] | [4] | | [5] | [6] | [7] | [8] | [9] | [10] | [11] |
| 1 | ABFC 2005-HE2 | 6,960 | 6,950 | 100% | | 2,386 | 34% | 1 | 537 | 273 | 549 | $52,965,738 |
| 2 | ABFC 2005-OPT1 | 2,672 | 2,669 | 100% | | 713 | 27% | 0 | 94 | 74 | 99 | $11,195,731 |
| 3 | ABFC 2006-OPT1 | 5,349 | 3,851 | 72% | | 1,111 | 29% | 123 | 341 | 183 | 343 | $44,230,744 |
| 4 | ABFC 2006-OPT2 | 5,052 | 1,388 | 27% | | 686 | 49% | 0 | 344 | 203 | 347 | $53,314,963 |
| 5 | ABSHE 2005-HE5 | 5,702 | 688 | 12% | | 389 | 57% | 0 | 132 | 58 | 138 | $14,645,158 |
| 6 | BOAMS 2006-B | 1,223 | 1,153 | 94% | | 171 | 15% | 1 | 6 | 3 | 6 | $2,056,462 |
| 7 | CMLTI 2005-OPT4 | 5,239 | 1,055 | 20% | | 520 | 49% | 0 | 105 | 80 | 105 | $8,422,585 |
| 8 | GPMF 2005-AR4 | 6,419 | 5,442 | 85% | | 2,938 | 54% | 0 | 538 | 308 | 539 | $110,275,030 |
| 9 | GPMF 2006-AR1 | 3,618 | 2,659 | 73% | | 1,002 | 38% | 1 | 355 | 167 | 355 | $55,688,209 |
| 10 | GPMF 2006-AR2 | 3,111 | 2,521 | 81% | | 840 | 33% | 1 | 254 | 133 | 255 | $54,701,841 |
| 11 | GPMF 2006-AR3 | 6,321 | 4,841 | 77% | | 1,362 | 28% | 4 | 464 | 284 | 465 | $90,825,415 |
| 12 | HVMLT 2007-3 | 2,397 | 1,377 | 57% | | 173 | 13% | 0 | 98 | 62 | 98 | $24,339,257 |
| 13 | MSAC 2005-WMC2 | 6,452 | 5,978 | 93% | | 1,650 | 28% | 0 | 211 | 109 | 213 | $19,902,662 |
| 14 | MSAC 2005-WMC3 | 5,243 | 5,243 | 100% | | 1,409 | 27% | 0 | 192 | 76 | 194 | $18,164,655 |
| 15 | MSAC 2005-WMC5 | 8,041 | 5,134 | 64% | | 2,006 | 40% | 0 | 188 | 117 | 192 | $16,315,837 |
| 16 | MSAC 2006-HE1 | 6,654 | 4,766 | 72% | | 2,014 | 42% | 0 | 442 | 194 | 450 | $59,107,216 |
| 17 | OOMLT 2006-2 | 7,525 | 7,489 | 100% | | 2,865 | 38% | 0 | 985 | 686 | 1,016 | $136,780,613 |
| **Total** | | **87,978** | **63,204** | **72%** | | **22,295** | **35%** | **131** | **5,286** | **3,010** | **5,364** | **$772,932,116** |

Sources: MBS Data, Exception Reports, Cure Reports, Trailing Exception Reports.

- Certain exceptions had Loan IDs that did not match any loans in the MBSData and therefore are not reflected in any of the performance statistics (Columns 8-11). The BOAMS 2006-B Final Report, the GPMF 2005-AR4 Final Report, the GPMF 2005-AR4

---

51   22,295 / 63,204 = 35%. See Document Exceptions Workpaper for reference.

52   See Document Exceptions Workpaper for a list of loans with relevant document exceptions that were liquidated or placed in REO status.

53   Note that one of these loans (part of GPMF 2006-AR2) was both placed in REO and repurchased according to MBSData.

HIGHLY CONFIDENTIAL

Cure Report, and the GPMF 2006-AR2 Cure Report contained 31, 20, 37, and 1 loan(s) respectively that did not match any loans in the MBSData.

- For ABFC 2005-HE2, ABFC 2005-OPT1, ABSHE 2005-HE5, MSAC 2005-WMC2, MSAC 2005-WMC3, MSAC 2006-HE1, and OOMLT 2006-2, a Final Report was not available. For these trusts a synthetic Final Report was created using the Cure and Trailing Exception Reports.

[2]: Loans in Trusts at Closing Date.

[3]: Loans with material document exceptions.

[4] = [3] / [2].

[5]: Loans with document exceptions that were not cured, according to Cure Reports in which cures were explicitly stated, or Trailing Exception Reports if Cure Reports were not available. Cure windows are not currently being considered in this analysis.

[6] = [5] / [3].

[7]: Loans with uncured document exceptions that were repurchased.

[8]: Loans with uncured document exceptions that were liquidated through foreclosure or REO.

[9]: Loans with uncured document exceptions that were placed in REO.

[10]: Loans with uncured document exceptions that were liquidated through foreclosure, liquidated through REO, or placed in REO.

[11]: Total loss amount from loans with uncured document exceptions that were liquidated (excluding loans that were repurchased). This includes both positive and negative losses.

## B.   THE SERVICERS EMPLOYED IMPROPER FORECLOSURE PRACTICES

99.   Based on the documents I reviewed, the Servicers employed improper foreclosure practices which were widespread and systemic. According to documents sent to, or authored by Wells Fargo, it was aware that the Servicers employed these improper foreclosure practices to loans in the at-issue Trusts.

### 1.   The Servicers' Improper Foreclosure Practices were Systemic

100.   As more fully described in Appendix D, many of the at-issue Trust Servicers systematically engaged in improper servicing practices.

101.   Of particular interest are the actions brought by the Board of Governors of the Federal Reserve System ("the Federal Reserve"), the Office of the Comptroller of the Currency ("OCC"), the Office of Thrift Supervision ("OTS"), and the State Attorneys General. These actions revealed that the Servicers, including Bank of America and JPMorgan Chase, which are both at-issue Trust Servicers, engaged in illegal and fraudulent foreclosure practices. Specifically, the investigation by the OCC, the Federal Reserve, and the OTS demonstrated that the Servicers:

    i.    filed false affidavits in judicial actions in which employees claimed to have personal knowledge of relevant facts, when they did not;

    ii.    filed other mortgage documents without the required notarization, signatures, or affirmations;

iii.    initiated and pursued foreclosure proceedings without ensuring that the promissory notes or mortgage documents were endorsed, assigned, or in the possession of the correct party; and

iv.    failed to properly staff, oversee, and manage employees, outside counsel, and other third parties engaged in servicing-related activities.[54]

102.    Additionally, the State Attorneys General of all 50 states entered into consent orders with the Servicers.[55] The consent orders required the Servicers to stop fraudulently foreclosing on homes.[56] The consent orders also required the Servicers to pay $25 billion, a portion of which was to go to Borrower relief.[57]

103.    These investigations led the Servicers to halt foreclosures until they had fixed their deficiencies.[58] These moratoriums, investigations, and proceedings naturally resulted in longer foreclosure timelines.[59]

## 2.   Attestations

104.    The Trustee knew that the servicers were not deploying prudent servicing practices as evidenced by the Regulation A/B assessments of compliance where the servicers self-disclosed instances of material non-compliance. A servicer is required to disclose

---

[54]  *See* "Consent Orders re: Foreclosure Practices," accessed April 26, 2018, https://www.occ.gov/topics/consumer-protection/foreclosure-prevention/correcting-foreclosure-practices.html. *See also* "The Interagency of Foreclosure Policies and Practices," accessed April 26, 2018, https://www.federalreserve.gov/boarddocs/rptcongress/interagency_review_foreclosures_20110413.pdf.

[55]  *See* "Joint State-Federal National Mortgage Servicing Settlements," accessed April 26, 2018, http://www.nationalmortgagesettlement.com/. Consent judgements were entered into with Bank of America Corporation, JPMorgan Chase & Co., and Ally Financial Inc. (formerly GMAC), each of which are at-issue Trust Servicers.

[56]  *See* "Consent Order with Bank of America," accessed April 26, 2018, http://scholarship.law.unc.edu/cgi/viewcontent.cgi?article=1000&context=mortgage-settlements.

[57]  *See* "Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses," accessed April 26, 2018, https://www.justice.gov/opa/pr/federal-government-and-state-attorneys-general-reach-25-billion-agreement-five-largest.

[58]  *See* "BofA projects 30,000 foreclosures to stop," accessed April 26, 2018, https://www.reuters.com/article/us-usa-foreclosures-bankofamerica-idUKTRE69D5LE20101015; "Ghosts Of Countrywide And $47 Billion Worth Of Bonds Haunt Bank Of America," accessed April 26, 2018, https://www.forbes.com/2010/10/19/foreclosures-bank-america-housing-markets-default.html#7b44932c4e32; *See also* "Bank of America, Ally Bank Extend Foreclosure Freeze To All 50 States," accessed April 26, 2018, https://www.cbsnews.com/news/bank-of-america-ally-bank-extend-foreclosure-freeze-to-all-50-states/.

[59]  *See* "National Mortgage Settlement Servicing Standards and Noncompliance," accessed April 26, 2018, http://www.hsgcenter.org/wp-content/uploads/2013/06/NMS_Findings.pdf; *see also* Reg AB attestations regarding the Servicers' inability to timely foreclose on homes and attestation listed in documents relied upon.

HIGHLY CONFIDENTIAL

instances of non-compliance that are material to the platform.[60] Reg A/B material non-compliance statements require a minimum 5% defect threshold.[61] Such instances of non-compliance include:

i. Custodial accounts were not maintained as set forth in the transaction agreements, as required by 1122(d)(2)(iv);[62]

ii. Pool assets and related documents were not safeguarded as required by the transaction agreement, as required by 1122(d)(4)(ii);[63]

iii. Changes with respect to the terms or status of an obligor's pool asset (*e.g.*, loan modifications or re-agings) were not made, reviewed and approved by authorized personnel in accordance with the transaction agreements and related pool asset documents, as required by 1122(d)(4)(vi);[64]

iv. Loss Mitigation or Recovery Actions (*e.g.*, forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and repossessions, as applicable) were not initiated, conducted, and concluded in accordance with the timeframes or other requirements established by the transaction agreements, as required by 1122(d)(4)(vii);[65]

v. Records of document collection efforts were not maintained during the period a pool asset was delinquent in accordance with the transaction agreements. Such records should be maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring delinquent pool assets including, for example, phone calls, letters, and payment rescheduling plans in cases where delinquency is deemed temporary (*e.g.*, illness or unemployment), as required by 1122(d)(4)(viii);[66]

---

[60] "Reports on assessment of compliance with servicing criteria under Item 1122 of Regulation AB do not have to include instances of noncompliance with the servicing criteria if the instances of noncompliance are not material to the servicing platform." S*EC Manual, Telephone Interpretative Guidance, Regulation AB and Related Rules*, 2005 WL 4156732, at 5.

[61] *See* U.S. Securities and Exchange Commission, Regulation AB and Related Rules, Section 200.03. Rules 13a-18 and 15d-18, updated September 6, 2016.

[62] *See, e.g.*, WF_BR_005336697; WF_BR_005336698; WF_BR_005336699; WF_BR_005336370; and WF_BR_005336703.

[63] *See, e.g.*, WF_BR_005335596 and WF_BR_005335599.

[64] *See, e.g.*, WF_NCUA_000219288; WF_PL_000038863; WF_NCUA_000309991; WF_PL_000038852; WF_BR_005335596; WF_BR_005335599; WF_BR_005335727; WF_BR_005335102 WF_PL_000402225.

[65] *See, e.g.*, WF_NCUA_000309991; WF_PL_000038852; WF_BR_005335596; WF_BR_005335599; WF_BR_005335727; and WF_BR_005335477.

[66] *See, e.g.*, WF_BR_005335596; WF_BR_005335599; and WF_BR_005335727.

HIGHLY CONFIDENTIAL

vi.   Servicers did not maintain sufficient records to determine compliance with requirements regarding the payer of late payment penalties, as required by 1122(d)(4)(xii);[67]

vii.  Records of document collection efforts were not maintained during the period a pool asset was delinquent, as required by USAP 6(a);[68] and

viii. Custodial bank account reconciliations were not prepared and reviewed on a timely bases, namely within 90 days.[69]

105. I note that in some cases, the servicer's explanations for some of the instances of non-compliance were due to regulatory moratoria or natural disasters. Federal and state moratoria are considered by the GSEs during their annual foreclosure timeline review and update. My analysis used the appropriate updated foreclosure timelines and took natural disaster moratoria into consideration when calculating foreclosure timeline compliance, and still found excessive non-compliance. (See Section VI.B.4.) In any event, the servicers themselves acknowledged that they failed to comply with the Governing Agreements.

106. Furthermore, in some cases the servicer's explanations for stating material non-compliance with section 1122(d)(4)(vii) of Regulation AB as it relates to initiating, conducting, and concluding Loss Mitigation or Recovery Actions was "due in large part to increased efforts to work with borrowers to modify or otherwise handle troubled loans while acting in the best interests of borrowers and investors." However, it is my opinion that in many cases, the servicers failed to appropriate and allocate the resources necessary for compliance as supported by the FDIC, OCC and OTS joint report[70] and the OCC Consent Order of April 13, 2011,[71] and failed to maintain or deploy proper servicing and subservicing protocols to govern servicing standards of newly-appointed subservicers, monthly reports with loan performance statistics, and the appointment of a performance review firm to ensure the subservicers' compliance with the subservicing protocols.[72]

---

[67] *See, e.g.*, WF_PL_000401693.

[68] *See, e.g.*, WF_BR_005335922.

[69] *See, e.g.*, WF_BR_005336225 and WF_BR_005336226.

[70] Office of the Comptroller of Currency, *Interagency Review of Foreclosure Policies and Practices*, Federal Reserve Board, April 2011.

[71] Consent Order, *In the Matter of Bank of America, N.A.*, United States of America Department of the Treasury, Comptroller of the Currency, AA-EC-11-12, at pp. 2-3, April 13, 2011.

[72] Petition, In the matter of the application of U.S. Bank, National Association et al., Index No. 652382/2014, New York Supreme Court, August 3, 2014, at Exhibit B, available at http://www.rmbstrusteesettlement.com/docs/2014-08-03%20Petition%20(In%20the%20Matter%20of%20the%20Application%20of%20U.S.%20Bank%20et%20al.pdf.

HIGHLY CONFIDENTIAL

107. It is also noted that the Servicers attest that the GSE guidelines are the industry standard and are used when specific timeframe standards are absent from the Governing Agreements:

> "under the Company's [BoA's] interpretation of 1122(d)(4)(vii), in absence of specific investor/insurer timeframe standards, the Company services loans in accordance with Fannie Mae guidelines which is considered the accepted industry standard."[73]

### 3. Wells Fargo Knew the Servicers Were Not Following Prudent Servicing Practices

108. A review of documents provided during discovery reflect that the Trustee knew the servicers were not following prudent servicing practices and that their deficient practices were exacerbating losses to the trusts.  These documents consist of emails, internal reports, internal assessments and scorecards as well as correspondence from external investors.

109. One such investor, AMG (Asset Management Group) of the Securities Industry and Financial Markets Association, issued a letter to Wells Fargo Corporate Trust Services in October of 2010 raising the following concerns:

> …recent revelations that mortgage servicers have operated with deficient policies and procedures with respect to the legal requirements for execution of certain documents necessary to foreclose on … delinquent mortgage borrowers in many states.  We write this letter to you in your capacity as trustee for residential mortgage backed securities… Servicers of loans held by RMBS trusts have a duty to follow prudent servicing procedures and all applicable local, state and federal laws and regulations. Clearly, the recent revelations … [are] and admission, and demonstration, that imprudent servicing procedures were followed on a systemic basis.  These actions have the potential to slow down the foreclosure process, cast doubt upon foreclosures previously completed, and impose significant losses on RMBS noteholders.[74]

110. These internal communications also reveal that the Trustee knew that excessive foreclosure timelines were an issue with the trust's servicers as in 2011, they found it necessary to establish a bi-weekly project team called the "Trustee Foreclosure Initiative" to attempt to gain control of the deteriorating situation.[75] Items addressed through this initiative include, among others:

i.   Drafting servicer letters that leverage the OCC Consent Order;

---

[73]   *See, e.g.*, WF_NCUA_000309991.

[74]   Exhibit 740, WF_NCUA_000753510-11.

[75]   Exhibit 702, WF_BR_000758717-19.

HIGHLY CONFIDENTIAL

    ii.    Continuing to push the servicers to comply with reporting; and

    iii.    Discussing the lack of servicer cooperation with reporting requirements, asking "How hard should we push them."[76]

111. It appears that this initiative was required as an overlay to a pre-existing Corporate Trust Services ("CTS') servicer oversight function that had a mandate to oversee servicer effectiveness in this area, but which had been ineffective in administering this function.

112. Other examples of the Trustee's knowledge of the trust's servicers imprudent practices are:

    i.    A January 2008 email from Scott Runkles to Elizabeth Walker, Re: Ocwen: $28 mm Recovery planned for January, which explores the possibility of limiting Ocwen's recovery claim of $28 million in servicing advances across 154 deals.[77]

    ii.    A March 2008 email from Brett Handelman, Re: Please Read Immediately: OOMC - Wells Deals--Confidential, which raises an alarm that Option One tripped 43 of 81, or 53.1% of the EOD triggers, and the Trustee (Wells Fargo), did not either track or send notices as required by the Governing Agreements.[78]

    iii.    An August 2008 email exchange between Linda Stinson, Jim Thomes, et. al., RE: Trigger Threshold Failures, expresses apparent confusion around which department in the organization was to have been issuing and tracking EOD notices.[79]

    iv.    An internal report identifying the Top 16 Servicers with Losses showing Total Losses by servicer as high as 32%.[80]

    v.    Initiative meeting minutes with the following notation: "There were some defective assignments produced by AHMSI that resulted in negative media attention for Wells Fargo.  The issue is being addressed internally, but this is a good example of the type of item that should be reported by servicers."[81]

    vi.    The Mortgage Asset Services Servicer Oversight ("MASSO") report for 2Q 2014 shows:

        a.    CHASE: 2012 Reg AB disclosed two Material Instances of Non-Compliance (MINC). Met to determine Chase's obligation to provide

---

[76]  Exhibit 702, WF_BR_000758721-22.

[77]  Exhibit 206, WF_PL_000198074-75.

[78]  Exhibit 625, WF_NCUA_000443262.

[79]  WF_CB_001160660.

[80]  Exhibit 197, WF_NCUA_000448343-44.

[81]  Exhibit 702, WF_BR_000758725.

HIGHLY CONFIDENTIAL

remedial statements regarding foreclosure timeline delays. There is no requirement for Chase to provide a remedial statement regarding foreclosure timelines.  Thus MASSO will not continue pursuing this.[82]

b. Greentree: Failed its servicer compliance tests.[83]

c. Ocwen: Received an attorney letter on 4/30 directing Wells Fargo and other Trustees to investigate Ocwen's servicing practices to assess conformance to industry servicing standards and if non-recoverable advance recovery practices are in compliance with PSA/Servicing agreements.[84]

d. Nationstar: Numerous modification reporting deficiencies.[85]

vii.  "Serious Impact Servicers" reports concern over Ocwen's CFPB settlement requiring $2Bn in borrower forgiveness and significant growth in 24 months adversely impacting their capabilities.[86]

viii.  In one "Brainstorming" email from September 2008, the Trustee floated these concepts which further supports my assertion that the Trustee knew of imprudent servicing practices:[87]

a. "Servicer must ensure full proof of ownership before initiating foreclosure process."

b. "Servicer must use proper naming convention when initiating proceedings in our name as Trustee and if there is an error, they [Servicer] need to immediately set the record straight."

c. "Addressing evictions also makes sense"

d. "Properties not inspected on a timely basis.  Since property is not properly secured vandalism can occur. This results in hazard insurance being denied."  Denial of hazard insurance will exacerbate losses to the Trustee.

e. Servicers are requesting repurchases without specifying the rep/warranty being breached. Trustee was "frequently" returning a Claim Clarification

---

[82]  Exhibit 579, WF_NCUA_000268689.

[83]  Exhibit 579, WF_NCUA_000268689.

[84]  Exhibit 579, WF_NCUA_000268690.

[85]  Exhibit 579, WF_NCUA_000268690.

[86]  Exhibit 579, WF_NCUA_000268695-96.

[87]  Exhibit 737, WF_NCUA_000186664.

HIGHLY CONFIDENTIAL

letter to the servicer thereby delaying, or potentially neutering, the repurchase request.

ix.   An October 2008 email from Diane Citron regarding AMHSI Servicing Advance where, in the 2nd sentence, she acknowledges the Trustee being in default of the PSA:[88]

   a.   "As you know, the trustee is in default of its duties under the Pooling and Servicing Agreement if the trustee does not declare an Event of Default if one has occurred.  As you know, we believe one has occurred in that many Advances were not made by the Servicer as required by the agreement…"

### 4.   The Servicers Routinely Exceeded Industry Standard Foreclosure Benchmarks

113.   One of the metrics utilized by industry professionals to assess servicing performance is the time it takes a servicer to complete a foreclosure sale. A foreclosure benchmark analysis involves comparing the length of foreclosures for loans in the at-issue Trusts to industry standard benchmarks. If servicers consistently fail to complete foreclosures within the prescribed timelines, action needs to be taken to improve servicer performance. Both of the GSEs consider a servicer's repeated failure to meet timelines a violation of prudent servicing standards and assess compensatory fees.

114.   I have been asked by counsel to assess the foreclosure sale timelines for the at-issue Trusts relative to industry standard benchmarks published by the GSEs. The GSE foreclosure timelines are provided in the Seller/Servicer Guides and are defined as the number of days between the Due Date of the Last Paid Installment and the date of the foreclosure sale.[89,90]

---

[88]   Exhibit 738, WF_NCUA_001195929-930.

[89]   "Freddie Mac Single-Family Seller/Servicer Guide (2011), Chapter 66.32: Allowable Delays in Completing a Foreclosure," accessed April 26, 2018, http://www.freddiemac.com/singlefamily/guide/bulletins/pdf/2011Guide.pdf.

[90]   In addition to the standard timeline, the GSEs provide extensions to the timeline under certain circumstances, as follows: Bankruptcy, Chapter 7 (Maximum of 80 Days); Bankruptcy, Chapter 11 (Maximum of 125 Days); Bankruptcy, Chapter 12 (Maximum of 125 Days); Bankruptcy, Chapter 13 (Maximum of 125 Days); Probate (Maximum of 120 Days); Military Indulgence (Maximum of 455 Days); Contested Foreclosure (Maximum of 90 Days); HAMP in Review (Maximum of 60 Days); HAMP Trial Period Plan (Maximum of 120 Days); Unemployment Forbearances (Maximum of 180 Days); Standard Modification (or Flex) Trial Period Plan (Maximum of 120 Days); Alternative Streamlined Modification Trial Period Plan (Maximum of 120 Days); Appeal of Loan Modification Denial (Maximum of 60 Days); New Jersey Foreclosure Delays (Maximum of 180 Days). For example, see Freddie Mac, "Single-Family Seller/Servicer Guide, Exhibit 83A, Determining State Foreclosure Timeline Performance Compensatory Fees," Bulletin 2017-1, Page E83A-1, February 2017. See Also Fannie Mae, Foreclosure Time Frames and Compensatory Fee Allowable Delays Exhibit, page 3, September 2016.

Continued on next page

HIGHLY CONFIDENTIAL

As previously described, allowable delays are factored into my calculation to account for the maximum 125 days allowable for bankruptcy delays, or any moratorium for natural disasters. The GSEs factor in federal and state legislative actions during the annual timeline review/re-publishing cycles.

115. In all of the at-issue Trusts, Servicers exceeded the industry standard GSE foreclosure timelines roughly 63% of the time when executing a foreclosure. As presented in Table 2, when they did exceed the timeline, it was by more than 350 days on average. In my opinion, this level of non-compliance with these timelines violates prudent servicing standards.

### Table 2: Foreclosure Timeline Analysis

| | | | Exceeded Foreclosure Benchmark | | | | | |
|---|---|---|---|---|---|---|---|---|
| Trust | Loans | Liquidated and REO | Count | Percent of Liquidated and REO | Average Length of Foreclosure | Average Foreclosure Benchmark | Average Days Exceeded | % of Timeline Exceeded |
| | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] |
| ABFC 2005-HE2 | 6,960 | 1,140 | 536 | 47.0% | 736 | 417 | 318 | 76.3% |
| ABFC 2005-OPT1 | 2,672 | 544 | 327 | 60.1% | 666 | 422 | 245 | 58.1% |
| ABFC 2006-OPT1 | 5,349 | 1,866 | 1,132 | 60.7% | 681 | 425 | 256 | 60.2% |
| ABFC 2006-OPT2 | 5,052 | 1,767 | 1,106 | 62.6% | 729 | 445 | 284 | 63.8% |
| ABSHE 2005-HE5 | 5,702 | 782 | 505 | 64.6% | 1,097 | 447 | 650 | 145.4% |
| BOAMS 2006-B | 1,223 | 155 | 143 | 92.3% | 1,119 | 443 | 676 | 152.6% |
| CMLTI 2005-OPT4 | 5,239 | 904 | 531 | 58.7% | 684 | 427 | 256 | 60.0% |
| GPMF 2005-AR4 | 6,419 | 1,713 | 1,154 | 67.4% | 742 | 387 | 355 | 91.7% |
| GPMF 2006-AR1 | 3,618 | 1,324 | 900 | 68.0% | 784 | 405 | 379 | 93.6% |
| GPMF 2006-AR2 | 3,111 | 1,134 | 757 | 66.8% | 759 | 398 | 360 | 90.5% |
| GPMF 2006-AR3 | 6,321 | 2,595 | 1,717 | 66.2% | 741 | 393 | 348 | 88.5% |
| HVMLT 2007-3 | 2,397 | 1,226 | 779 | 63.5% | 724 | 445 | 278 | 62.5% |
| MSAC 2005-WMC2 | 6,452 | 494 | 302 | 61.1% | 990 | 420 | 570 | 135.7% |
| MSAC 2005-WMC3 | 5,243 | 472 | 302 | 64.0% | 984 | 423 | 561 | 132.6% |
| MSAC 2005-WMC5 | 8,041 | 946 | 603 | 63.7% | 1,027 | 432 | 595 | 137.7% |
| MSAC 2006-HE1 | 6,654 | 1,661 | 1,026 | 61.8% | 763 | 418 | 346 | 82.8% |
| OOMLT 2006-2 | 7,525 | 2,291 | 1,382 | 60.3% | 689 | 423 | 266 | 62.9% |
| All Trusts | 87,978 | 21,014 | 13,202 | 62.8% | 772 | 418 | 354 | 84.7% |

---

Continued from previous page

The MBSData on which I rely provides information about loans for which the borrower was in a period of bankruptcy (but does not indicate the type of bankruptcy). I have allowed for an extension of 125 days to the timeline for these loans. Other allowable extensions are not identified in the MBSData and have not been taken into account for this analysis. However, in my opinion, these allowances are not common and would not materially affect the results of this analysis.

Furthermore, after natural disasters, the GSEs can announce foreclosure moratoria which instruct servicers to halt foreclosure proceedings for a certain period of time in the areas affected by the disaster. I have reviewed bulletins published by Freddie Mac and Fannie Mae to identify the relevant natural disaster moratoria and have adjusted the foreclosure timelines for the loans accordingly. In instances where the moratoria were different between the GSEs for the same disaster, we chose the more generous of the two.

HIGHLY CONFIDENTIAL

Sources: MBSData.

Notes:

[1]: Loans in trust at closing date.

[2]: First lien loans, having gone through a foreclosure that ended in REO or liquidation, and with a liquidation date and last payment date not exceeding the date of first REO or liquation, are included.

[3]: A loan that surpasses the GSEs' Foreclosure Timeline Guideline for its state and liquidation/REO date is defined as a loan that 'Exceeded Foreclosure Benchmark' after accounting for the maximum 125 day allowance for bankruptcies, and for any relevant natural disaster moratoria.

[4]: [3] / [2].

[5]: The average time between last paid date and first liquidation or REO.

[6]: The average time allowed for foreclosure according to the GSE benchmark. Note that guidelines vary by state and are revised over time by each of the GSEs.

[7]: The average number of days that a loan exceeded its GSE foreclosure benchmark.

[8]: [7] / [6].

116. The fact that a delay in foreclosure adds substantial costs is well known in the industry and has been demonstrated through academic research. A 2015 article published in *Real Estate Economics* by Cordell, Geng, Goodman, and Yang "measure[s] the cost of foreclosure delay by estimating time-related foreclosure costs using a large national sample of residential mortgages." The authors found that:

> Post-crisis [foreclosure] timelines in judicial foreclosure states increased by 20 months while timelines rose by seven months in non-judicial states.

> But while time-related foreclosure costs have gone up four percentage points in non-judicial states, they have gone up 15 percentage points in judicial states.[91]

117. The authors also describe delay periods, in particular Period 4, where they outline servicer impropriety that resulted in self-imposed moratorium that added, on average, 10 months and 11 months to foreclosures in judicial and non-judicial states, respectively. This resulted in average foreclosure timelines of 34 months and 29 months in judicial and non-judicial states, respectively.[92]

> Period 4 begins in September 2010 with a series of announcements by the major mortgage servicers that they were suspending foreclosures after defects were uncovered in the foreclosure process—commonly known as the robosigning scandal—because of the practice of signing off on foreclosures *en masse* before obtaining all appropriate documents.[93]

---

[91]   Larry Cordell, Liang Geng, Laurie S. Goodman, and Lidan Yang, *The Cost of Foreclosure Delay*, Real Estate Economics, V43-4, p. 917 (2015).

[92]   Larry Cordell, Liang Geng, Laurie S. Goodman, and Lidan Yang, *The Cost of Foreclosure Delay*, Real Estate Economics, V43-4, p. 926 (2015).

[93]   *Id.*

HIGHLY CONFIDENTIAL

118. The authors measured time-related foreclosure costs as a percentage of loans' unpaid balances and found that time-related foreclosure costs can be estimated to be 0.57% of the unpaid balance per month for non-judicial states and 0.75% of the unpaid balance per month for judicial states.[94] Table 3 summarizes the incremental time-related losses to the at-issue Trusts that resulted from exceeding prudent foreclosure timelines based on the application of their findings.

**Table 3: Estimated Excess Costs due to Exceeded Foreclosure Timelines**

| Trust | Loans Exceeding Foreclosure Benchmark | Average Months Exceeded | Average Incr. Loss Severity (% of Unpaid Balance) | Total Unpaid Balance | Excess Costs from Exceeding Foreclosure Benchmark |
|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] | [5] |
| All Trusts | 13,202 | 11.8 | 7.6% | $3,472,291,425 | $235,345,804 |

Sources: MBSData.

Notes:

[1]: Loans that surpassed GSEs' foreclosure timeline, as described in Table 2.

[2]: The average number of months that a loan exceeded GSE foreclosure timeline after allowing for the maximum 125 day extension for bankruptcies, and for any relevant natural disaster moratoria.

[3]: Increased loss severity due to extended foreclosure timeline. [3] = [2] × 0.75% for loans in judicial states and [3] = [2] × 0.57% for loans in non-judicial states.

[4]: Sum of unpaid balances for loans exceeding GSE foreclosure timeline.

[5]: Sum of ([3] x [4]) calculated for each loan.

119. Further, as shown in Table 4, many loans in the at-issue Trusts have lingered in delinquency for excessive periods of time. Once a Borrower stops making payments, the Servicer should act as swiftly as possible to determine the best course of action - whether that means re-establishing a payment schedule or proceeding with foreclosure. However, among the at-issue Trusts, there are currently 897 loans that are more than five years delinquent. 111 loans have been delinquent for more than eight years, and 7 loans have been delinquent for more than ten years. These elongated delinquencies are not representative of prudent servicing.

---

[94]   0.75% = 15% / 20 months, and 0.57% = 4% / 7 months.

HIGHLY CONFIDENTIAL

**Table 4: Loans in Trusts at Issue with Excessive Delinquency**

| Trust | Years in Delinquency | | | | | | | |
|-------|-----|-----|-----|-----|-----|-----|------|-----|
|       | 3-4 | 4-5 | 5-6 | 6-7 | 7-8 | 8-9 | 9-10 | 10+ |
| ABFC 2005-HE2  | 42  | 16  | 12  | 11  | 4   | 2   | 3    | 1   |
| ABFC 2005-OPT1 | 18  | 12  | 9   | 3   | 2   | 1   | 0    | 0   |
| ABFC 2006-OPT1 | 75  | 37  | 11  | 13  | 7   | 6   | 1    | 0   |
| ABFC 2006-OPT2 | 91  | 50  | 22  | 13  | 7   | 5   | 0    | 0   |
| ABSHE 2005-HE5 | 62  | 32  | 26  | 35  | 22  | 9   | 1    | 3   |
| BOAMS 2006-B   | 19  | 10  | 5   | 15  | 4   | 3   | 0    | 0   |
| CMLTI 2005-OPT4| 38  | 23  | 15  | 4   | 1   | 0   | 0    | 1   |
| GPMF 2005-AR4  | 87  | 46  | 31  | 23  | 15  | 7   | 3    | 0   |
| GPMF 2006-AR1  | 83  | 53  | 36  | 13  | 8   | 5   | 2    | 0   |
| GPMF 2006-AR2  | 67  | 41  | 16  | 13  | 2   | 6   | 3    | 0   |
| GPMF 2006-AR3  | 148 | 83  | 54  | 31  | 8   | 7   | 1    | 0   |
| HVMLT 2007-3   | 49  | 39  | 21  | 13  | 5   | 4   | 0    | 0   |
| MSAC 2005-WMC2 | 29  | 18  | 19  | 13  | 10  | 0   | 1    | 0   |
| MSAC 2005-WMC3 | 33  | 21  | 13  | 12  | 5   | 7   | 2    | 1   |
| MSAC 2005-WMC5 | 86  | 48  | 35  | 26  | 19  | 7   | 1    | 0   |
| MSAC 2006-HE1  | 95  | 41  | 23  | 16  | 10  | 10  | 1    | 0   |
| OOMLT 2006-2   | 89  | 43  | 26  | 15  | 14  | 5   | 1    | 1   |
| Total          | 1,111 | 613 | 374 | 269 | 143 | 84  | 20   | 7   |

Sources: MBSData.

Notes: Analysis restricted to first-lien loans, having gone through a period of foreclosure that ended in REO or liquidation and that lasted at least 3 years.

### 5. Foreclosure Actions Reflect Examples of the Servicers' Improper Foreclosure Practices

120. I also reviewed filings from foreclosure actions involving loans in the at-issue Trusts that were filed by the Servicers, in the name of Wells Fargo as Trustee. This analysis is intended to provide examples of wrongdoing in foreclosure proceedings that occurred in the at-issue Trusts and the selected examples are not meant to be a statistically representative sample.

121. These foreclosure actions were identified by reviewing state court foreclosure actions filed between 2009 and 2012 on publicly accessible dockets for loans included in the at-issue

HIGHLY CONFIDENTIAL

Trusts.[95] These were reviewed for instances where there was clear evidence of servicer misconduct.[96]

122. The examples I've identified are below:

i. On January 2, 2009, Wells Fargo filed a foreclosure complaint against the borrower of mortgage loan 651019845 (part of ABFC 2006-OPT1). **Five days after the complaint was filed Wells Fargo produced a backdated assignment**, which was signed on January 7, 2009, but which Wells Fargo claimed was effective as of December 1, 2008.[97]

ii. September 18, 2009, Wells Fargo filed a foreclosure complaint against the borrower of mortgage loan 11332524 (part of MSAC 2006-HE1). After no activity on the case for 10 months, the court issued a Notice of Lack of Prosecution on January 10, 2011. **The court dismissed the case for lack of prosecution on May 11, 2011**.[98]

iii. On October 27, 2009, Wells Fargo filed a foreclosure complaint against the borrower of mortgage loan 11116495 (part of ABSHE 2005-HE5). The defendant contested the foreclosure and the **court upheld its claims that there was no notice of default issued, illegal charges were added to the loan balance, signatures on the Mortgage Note were not authentic, among others**. Wells Fargo filed for summary judgement and it was denied on December 12, 2013. **Wells Fargo voluntarily dismissed the case on Decmber 19, 2013 (more than 4 years after the complaint was filed)**.[99]

iv. On December 7, 2009, Wells Fargo filed a foreclosure complaint against the borrower of mortgage loan 11161877 (part of MSAC 2005-WMC5). **Due to Wells Fargo's delay, the court granted a Notice of Lack of Prosecution on July 22, 2011.** Wells Fargo voluntarily dismissed the case on April 27, 2013 (more than 3 years after the initial complaint was filed.[100]

---

[95] Note that many foreclosure actions with public dockets from this period do not provide access to all of the court documents listed on the docket. I have limited my review to cases for which I was able to access the court documents.

[96] Counsel provided me with these filings. I reserve the right to review public filings in additional foreclosure actions if requested by counsel.

[97] Wells Fargo Bank, N.A., v. Fred Tirado, et. al., 09-CA-050409 (Circuit Court of the 20th Judicial Circuit, Lee County, Florida, 2009).

[98] Wells Fargo Bank, N.A., v. Robert E. Dorsey, et. al., 2009-14361-CIDL (Circuit Court of the 7th Judicial Circuit, Volusia County, Florida, 2009).

[99] Wells Fargo Bank, N.A., v. Donna L. Freeman, et. al., 2009-21301-CINS (Circuit Court of the 7th Judicial Circuit, Volusia County, Florida, 2009).

[100] Wells Fargo Bank, N.A., v. Consuelo del Pilar Barrera, et. al., 42-2009-CA-006843 (Circuit Court of the 5th Judicial Circuit, Marion County, Florida, 2009).

HIGHLY CONFIDENTIAL

v.    On February 1, 2010, Wells Fargo filed a foreclosure complaint against the borrower of mortgage loan 071073555 (part of ABFC 2006-OPT2). To support the foreclosure claim, Wells Fargo attached an assignment to the complaint. This **assignment was executed on June 17, 2008 by Eric Tate, a known robo-signer**, whose signature on an assignment could provide support for foreclosure nullification.[101]

vi.   On December 28, 2010, Wells Fargo filed a foreclosure complaint against the borrower of mortgage loan 141046337 (part of CMLTI 2005-OPT4). A judgment of foreclosure was entered on June 7, 2013. The order was vacated on July 15, 2013 when the **plaintiff discovered that "not all parties to the action had been properly served with the process" and that the "trial was procedurally improper…."**[102]

## C. WELLS FARGO KNEW ITS SERVICERS DID NOT PROPERLY MAINTAIN REO PROPERTIES

123.   Wells Fargo's internal servicing assessments from 2011 identified Ocwen, Litton, JPMorgan Chase, Bank of America, American Home Mortgage Servicing, Inc., and Saxon Mortgage Services as having unsatisfactory servicing controls related to REO property preservation practices and unabated code violations.[103]

124.   Wells Fargo was also in contact with cities and municipalities regarding the Servicers' failure to properly maintain REO properties, including in-person meetings with city officials and the Servicers to address these problems.

125.   For example, in 2010 Wells Fargo met with representatives from the City of Milwaukee and local community groups regarding the maintenance of properties in foreclosure.[104] Wells Fargo was to confirm that it had registered all foreclosed properties with the City of Milwaukee, describe the efforts taken to maintain those properties, and outline the plan to continue maintaining those properties.[105] Wells Fargo continued to have similar meetings with representatives from the City of Milwaukee through 2012.[106] The City of Richmond threatened to use eminent domain as a solution to Servicers' improper handling of REO properties, which the City believed was "harming the community in many ways."[107] The City wanted to seize properties from various Trusts.[108] On July 31,

---

[101]  Wells Fargo Bank, N.A., v. Jose O'Farril; Maribel O'Farril, et. al., 10-CA-002880 (9th Judicial Circuit Court, Orange County, Florida, 2010).

[102]  Wells Fargo Bank, N.A., v. Curtis M. Leda, et. al., 2010-CA-010740 (Circuit Court of the 12th Judicial Circuit, Manatee County, Florida, 2010).

[103]  WF_NCUA_000354481.

[104]  WF_NCUA_000954308.

[105]  Id.

[106]  WF_NCUA_001000381.

[107]  WF_NCUA_000792722. The affected at-issue trusts include GPMF 2005-AR4, GPMF 2006-AR3, and HVMLT 2007-3.

HIGHLY CONFIDENTIAL

2013 the City of Richmond sent out letters to approximately twenty-nine RMBS Servicers and Trustees stating that it "has been investigating the acquisition of mortgage loans from the trust(s) as part of a public program to modify underwater mortgage loans to reduce principal and avoid foreclosures."[109] Upon receipt of the letters, Wells Fargo was forced to seek an emergency injunction to prevent the seizure of these properties, which belonged to the Trusts.[110]

126. The Los Angeles County Tax Collector threatened to collect unpaid property taxes, which the Servicers were responsible for paying, by seizing properties. In 2011 the Los Angeles County Tax Collector took action against Wells Fargo for delinquent debt to be paid by BAC Home Loan Servicing, LP.[111]

Ingrid Beckles
Dated November 28, 2018

---

Continued from previous page

[108] *Id.*

[109] WF_NCUA_000792760.

[110] *Wells Fargo Bank, N.A. v. City of Richmond*, No. C 13-03663 CRB, N.D. Cal. Aug. 7, 2013, WF_NCUA_000047393.

[111] WF_CB_000969289. The affected at-issue trusts were MSAC 2005-WMC5 and MSAC 2005-WMC3.

HIGHLY CONFIDENTIAL

# Appendix A: Documents Relied Upon

| Report Sources |
| --- |

***Pleadings***

Complaint, *Commerzbank AG v. Wells Fargo Bank, N.A.*,  Case No. 1:15-cv-10033, United States District Court Southern District of New York. Filed December 24, 2015.

***Legal Documents***

Answer, *Wells Fargo Bank, N.A., v. Fred Tirado, et. al.* , 09-CA-050409 (Circuit Court of the 20th Judicial Circuit, Lee County, Florida, 2009)

Assignment, *Wells Fargo Bank, N.A., v. Fred Tirado, et. al.* , 09-CA-050409 (Circuit Court of the 20th Judicial Circuit, Lee County, Florida, 2009)

Complaint, *Wells Fargo Bank, N.A., v. Fred Tirado, et. al.* , 09-CA-050409 (Circuit Court of the 20th Judicial Circuit, Lee County, Florida, 2009)

Notice of Filing, *Wells Fargo Bank, N.A., v. Fred Tirado, et. al.* , 09-CA-050409 (Circuit Court of the 20th Judicial Circuit, Lee County, Florida, 2009)

Voluntary Dismissal, *Wells Fargo Bank, N.A., v. Fred Tirado, et. al.* , 09-CA-050409 (Circuit Court of the 20th Judicial Circuit, Lee County, Florida, 2009)

Answer, *Wells Fargo Bank, N.A., v. Curtis M. Leda, et. al.* , 2010-CA-010740 (Circuit Court of the 12th Judicial Circuit, Manatee County, Florida, 2010)

Complaint, *Wells Fargo Bank, N.A., v. Curtis M. Leda, et. al.* , 2010-CA-010740 (Circuit Court of the 12th Judicial Circuit, Manatee County, Florida, 2010)

Final Disposition, *Wells Fargo Bank, N.A., v. Curtis M. Leda, et. al.* , 2010-CA-010740 (Circuit Court of the 12th Judicial Circuit, Manatee County, Florida, 2010)

Judgment or Foreclosure, *Wells Fargo Bank, N.A., v. Curtis M. Leda, et. al.* , 2010-CA-010740 (Circuit Court of the 12th Judicial Circuit, Manatee County, Florida, 2010)

Mediation Report, *Wells Fargo Bank, N.A., v. Curtis M. Leda, et. al.* , 2010-CA-010740 (Circuit Court of the 12th Judicial Circuit, Manatee County, Florida, 2010)

Mortgage, *Wells Fargo Bank, N.A., v. Curtis M. Leda, et. al.* , 2010-CA-010740 (Circuit Court of the 12th Judicial Circuit, Manatee County, Florida, 2010)

Motion to Cancel Foreclosure Sale, *Wells Fargo Bank, N.A., v. Curtis M. Leda, et. al.* , 2010-CA-010740 (Circuit Court of the 12th Judicial Circuit, Manatee County, Florida, 2010)

Motion to Dismiss - Leda, *Wells Fargo Bank, N.A., v. Curtis M. Leda, et. al.* , 2010-CA-010740 (Circuit Court of the 12th Judicial Circuit, Manatee County, Florida, 2010)

Motion to Dismiss Order, *Wells Fargo Bank, N.A., v. Curtis M. Leda, et. al.* , 2010-CA-010740 (Circuit Court of the 12th Judicial Circuit, Manatee County, Florida, 2010)

Motion to Dismiss, *Wells Fargo Bank, N.A., v. Curtis M. Leda, et. al.* , 2010-CA-010740 (Circuit Court of the 12th Judicial Circuit, Manatee County, Florida, 2010)

Note and Exhibits, *Wells Fargo Bank, N.A., v. Curtis M. Leda, et. al.* , 2010-CA-010740 (Circuit Court of the 12th Judicial Circuit, Manatee County, Florida, 2010)

Note, *Wells Fargo Bank, N.A., v. Curtis M. Leda, et. al.* , 2010-CA-010740 (Circuit Court of the 12th Judicial Circuit, Manatee County, Florida, 2010)

Order Vacating Judgment, *Wells Fargo Bank, N.A., v. Curtis M. Leda, et. al.* , 2010-CA-010740 (Circuit Court of the 12th Judicial Circuit, Manatee County, Florida, 2010)

Trial Disposition, *Wells Fargo Bank, N.A., v. Curtis M. Leda, et. al.* , 2010-CA-010740 (Circuit Court of the 12th Judicial Circuit, Manatee County, Florida, 2010)

Voluntary Dismissal, *Wells Fargo Bank, N.A., v. Curtis M. Leda, et. al.* , 2010-CA-010740 (Circuit Court of the 12th Judicial Circuit, Manatee County, Florida, 2010)

Amended Summary Judgment Motion, *Wells Fargo Bank, N.A., v. Consuelo del Pilar Barrera, et. al.* , 42-2009-CA-006843 (Circuit Court of the 5th Judicial Circuit, Marion County, Florida, 2009)

Complaint, *Wells Fargo Bank, N.A., v. Consuelo del Pilar Barrera, et. al.* , 42-2009-CA-006843 (Circuit Court of the 5th Judicial Circuit, Marion County, Florida, 2009)

Final Disposition Form, *Wells Fargo Bank, N.A., v. Consuelo del Pilar Barrera, et. al.* , 42-2009-CA-006843 (Circuit Court of the 5th Judicial Circuit, Marion County, Florida, 2009)

Motion for Summary Judgment, *Wells Fargo Bank, N.A., v. Consuelo del Pilar Barrera, et. al.* , 42-2009-CA-006843 (Circuit Court of the 5th Judicial Circuit, Marion County, Florida, 2009)

Note Mortgage Assignment, *Wells Fargo Bank, N.A., v. Consuelo del Pilar Barrera, et. al.* , 42-2009-CA-006843 (Circuit Court of the 5th Judicial Circuit, Marion County, Florida, 2009)

HIGHLY CONFIDENTIAL

Notice of Dismissal, *Wells Fargo Bank, N.A., v. Consuelo del Pilar Barrera, et. al.* , 42-2009-CA-006843 (Circuit Court of the 5th Judicial Circuit, Marion County, Florida, 2009)

Notice of Lack of Prosecution, *Wells Fargo Bank, N.A., v. Consuelo del Pilar Barrera, et. al.* , 42-2009-CA-006843 (Circuit Court of the 5th Judicial Circuit, Marion County, Florida, 2009)

Order Granting Noice of Motion for Lack of Prosecution, *Wells Fargo Bank, N.A., v. Consuelo del Pilar Barrera, et. al.* , 42-2009-CA-006843 (Circuit Court of the 5th Judicial Circuit, Marion County, Florida, 2009)

REO, Case Reopened, *Wells Fargo Bank, N.A., v. Consuelo del Pilar Barrera, et. al.* , 42-2009-CA-006843 (Circuit Court of the 5th Judicial Circuit, Marion County, Florida, 2009)

Assignment, *Wells Fargo Bank, N.A., v. Robert E. Dorsey* , 2009-14361-CIDL (Circuit Court of the 7th Judicial Cicrcuit, Volusia County, Florida, 2009)

Complaint, *Wells Fargo Bank, N.A., v. Robert E. Dorsey, et. al.* , 2009-14361-CIDL (Circuit Court of the 7th Judicial Cicrcuit, Volusia County, Florida, 2009)

Dismissal for Failure to Prosecute, *Wells Fargo Bank, N.A., v. Robert E. Dorsey, et. al.* , 2009-14361-CIDL (Circuit Court of the 7th Judicial Cicrcuit, Volusia County, Florida, 2009)

Lack of Prosecution Motion, *Wells Fargo Bank, N.A., v. Robert E. Dorsey, et. al.* , 2009-14361-CIDL (Circuit Court of the 7th Judicial Cicrcuit, Volusia County, Florida, 2009)

Summary Judgment Motion, *Wells Fargo Bank, N.A., v. Robert E. Dorsey, et. al.* , 2009-14361-CIDL (Circuit Court of the 7th Judicial Cicrcuit, Volusia County, Florida, 2009)

Complaint, *Wells Fargo Bank, N.A., v. Jose O'Farril; Maribel O'Farril, et. al.* , 10-CA-002880 (9th Judicial Circuit Court, Orange County, Florida, 2010)

Order Vacating Judgment, *Wells Fargo Bank, N.A., v. Jose O'Farril; Maribel O'Farril, et. al.* , 10-CA-002880 (9th Judicial Circuit Court, Orange County, Florida, 2010)

Original Judgment, *Wells Fargo Bank, N.A., v. Jose O'Farril; Maribel O'Farril, et. al.* , 10-CA-002880 (9th Judicial Circuit Court, Orange County, Florida, 2010)

Summary Judgment Motion with Assignment, *Wells Fargo Bank, N.A., v. Jose O'Farril; Maribel O'Farril, et. al.* , 10-CA-002880 (9th Judicial Circuit Court, Orange County, Florida, 2010)

Amended Answer, *Wells Fargo Bank, N.A., v. Donna L. Freeman, et. al.* , 2009-21301-CINS (Circuit Court of the 7th Judicial Circuit, Volusia County, Florida, 2009)

Answer, *Wells Fargo Bank, N.A., v. Donna L. Freeman, et. al.* , 2009-21301-CINS (Circuit Court of the 7th Judicial Circuit, Volusia County, Florida, 2009)

Complaint, *Wells Fargo Bank, N.A., v. Donna L. Freeman, et. al.* , 2009-21301-CINS (Circuit Court of the 7th Judicial Circuit, Volusia County, Florida, 2009)

Lack of Prosecution Notice, *Wells Fargo Bank, N.A., v. Donna L. Freeman, et. al.* , 2009-21301-CINS (Circuit Court of the 7th Judicial Circuit, Volusia County, Florida, 2009)

Motion to Dismiss, *Wells Fargo Bank, N.A., v. Donna L. Freeman, et. al.* , 2009-21301-CINS (Circuit Court of the 7th Judicial Circuit, Volusia County, Florida, 2009)

Note Mortgage Assignment, *Wells Fargo Bank, N.A., v. Donna L. Freeman, et. al.* , 2009-21301-CINS (Circuit Court of the 7th Judicial Circuit, Volusia County, Florida, 2009)

Order Denying Motion to Dismiss, *Wells Fargo Bank, N.A., v. Donna L. Freeman, et. al.* , 2009-21301-CINS (Circuit Court of the 7th Judicial Circuit, Volusia County, Florida, 2009)

Order Denying WF's SJ Motion, *Wells Fargo Bank, N.A., v. Donna L. Freeman, et. al.* , 2009-21301-CINS (Circuit Court of the 7th Judicial Circuit, Volusia County, Florida, 2009)

Order for Default, *Wells Fargo Bank, N.A., v. Donna L. Freeman, et. al.* , 2009-21301-CINS (Circuit Court of the 7th Judicial Circuit, Volusia County, Florida, 2009)

Order Striking Affirmative Defenses, *Wells Fargo Bank, N.A., v. Donna L. Freeman, et. al.* , 2009-21301-CINS (Circuit Court of the 7th Judicial Circuit, Volusia County, Florida, 2009)

Order Vacating Default, *Wells Fargo Bank, N.A., v. Donna L. Freeman, et. al.* , 2009-21301-CINS (Circuit Court of the 7th Judicial Circuit, Volusia County, Florida, 2009)

Reply to Answer, *Wells Fargo Bank, N.A., v. Donna L. Freeman, et. al.* , 2009-21301-CINS (Circuit Court of the 7th Judicial Circuit, Volusia County, Florida, 2009)

Second Amended Answer, *Wells Fargo Bank, N.A., v. Donna L. Freeman, et. al.* , 2009-21301-CINS (Circuit Court of the 7th Judicial Circuit, Volusia County, Florida, 2009)

WF's Voluntary Dismissal, *Wells Fargo Bank, N.A., v. Donna L. Freeman, et. al.* , 2009-21301-CINS (Circuit Court of the 7th Judicial Circuit, Volusia County, Florida, 2009)

WF Motion for SJ, *Wells Fargo Bank, N.A., v. Donna L. Freeman, et. al.* , 2009-21301-CINS (Circuit Court of the 7th Judicial Circuit, Volusia County, Florida, 2009)

***Produced Documents & Data***

| | | |
|---|---|---|
| Exhibit 197, WF_NCUA_000448343-44 | WF_BR_005335599 | WF_NCUA_000047393 |
| Exhibit 206, WF_PL_000198074-75 | WF_BR_005335727 | WF_NCUA_000219288 |

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| Exhibit 579, WF_NCUA_000268689-96 | WF_BR_005335922 | WF_NCUA_000309991 |
| Exhibit 625, WF_NCUA_000443262 | WF_BR_005336225 | WF_NCUA_000354481 |
| Exhibit 702, WF_BR_000758717-25 | WF_BR_005336226 | WF_NCUA_000792722 |
| Exhibit 737, WF_NCUA_000186664 | WF_BR_005336370 | WF_NCUA_000792760 |
| Exhibit 738, WF_NCUA_001195929-930 | WF_BR_005336697 | WF_NCUA_000954308 |
| Exhibit 740, WF_NCUA_000753510-11 | WF_BR_005336698 | WF_NCUA_001000381 |
| WF_BR_005335102 | WF_BR_005336699 | WF_PL_000038852 |
| WF_BR_005335477 | WF_BR_005336703 | WF_PL_000038863 |
| WF_BR_005335596 | WF_CB_000969289 | WF_PL_000401693 |
| WF_BR_005335596 | WF_CB_001160660 | WF_PL_000402225 |

***Exception Reports***

| | | |
|---|---|---|
| BANA_GSS_CB_WF_000000003 | WF_BR_005334966 | WF_CB_001478370 |
| DBTCA-BR-WF-000484 | WF_CB_000208993 | WF_CB_001478371 |
| DBTCA-BR-WF-001973 | WF_CB_000741921 | WF_CB_001559250 |
| DBTCA-BR-WF-002753 | WF_CB_001478366 | WF_CB_001669112 |
| WF_BR_005334965 | WF_CB_001478367 | WF_CB_001671277 |
| Group 1of3 U005_XT_Exception_Removed_Export_122016 | | |
| Group 2of3 U005_XT_Exception_Removed_Export_122016 | | |
| Group 3of3 U005_XT_Exception_Removed_Export_122016 | | |
| U002_XT_Uncleared_Exception_Export_122016 | | |

***Cure Reports***

WF_BR_005327267
WF_BR_005334966
Group 1of3 U005_XT_Exception_Removed_Export_122016
Group 2of3 U005_XT_Exception_Removed_Export_122016
Group 3of3 U005_XT_Exception_Removed_Export_122016

***Loan Tapes***

WF_CB_000000003
WF_CB_000000004
WF_CB_000000005
WF_CB_000000006
WF_CB_000000009
WF_CB_000000018
WF_CB_000000019
0929_gpmf05ar4pfund_final_data_trustee_orignl
LoanNbr_Xref_MSC 2006-HE1

***Governing Agreements & Offering Documents***

ABFC 2005-HE2 Mortgage Loan Purchase Agreement (WF_CB_001698773)
ABFC 2005-HE2 Pooling and Servicing Agreement (WF_CB_000758361)
ABFC 2005-HE2 Pooling and Servicing Agreement Exhibits (WF_CB_000757578)
ABFC 2005-HE2 Prospectus Supplement (WF_CB_000756880)
ABFC 2005-OPT1 Mortgage Loan Purchase Agreement (WF_CB_001699961)
ABFC 2005-OPT1 Pooling and Servicing Agreement (WF_CB_000759744)
ABFC 2005-OPT1 Pooling and Servicing Agreement Exhibits (WF_CB_000759517)
ABFC 2005-OPT1 Prospectus Supplement (WF_CB_001232768)
ABFC 2006-OPT1 Flow Sale and Servicing Agreement (WF_CB_000978819)
ABFC 2006-OPT1 Mortgage Loan Purchase Agreement (WF_CB_000763433)
ABFC 2006-OPT1 Pooling and Servicing Agreement (WF_CB_000954031)
ABFC 2006-OPT1 Pooling and Servicing Agreement Exhibits (WF_CB_001151634)
ABFC 2006-OPT1 Prospectus Supplement (WF_CB_001238416)
ABFC 2006-OPT2 Mortgage Loan Purchase Agreement (WF_CB_001720914)
ABFC 2006-OPT2 Pooling and Servicing Agreement (WF_CB_000764447)
ABFC 2006-OPT2 Prospectus Supplement (WF_CB_000741646)
ABSHE 2005-HE5 Mortgage Loan Purchase and Interim Servicing Agreement (WF_CB_000568019)
ABSHE 2005-HE5 Pooling and Servicing Agreement (WF_CB_000758635)
ABSHE 2005-HE5 Prospectus Supplement (WF_CB_000754222)
BOAMS 2006-B Pooling and Servicing Agreement (WF_CB_000765038)
BOAMS 2006-B Prospectus Supplement (WF_CB_000740786)

HIGHLY CONFIDENTIAL

CMLTI 2005-OPT4 Mortgage Loan Purchase Agreement (WF_CB_001232095)
CMLTI 2005-OPT4 Pooling and Servicing Agreement (WF_CB_001232607)
CMLTI 2005-OPT4 Pooling and Servicing Agreement Exhibits (WF_CB_001232127)
CMLTI 2005-OPT4 Prospectus Supplement (WF_CB_001231761)
GPMF 2005-AR4 Pooling and Servicing Agreement (WF_CB_001237445)
GPMF 2005-AR4 Pooling and Servicing Agreement Exhibits (WF_CB_001645024)
GPMF 2005-AR4 Prospectus Supplement (WF_CB_001230822)
GPMF 2006-AR1 Custodial Agreement (WF_CB_001265468)
GPMF 2006-AR1 Mortgage Loan Purchase Agreement (WF_CB_001238894)
GPMF 2006-AR1 Pooling and Servicing Agreement (WF_CB_001237885)
GPMF 2006-AR1 Pooling and Servicing Agreement Exhibits (WF_CB_001235992)
GPMF 2006-AR1 Prospectus Supplement (WF_CB_001235641)
GPMF 2006-AR2 Mortgage Loan Purchase Agreement (WF_CB_001240491)
GPMF 2006-AR2 Pooling and Servicing Agreement (WF_CB_001145027)
GPMF 2006-AR2 Pooling and Servicing Agreement Exhibits (WF_CB_001237631)
GPMF 2006-AR2 Prospectus Supplement (WF_CB_001236317)
GPMF 2006-AR3 Mortgage Loan Purchase Agreement (WF_CB_001237165)
GPMF 2006-AR3 Pooling and Servicing Agreement (WF_CB_001608997)
GPMF 2006-AR3 Pooling and Servicing Agreement Exhibits (WF_CB_001238691)
GPMF 2006-AR3 Prospectus Supplement (WF_CB_001236818)
HVMLT 2007-3 Pooling and Servicing Agreement (WF_CB_000773482)
HVMLT 2007-3 Prospectus Supplement (WF_CB_000769493)
MSAC 2005-WMC2 Mortgage Loan Purchase Agreement (WF_CB_001266019)
MSAC 2005-WMC2 Mortgage Loan Purchase Agreement Exhibits (WF_CB_001110225)
MSAC 2005-WMC2 Pooling and Servicing Agreement (WF_CB_001693562)
MSAC 2005-WMC2 Prospectus Supplement (WF_CB_000752201)
MSAC 2005-WMC3 Mortgage Loan Purchase Agreement (WF_CB_001266019)
MSAC 2005-WMC3 Pooling and Servicing Agreement (WF_CB_000753366)
MSAC 2005-WMC3 Prospectus Supplement (WF_CB_000753030)
MSAC 2005-WMC5 Mortgage Loan Purchase Agreement (WF_CB_001266019)
MSAC 2005-WMC5 Pooling and Servicing Agreement (WF_CB_000960566)
MSAC 2005-WMC5 Prospectus Supplement (WF_CB_000755448)
MSAC 2006-HE1 Pooling and Servicing Agreement (WF_CB_000762909)
MSAC 2006-HE1 Prospectus Supplement (WF_CB_000760844)
OOMLT 2006-2 Assignment, Assumption, and Recognition Agreement (WF_CB_001720447)
OOMLT 2006-2 Mortgage Loan Purchase Agreement (WF_CB_001515979)
OOMLT 2006-2 Pooling and Servicing Agreement (WF_CB_001640548)
OOMLT 2006-2 Prospectus Supplement (WF_CB_000230806)

*Regulation AB Attestations*

| | | |
|---|---|---|
| WF_BR_005335102 | WF_BR_005336226 | WF_NCUA_000309991 |
| WF_BR_005335477 | WF_BR_005336370 | WF_PL_000038852 |
| WF_BR_005335596 | WF_BR_005336697 | WF_PL_000038863 |
| WF_BR_005335599 | WF_BR_005336698 | WF_PL_000401693 |
| WF_BR_005335727 | WF_BR_005336699 | WF_PL_000402225 |
| WF_BR_005335922 | WF_BR_005336703 | |
| WF_BR_005336225 | WF_NCUA_000219288 | |

*Public Press & Other Materials*

"2010 Servicing Guide," Fannie Mae Single Family, Part VIII, Chapter 1: Foreclosures.

"2017 Servicing Guide," Fannie Mae Single Family, May 10, 2017.

"Bank of America, Ally Bank Extend Foreclosure Freeze To All 50 States,"
    https://www.cbsnews.com/news/bank-of-america-ally-bank-extend-foreclosure-freeze-to-all-50-states.

"BofA projects 30,000 foreclosures to stop,"
    https://www.reuters.com/article/us-usa-foreclosures-bankofamerica-idUKTRE69D5LE20101015.

"Collateral Assignment," Business Dictionary,
    http://www.businessdictionary.com/definition/collateral-assignment.html.

Consent Order, In the Matter of Bank of America, N.A., United States of America Department of the Treasury,
    Comptroller of the Currency, AA-EC-11-12, at pp. 2-3, April 13, 2011

"Consent Order with Bank of America - Exhibit A,"
    http://scholarship.law.unc.edu/cgi/viewcontent.cgi?article=1000&context=mortgage-settlements.

"Consent Orders re: Foreclosure Practices,"
    https://www.occ.gov/topics/consumer-protection/foreclosure-prevention/correcting-foreclosure-practices.html.

A-4

Cordell, Larry, Liang Geng, Laurie S. Goodman, and Lidan Yang. "The Cost of Foreclosure Delay,"
    Real Estate Economics, (43)4; United States Government Accountability Office Report to Congress,
    "Mortgage Foreclosures: Documentation Problems Reveal Need for Ongoing Regulatory Oversight," (2015).

Cutts, Amy Crews and William A. Merrill. "Interventions in Mortgage Default: Policies and Practices to Prevent
    Home Loss and Lower Costs," Joint Center for Housing Studies Harvard University, March 2008.

Fannie Mae Single Family Announcements, Letters and Notices, "LL01-05: Hurricane Katrina (09/19/05),"
    https://www.fanniemae.com/singlefamily/guides?taskId=task-58.

Fannie Mae Single Family Announcements, Letters and Notices, "LL01-06: Hurricane-Related Special Relief Measures (With
    Correction in Foreclosure Evaluation Process Section) (02/14/06),"
    https://www.fanniemae.com/singlefamily/guides?taskId=task-58.

Fannie Mae Single Family Announcements, Letters and Notices, "LL01-07: Hurricane-Related Special Relief Measures
    (03/29/07)," https://www.fanniemae.com/singlefamily/guides?taskId=task-58.

Fannie Mae Single Family Announcements, Letters and Notices, "LL03-06: Hurricane-Related Special Relief Measures
    (05/11/06)," https://www.fanniemae.com/singlefamily/guides?taskId=task-58.

Fannie Mae Single Family Announcements, Letters and Notices, "LL04-06: Hurricane-Related Special Relief Measures
    (08/08/06)," https://www.fanniemae.com/singlefamily/guides?taskId=task-58.

Fannie Mae Single Family Announcements, Letters and Notices, "LL06-06: Extension of Requirement to Obtain Fannie Mae
    Approval Prior to Foreclosure in Certain Areas and Louisiana Redevelopment Authority's - The Road Home Program
    (11/21/06)," https://www.fanniemae.com/singlefamily/guides?taskId=task-58.

Fannie Mae Single Family Announcements, Letters and Notices, "LL08-07: Clarification of the Transfer of Properties Involving
    The Road Home Program and Expiration of our Foreclosure Notification Requirements (12/21/07),"
    https://www.fanniemae.com/singlefamily/guides?taskId=task-58.

Fannie Mae Single Family Announcements, Letters and Notices, "LL-2012-09: Additional Flexibilities for Mortgage Loans
    Impacted by Hurricane Sandy (11/13/12)," https://www.fanniemae.com/singlefamily/guides?taskId=task-58.

Fannie Mae Single Family Announcements, Letters and Notices, "LL-2013-02: Extension of Foreclosure and Eviction Moratorium
    (01/31/13)," https://www.fanniemae.com/singlefamily/guides?taskId=task-58.

Fannie Mae Single Family Announcements, Letters and Notices, "LL-2017-03: Servicing Policies for Mortgage Loans Impacted by
    Hurricane Harvey (08/29/17)," https://www.fanniemae.com/singlefamily/guides?taskId=task-58.

Fannie Mae Single Family Announcements, Letters and Notices, "LL-2017-06: Additional Clarifications for Mortgage Loans
    Impacted by Hurricanes Harvey and Irma (09/13/17)," https://www.fanniemae.com/singlefamily/guides?taskId=task-58.

Fannie Mae Single Family Announcements, Letters and Notices, "LL-2017-11: Temporary Suspension of Foreclosure Sales in
    Puerto Rico and the U.S. Virgin Islands (12/20/17)," https://www.fanniemae.com/singlefamily/guides?taskId=task-58.

Fannie Mae Single Family Announcements, Letters and Notices, "LL-2018-01: Extension of Foreclosure Sale Suspension in
    Puerto Rico and the U.S. Virgin Islands (03/07/18)," https://www.fanniemae.com/singlefamily/guides?taskId=task-58.

Fannie Mae Single Family Announcements, Letters and Notices, "Servicing Notice: Assistance in Disasters: Hurricane Sandy
    (10/31/12)," https://www.fanniemae.com/singlefamily/guides?taskId=task-58.

Federal Emergency Management Agency, "Designated Areas: Disaster 1602,"
    https://www.fema.gov/disaster/1602/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 1603,"
    https://www.fema.gov/disaster/1603/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 1604,"
    https://www.fema.gov/disaster/1604/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 1605,"
    https://www.fema.gov/disaster/1605/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 1606,"
    https://www.fema.gov/disaster/1606/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 1607,"
    https://www.fema.gov/disaster/1607/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 1702,"
    https://www.fema.gov/disaster/1702/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 1791,"
    https://www.fema.gov/disaster/1791/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4085,"
    https://www.fema.gov/disaster/4085/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4086,"
    https://www.fema.gov/disaster/4086/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4087,"
    https://www.fema.gov/disaster/4087/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4089,"
    https://www.fema.gov/disaster/4089/designated-areas.

HIGHLY CONFIDENTIAL

Federal Emergency Management Agency, "Designated Areas: Disaster 4090," https://www.fema.gov/disaster/4090/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4091," https://www.fema.gov/disaster/4091/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4092," https://www.fema.gov/disaster/4092/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4093," https://www.fema.gov/disaster/4093/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4095," https://www.fema.gov/disaster/4095/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4096," https://www.fema.gov/disaster/4096/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4097," https://www.fema.gov/disaster/4097/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4098," https://www.fema.gov/disaster/4098/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4099," https://www.fema.gov/disaster/4099/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4332," https://www.fema.gov/disaster/4332/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4335," https://www.fema.gov/disaster/4335/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4336," https://www.fema.gov/disaster/4336/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4337," https://www.fema.gov/disaster/4337/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4339," https://www.fema.gov/disaster/4339/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4340," https://www.fema.gov/disaster/4340/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4341," https://www.fema.gov/disaster/4341/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4345," https://www.fema.gov/disaster/4345/designated-areas.

Federal Emergency Management Agency, "Designated Areas: Disaster 4346," https://www.fema.gov/disaster/4346/designated-areas.

Federal Emergency Management Agency, "DR-4338-GA Initial Public Notice," https://www.fema.gov/disaster/notices/dr-4338-ga-initial-public-notice.

"Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses," https://www.justice.gov/opa/pr/federal-government-and-state-attorneys-general-reach-25-billion-agreement-five-largest.

"Foreclosure Time Frames and Compensatory Fee Allowable Delays Exhibit, Fannie Mae," https://www.fanniemae.com/content/guide_exhibit/foreclosure-timeframes-compensatory-fees-allowable-delays.pdf

Freddie Mac Single Family Guide Bulletins and Industry Letters, "Bulletin 02/10/06: Updated Temporary Servicing Requirements for Mortgages Affected by Hurricane Katrina and Hurricane Rita (02/10/06)," http://www.freddiemac.com/singlefamily/guide/.

Freddie Mac Single Family Guide Bulletins and Industry Letters, "Bulletin 03/01/07: Revised Selling and Servicing Requirements for Mortgages Affected by Hurricane Katrina and Hurricane Rita (03/01/07)," http://www.freddiemac.com/singlefamily/guide/.

Freddie Mac Single Family Guide Bulletins and Industry Letters, "Bulletin 05/01/06: Revised Selling and Servicing Requirements for Mortgages Affected by Hurricane Katrina and Hurricane Rita (05/01/06)," http://www.freddiemac.com/singlefamily/guide/.

Freddie Mac Single Family Guide Bulletins and Industry Letters, "Bulletin 06/04/07: Revised Selling and Servicing Requirements for Mortgages Affected by Hurricane Katrina and Hurricane Rita (06/04/07)," http://www.freddiemac.com/singlefamily/guide/.

Freddie Mac Single Family Guide Bulletins and Industry Letters, "Bulletin 09/10/07: Revised Servicing Requirements for Mortgages Affected by Hurricane Katrina and Hurricane Rita (09/10/07)," http://www.freddiemac.com/singlefamily/guide/.

Freddie Mac Single Family Guide Bulletins and Industry Letters, "Bulletin 10/07/05: Servicing Relief Measures for Mortgages Affected by Hurricane Katrina and Hurricane Rita, and a Change to Selling Requirements for Mortgages Affected by Hurricane Rita (10/07/05)," http://www.freddiemac.com/singlefamily/guide/.

HIGHLY CONFIDENTIAL

Freddie Mac Single Family Guide Bulletins and Industry Letters, "Bulletin 11/07/06: Revised Selling and Servicing Requirements for Mortgages Affected by Hurricane Katrina and Hurricane Rita," http://www.freddiemac.com/singlefamily/guide/.

Freddie Mac Single Family Guide Bulletins and Industry Letters, "Bulletin 11/24/08: Changes to Credit Requirements and Postsettlement Delivery Fees (11/24/08)," http://www.freddiemac.com/singlefamily/guide/.

Freddie Mac Single Family Guide Bulletins and Industry Letters, "Bulletin 11/30/05: Extension of the Foreclosure Suspension Period and Additional Servicing Requirements for Mortgages Affected by Hurricane Katrina and Hurricane Rita (11/30/05)," http://www.freddiemac.com/singlefamily/guide/.

Freddie Mac Single Family Guide Bulletins and Industry Letters, "Bulletin 12/05/07: Temporary Selling Requirements for Mortgages Affected by Hurricane Katrina and Hurricane Rita Extended, Many Temporary Servicing Requirements Expire December 31, 2007 (12/05/07)," http://www.freddiemac.com/singlefamily/guide/.

Freddie Mac Single Family Guide Bulletins and Industry Letters, "Bulletin 12/12/08: Streamlined Modification Program Requirements (12/12/08)," http://www.freddiemac.com/singlefamily/guide/.

Freddie Mac Single Family Guide Bulletins and Industry Letters, "Bulletin 12/22/05: Additional Servicing Relief Measures for Mortgages Affected by Hurricane Katrina and Hurricane Rita (12/22/05)," http://www.freddiemac.com/singlefamily/guide/.

Freddie Mac Single Family Guide Bulletins and Industry Letters, "Bulletin 2012-26: Servicing Requirements Related to Properties Affected by Hurricane Sandy and Other Disaster-Related Requirements (11/13/12)," http://www.freddiemac.com/singlefamily/guide/.

Freddie Mac Single Family Guide Bulletins and Industry Letters, "Bulletin 2013-1: Foreclosure Sale and Eviction Closeout Moratorium Extension Related to Hurricane Sandy (01/31/13)," http://www.freddiemac.com/singlefamily/guide/.

Freddie Mac Single Family Guide Bulletins and Industry Letters, "Bulletin 2017-14: Temporary Servicing Requirements Related to Hurricane Harvey (08/29/17)," http://www.freddiemac.com/singlefamily/guide/.

Freddie Mac Single Family Guide Bulletins and Industry Letters, "Bulletin 2017-19: Selling and Servicing Requirements Related to Hurricanes Irma and Harvey (09/13/17)," http://www.freddiemac.com/singlefamily/guide/.

Freddie Mac Single Family Guide Bulletins and Industry Letters, "Bulletin 2017-21: Extension of Certain Hurricane-Related Requirements and Property Inspection Reimbursement for Eligible Disaster Areas (09/25/17)," http://www.freddiemac.com/singlefamily/guide/.

Freddie Mac Single Family Guide Bulletins and Industry Letters, "Bulletin 2017-29: Extension of Foreclosure Sale Suspension (12/20/17)," http://www.freddiemac.com/singlefamily/guide/.

Freddie Mac Single Family Guide Bulletins and Industry Letters, "Bulletin 2018-4: Extension of Foreclosure Sale Suspension in Puerto Rico and the U.S. Virgin Islands (03/07/18)," http://www.freddiemac.com/singlefamily/guide/.

Freddie Mac Single-Family Seller/Servicer Guide, Exhibit 83: Freddie Mac State Foreclosure Timelines (09/01/16).

Freddie Mac Single-Family Seller/Servicer Guide, Section 9201.1: Rationale for Servicer loss mitigation activities (03/02/16).

Freddie Mac Single-Family Seller/Servicer Guide, Section 9202.10: What is a Property Inspection (03/02/2016).

Freddie Mac Single-Family Seller/Servicer Guide, Section 9203.17: What is a long-term forbearance? (03/02/16).

Freddie Mac Single-Family Seller/Servicer Guide, Section 9301.4: Pre-foreclosure referral account review (03/02/2016).

Freddie Mac Single-Family Seller/Servicer Guide, Section 9301.46: Allowable Delays in completing a foreclosure (10/01/2017).

Freddie Mac Single-Family Seller/Servicer Guide, Section 9301.47: State foreclosure timeline performance assessment (12/13/2017).

Freddie Mac Single-Family Seller/Servicer Guide, Section 9603.1: General servicer requirements for REO properties (12/13/2017).

Freddie Mac Single-Family Seller/Servicer Guide, Volume 2, Section 57.2, Prevention and Detection (01/01/15).

Freddie Mac Single-Family Seller/Servicer Guide, Volume 2, Section 66.30, State foreclosure time lines (10/01/11).

Freddie Mac Single-Family Seller/Servicer Guide, Volume 2, Section 66.32, Allowable Delays in Completing a Foreclosure.

Freddie Mac Single-Family Seller/Servicer Guide, Volume 2, Section 66.9, Pre-referral account review and detection.

Freddie Mac Single-Family Seller/Servicer Guide, Volume 2, Section 64.5: Collection efforts.

Freddie Mac Single-Family Seller/Servicer Guide, Volume 2, Section 64.6: Evaluation hierarchy, Borrower solicitation and communication.

Freddie Mac Single-Family Seller/Servicer Guide, Volume 2, Section C65.6: Underwriting the Borrower (08/21/12).

"Ghosts Of Countrywide And $47 Billion Worth Of Bonds Haunt Bank Of America," https://www.forbes.com/2010/10/19/foreclosures-bank-america-housing-markets-default.html#7b44932c4e32.

"Home Affordable Modification Program Base Net Present Value (NPV) Model Specifications," Home Affordable Modification Program, June 11, 2009.

"Internal Revenue Bulletin No. 2009-28," Internal Revenue Service, July 13, 2009.

"Joint State-Federal National Mortgage Servicing Settlements," http://www.nationalmortgagesettlement.com.

HIGHLY CONFIDENTIAL

Levitin, Adam J. "Problems in Mortgage Servicing from Modification to Foreclosure, written testimony
    before the Senate Committee on Banking, Housing, and Urban Affairs," November 16, 2010.
"Mortgage Foreclosures: Documentation Problems Reveal Need for Ongoing Regulatory Oversight,"
    United States Government Accountability Office Report to Congressional Requesters (May 2011).
"Mortgage Note," Business Dictionary, http://www.businessdictionary.com/definition/mortgage-note.html.
"National Mortgage Settlement Servicing Standards and Noncompliance,"
    http://www.hsgcenter.org/wp-content/uploads/2013/06/NMS_Findings.pdf.
Office of the Comptroller of Currency, Interagency Review of Foreclosure Policies and Practices,
    Federal Reserve Board, April 2011.
Petition, *In the matter of the application of U.S. Bank, National Association et al.* , Index No. 652382/2014,
    New York Supreme Court, August 3, 2014
"Regulation AB and Related Rules," U.S. Securities and Exchange Commission,
    https://www.sec.gov/divisions/corpfin/guidance/regulation-ab-interps.htm.
Reifsnyder, Jeremy. "Potential Claims for Prior Servicing Performance to be Released And Potential Benefit
    from Implementation of the Subservicing Protocol," Boston Portfolio Advisors, Inc., July 12, 2014.
SEC Manual, Telephone Interpretative Guidance, Regulation AB and Related Rules, 2005 WL 4156732.
"Security Instrument," Business Dictionary,
    http://www.businessdictionary.com/definition/security-instrument.html.
"The Interagency of Foreclosure Policies and Practices,"
    https://www.federalreserve.gov/boarddocs/rptcongress/interagency_review_foreclosures_20110413.pdf.
United States Government Accountability Office. "Mortgage Foreclosures: Documentation Problems Reveal
    Need for Onanging Regulatory Oversight," United States Government Accountability Office Report To
    Congressional Requesters (May 2011).
Weintraub, Elizabeth. "Property Deeds: Warranty, Grant and Quitclaim," The Balance, July 22, 2017.

MBS Data
* Sources otherwise cited in Report & Appendices

---

**Appendix D Sources**

***Legal Pleadings***

*Bank of America, N.A. v. Russell* , No. 2-14-0075, 2015 WL 2453999 (Ill. App. Ct. May 21, 2015)
Bank of New York Mellon for Certificate Holders of CWALT, Inc., Alternative Loan Tr. 2007-HY6 Mortg. Pass-through Certificates
    Series 2007-HY6 v. Brooks, 169 A.3d 667, 672 (Pa. Super. Ct. 2017)
*Bergsrud v. Bank of America, NA,*  2017 WL 4560185 (D. Nev. Oct. 11, 2017)
*Carmichael v. Saxon Mortg. Services, Inc.* , 2013, WL 4786120 (M.D. Ala. Sept. 6, 2013)
*Cave v. Saxon Mortg. Services, Inc.* , 2013 WL 1915660 (E.D. Pa. May 9, 2013)
Complaint, *United States v. Bank of America* , No. 12-cv-00361 (D.D.C. March 12, 2012) ECF 1
Consent Judgement, *CFPB, et al. v. Ocwen Financial Corp. et al.* , D.D.C. December 19, 2013
Consent Judgement, *U.S., et al., v. Bank of America Corp., et al.* , No. 12-cv-00361-RMC (D.D.C. March 12, 2012)
Consent Judgement, *United States v. Bank of America* , No. 12-cv-00361 (D.D.C. April 4, 2012) ECF 10
Consent Judgment and Order, *FTC v. Countrywide Home Loans, Inc. and BAC Home Loans Servicing, LP* ,
    No. CV10-4193 (C.D. Cal. June 15, 2010)
Consent Order, In re Morgan Stanley, 12-015-B-HC (2012)
Consent Order, *In the Matter of Bank of America, N.A* ., United States of America Department of the Treasury,
    Comptroller of the Currency, AA-EC-11-12, at pp. 2-3, April 13, 2011
Consent Order, *In the Matter of JPMorgan Chase Bank, N.A.* , AA-EC-11-15, April 13, 2011
*Corrigan v. Bank of Am., N.A* ., 189 So.3d 187 (Fla. Dist. Ct. App. 2d 2016)
*Credit Suisse Fin. Corp. v. Lisvonsce,*  950 N.Y.S.2d 553, 555 (N.Y. Sup. Ct. 2012)
*Cruz v. JPMorgan Chase Bank, N.A.* , 199 So. 3d 992, 997 (Fla. Dist. Ct. App. 2016)
*Deutsche Bank Nat. Tr. Co. v. Ayers, No. CV085009166S, 2011 WL 2611806 (Conn. Super. Ct. 2011)*
*Deutsche Bank Nat. Tr. Co. v. Burke, 2014 WL 4649879 (S.D. Tex. Sept. 16, 2014)*
*Deutsche Bank Natl. Tr. Co. v. Dvorak, 2014 WL 5361375,*  at *3-4 (Ohio Ct. App. 2014)
*Deutsche Bank Nat. Tr. Co. v. Hopkins* , 2014 WL 6811154, at *5-6 (C.D. Ill. Dec. 3, 2014)
*Deutsche Bank Nat. Tr. Co. v. Tanibajeva* , 132 A.D.3d 430 (1st Dep't 2015)
*Deutsche Bank Nat. Tr. Co., Trustee Under Saxon Asset Securities Trust 2007-4 v. Delmastro,*
    2010 WL 427216 (Conn. Super. Ct. 2010)

*Deutsche Bank Trust Co. Americas v. Eisenberg* , No. 17879-2008, 890 N.Y.S.2d 368, 2009 WL 1789407
    (N.Y. Sup. Ct. June 23, 2009)
Final Order and Judgement Granting Approval to Class Action Settlement, *Philip Pulley, et al. v.*
    *JPMorgan Chase Bank, et al, N.A.* , No. 12–cv–60936 (S.D. Fla. Nov. 26, 2013)
*Fiorito v. JPMorgan Chase Bank, N.A.* , 174 So. 3d 519, 521-22 (Fla. Dist. Ct. App. 2015)
*FV-I, Inc. v. Kallevig* , 306 Kan. 204, 222, 227 (Kan. 2017)
*Graupner v. Select Portfolio Servicing,* 2009 WL 428578, at *6 (Cal. Ct. App. Feb. 23, 2009)
*Green v. Green Tree Servicing, LLC* , 230 So.3d 989 (Fla. Dist. Ct. App. 5th 2017)
*GSAA Home Equity Trust 2006-2 v. Wells Fargo Bank, N.A.* , 200 F.Supp.3d 912, 918 (D.S.D. 2016)
*Homeward Residential, Inc. v. Gregor* , 2015 ME ¶ 21, 122 A.3d 947, 954
*Hoyt v. Saxon Mortgage Services, Inc.* , 2016 WL 3855176 (N.D. Tex. 2016)
*HSBC Bank USA, N.A. v. Antrobus* , 2008 WL 2928553 (Sup. Ct. Kings Cty. 2008)
*HSBC Bank USA, N.A. v. Charlevagne* , 2008 WL 2954767 (Sup. Ct. Kings Cty. 2008)
*HSBC Bank USA, N.A. v. Cherry* , 2007 WL 4374284 (Sup. Ct. 2007)
*In re Dimogerodakis* , 2011 WL 1362342 (D.N.J. Apr. 11, 2011)
*Jelic v. LaSalle Bank, N.A.,* 160 So. 3d 127, 130 (Fla. Dist. Ct. App. 2015)
*JPMorgan Chase Bank, N.A. v. Hill* , 133 A.D.3d 1057, 1059 (App. Div. 3rd Dep't 2015)
*Juan Almanzar, et al. v. Select Portfolio Servicing Inc., et al.,* No. 14-CIV-22586-MORENO, ECF 36, S.D. Fla., October 16, 2014
*Juan Almanzar, et al. v. Select Portfolio Servicing Inc., et al.,* No. 14-CIV-22586-MORENO, ECF 92, S.D. Fla., September 15, 2015
*Lacombe v. Deutsche Bank National Trust Company,* 149 So. 3d 152, 154-55 (Fla. Dist. Ct. App. 2014)
*Monday v. Saxon Mortg. Services, Inc.* , 2014 WL 10065312 (E.D. Cal. Nov. 29, 2010)
*Nelson v. Saxon Mortg. Services, Inc.* , 2014 WL 186163 (D. Minn. 2014)
*Nguyen v. Saxon Mortg. Services, Inc.* , 2011 WL 2135480 (D. Or. May 31, 2011)
*Pennington v. Ocwen Loan Servicing, LLC* , 151 So. 3d 52, 54 (Fla. Dist. Ct. App. 2014)
*Peters v. Bank of New York Mellon,* 227 So. 3d 175, 180, (Fla. Dist. Ct. App., 2017)
Petition, *In the matter of the application of U.S. Bank, National Association et al.* , Index No. 652382/2014,
    New York Supreme Court, August 3, 2014
*Salazar v. US Bank NA* , No. CL-2010-7915, 82 Va. Cir. 244 (Va. Cir. Ct. 2011)
*Salvatore Saccoccio, et al. v. JP Morgan Chase Bank, N.A., et al.* , No. 13-21107-CIV, 297 FRD 683, 689 (S.D. Fla. Feb. 28, 2014)
*Saver v. JPMorgan Chase Bank, N.A.* , 114 So. 3d 352, 353 (Fla Dist. Ct. App. 2013)
*Saxon Mortg. Services, Inc. v. Hillery* , No. C-08-4357, 2018 WL 5170180 (N.D. Cal. Dec. 9, 2008)
*Saxon Mortgage Serv. v. Jackman* , No. 41546/2007, 2012 WL 6758044, *5 (N.Y. Sup. Ct. Dec. 20, 2012)
Second Amended Complaint, *Lyons et al. v. Litton Loan Servicing LP, et al.* , Case No. 13-cv-00513,
    (S.D.N.Y., November 19, 2013)
*Sencion v. Saxon Mortg. Services, Inc.* , 2011 WL 311383 (N.D. Cal. Jan. 28, 2011)
*Sherbino v. Select Portfolio Servicing, Inc.,* 128 Nev. 934, 934 (Sup. Ct. Nev. June 14, 2012)
*Silkes v. Select Portfolio Servicing,* 2014 WL 6992144, at *5 (Cal. Ct. App. Dec. 11, 2014)
*Snyder v. JPMorgan Chase Bank, N.A.* , 169 So. 3d 1270, 1274 (Fla. Dist. Ct. App. 2015)
Temporary Order to Cease and Desist, *In the Matter of Ocwen Loan Servicing, LLC,* Commonwealth of Massachusetts
    Division of Banks, Docket No. 2017-001, April 20, 2017
*U.S  Bank N.A. v. Mattos* , 398 P.3d 615, 617 (2017)
*U.S. Bank N.A. v. Sawyer,* 95 A3d 608, 612 (Me. 2014)
*U.S. Bank v. Schubert* , 2014 WL 4402112, at *7 (Ohio Ct. App. Sept., 8, 2014)
*Vangsness v. Deutsche Bank Nat. Trust Co.* , 2013 WL 3031017 (N.D. Ill. June 17, 2013)
*Walton v. Deutsche Bank Nat. Tr. Co.* , 201 So. 3d 831, 834 (Fla. Dist. Ct. App. 2016)
*Zimmerman v. Saxon Mortgage Serv. Inc.* , 381 P.3d 678 (Nov. 2012)

***Public Press & Other Materials***
Bank of America 2008 Annual Report, http://media.corporate-ir.net/media_files/irol/71/71595/reports/2008_AR.pdf.
"Fairbanks Capital Settles FTC and HUD Charges," Federal Trade Commission, November 12, 2003.
"HUD And FTC Announce Record RESPA Settlement With Fairbanks Capital For Alleged Abuses Of Borrowers,"
    Department of Housing and Urban Development, November 12, 2003.
John Hintze, *Servicer Advance Rates Fall* , Asset Securitization Report, November 12, 2012.
JPMorgan Chase & Co., 2011 Annual Report.
JPMorgan Chase & Co., Form 10-K for 2010.
"Independent Foreclosure Review Frequently Asked Questions," Board of Governers of the Fedeal Reserve System,
    https://www.federalreserve.gov/consumerscommunities/independent-foreclosure-review-payment-agreement-faqs.htm.
*Moody's Servicer Dashboard,* Third Quarter 2012.
*Non-Agency Special Topics: Ocwen Announces Purchase of Servicing Rights from OneWest* , Nomura, June 14, 2013.

HIGHLY CONFIDENTIAL

"NYDFS Announces Ocwen Chairman to Resign From Firm and Related Companies; Ocwen to Provide Direct Homeowner Relief and Undertake Significant Operational Reductions," New York Department of Financial Services, Press Release, Dec. 22, 2014.

Office of Inspector General, *Bank of America's Foreclosure and Claims Process Review* , U.S. Department of Housing and Urban Development, March 12, 2012, Memorandum No. 2012-FW-1802.

Office of Public Affairs, *"U.S. Trustee Program Reaches $50 Million Settlement with JPMorgan Chase to Protect Homeowners in Bankruptcy,"* Press Release, Department of Justice, March 3, 2015.

Office of the Comptroller of Currency, *Interagency Review of Foreclosure Policies and Practices* , Federal Reserve Board, April 2011.

Office of the Special Inspector General for the Troubled Asset Relief Program, *Quarterly Report to Congress* , U.S. Treasury Department, January 27, 2017.

Office of the Special Inspector General for the Troubled Asset Relief Program, *Quarterly Report to Congress* , U.S. Treasury Department, July 28, 2011.

Press Release, Fed. Res., Federal Reserve Board announces consent order against Morgan Stanley (Apr. 03,2012).

Reifsnyder, Jeremy. "Potential Claims for Prior Servicing Performance to be Released And Potential Benefit from Implementation of the Subservicing Protocol," Boston Portfolio Advisors, Inc., July 12, 2014.

"State Authorities Order Ocwen to Provide $2 Billion in Relief to Homeowners for Servicing Wrongs," Consumer Finance Protection Bureau, December 19, 2013.

Steve Trader, "$4.1M Force-Placed Insurance Suit Deal Gets Preliminary OK," Law360, April 21, 2016

"Subprime Mortgage Servicer Agree to Modified Settlement," Federal Trade Commission, August 2, 2007

"Superintendent Lawsky Announces Agreement with Goldman Sachs, Ocwen, Litton on Groundbreaking New Mortgage Practices," New York Department of Financial Services, Press Release, September 1, 2011

The PMI Group, Inc. Form 8-Q, June 30, 2004

***Produced Documents & Data***

| | |
|---|---|
| WF_NCUA_000283842 | WF_NCUA_001372254 |
| WF_NCUA_000284232 | WF_NCUA_001372510 |
| WF_NCUA_000312240 | WF_PL_001396478 |

***Governing Agreements & Offering Documents***

ABFC 2005-HE2 Mortgage Loan Purchase Agreement (WF_CB_001698773)
ABFC 2005-HE2 Pooling and Servicing Agreement (WF_CB_000758361)
ABFC 2005-HE2 Pooling and Servicing Agreement Exhibits (WF_CB_000757578)
ABFC 2005-HE2 Prospectus Supplement (WF_CB_000756880)
ABFC 2005-OPT1 Mortgage Loan Purchase Agreement (WF_CB_001699961)
ABFC 2005-OPT1 Pooling and Servicing Agreement (WF_CB_000759744)
ABFC 2005-OPT1 Pooling and Servicing Agreement Exhibits (WF_CB_000759517)
ABFC 2005-OPT1 Prospectus Supplement (WF_CB_001232768)
ABFC 2005-OPT1 Flow Sale and Servicing Agreement (WF_CB_000978819)
ABFC 2006-OPT1 Mortgage Loan Purchase Agreement (WF_CB_000763433)
ABFC 2006-OPT1 Pooling and Servicing Agreement (WF_CB_000954031)
ABFC 2006-OPT1 Pooling and Servicing Agreement Exhibits (WF_CB_001151634)
ABFC 2006-OPT1 Prospectus Supplement (WF_CB_001238416)
ABFC 2006-OPT2 Mortgage Loan Purchase Agreement (WF_CB_001720914)
ABFC 2006-OPT2 Pooling and Servicing Agreement (WF_CB_000764447)
ABFC 2006-OPT2 Prospectus Supplement (WF_CB_000741646)
ABSHE 2005-HE5 Mortgage Loan Purchase and Interim Servicing Agreement (WF_CB_000568019)
ABSHE 2005-HE5 Pooling and Servicing Agreement (WF_CB_000758635)
ABSHE 2005-HE5 Prospectus Supplement (WF_CB_000754222)
BOAMS 2006-B Pooling and Servicing Agreement (WF_CB_000765038)
BOAMS 2006-B Prospectus Supplement (WF_CB_000740786)
CMLTI 2005-OPT4 Mortgage Loan Purchase Agreement (WF_CB_001232095)
CMLTI 2005-OPT4 Pooling and Servicing Agreement (WF_CB_001232607)
CMLTI 2005-OPT4 Pooling and Servicing Agreement Exhibits (WF_CB_001232127)
CMLTI 2005-OPT4 Prospectus Supplement (WF_CB_001231761)
GPMF 2005-AR4 Pooling and Servicing Agreement (WF_CB_001237445)
GPMF 2005-AR4 Pooling and Servicing Agreement Exhibits (WF_CB_001645024)
GPMF 2005-AR4 Prospectus Supplement (WF_CB_001230822)
GPMF 2006-AR1 Custodial Agreement (WF_CB_001265468)
GPMF 2006-AR1 Mortgage Loan Purchase Agreement (WF_CB_001238894)
GPMF 2006-AR1 Pooling and Servicing Agreement (WF_CB_001237885)
GPMF 2006-AR1 Pooling and Servicing Agreement Exhibits (WF_CB_001235992)

HIGHLY CONFIDENTIAL

GPMF 2006-AR1 Prospectus Supplement (WF_CB_001235641)
GPMF 2006-AR2 Mortgage Loan Purchase Agreement (WF_CB_001240491)
GPMF 2006-AR2 Pooling and Servicing Agreement (WF_CB_001145027)
GPMF 2006-AR2 Pooling and Servicing Agreement Exhibits (WF_CB_001237631)
GPMF 2006-AR2 Prospectus Supplement (WF_CB_001236317)
GPMF 2006-AR3 Mortgage Loan Purchase Agreement (WF_CB_001237165)
GPMF 2006-AR3 Pooling and Servicing Agreement (WF_CB_001608997)
GPMF 2006-AR3 Pooling and Servicing Agreement Exhibits (WF_CB_001238691)
GPMF 2006-AR3 Prospectus Supplement (WF_CB_001236818)
HVMLT 2007-3 Pooling and Servicing Agreement (WF_CB_000773482)
HVMLT 2007-3 Prospectus Supplement (WF_CB_000769493)
MSAC 2005-WMC2 Mortgage Loan Purchase Agreement (WF_CB_001266019)
MSAC 2005-WMC2 Mortgage Loan Purchase Agreement Exhibits (WF_CB_001110225)
MSAC 2005-WMC2 Pooling and Servicing Agreement (WF_CB_001693562)
MSAC 2005-WMC2 Prospectus Supplement (WF_CB_000752201)
MSAC 2005-WMC3 Mortgage Loan Purchase Agreement (WF_CB_001266019)
MSAC 2005-WMC3 Pooling and Servicing Agreement (WF_CB_000753366)
MSAC 2005-WMC3 Prospectus Supplement (WF_CB_000753030)
MSAC 2005-WMC5 Mortgage Loan Purchase Agreement (WF_CB_001266019)
MSAC 2005-WMC5 Pooling and Servicing Agreement (WF_CB_000960566)
MSAC 2005-WMC5 Prospectus Supplement (WF_CB_000755448)
MSAC 2006-HE1 Pooling and Servicing Agreement (WF_CB_000762909)
MSAC 2006-HE1 Prospectus Supplement (WF_CB_000760844)
OOMLT 2006-2 Assignment, Assumption, and Recognition Agreement (WF_CB_001720447)
OOMLT 2006-2 Mortgage Loan Purchase Agreement (WF_CB_001515979)
OOMLT 2006-2 Pooling and Servicing Agreement (WF_CB_001640548)
OOMLT 2006-2 Prospectus Supplement (WF_CB_000230806)

HIGHLY CONFIDENTIAL

# Appendix B: Resume of Ingrid Beckles

## INGRID BECKLES

7019 31ST STREET NW | WASHINGTON, DC 20015 | EMAIL: IBECKLES@THEBECKLESCOLLECTIVE.COM | MOBILE: 202.288.2492

### SENIOR EXECUTIVE OPERATIONS PROFESSIONAL

*PRESIDENT / SENIOR VICE PRESIDENT / VICE PRESIDENT*

*OPERATIONS STAND-UP & REMEDIATION   /   OPTIMIZING P/L   /   HIGH VISIBILITY-VOLUME- GROWTH ORGANIZATIONS*

Focused, results-driven Senior Executive offering +25 years' comprehensive achievements across the Mortgage Banking continuum. Recognized for leveraging business acumen across diverse operations, and cultures to deliver superior results for high-level, visible/critical corporate operations. Proven track record in strategic plan design/development, and in delivering effective, metric-driven execution strategies and solutions that support corporate, investor, and regulatory requirements. Successful leadership of multi-million-dollar division budgets with full P/L responsibility. Delivers litigation support via written and oral expert opinion. Delivers multi-million-dollar, cross-corporate, change management initiatives that enhanced business practices, increased operational efficiencies, reduced costs, and increased customer and employee satisfaction. Compelling communicator well versed in effective presentations that create transparent relationships and stakeholder alignment between C-suite, boards of directors, investors, regulators and members of Congress. Divisions consistently rank in Top Tier of corporate employee satisfaction results. B/S in Accounting with a Technology & Mgmt. minor; Graduate Executive Certifications.

### EXECUTIVE LEADERSHIP COMPETENCIES

- Servicing Portfolio & Loss Mitigation Strategy & Mgmt.
- Investor Relations/ PSA Mgmt.
- Real Estate Acquisition, Mgmt. & Disposition Strategies
- Event Driven Workflow & Reporting Platforms
- Risk & Controls Mgmt.

- Strategic Planning & Operating Framework Design
- Regulatory Compliance
- Vendor Utilization & Oversight
- Policy vs. Regulatory Intersection Acuity
- Business Process Redesign/ Enhance Productivity)

### TRACK RECORD OF SUCCESS

- Lead cross-functional teams that collaborate as a focused unit to successfully drive the evolution of concepts into achievable, future-state business strategies and executions that further the mission/vision of organizations.
- Effectively stand-up, remediate and/or optimize operations of functional units, departments and divisions of Fortune 50+ organizations to expediently meet or exceed corporate objectives.
- Identify / build effective models to: inform key stakeholder/BOD decisions; ensure effective execution, portfolio / vendor management, and workforce allocation; and rapidly detect/escalate/remediate process and control defects.
- Dynamically and flexibly manage strategies, personnel, systems, and customers impacted by volume spikes in distressed asset / property inventory, and the resulting implications to the Credit Enhancement portfolio and corporate financials.
- Develop and implement effective feedback and validation systems to confirm/measure/manage the expected executions, outcomes, risk, and to retain transparent line of sight for the employees and the unit/division/corporate goals.

### CAREER BACKGROUND

#### The Beckles Collective LLC, Washington, DC                                                      3/2011- Present

*Mortgage Banking and Housing Policy Advisory practice providing national and international consultancy.*

#### Founder & Principal

Provides advisory and expert services on: Prudent Servicing standards; Strategic Framework design; Business Process design / Remediation; Compliance frameworks; Distressed Asset acquisition/disposition strategies; Understanding the basics of the residential mortgage continuum, cash flows and the viability of various segments of the mortgage value chain. Delivers expertise to the U.S. housing industry, the national/international investor community, and members of the US Congress and staff on the impact and implications of pending legislation vs industry process vis-à-vis their constituency.

#### *Selected Achievements:*

- Provided litigation support via written and deposed oral expert opinion regarding the servicing of residential mortgage loans housed in residential mortgage-backed securities (RMBS).
- Served as Operations Executive to deliver gap assessment and remediation plan development/implementation for non-profit operations.
- Lead development of the Level 0 and Level 1 strategic operating framework for mortgage division re-start. Gained C-suite approval upon first presentation.
- Conceived and delivered an evolved, proactive servicing process architecture for post crisis national servicing policy.
- Developed and delivered the compliance governance framework for Retail & Correspondent ops for CFPB prep.
- Developed content, organized, and launched inaugural conferences for clients entering the conference arena; +90% attendee satisfaction ratings.

HIGHLY CONFIDENTIAL

## INGRID BECKLES

**Velocity Capital Defense,** Austin, TX                                                                      10/2010 – 3/2011
*Capital Preservation and Process Optimization Strategies & Services*

**President**

Designed and launched the company to advise clients around capital preservation strategies to mitigate accumulated impacts of repurchases on credit losses, LLR dollars, credit loss forecasting, reputation and ultimate share price.

*Selected Achievements:*

- Designed organizational infrastructure, operational flows, pro-forma financials, and control and escalation points.
- Developed and implemented Repurchase Demand review and arbitration process.
- Structured the Servicing process optimization assessment process leveraging proprietary tools of parent company.
- Developed clear and concise management and client reporting packages and operational scorecards (KRI / KPI).
- Presented offerings and services, and facilitated contract negotiation to close the first client within weeks of launch.

**Freddie Mac,** McLean, VA                                                                                12/2001-6/2010

**Senior Vice President,** Head of Default Asset Mgmt. Division *(2008)*   **Vice President,** Head of Servicing & Asset Mgmt. Div. *(2006)*
**Vice President,** Head of Default Asset Mgmt. Division        *(2003)*   **Vice President,** Credit Strategy & Operations Dept.  *(2001)*

Leadership of and results accountability for the departments, processes and data and systems supporting the 800K+/$127B delinquent loan portfolio, 110K/$21B REO inventory, and $10 - $15B Credit Enhancement portfolio. Prior to, was appointed to consolidate/lead a new Servicing and Asset Management Division to form a cohesive infrastructure focused on cash mgmt., investor reporting, default capital and processes, credit loss and property management consistent with corporate philosophy/mission; optimize resources (technical and human), embrace a strong operating risk management culture, and foster internal/external transparency and alignment; generated fee income to targets; optimize P/L.

*Selected Achievements:*

- Met or exceeded targets and corporate goals during tenure by building a solid division personnel infrastructure and business partner linkages; deploying effective strategic plans with structured feedback mechanisms; and establishing key performance/risk metrics for each functional area to measure the execution results vs. the agreed upon targets.
- Conceived and deployed effective alternative and balanced non-performing asset disposition/loss mitigations strategies.
- Implemented an annual divisional Policies and Procedures Stand-Down day as a self-audit measure to assess written policies, processes and controls vs. actual execution.
- Developed /deployed a department and division level roll-up, balanced management reporting methodology to quantify activity, performance and risks of the, people, processes, budget, and systems supporting the portfolio.
- Implemented an annual divisional Policies & Procedures Stand-Down day as a self-audit measure to assess written policies, processes and controls vs. actual execution. Resulted in zero failed external/internal audits during tenure.
- Conceived and deployed the 3-way recon between BONY, Freddie Mac and the MHA Administrator to control servicer incentive payouts by prospectively identifying areas of systemic exposure, ensuring proper stakeholder notification.
- Executive leading/delivering the cross-corporate development/deployment of and accountability for MHA HAMP.

**PNC Mortgage Corp of America,** Vernon Hills, IL                                                          1991-2001

**Vice President,** Head of Credit Policy, Quality Assurance, Appraisal Policies Div. *(1999)*   **Second Vice President,** National UW Mgr.  *(1993)*
**Vice President,** Head of Credit Policy & Chief Underwriter        *(1996)*   **Assistant Vice President,** Regional Ops Mgr.*(1991)*

**Chevy Chase Savings Bank/BF Saul Mortgage Co.,** Chevy Chase, MD                                          1981-1991

**Vice President,** Quality Assurance, Policies & Procedures, and Central Processing departments.

## EDUCATION

**Bachelor of Science,** Accounting w / Technology and Mgmt.- Minor                          University of Maryland
**Executive Certificate,** Finance for Executives                          Northwestern University, Kellogg School of Mgmt.
**Executive Certificate,** Developing Leading Edge Operations         Massachusetts Institute of Technology, Sloan School of Mgmt.
**Executive Certificate,** Reinventing Your Business Strategy         Massachusetts Institute of Technology, Sloan School of Mgmt.

## PHILANTHROPIC

**Chair - Audit Committee,** Board of Directors                                                  National Capital YWCA
**Director & Executive Committee,** Board of Directors                                           National Capital YWCA
**Real Estate, Finance, Investment, Alternative Revenue Committees,** Board of Directors          National Capital YWCA
**Director, Audit Committee & Operations Committee,** Board of Directors                          Various Non-Profits

## Appendix C: Initial Servicers for Trusts at Issue

|      | Trust | Servicer |
|------|-------|----------|
| [1]  | ABFC 2005-HE2   | Saxon Mortgage Services |
| [2]  | ABFC 2005-OPT1  | Option One Mortgage Corporation |
| [3]  | ABFC 2006-OPT1  | Option One Mortgage Corporation |
| [4]  | ABFC 2006-OPT2  | Option One Mortgage Corporation |
| [5]  | ABSHE 2005-HE5  | Countrywide Home Loans Servicing |
| [6]  | BOAMS 2006-B    | Bank of America, National Association |
| [7]  | CMLTI 2005-OPT4 | Option One Mortgage Corporation |
| [8]  | GPMF 2005-AR4   | EMC Mortgage Corporation |
| [9]  | GPMF 2006-AR1   | EMC Mortgage Corporation |
| [10] | GPMF 2006-AR2   | EMC Mortgage Corporation |
| [11] | GPMF 2006-AR3   | EMC Mortgage Corporation |
| [12] | HVMLT 2007-3    | GMAC Mortgage |
| [13] | MSAC 2005-WMC2  | Countrywide Home Loans Servicing |
| [14] | MSAC 2005-WMC3  | Countrywide Home Loans Servicing |
| [15] | MSAC 2005-WMC5  | Countrywide Home Loans Servicing |
| [16] | MSAC 2006-HE1   | JPMorgan Chase Bank, National Association |
| [17] | OOMLT 2006-2    | Option One Mortgage Corporation |

Sources:

[1]: ABFC 2005-HE2 PSA, Section 1.01.

[2]: ABFC 2005-OPT1 PSA, Section 1.01.

[3]: ABFC 2006-OPT1 PSA, Section 1.01.

[4]: ABFC 2006-OPT2 PSA, Section 1.01.

[5]: ABSHE 2005-HE5 PSA, Section 1.01.

[6]: BOAMS 2006-B PSA, Section 1.01.

[7]: CMLTI 2005-OPT4 PSA, Section 1.01.

[8]: GPMF 2005-AR4 PSA, Article 1.

[9]: GPMF 2006-AR1 PSA, Article 1.

[10]: GPMF 2006-AR2 PSA, Article 1.

[11]: GPMF 2006-AR3 PSA, Article 1.

[12]: HVMLT 2007-3 PSA, Section 1.01.

[13]: MSAC 2005-WMC2 PSA, Article 1.

[14]: MSAC 2005-WMC3 PSA, Article 1.

[15]: MSAC 2005-WMC5 PSA, Article 1.

[16]: MSAC 2006-HE1 PSA, Article 1.

[17]: OOMLT 2006-2 PSA, Section 1.01.

HIGHLY CONFIDENTIAL

## Appendix D: Wells Fargo Knew that the Trust Servicers Engaged in Improper Foreclosure Practices

1.  This appendix provides a summary of publicly available information regarding widespread and systemic servicing failures by the Trusts' servicers, including the results of regulatory actions and investigations. This summary includes only a few examples of well-documented public reports addressing servicing failures by the Trusts' servicers.

### A.  OCWEN LOAN SERVICING

2.  Ocwen Loan Servicing ("Ocwen") became the servicer for the Trusts serviced by JPMorgan, GMAC Mortgage, LLC, Homeward Residential, Inc., and Saxon through the acquisition of servicing rights from those Servicers, or the actual acquisition of those Servicers themselves.[1]

3.  In July 2011, the Office of the Inspector General (the "OIG") for the Troubled Asset Relief Program reported on its review of Ocwen's servicing practices, including compliance with prudent procedures for identifying and contacting borrowers in default and evaluating borrowers to determine if modification or forbearance is appropriate. The OIG noted that Ocwen's servicing practices "require[d] substantial improvement" and noted that continued monitoring of Ocwen was necessary.[2] These problems persisted throughout the relevant period and, in January 2017, the OIG noted that Ocwen "has one of the worst track records in foreclosure mitigation."[3]

4.  In December 2013, the Consumer Financial Protection Bureau ("CFPB") and regulators in 49 states and the District of Columbia filed a proposed Consent Order with Ocwen under which Ocwen was ordered to pay $2 billion to borrowers.[4] The payment also applied to borrowers whose loans had been originally serviced by other businesses later acquired by Ocwen, including Litton.[5] The CFPB cited to the Servicers' imposition of unauthorized fees, customer deception, and engagement in illegal foreclosures.[6]

5.  The CFPB described imprudent servicing practices at Ocwen, including:

---

[1]  *See* WF_NCUA_000283842; WF_NCUA_000284232; WF_NCUA_000312240; and WF_PL_001396478.

[2]  Office of the Special Inspector General for the Troubled Asset Relief Program, *Quarterly Report to Congress*, U.S. Treasury Department, July 28, 2011, at p. 70.

[3]  Office of the Special Inspector General for the Troubled Asset Relief Program, *Quarterly Report to Congress*, U.S. Treasury Department, January 27, 2017, at p. 75.

[4]  *See* "State Authorities Order Ocwen to Provide $2 Billion in Relief to Homeowners for Servicing Wrongs," Consumer Finance Protection Bureau, December 19, 2013; *see also* Consent Judgement, *CFPB, et al. v. Ocwen Financial Corp. et al.*, D.D.C. December 19, 2013.

[5]  Consent Judgement, *CFPB, et al. v. Ocwen Financial Corp. et al.*, D.D.C., December 19, 2013.

[6]  *Id.*

HIGHLY CONFIDENTIAL

    i.    charging unauthorized fees for default-related services;

    ii.    imposing force-placed insurance when the Servicer knew or should have known that borrowers already had adequate coverage;

    iii.    numerous failures relating to loan modifications, including wrongful denials and outright misrepresentations to borrowers; and

    iv.    preparing, executing, notarizing, and filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process.[7]

6.    In December 2014, the New York Department of Financial Services ("NYDFS") reported it was taking steps to "address serious conflict of interest issues uncovered during" the department's multi-year investigation of Ocwen. The NYDFS found that Ocwen misused affiliates to overcharge borrowers (and ultimately investors) for default-related services. As a result of the findings, Ocwen's chairman was forced to resign.[8]

7.    The NYDFS found that Ocwen was using its own out-of-state real estate brokers – who did not perform on-site work – for the same price as local realtors would perform on-site work.[9] The NYDFS also reported that it engaged in examinations of Ocwen in 2010 and 2011 that showed numerous "deficiencies in Ocwen's servicing platform and loss mitigation infrastructure, including (a) robo-signing, (b) inaccurate affidavits and failure to properly validate document execution processes, (c) missing documentation, (d) wrongful foreclosure, (e) failure to properly maintain books and records, and (f) initiation of foreclosure actions without proper legal standing."[10] Counsel has pointed me to various foreclosure cases which were commenced in the name of RMBS trustees that have repeatedly been dismissed or delayed due to Ocwen's use of false or misleading documents in foreclosure proceedings[11] and its employees' lack of personal knowledge of the

---

[7]    *Id.*

[8]    "NYDFS Announces Ocwen Chairman to Resign From Firm and Related Companies; Ocwen to Provide Direct Homeowner Relief and Undertake Significant Operational Reductions," New York Department of Financial Services, Press Release, Dec. 22, 2014.

[9]    *Id.*

[10]    *Id.*

[11]    *See, e.g., U.S Bank N.A. v. Mattos*, 398 P.3d 615, 617 (2017); *HSBC Bank USA, Nat. Ass'n v. Antrobus*, 2008 WL 2928553, at *5 (Sup. Ct. Kings Cty. 2008); *HSBC Bank USA, N.A. v. Charlevagne*, 2008 WL 2954767, at *4, (Sup. Ct. Kings Cty. 2008); *HSBC Bank USA, N.A. v. Cherry*, 2007 WL 4374284, at *4 (Sup. Ct. 2007); *Pennington v. Ocwen Loan Servicing, LLC*, 151 So. 3d 52, 54 (Fla. Dist. Ct. App. 2014); *Homeward Residential, Inc. v. Gregor*, 2015 ME ¶ 21, 122 A.3d 947, 954; *U.S. Bank v. Schubert*, 2014 WL 4402112, at *7 (Ohio Ct. App. Sept., 8, 2014).

HIGHLY CONFIDENTIAL

foreclosure documents.[12] It is my understanding that there are many more cases similar to these.

8.   On April 20, 2017, a multi-state group of regulators released the results of an examination of Ocwen, finding, "Ocwen's overall condition is deficient due to the failure to identify, measure, monitor, and control risk associated with rapid growth."[13] Along with other problems, the examination found that "Ocwen has engaged in a pattern and practice of unsafe and unsound loan servicing by manipulating the lender-placed force-placed insurance market and artificially inflating the premiums and then passing the improperly inflated amounts onto consumers."[14]

9.   Deficiencies in Ocwen's servicing were also noted in industry research reports published during the relevant period:

i.   A Moody's report dated January 17, 2013 showed that on average Ocwen took 100 days longer to liquidate REO properties than did other subprime servicers.[15] The same Moody's report illustrated that loans modified by Ocwen re-defaulted twice as often as other servicers.[16]

ii.   A Nomura report established that Ocwen's default rate was more than double that of other servicers.[17]

iii.   According to the Asset Securitization Report, Ocwen has a low servicer advance rate, ranging from 13.6% to 26.2% (depending on the portfolio of mortgages), which could cause investors in RMBS serviced by Ocwen to suddenly find their securities facing interest shortfalls. These advance rates are critical to Certificateholders, since curtailing advance rates could lead to a shortage of cash in the trust, thereby hindering the trust's ability to make interest and principal payments.[18]

---

[12]   *Walton v. Deutsche Bank Nat. Tr. Co.*, 201 So. 3d 831, 834 (Fla. Dist. Ct. App. 2016); *Deutsche Bank Nat'l Tr. Co. v. Burke*, 2014 WL 4649879, at *3 (S.D. Tex. Sept. 16, 2014); *Deutsche Bank Nat'l Tr. Co. v. Hopkins*, 2014 WL 6811154, at *5-6 (C.D. Ill. Dec. 3, 2014).

[13]   Temporary Order to Cease and Desist, *In the Matter of Ocwen Loan Servicing, LLC,* Commonwealth of Massachusetts Division of Banks, Docket No. 2017-001, April 20, 2017.

[14]   *Id.* For accounts from individual borrowers with evidentiary support of Ocwen's conduct *see e.*g., Second Amended Complaint, *Lyons et al. v. Litton Loan Servicing LP, et al.*, Case No. 13-cv-00513, (S.D.N.Y., November 19, 2013). This action was ultimately settled in exchange for monetary and equitable relief. Steve Trader, "$4.1M Force-Placed Insurance Suit Deal Gets Preliminary OK," Law360, April 21, 2016.

[15]   *Moody's Servicer Dashboard,* Third Quarter 2012.

[16]   *Id.*

[17]   *Non-Agency Special Topics: Ocwen Announces Purchase of Servicing Rights from OneWest*, Nomura, June 14, 2013.

[18]   John Hintze, *Servicer Advance Rates Fall*, Asset Securitization Report, November 12, 2012.

HIGHLY CONFIDENTIAL

## B. COUNTRYWIDE HOME LOANS SERVICING LP AND BAC HOME LOAN SERVICING

10. Countrywide Home Loans Servicing LP ("Countrywide"), which was merged into Bank of America, N.A. ("BANA") in 2008,[19] and BANA serviced five of the at-issue Trusts.[20]

11. In June 2010, a lawsuit filed by the Federal Trade Commission ("FTC") against Countrywide Home Loans, Inc. and Bank of America Corporation ("BAC") for charging borrowers excessive fees was settled for $108 million.[21] The settlement provided that the two Countrywide affiliated mortgage Servicers would convey the $108 million judgment to the overcharged borrowers whose loans were serviced by Countrywide and BAC.[22] Per the terms of the settlement, Countrywide Home Loans, Inc. and BAC were prohibited from:

    i. Misrepresenting, expressly or by implication, the status of the Loan or amounts owed on the Loan, including but not limited to the amount of any Monthly Payment, Fee claimed or assessed, Escrow Shortage, or Escrow Deficiency;

    ii. Misrepresenting, expressly or by implication, that any payment or Fee is allowed under the Loan Instruments or permitted by law;

    iii. Misrepresenting, expressly or by implication, the amount, nature, or terms of any Fee or other condition or requirement of any Loan; and

    iv. Making any representation, expressly or by implication, about the status of the Loan, amounts owed on the Loan (including but not limited to the amount of any Monthly Payment, Fee claimed or assessed, Escrow Shortage, or Escrow Deficiency), the date that any payment or Fee is due, or any other information regarding the terms or conditions of a Loan, unless, at the time of making such representation, such Persons possess and rely on Competent and Reliable Evidence that substantiates that the representation is true.[23]

12. The Board of Governors of the Federal Reserve System ("Federal Reserve"), Office of the Comptroller of the Currency ("OCC"), Federal Deposit Insurance Corporation ("FDIC") and the Office of Thrift Supervision ("OTS") issued a report finding that BANA, including its affiliates such as Countrywide, had "critical weaknesses in servicers' foreclosure

---

[19] In January 2008, Bank of America Corp. acquired Countrywide Financial Corporation and it became known as "BAC Home Loans Servicing, LP". *See* Bank of America 2008 Annual Report, http://media.corporate-ir.net/media_files/irol/71/71595/reports/2008_AR.pdf.

[20] *See* the Governing Documents for ABSHE 2005-HE5, BOAMS 2006-B, MSAC 2005-WMC2, MSAC 2005-WMC3, and MSAC 2005-WMC5.

[21] Consent Judgment and Order, *FTC v. Countrywide Home Loans, Inc. and BAC Home Loans Servicing, LP*, No. CV10-4193 (C.D. Cal. June 15, 2010).

[22] *Id.* at pp. 15-16.

[23] *Id.* at pp. 6-7.

HIGHLY CONFIDENTIAL

governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys."[24] Further, the regulators found that employees of the Servicers "who signed foreclosure affidavits often did not personally check the documents for accuracy" and at times indicated foreclosure documents were signed under oath, when no oath was actually administered.[25] I have reviewed various examples, provided to me by counsel, of foreclosure cases that have repeatedly been dismissed or delayed due to Countrywide, BAC, or its affiliates' faulty servicing practices.[26] It is my understanding that there are many more cases similar to these.

13. On April 13, 2011, the OCC issued a Consent Order finding that BANA, including in its role as successor to Countrywide, engaged in improper foreclosure practices because it had:

> "(a) filed or caused to be filed in state and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records;

> (b) filed or caused to be filed in state and federal courts, or in local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary;

> (c) litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time;

> (d) failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes;

> (e) failed to devote its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and

---

[24] Office of the Comptroller of Currency, *Interagency Review of Foreclosure Policies and Practices*, Federal Reserve Board, April 2011, at p. 2.

[25] *Id.* at p. 3.

[26] *See, e.g., Green v. Green Tree Servicing, LLC*, 230 So.3d 989 (Fla. Dist. Ct. App. 5th 2017); *Corrigan v. Bank of Am., N.A.*, 189 So.3d 187 (Fla. Dist. Ct. App. 2d 2016); *Deutsche Bank Nat'l Trust Co. v. Tanibajeva*, 132 A.D.3d 430 (1st Dep't 2015); *Bank of Am., N.A. v. Russell*, No. 2-14-0075, 2015 WL 2453999 (Ill. App. Ct. May 21, 2015).

HIGHLY CONFIDENTIAL

(f) failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services."[27]

14.    In 2012, BAC, including as successor to Countrywide and Merrill Lynch, was one of five large mortgage Servicers that agreed to an approximately $2.4 billion settlement with 49 State Attorneys General as a result of their servicing misconduct.[28] The agreement requires the Servicers to implement comprehensive, new mortgage loan servicing standards to remedy violations of state and federal law.[29] The consent judgment further requires part of the billion dollar payment to be used to provide cash payments to borrowers whose homes were sold or taken in foreclosure between January 1, 2008 and December 31, 2011.[30]

15.    In March 2012, the Department of Housing and Urban Development, and the OIG reported on BANA's engagement in the mass fabrication of mortgage loan documentation and generation of testimonial affidavits to remove borrowers from their homes in response to the mortgage crisis.[31] During the applicable review period, around 90 percent of BANA's processed claims were for loans that were previously serviced by Countrywide.[32] This OIG report stated that BANA employees "confirmed that affiants routinely signed legal documents, including affidavits, without the supporting documentation" and "without reviewing and verifying the accuracy of the foreclosure information."[33] The employees did acknowledge that the number of foreclosures "increased exponentially" to the point where employees were "signing 12-to 18-inch stacks of documents at a time without review."[34] The OIG report describes how affiants "routinely" signed mortgage documents absent the presence of a notary.[35] In addition, BANA relied upon certain law firms that would engage in "questionable foreclosure activities," including for example the law firm Adorno & Yoss.[36]

## C.    JPMorgan Chase Bank, N.A.

16.    JPMorgan Chase Bank, N.A. is a financial services firm operated by JPMorgan Chase & Co. that was involved in every aspect of the mortgage loan services industry, including

---

[27]    Consent Order, *In the Matter of Bank of America, N.A.*, United States of America Department of the Treasury, Comptroller of the Currency, AA-EC-11-12, at pp. 2-3, April 13, 2011.

[28]    Consent Judgement, *U.S., et al., v. Bank of America Corp., et al.*, No. 12-cv-00361-RMC (D.D.C. March 12, 2012).

[29]    *Id.* at p. 4.

[30]    *Id.*

[31]    Office of Inspector General, *Bank of America's Foreclosure and Claims Process Review*, U.S. Department of Housing and Urban Development, March 12, 2012, Memorandum No. 2012-FW-1802.

[32]    *Id.* at p. 2.

[33]    *Id.* at pp. 5-6.

[34]    *Id.*

[35]    *Id.* at p. 8.

[36]    *Id.* at p. 11.

HIGHLY CONFIDENTIAL

servicing mortgage loans directly and through subsidiaries such as Chase Home Finance, LLC (collectively, "JPMorgan"). JPMorgan was the Servicer for one of the at-issue Trusts.[37]

17.    JPMorgan also obtained servicing rights through its acquisition of Washington Mutual Bank's and Bear Stearns Companies, Inc.'s servicing platforms, including ECC Capital Corp. and EMC Mortgage Corporation. By 2010, JPMorgan's servicing revenue was valued at $2.2 billion.[38] As a result, JPMorgan serviced over 6.3 million residential mortgage loans.[39] JPMorgan became the servicer for four of the at-issue Trusts serviced by EMC Mortgage Corporation through its acquisition of that Servicer.

18.    In its 2011 Annual Report, JPMorgan CEO Jamie Dimon admitted that "[o]ur servicing operations left a lot to be desired: There were too many paperwork errors, including affidavits that were improperly signed because the signers did not have personal knowledge about what was in the affidavits but, instead, relied on the company's processes."[40]

19.    On April 13, 2011 the OCC entered into a Consent Order with JPMorgan.[41] In particular, the OCC found that JPMorgan:

    i.    Filed affidavits in various judicial actions based on personal knowledge of the affiant, when such affidavits were in fact, not based on any personal knowledge;

    ii.    Filed other mortgage documents without the required notarization, signature, or affirmation;

    iii.    Litigated foreclosure proceedings without ensuring that the promissory notes or mortgage documents were endorsed, assigned, or in the possession of the correct party; and

    iv.    Failed to properly staff, oversee, and manage employees, outside counsel, and other third parties engaged in servicing-related actions.[42]

---

[37]    *See* the Governing Documents for MSAC 2006-HE1.

[38]    JPMorgan Chase & Co., Form 10-K for 2010, at p. 75, accessed April 9, 2018, *available* at https://www.sec.gov/Archives/edgar/data/19617/000095012311019773/y86143e10vk.htm.

[39]    Consent Order, *In the Matter of JPMorgan Chase Bank, N.A.*, AA-EC-11-15, April 13, 2011, at p. 1, accessed April 9, 2018, available at http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf.

[40]    JPMorgan Chase & Co., *2011 Annual Report*, 2011, at p. 27, accessed April 9, 2018, *available* at http://files.shareholder.com/downloads/ONE/1766191294x0x556139/75b4bd59-02e7-4495-a84c-06e0b19d6990/JPM_2011_annual_report_complete.pdf .

[41]    Consent Order, *In the Matter of JPMorgan Chase Bank, N.A.*, AA-EC-11-15, April 13, 2011, *available* at http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf.

[42]    *Id.* at 1-2.

HIGHLY CONFIDENTIAL

20. Similarly, in May 2011 the Federal Reserve, the FDIC, the OCC and the OTS issued a report concerning foreclosure-processing reviews of 14 servicers, including JPMorgan.[43] The report found, among other things, that servicers such as JPMorgan:

    i. Inadequately monitored and controlled foreclosure litigation by failing to staff and organize groups to address foreclosures;

    ii. Lacked sufficient audit trails to show how information indicated in servicer affidavits (including the amount of fees and penalties charged) was linked to the Servicers' internal records; and

    iii. Failed to ensure accurate foreclosure documentation, including documenting the fees.

21. JPMorgan was also investigated by 49 State Attorneys General and the Departments of Justice, Treasury, and Housing and Urban Development as part of an investigation into false and deceptive affidavits in foreclosure practices, excessive fees and other improper charges imposed on borrowers, and unfair loan modification and loss mitigation practices.[44] JPMorgan entered into a Consent Order on April 4, 2012 to resolve the action. As part of the Consent Order, JPMorgan agreed to pay over $2.5 billion to settle all claims and submitted to quarterly reporting evaluating JPMorgan's servicing practices.[45]

22. As a result of a settlement in November 2013, JPMorgan was also required to pay $4.5 billion and to improve its servicing procedures.[46] Institutional investors supported the settlement in part because it required JPMorgan to implement improved servicing practices, including a subservicing protocol to govern servicing standards of newly-appointed subservicers, monthly reports with loan performance statistics, and the appointment of a performance review firm to ensure the subservicers' compliance with the subservicing protocol.[47] In assessing the settlement, the Trustees relied on an analysis performed by Jeremy Reifsnyder that tended to show that JPMorgan's loss mitigation practices lagged

---

[43] Office of the Comptroller of Currency, *Interagency Review of Foreclosure Policies and Practices*, Federal Reserve Board, April 2011, at p. 2, *available* at https://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf. "Interagency Review of Foreclosure Policies and Practices," Federal Reserve Board, May 23, 2011, accessed April 12, 2018 available at http://www.federalreserve.gov/boarddocs/rptcongress/interagency/interagency.htm.

[44] Complaint, *United States v. Bank of America et al.*, No. 12-cv-00361 (D.D.C. March 12, 2012) ECF 1.

[45] Consent Judgement, *United States v. Bank of America et al.*, No. 12-cv-00361 (D.D.C. April 4, 2012) ECF 10.

[46] Petition, *In the matter of the application of U.S. Bank, National Association et al.*, Index No. 652382/2014, New York Supreme Court, August 3, 2014, at p. 6, *available* at http://www.rmbstrusteesettlement.com/docs/2014-08-03%20Petition%20(In%20the%20Matter%20of%20the%20Application%20of%20U.S.%20Bank%20et%20al.pdf.

[47] *Id*. at Exhibit B.

HIGHLY CONFIDENTIAL

other Servicers in key respects and that JPMorgan serviced loans suffered higher loss severities as a result.[48]

23.   JPMorgan entered into a settlement agreement with the Department of Justice's U.S. Trustee Program in March 2015. In the settlement, JPMorgan acknowledged that it filed more than 50,000 improper payment change notices and failed to provide accurate escrow statements to borrowers involved in foreclosure actions. JPMorgan was required to pay more than $50 million to over 25,000 homeowners because of fraudulent foreclosures.[49] In addition to the settlement amount, JPMorgan also agreed to change its policies, procedures, and oversight systems, and submit to an independent reviewer who will assess JPMorgan's compliance with the settlement agreement.

24.   JPMorgan's servicing conduct has also been the subject of private litigations. On February 28, 2014, the United States District Court for the Southern District of Florida approved a $300 million settlement of claims by a class of mortgage borrowers against JPMorgan for inflating force-placed insurance premiums.[50] The settlement class included nearly one million borrowers who paid increased hazard insurance premiums as part of a scheme orchestrated by JPMorgan. JPMorgan purchased master insurance policies from Assurant Inc., granting Assurant Inc. exclusive rights to force new coverage on borrowers. Assurant Inc. would then provide kickbacks to JPMorgan. In addition to the $300 million payment, JPMorgan was also enjoined from inflating insurance premiums for six years, entering into reinsurance agreements with insurers, and accepting below-cost services from insurers or vendors. The Southern District of Florida approved a similar class action settlement on November 26, 2013 for $4.75 million regarding JPMorgan's imposition of forced-placed wind insurance.[51] Finally, as evidenced by the investigations and federal actions referenced above, counsel has pointed me to various foreclosure proceedings where JPMorgan has acted as servicer that have repeatedly been dismissed or delayed due to JPMorgan's use of false or misleading documents.[52] It is my understanding that there are many more cases like these.

---

[48]   RMBS Trust Settlement Agreement, Expert Report of Jeremy E. Reifsnyder, (July 12, 2014), available at http://www.rmbstrusteesettlement.com/Expert_Report_of_Jeremy_E_Reifsnyder.pdf.

[49]   Office of Public Affairs, *"U.S. Trustee Program Reaches $50 Million Settlement with JPMorgan Chase to Protect Homeowners in Bankruptcy,"* Press Release, Department of Justice, March 3, 2015, *available* at https://www.justice.gov/opa/pr/us-trustee-program-reaches-50-million-settlement-jpmorgan-chase-protect-homeowners-bankruptcy.

[50]   *Salvatore Saccoccio, et al. v. JP Morgan Chase Bank, N.A., et al.*, No. 13-21107-CIV, 297 FRD 683, 689 (S.D. Fla. Feb. 28, 2014).

[51]   Final Order and Judgement Granting Approval to Class Action Settlement, *Philip Pulley, et al. v. JPMorgan Chase Bank, et al, N.A.*, No. 12–cv–60936 (S.D. Fla. Nov. 26, 2013).

[52]   *See, e.g., Saver v. JPMorgan Chase Bank, N.A.*, 114 So. 3d 352, 353 (Fla Dist. Ct. App. 2013); *Fiorito v. JPMorgan Chase Bank, N.A.*, 174 So. 3d 519, 521-22 (Fla. Dist. Ct. App. 2015); *JPMorgan Chase Bank, N.A. v. Hill*, 133 A.D.3d 1057, 1059 (App. Div. 3rd Dep't 2015); *Snyder v. JPMorgan Chase Bank, N.A.*, 169 So. 3d 1270, 1274 (Fla. Dist. Ct. App. 2015); *Cruz v. JPMorgan Chase Bank, N.A.*, 199 So. 3d 992, 997 (Fla. Dist. Ct. App. 2016).

HIGHLY CONFIDENTIAL

## D.   Saxon Mortgage Services

25.   Saxon Mortgage Services ("Saxon") was the Servicer for one of the at-issue Trusts.[53]

26.   In November 2011, the NYFDS entered into an agreement with Saxon to redress "troublesome and unlawful practices that have plagued the mortgage servicing industry as a whole."[54] Some of the changes Saxon was required to make under the agreement included:

i.   Ending Robo-signing and imposing staffing and training requirements to prevent robo-signing;

ii.   Imposing more rigorous pleading requirements in foreclosure actions to ensure that only parties and entities possessing the legal right to foreclose can sue Borrowers; and

iii.   Requiring Servicers to withdraw any pending foreclosure actions in which filed affidavits were robo-signed or otherwise not accurate.[55]

27.   In April 2012, the Federal Reserve announced a Consent Order against Morgan Stanley, for actions taken by its subsidiary, Saxon, to "address a pattern of misconduct and negligence in mortgage loan servicing and processing."[56] The Consent Order required Morgan Stanley to retain an independent consultant to review foreclosure proceedings initiated by Saxon that were pending at any time in 2009 or 2010.[57] The Consent Order noted the following misconduct by Saxon:

i.   Saxon "[l]itigated foreclosure and bankruptcy proceedings and initiated non-judicial foreclosures without always confirming that documentation of ownership was in order at the appropriate time, including confirming that the promissory note and mortgage documents were … in the possession of the appropriate party."

ii.   Saxon "[f]iled or caused to be filed in courts in various states and in connection with bankruptcy proceedings in federal courts or in the local land record offices, numerous affidavits and other mortgage-related documents that were not properly notarized…"

---

[53]   *See* Governing Documents for ABFC 2005-HE2.

[54]   Press Release, Dep't of Fin., "Superintendent Lawsky Announces Agreements with Morgan Stanley, Saxon, AHMSI & Vericrest on Groundbreaking New Mortgage Practices," (Nov. 10, 2011), *available* at http://www.dfs.ny.gov/about/press/pr1111101.htm.

[55]   *Id.*

[56]   *See* Consent Order, *In re Morgan Stanley*, 12-015-B-HC (2012), https://www.federalreserve.gov/newsevents/pressreleases/files/enf20120403a1.pdf; *see also* Press Release, Fed. Res., Federal Reserve Board announces consent order against Morgan Stanley (Apr. 03, 2012), https://www.federalreserve.gov/newsevents/pressreleases/enforcement20120403b.htm.

[57]   Press Release, Fed. Res., Federal Reserve Board announces consent order against Morgan Stanley (Apr. 03, 2012), https://www.federalreserve.gov/newsevents/pressreleases/enforcement20120403b.htm.

HIGHLY CONFIDENTIAL

    iii.    Saxon "[f]ailed to have adequate internal controls, policies and procedures, compliance risk management, internal audit, training, and oversight of the foreclosure process…"[58]

28.    Furthermore, in numerous instances, courts held that Saxon lacked standing to institute foreclosure proceedings. In 2009, Saxon "failed to submit proper proof…that [it was] the holder of the note and mortgage" and therefore it was denied the ability to foreclose.[59] Further, in 2012, the Kings County Supreme Court dismissed a foreclosure action brought by Saxon for lack of standing, noting Saxon was not the owner of the Note and mortgage needed to foreclose on the defendant's property.[60] Saxon even acknowledged during a conference before the judge that it did not own the Note that was sold to Morgan Stanley in 2007.[61] Other courts found:

    i.    Saxon could not prove ownership to mortgage loans;[62]

    ii.    Saxon failed to properly file pleadings to quiet title;[63]

    iii.    Saxon failed to show it was the holder of the mortgage and Note at the time of filing the foreclosure action.[64]

29.    Additional cases caused delayed or halted foreclosures because Saxon failed to show that the court had jurisdiction over the claims.[65] It is my understanding that there are many other cases like these.

---

[58]    *See* Consent Order *In re Morgan Stanley*, 12-015-B-HC (2012), https://www.federalreserve.gov/newsevents/pressreleases/files/enf20120403a1.pdf.

[59]    *See Deutsche Bank Trust Co. Americas v. Eisenberg*, No. 17879-2008, 890 N.Y.S.2d 368, 2009 WL 1789407, *5 (N.Y. Sup. Ct. June 23, 2009).

[60]    *See Saxon Mortgage Serv. v. Jackman*, No. 41546/2007, 2012 WL 6758044, *5 (N.Y. Sup. Ct. Dec. 20, 2012).

[61]    *Id.*; In *Saxon Mortg. Services, Inc. v. Hillery*, No. C-08-4357, 2018 WL 5170180 (N.D. Cal. Dec. 9, 2008), the court dismissed the action for lack of standing, however, this was due to co-Plaintiff's inability to demonstrate standing, not Saxon's ("Accordingly, the Court concludes that there is insufficient evidence that [co-Plaintiff] has standing to proceed with this litigation. Dismissal is therefore warranted).

[62]    *Deutsche Bank National Trust Co., v. Ayers*, No. CV085009166S, 2011 WL 2611806 (Conn. Super. Ct. 2011) (holding there is an issue of fact as to whether Saxon's dishonest conduct prevented Defendant from properly curing default).

[63]    *See Salazar v. US Bank NA*, No. CL-2010-7915, 82 Va. Cir. 244 (Va. Cir. Ct. 2011).

[64]    *FV-I, Inc. v. Kallevig*, 306 Kan. 204, 222, 227 (Kan. 2017) (holding Plaintiff's possession of the mortgage alone was insufficient to prove standing and that "Saxon Mortgage serviced the loan…when this case was filed").

[65]    *See, e.g.*, *Zimmerman v. Saxon Mortgage Serv. Inc.*, 381 P.3d 678 (Nev. 2012); *Deutsche Bank Nat'l Tr. Co., Trustee Under Saxon Asset Securities Trust 2007-4 v. Delmastro*, 2010 WL 427216 (Conn. Super. Ct. 2010); *GSAA Home Equity Trust 2006-2 v. Wells Fargo Bank, N.A.*, 200 F.Supp.3d 912, 918 (D.S.D. 2016); *Hoyt v. Saxon Mortgage Services, Inc.*, 2016 WL 3855176 (N.D. Tex. 2016); *Nelson v. Saxon Mortg, Inc.*, 2014 WL 186163 (D. Minn. 2014); *In re Dimogerodakis*, 2011 WL 1362342 (D.N.J. Apr. 11,

Continued on next page

HIGHLY CONFIDENTIAL

### E.   SELECT PORTFOLIO SERVICING

30.   Select Portfolio Servicing, Inc. ("SPS") acquired the servicing rights for four of the at-issue Trusts.[66]

31.   In 2003, the FTC and the U.S. Department of Housing and Urban Development ("HUD") sued SPS[67] for engaging in unfair or deceptive acts or practices in violation of federal law.[68] SPS paid $40 million and committed to changes in its servicing operations including prohibitions relating to forced placed insurance policies and imposition of servicing fees.[69] Despite these restrictions on SPS, numerous borrowers filed complaints against SPS for that same prohibited action with credible evidence demonstrating SPS forced-placed insurance and ultimately received kickbacks.[70] SPS again entered into a settlement and again agreed to stop charging borrowers inflated premiums for insurance.[71] In 2007, the FTC conducted a review of SPS' compliance with the 2003 settlement and determined that SPS failed to implement many of the changes that it had committed to make.[72] Accordingly, SPS, the FTC, and HUD agreed to modifications of the settlement, including refunds to consumers and prohibitions on SPS' marketing and sale of "optional products" *i.e.*, "products or services that are not required by the consumer's loan."[73]

---

Continued from previous page

2011); *Carmichael v. Saxon Mortg. Services, Inc.*, 2013 WL 4786120 (M.D. Ala. Sept. 6, 2013); *Monday v. Saxon Mortg. Services, Inc.*, 2014 WL 10065312 (E.D. Cal. Nov. 29, 2010); *Sencion v. Saxon Mortg. Services, Inc.*, 2011 WL 311383 (N.D. Cal. Jan. 28, 2011); *Vangsness v. Deutsche Bank Nat. Trust Co.*, 2013 WL 3031017(N.D. Ill. June 17, 2013); *Cave v. Saxon Mortg. Services, Inc.*, 2013 WL 1915660 (E.D. Pa. May 9, 2013); *Nguyen v. Saxon Mortg. Services, Inc.*, 2011 WL 2135480 (D. Or. May 31, 2011); *Bergsrud v. Bank of America, NA,* 2017 WL 4560185 (D. Nev. Oct. 11, 2017).

[66]   *See* WF_NCUA_001372510 and WF_NCUA_001372254.

[67]   SPS was known at the time as Fairbanks Capital Corp. and Fairbanks Capital Holding Corp. On June 30, 2004 Fairbanks Capital Holding Corp. and Fairbanks Capital Corp. changed their name to Select Portfolio Servicing, Inc. and Select Servicing, respectfully. *See* The PMI Group, Inc. Form 8-Q, June 30, 2004.

[68]   *See* "HUD And FTC Announce Record RESPA Settlement With Fairbanks Capital For Alleged Abuses Of Borrowers," Department of Housing and Urban Development, November 12, 2003.

[69]   *See "*Fairbanks Capital Settles FTC and HUD Charges," Federal Trade Commission*,* November 12, 2003.

[70]   For example, Juan Almanzar was notified by SPS of its intent to place insurance for an annual premium of $5,133.79 despite that Mr. Almanzar had voluntarily purchased insurance. Similarly, Jocelyn Evans was also notified that SPS would purchase or renew force-placed coverage if voluntary insurance was not secured by a certain date. In both instances SPS represented that it would "obtain" the required coverage and charge the borrower "the premium amount" or "the cost of the insurance." In making these statements, SPS knowingly and intentionally falsely stated that the amounts for force-placed insurance that they were charged represented the actual "cost" of the policies, when in fact such amounts also included kickbacks and other costs paid as bribes to SPS. *Juan Almanzar, et al. v. Select Portfolio Servicing Inc., et al.,* No. 14-CIV-22586-MORENO, ECF 36, S.D. Fla., October 16, 2014, at pp. 22, 24.

[71]   *Id.* at ECF 92, S.D. Fla., Sept. 15, 2015, at p. 5.

[72]   *See* "Subprime Mortgage Servicer Agree to Modified Settlement," Federal Trade Commission*,* August 2, 2007.

[73]   *Id.*

HIGHLY CONFIDENTIAL

32. Counsel has pointed me to many foreclosure proceedings that have also been dismissed because SPS did not have adequate documentation such as the note or properly assigned mortgage.[74] I understand that there are many more cases similar to these. In one case, BNYM was denied the ability to foreclose on a property because a "case manager" employed by SPS conceded that the note was lost and never in SPS' possession.[75] In another case, the trustee was denied the ability to foreclose on a property because SPS employees lacked the necessary personal knowledge of the underlying facts entitling the trustee to foreclose.[76] Moreover, counsel has provided me examples of cases in which the trustees were denied the ability to foreclosure because SPS failed to modify the loans in good faith,[77] and because SPS initiated wrongful foreclosure actions for a variety of reasons including when the borrowers asserted their rights to redemption.[78] Furthermore, in some cases the foreclosure process was delayed for years due to appeals illustrating SPS' inability to timely show it had proper standing to foreclose on a property.[79] I am aware that there are many other cases like these that I have not reviewed.

---

[74] *See, e.g., Jelic v. LaSalle Bank, N.A.*, 160 So. 3d 127, 130 (Fla. Dist. Ct. App. 2015); *Lacombe v. Deutsche Bank National Trust Company*, 149 So. 3d 152, 154-55 (Fla. Dist. Ct. App. 2014); *Credit Suisse Fin. Corp. v. Lisvonsce*, 950 N.Y.S.2d 553, 555 (N.Y. Sup. Ct. 2012); *Deutsche Bank Natl. Tr. Co. v. Dvorak*, 2014 WL 5361375, at *3-4 (Ohio Ct. App. 2014).

[75] *Peters v. Bank of New York Mellon*, 227 So. 3d 175, 180, (Fla. Dist. Ct. App., 2017).

[76] *Deutsche Bank Natl. Tr. Co. v. Dvorak*, 2014 WL 5361375, at *3-4 (Ohio Ct. App., 2014).

[77] *See, e.g., Sherbino v. Select Portfolio Servicing, Inc.*, 128 Nev. 934, 934 (Sup. Ct. Nev. June 14, 2012); *Silkes v. Select Portfolio Servicing*, 2014 WL 6992144, at *5 (Cal. Ct. App. Dec. 11, 2014); *U.S. Bank N.A. v. Sawyer*, 95 A3d 608, 612 (Me. 2014).

[78] *See, e.g., Graupner v. Select Portfolio Servicing*, 2009 WL 428578, at *6 (Cal. Ct. App. Feb. 23, 2009); *see also Silkes v. Select Portfolio Servicing*, 2014 WL 6992144, at *10 (Cal. Ct. App. Dec. 11, 2014); *Bank of New York Mellon for Certificate Holders of CWALT, Inc., Alternative Loan Tr. 2007-HY6 Mortg. Pass-through Certificates Series 2007-HY6 v. Brooks*, 169 A.3d 667, 672 (Pa. Super. Ct. 2017).

[79] *Peters*, 227 So. 3d at 180.