**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COMMERZBANK AG, | Case No. 15-cv-10033-KPF-SN |
| Plaintiff, | |
| -against- | |
| WELLS FARGO BANK, NATIONAL ASSOCIATION, | |
| Defendant. | |
| PHOENIX LIGHT SF LIMITED, et al., Plaintiffs, | Case No.  14-cv-10102-KPF-SN |
| -against- | |
| WELLS FARGO BANK, N.A., Defendant. | |

**DEFENDANT WELLS FARGO BANK, N.A.'S MEMORANDUM OF LAW IN
SUPPORT OF ITS CONSOLIDATED MOTIONS FOR SUMMARY JUDGMENT**

JONES DAY
250 Vesey Street
New York, NY 10281
Tel:    (212) 326-3939
Fax:    (212) 755-7306

*Attorneys for Defendant Wells Fargo Bank, N.A.*

**THIS DOCUMENT CONTAINS INFORMATION DESIGNATED
BY THE PARTIES AS CONFIDENTIAL AND HIGHLY CONFIDENTIAL**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

LEGAL STANDARD ........................................................................................... 5

ARGUMENT ........................................................................................................ 5

I.      PLAINTIFFS LACK STANDING TO BRING MANY OF THEIR CLAIMS. .............. 5

        A.      Commerzbank Lacks Standing to Bring Claims Based on the Certificates
                It Sold Without Reserving Its Claims. ..................................................... 5

        B.      Phoenix Light Can Prove Ownership of Neither the M3 Tranche Nor a
                Portion of the M1 Tranche of the FFML 2006-FFA Trust. ................................. 7

II.     PLAINTIFFS ARE CONTRACTUALLY BARRED FROM BRINGING MANY
        OF THEIR CLAIMS. .......................................................................................... 8

        A.      Negating Clauses Bar Many of Plaintiffs' Breach-of-Contract Claims ................ 8

        B.      No-Action Clauses Bar Commerzbank's Claims as to Four Trusts. ................... 12

III.    COURT ORDERS BAR 5,103 CLAIMS. ........................................................... 14

        A.      A Minnesota Court Had Relieved Wells Fargo of Repurchase-Related
                Obligations Prior to Wells Fargo's Purported Breaches of Those
                Obligations. ........................................................................................ 15

        B.      A Minnesota Court Ordered That the Actions Taken by the Separate
                Trustee on Behalf of the FFML 2006-FFA Trust Were Reasonable. ................ 18

IV.     MANY OF PLAINTIFFS' CLAIMS ARE UNTIMELY ............................................ 21

        A.      The New York Statute of Limitations Bars Many of Plaintiffs' Claims. ........... 21

                1.      Plaintiffs' Document-Defect Claims Regarding Loans in the Eight
                        Exception Report Trusts Are Untimely Under New York Law. ............. 21

                2.      Plaintiffs' Document-Defect Claims Regarding Many Liquidated
                        Loans Are Untimely Under New York Law. ................................... 24

                3.      Plaintiffs' Post-EOD Claims Regarding the Five Early EOD Trusts
                        Are Untimely Under New York Law. ........................................... 25

        B.      Commerzbank's Claims That Accrued in Germany Are Untimely Under
                German Law. ......................................................................................... 26

                1.      Commerzbank's Claims "Arose" Before the End of 2011. .................. 26

                2.      By the End of 2011, Commerzbank Knew the Facts Surrounding
                        Its Claims or was Grossly Negligent in Failing to Know them. ............ 27

V.      WELLS FARGO IS ENTITLED TO SUMMARY JUDGMENT ON ALL OF
        PLAINTIFFS' PRE-EVENT OF DEFAULT R&W-RELATED CLAIMS. ................... 31

## TABLE OF CONTENTS

Page

A.   Plaintiffs Have No Evidence That Wells Fargo Discovered R&W
Breaches Regarding the 957 No-Discovery Loans. .............................. 31

B.   Plaintiffs Cannot Prove That Wells Fargo Breached Any R&W-Related
Duties Regarding the 4,840 Loans for Which Repurchase Duties Had
Been Reassigned to Separate Trustees. ............................................... 36

   1.   At the Relevant Times, Wells Fargo Had No R&W-Related Duties
   Regarding the 4,840 Loans. .................................................. 36

   2.   Phoenix Light Impermissibly Relies on Sampling to Prove
   Liability and Damages for 4,759 of the 4,840 Loans. ............................. 37

   3.   At the Relevant Times, Commerzbank Did Not Own Certificates in
   the Trust Holding 19 of the 4,840 Loans. ................................. 38

C.   Wells Fargo Satisfied Any Notice and Enforcement Duties as to the 187
R&W Compliance Loans. ................................................................... 38

   1.   Wells Fargo Satisfied Any Notice Duties as to 187 Loans..................... 38

   2.   Wells Fargo Satisfied Any Enforcement Duties as to 187 Loans........... 39

VI.   WELLS FARGO IS ENTITLED TO SUMMARY JUDGMENT ON MANY OF
PLAINTIFFS' PRE-EVENT OF DEFAULT DOCUMENT-DEFECT CLAIMS.......... 41

VII.   WELLS FARGO IS ENTITLED TO SUMMARY JUDGMENT ON THE VAST
MAJORITY OF PLAINTIFFS' POST-EVENT OF DEFAULT CLAIMS. ................... 41

A.   Regarding 13 Trusts, Plaintiffs Have No Evidence That a "Prudent
Person" Duty Was Triggered. ............................................................. 42

   1.   There Is No Evidence an EOD Occurred With Respect to the 13
   Trusts....................................................................................... 42

   2.   There Is No Evidence That Wells Fargo Had Actual Knowledge or
   Received Written Notice of an EOD With Respect to the 13 Trusts....... 45

B.   Regarding Another Trust, There Is No Evidence That Wells Fargo Owed a
Post-EOD Duty to Commerzbank. ...................................................... 46

C.   Regarding One More Trust, Plaintiffs Do Not Point to an EOD. ......................... 46

D.   Regarding Two Additional Trusts, Wells Fargo Indisputably Complied
With Any "Prudent Person" Duty......................................................... 47

E.   Regarding the Remaining Seven Trusts, Plaintiffs Cannot Prove a Prudent
Person Duty Was Triggered by a Prudent Servicing EOD. ................................. 49

F.   Wells Fargo Is Entitled to Summary Judgment on All of Phoenix Light's
Post-EOD Claims Regarding Alleged Servicing-Oversight Failures. ................. 50

   1.   Phoenix Light Has No Evidence of "Servicing Oversight"
   Breaches by Wells Fargo. ...................................................... 51

**TABLE OF CONTENTS**

                                                                                     **Page**

    2.    Phoenix Light Has No Admissible Evidence Regarding Damages Associated with Alleged Servicing-Oversight Breaches. ....................... 52

    3.    Phoenix Light's Claims for "Catch-Up Servicing Damages" Fail. ......... 52

VIII.  PLAINTIFFS' TORT CLAIMS FAIL.............................................................. 54

    A.    The Tort Claims Are Impermissibly Duplicative of the Contract Claims. .......... 54

    B.    The Economic Loss Doctrine Bars Plaintiffs' Tort Claims. ................................ 55

    C.    Plaintiffs' Conflict-of-Interest Claims Fail For Lack of Evidence. .................... 57

    D.    Plaintiffs' Tort Claims Based on Ministerial Duties Also Fail........................... 58

IX.    PHOENIX LIGHT'S TRUST INDENTURE ACT CLAIMS FAIL.............................. 58

X.    ALL OF PLAINTIFFS' ALLEGED DAMAGES ARE BARRED................................ 60

    A.    Damages Limitation Clauses Governing Five Trusts Bar the Damages Plaintiffs Seek. .................................................................................................. 60

    B.    Plaintiffs Cannot Prove Damages With the Requisite Reasonable Certainty.............................................................................................................. 63

    C.    Regarding the Four Morgan Stanley Trusts, Commerzbank Cannot Prove the Existence of Pre-Event of Default Damages With Reasonable Certainty.............................................................................................................. 66

    D.    There Is No Basis in Fact for Commerzbank's "Held-to-Maturity" Damages Scenario.............................................................................................. 66

    E.    The Governing Agreements for the Eight Liquidated Loan Trusts Limit Plaintiffs' Damages With Respect to Certain Liquidated Loans. ....................... 68

XI.    PHOENIX LIGHT'S ASSIGNMENTS ARE CHAMPERTOUS AND VOID...............70

## TABLE OF AUTHORITIES

Page

CASES

*17 Vista Fee Assocs. v. Teachers Ins. & Annuity Ass'n of Am.*,
259 A.D.2d 75 (1st Dep't 1999) .................................................................................55

*ACE Sec. Corp. Home Equity Loan Trust, Series 2007-HE3 ex rel.
HSBC Bank USA, Nat'l Ass'n v. DB Structured Prods., Inc.*,
5 F. Supp. 3d 543 (S.D.N.Y. 2014)..............................................................................68

*ACE Sec. Corp. v. DB Structured Prod., Inc.*,
965 N.Y.S.2d 844 (N.Y. Sup. Ct. 2013) ......................................................................69

*ACE Sec. Corp. v. DB Structured Prods.*,
36 N.E.3d 623 (N.Y. 2015)...........................................................................................21

*Allen v. McCurry*,
449 U.S. 90 (1980)...............................................................................................16, 19

*Bakal v. U.S. Bank Nat'l Ass'n*,
747 F. App'x 32 (2d Cir. 2019) ....................................................................................42

*Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*,
969 F. Supp. 2d 339 (S.D.N.Y. 2013)..........................................................................67

*Bank of N.Y. Mellon v. WMC Mortg., LLC*,
151 A.D.3d 72 (1st Dep't 2017) ...................................................................................21

*Bank of N.Y. Mellon v. WMC Mortgage, LLC*,
No. 1:12-cv-7096, Dkt. 323 (S.D.N.Y. Aug. 18, 2015)...............................................69

*Bear Stearns v. EMC Mortg.*,
2015 WL 139731 (Del. Ch. Jan. 12, 2015)..................................................................68

*BlackRock Allocation Target Shares: Series S Portfolio v. U.S. Bank Nat'l Ass'n*,
2015 WL 2359319 (S.D.N.Y. May 18, 2015) ..............................................................53

*BlackRock Balanced Capital Portfolio (FI) v. Deutsche Bank Nat'l Trust Co.*,
2018 WL 5619957 (S.D.N.Y. Aug. 7, 2018).................................................................66

*Blackrock Balanced Capital Portfolio (FI) v. U.S. Bank N.A.*,
    165 A.D.3d 526 (1st Dep't 2018) ..............................................................43, 44, 57

*BlackRock Balanced Capital Portfolio (FI) v. U.S. Bank National Association*,
    2018 WL 452001 (N.Y. Sup Ct. Jan. 17, 2018)..........................................56, 57, 58

*Blackrock Core Bond Portfolio v. U.S. Bank N.A.*,
    165 F. Supp. 3d 80 (S.D.N.Y. 2016)...............................................................13, 14

*Bluebird Partners, L.P. v. First Fid. Bank, N.A.*,
    767 N.E.2d 672 (N.Y. 2002).......................................................................................6

*Buckley v. Deloitte & Touche USA LLP*,
    888 F. Supp. 2d 404 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 62 (2d Cir. 2013).......67

*Carco Grp., Inc. v. Maconachy*,
    383 F. App'x 73 (2d Cir. 2010) ...............................................................................61

*Carco Grp., Inc. v. Maconachy*,
    718 F.3d 72 (2d Cir. 2013).......................................................................................61

*Commerce Bank v. Bank of New N.Y. Mellon*,
    141 A.D.3d 413 (1st Dep't 2016) ................................................................45, 57, 58

*Commerzbank AG v. Deutsche Bank Nat'l Trust Co.*,
    234 F. Supp. 3d 462 (S.D.N.Y. 2017)......................................................................9, 11

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
    650 F. Supp. 2d 314 (S.D.N.Y. 2009).....................................................................63

*Cruden v. Bank of N.Y.*,
    957 F.2d 961 (2d Cir 1992).................................................................................13, 14

*Deutsche Zentral-Genossenchaftsbank AG v. HSBC N. Am. Holdings, Inc.*,
    2013 WL 6667601 (S.D.N.Y. Dec. 17, 2013) .......................................................27

*Dormitory Auth. of N.Y. v. Samson Constr. Co.*,
    94 N.E.3d 456 (N.Y. 2018)....................................................................................54, 55

*Elliot Assocs. v. J. Henry Schroder Bank and Trust Co.*,
    838 F.2d 66 (2d Cir. 1988)......................................................................................1, 34

*Ellis v. Minn. Comm'n on Civil Rights*,
    319 N.W.2d 702 (Minn. 1982).................................................................................17

*FDIC v. Drysdale*,
   2013 WL 5695723 (E.D.N.Y. Nov. 7. 2013)..........................................................62

*Feldbaum v. McCrory Corp.*,
   1992 WL 119095 (Del. Ch. June 1, 1992)..............................................................14

*FHFA v. Morgan Stanley ABS Capital I Inc.*,
   59 Misc. 3d 754 (N.Y. Sup. Ct. N.Y. Cty. 2018) ............................................21, 23

*Fixed Income Shares: Series M v. Citibank, N.A.*,
   157 A.D.3d 541 (1st Dep't 2018) ..........................................................................43

*Fixed Income Shares: Series M v. Citibank N.A.*,
   314 F. Supp. 3d 552 (S.D.N.Y. 2018)..................................................20, 43, 57

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
   479 F. Supp. 2d 349 (S.D.N.Y. 2007)....................................................................35

*Global Fin. Corp. v. Triarc Corp.*,
   715 N.E.2d 482 (N.Y. 1999)..................................................................................21

*Goenaga v. March of Dimes Birth Defects Found.*,
   51 F.3d 14 (2d Cir. 1995) .......................................................................................5

*Govern v. Hall*,
   430 N.W.2d 874 (Minn. Ct. App. 1988).................................................................17

*Greer v. Prof'l Fiduciary, Inc.*,
   792 N.W.2d 120 (Minn. Ct. App. 2011).................................................................17

*In re Estate and Trust of Anderson*,
   654 N.W.2d 682 (Minn. Ct. App. 2002).................................................................17

*In re Moody's Corp. Sec. Litig.*,
   No. 07-8375, 2013 WL 4516788 (S.D.N.Y. Aug. 23, 2015)..................................67

*In re Trusteeship Created by Am. Home Mortg. Inv. Trust 2005-2*,
   2014 WL 3858506 (S.D.N.Y July 24, 2014) ..........................................................18

*In the Matter of Merrill Lynch First Franklin Mortgage Loan Trust, Mortgage
   Loan Asset-Backed Certificates, Series 2007-4*,
   No. 62-TR-CV-19-11 (Minn. Dist. Ct. June 4, 2019) ............................................39

*In the Matter of Merrill Lynch First Franklin Mortgage Loan Trust, Mortgage*
    *Loan Asset-Backed Certificates, Series 2007-5,*
    No. 62-TR-CV-19-30 (Minn. Dist. Ct. Oct. 4, 2019) ............................................39

*Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*,
    38 F.3d 1279 (2d Cir. 1994)........................................................................61

*Intimate Bookshop v. Barnes & Noble, Inc.*,
    2003 WL 22251312 (S.D.N.Y. Sept. 30, 2003)...........................................67

*Kenford Co. v. Cty. of Erie*,
    493 N.E.2d 234 (N.Y. 1986)........................................................................63

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp.*,
    28 F. Supp. 2d 126 (S.D.N.Y. 1998)......................................................63, 64

*Levy v. Bessemer Trust Co.*,
    1999 WL 199027 (S.D.N.Y. Apr. 8, 1999)............................................63, 67

*LuxSoma LLC v. Leg Resource, Inc.*,
    289 F. Supp. 3d 514 (S.D.N.Y. 2018)...........................................................5

*Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.*,
    846 F.3d 1 (2d Cir. 2017) ..........................................................................60

*MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Sec. Inc.*,
    2013 WL 4399210 (S.D.N.Y. Aug. 15, 2013)...........................................69

*Matsushita Elec. Indus. Co. v. Epstein*,
    516 U.S. 367 (1996)...................................................................................16

*Matter of Trusts Created by Hormel*,
    504 N.W.2d 505 (Minn. Ct. App. 1993).....................................................18

*MMS USA Holdings, Inc. v. PricewaterhouseCoopers LLP*,
    2013 WL 1154932 (N.Y. Sup. Ct. Mar. 19, 2013) ................................61, 62

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*,
    859 F.2d 242 (2d Cir. 1988).........................................................................8

*MVP Health Plan, Inc. v. Optuminsight, Inc.*,
    2017 WL 3669558 (N.D.N.Y. Aug. 24, 2017),
    *aff'd*, 765 F. App'x 615 (2d Cir. 2019)...............................................61, 63

*N. Indus. Holdings, LLC v. E. Envt'l Grp. Inc.*,
   2016 WL 8541049 (N.D.N.Y. Feb. 23, 2016) ...................................................................61, 62

*N.Y. Univ. v. Cont'l Ins. Co.*,
   662 N.E.2d 763 (N.Y. 1995) ...............................................................................................54

*Nacional Financiera, S.N.C. v. Bankers Trustee Co. Ltd.*,
   2000 WL 36564710 (N.Y. Sup. Ct. Nov. 17, 2000) ...........................................................34

*NCUA v. Deutsche Bank Nat'l Trust Co.*,
   410 F. Supp. 3d 662 (S.D.N.Y. 2019) ...........................................................................56, 57

*NCUA v. U.S. Bank*,
   2020 WL 764249 (S.D.N.Y. Feb. 13, 2020) ...........................................................2, 3, 9, 32

*Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura
   Credit & Capital, Inc.*, 92 N.E.3d 743 (N.Y. 2017) ..........................................................60

*Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n*,
   986 F. Supp. 2d 412 (S.D.N.Y. 2013) ..................................................................................6

*One William St. Capital Mgmt. L.P. v. U.S. Educ. Loan Trust IV, LLC*,
   2017 WL 2152585 (N.Y. Sup. Ct. May 17, 2017) ...............................................................6

*Optima Media Grp. Ltd. v. Bloomberg L.P.*,
   2018 WL 1587074 (S.D.N.Y. Mar. 28, 2018) ....................................................................60

*People ex rel. Spitzer v. Applied Card Sys., Inc.*,
   894 N.E.2d 1 (N.Y. 2008) ...................................................................................................20

*Phelan v. Local 305 of United Ass'n of Journeymen*,
   973 F.2d 1050 (2d Cir. 1992) .............................................................................................20

*Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*,
   2015 WL 5710645 (S.D.N.Y. Sept. 29, 2015) ..............................................................53, 60

*Phoenix Light SF Ltd. v. BNYM*,
   2017 WL 3973951 (S.D.N.Y. Sept. 7, 2017) ............................................................. *passim*

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Trust Co.*,
   172 F. Supp. 3d 700 (S.D.N.Y. 2016) ..............................................................................9, 60

*Phoenix Warehouse of California, LLC v. Townley, Inc.*,
   2011 WL 1345134 (S.D.N.Y. Mar. 29, 2011) ....................................................................62

*Policemen's Annuity & Benefit Fund of City of Chicago v. Bank of Am., N.A.*,
　　907 F. Supp. 2d 536 (S.D.N.Y. 2012).................................................................48, 54

*Popp Telcom v. Am. Sharecom., Inc.*,
　　210 F.3d 928 (8th Cir. 2000) ...........................................................................17

*Quadrant Structured Prods. Co. v. Vertin*,
　　16 N.E.3d 1165 (N.Y. 2014)......................................................................12, 13, 14

*Racepoint Partners, LLC v. JPMorgan Chase Bank, N.A.*,
　　928 N.E.2d 396 (N.Y. 2010)..............................................................................58

*Reichel Invs., L.P. v. Reichel*,
　　2016 WL 3884552 (Minn. Ct. App. July 18, 2016)........................................17, 18

*Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of
　　N.Y. Mellon*, 775 F.3d 154 (2d Cir. 2014) ...................................................... *passim*

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
　　2018 WL 1088020 (S.D.N.Y. Feb. 12, 2018).....................................................34

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*,
　　2018 WL 4682220 (S.D.N.Y. Sept. 28, 2018)...........................................33, 48, 54

*Royal Park Invs. SA/NV v. HSBC Bank USA, Nat'l Ass'n*,
　　109 F. Supp. 3d 587 (S.D.N.Y. 2015)..................................................................8, 9

*Royal Park Invs. SA/NV v. HSBC Bank USA Nat'l Ass'n*,
　　2017 WL 945099 (S.D.N.Y. Mar. 10, 2017) ..................................................... *passim*

*Royal Park Invs. SA/NV v. Morgan Stanley*,
　　165 A.D.3d 460 (1st Dep't 2018) ........................................................................6, 7

*Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.*,
　　2018 WL 1831850 (S.D.N.Y. Apr. 17, 2018)........................................................6

*Scher Law Firm, LLC v. DB Partners I, LLP*,
　　97 A.D.3d 590 (2d Dep't 2012) .........................................................................35

*Schonfeld v. Hilliard*,
　　218 F.3d 164 (2d Cir. 2000)....................................................................61, 62, 63

*Semi-Tech Litig., LLC v. Bankers Trust Co.*,
　　272 F. Supp. 2d 319 (S.D.N.Y. 2003).............................................................38, 46

*Semi-Tech Litig., LLC v. Bankers Trust Co.*,
   353 F. Supp. 2d 460 (S.D.N.Y. 2005) .................................................................. 59

*Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het*
   *Kapitaal Van Saybolt Int'l B.V. v. Schreiber*,
   407 F.3d 34 (2d Cir. 2005) ................................................................................... 6

*The Upper Deck Co. v. Breakey Int'l, BV*,
   390 F. Supp. 2d 355 (S.D.N.Y. 2005) .................................................................. 67

*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*,
   487 F.3d 89 (2d Cir. 2007) ............................................................................. 63, 66

*Triaxx CDO 2006-1, Ltd. v. U.S. Bank Nat'l Ass'n*,
   741 F. App'x 857 (2d Cir. 2018) .......................................................................... 56

*Triaxx Prime CDO 2006-1, Ltd. v. Bank of N.Y. Mellon*,
   2018 WL 1417850 (S.D.N.Y. Mar. 8, 2018) ......................................................... 56

*U.S. Bank, Nat'l Ass'n v. Citigroup Global Markets Realty Corp.*,
   2015 WL 1222075 (S.D.N.Y. Mar. 13, 2015) ....................................................... 40

*U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*,
   205 F. Supp. 3d 386 (S.D.N.Y. 2016) .................................................................. 35

*Virgin Atl. Airways, Ltd. v. British Airways PLC*,
   69 F. Supp. 2d 571 (S.D.N.Y. 1999), *aff'd* 257 F.3d 256 (2d Cir. 2001) .............. 67

*W. & S. Life Ins. Co. v. Bank of N.Y. Mellon*,
   129 N.E.3d 1085 (Ohio Ct. App. 2019) ................................................................ 43

*W. & S. Life Ins. Co. v. Bank of N.Y. Mellon*,
   2017 WL 3392855 (Ohio Com. Pl. Aug 4, 2017) .................................................. 35

*Wells Fargo Bank, N.A. v. Bank of America, N.A.*,
   2014 WL 476299 (S.D.N.Y. Feb. 6, 2014), *vacated on other grounds*, 627
   Fed. App'x 27 (2d Cir. 2015) ............................................................................... 69

*Wilder v. World of Boxing LLC*,
   310 F. Supp. 3d 426 (S.D.N.Y. 2018) .................................................................. 52

*Wilson v. Dantas*,
   746 F.3d 530 (2d Cir. 2014) .................................................................................. 8

**STATUTES**

15 U.S.C. § 77ooo(b) ...................................................................................................59

15 U.S.C. § 77ooo(c) ...................................................................................................59

15 U.S.C. § 77ppp(b) ...................................................................................................60

15 U.S.C. § 77www .....................................................................................................59

Full Faith and Credit Act, 28 U.S.C. § 1738 ..............................................................16

Minn. Stat. § 501B ..................................................................................................17, 18

Minn. Stat. § 501C ..................................................................................................16, 18

N.Y. Gen. Oblig. L. § 13-107 ...................................................................................6, 7

**OTHER AUTHORITIES**

N.Y. C.P.L.R. § 202 ....................................................................................................21

N.Y. C.P.L.R. § 213(2) ..........................................................................................21, 23

# CHARTS OF GROUNDS FOR SUMMARY JUDGMENT

**Trust**

| Commerzbank — Argument | ABFC 2005-HE2 | ABFC 2005-OPT1 | ABFC 2006-OPT1 | ABFC 2006-OPT2 | ABSHE 2005-HE5 | CMLTI 2005-OPT4 | GPMF 2005-AR4 | GPMF 2006-AR1 | GPMF 2006-AR2 | GPMF 2006-AR3 | MSAC 2005-WMC2 | MSAC 2005-WMC3 | MSAC 2005-WMC5 | MSAC 2006-HE1 | OOMLT 2006-2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Standing & Contractual Bars** | | | | | | | | | | | | | | | |
| Sold Certificates | Y | Y | M1 & M3 tranches | | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | 2A4 tranche |
| Negating Clause Securities | Y | Y | Y | Y | Y | Y | | | | | | | | | Y |
| No Action Clause Trust | | | | | | | Y | Y | Y | Y | | | | | |
| **Statute of Limitations Arguments** | | | | | | | | | | | | | | | |
| Exception Report Trust | | | Y | Y | Y | Y | Y | Y | | Y | | | Y | | |
| German SOL Trust | Y | Y | M3 tranche | | Y | Y | Y | Y | Y | Y | | Y | Y | Y | 2A4 tranche |
| Liquidated Loan Claims Untimely | 314 loans | 48 loans | 232 loans | 213 loans | 14 loans | 87 loans | 490 loans | 314 loans | 224 loans | 382 loans | 80 loans | 42 loans | 132 loans | 226 loans | 579 loans |
| Early EOD Trust | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | | | Y |
| **Claim-Specific Arguments** | | | | | | | | | | | | | | | |
| Pre-EOD R&W Claims Fail | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N/A | N/A |
| Pre-EOD Document Defect-Claims Fail | Y | Y | 232 loans | Y | Y | Y | Y | Y | Y | Y | 92 loans | Y | Y | Y | 703 loans |
| Post-EOD Claims Fail | In part | In part | In part | In part | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | In part |
| Tort Claims Fail | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| **Damages Arguments** | | | | | | | | | | | | | | | |
| Damages Limitation Clause Trust | | | | | Y | | Y | Y | Y | Y | | | | | |
| Damages Not Reasonably Certain | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| Liquidated Loan Trust | Y | Y | Y | Y | Y | Y | | | | | | | | | Y |
| **Summary Judgment on All Claims?** | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |

Note: "N/A" denotes arguments that are not applicable because Plaintiffs do not assert claims (e.g., pre-EOD R&W claims) necessary for that argument to apply to a particular trust.

**Phoenix Light**

| Category | Argument | ABFC 2006-OPT2 | CARR 2006-NC3 | CARR 2006-NC4 | CARR 2007-FRE1 | FFML 2006-FFA | IMM 2005-6 | IMSA 2005-2 | OOMLT 2007-3 | OWNIT 2006-2 | PPSI 2005-WLL1 | SABR 2006-FR2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Standing & Contractual Bars | Non-Transferred Securities | | | | | M1 (in part) & M3 tranches | | | | | | |
| | Negating Clause Securities | Y | | | | M1 (in part) & M3 tranches | 1A1 (in part) & M1 tranches | | | | | |
| Statute of Limitations Arguments | Exception Report Trust | Y | N/A | N/A | N/A | N/A | N/A | N/A | Y | Y | N/A | N/A |
| | Liquidated Loan Claims Untimely | 109 loans | N/A | N/A | N/A | N/A | N/A | N/A | 122 loans | 295 loans | N/A | N/A |
| | Early EOD Trust | Y | | | | | | | | | | |
| Claim-Specific Arguments | Pre-EOD R&W Claims Fail | Y | N/A | N/A | N/A | Y | N/A | N/A | Y | Y | N/A | N/A |
| | Pre-EOD Document Defect-Claims Fail | Y | N/A | N/A | N/A | N/A | N/A | N/A | Y | Y | N/A | N/A |
| | Post-EOD Claims Fail | In part | Y | Y | Y | In part | Y | Y | In part | Y | Y | In part |
| | Tort Claims Fail | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| | TIA Claims Fail | N/A | N/A | N/A | N/A | N/A | Y | N/A | N/A | N/A | N/A | N/A |
| Damages Arguments | Damages Limitation Clause Trust | | | | | Y | | | | | | |
| | Damages Not Reasonably Certain | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| | Liquidated Loan Trust | Y | | | | | | | Y | | | |
| | Summary Judgment on All Claims? | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |

Note: "N/A" denotes arguments that are not applicable because Plaintiffs do not assert claims (e.g., pre-EOD R&W claims) necessary for that argument to apply to a particular trust.

## <u>PRELIMINARY STATEMENT</u>

These actions run afoul of settled law.  For decades, it has been established that the duties of a residential mortgage backed securities ("RMBS") trustee "are strictly defined and limited to the [contractual] terms" governing the trust.  *Elliot Assocs. v. J. Henry Schroder Bank and Trust Co.*, 838 F.2d 66, 71 (2d Cir. 1988).  Courts "have consistently rejected the imposition of additional duties on the trustee."  *Id.*  Nonetheless, Plaintiffs in these two cases—eight issuers of collateralized debt obligations (collectively, "Phoenix Light") in one action, and Commerzbank AG ("Commerzbank") in the other—demand damages from Wells Fargo, the trustee for 25 at-issue RMBS trusts (the "Trusts"), based on nonexistent "additional duties."  With extensive discovery now complete, it is clear that these two actions lack material factual support; instead, they rest on unprecedented theories of liability that are divorced from legal obligations and unsubstantiated by claim-specific evidence.

Wells Fargo's *actual* duties as trustee of the 25 RMBS Trusts[1] are specifically set forth in the written contracts—including Pooling and Servicing Agreements ("PSAs"), an indenture, and certain ancillary contracts (collectively, the "Governing Agreements" or the "Agreements")—that "dictate the scope of [Wells Fargo's] duties to Plaintiffs."  PL ECF 305 at 7.[2]  The Governing Agreements define the particular rights and obligations of the trustee, Wells Fargo, with respect to the other entities involved in the RMBS securitizations, including: (i) the entities that originated, pooled, and made representations and warranties ("R&Ws") regarding the loans

---

[1] Commerzbank has not pursued damages regarding four additional trusts mentioned in its pleadings (the BAFC 2005-C, BOAMS 2006-B, HVMLT 2007-3, and MABS 2007-NCW trusts) and appears to have abandoned claims relating to those four trusts.  56.1 ¶ 4.  Wells Fargo accordingly moves for summary judgment on those trusts.

[2] "PL ECF" and "CB ECF" refer to docket entries in the Phoenix Light and Commerzbank actions, respectively.  "56.1" refers to Wells Fargo's accompanying Statement of Undisputed Facts Pursuant to Local Rule 56.1.  "Exhibit" refers to Exhibits in the accompanying Declaration of Ryan J. Andreoli in Support of Wells Fargo's Consolidated Motions for Summary Judgment.  "Stanton Exhibit" refers to Exhibits in the accompanying Declaration of Andrew R. Stanton in Support of Wells Fargo's Consolidated Motions for Summary Judgment.

in the Trust (the "Responsible Parties"); (ii) the entity that enforces the loan terms and collects payments from borrowers (the "Servicer"); and (iii) the registered owners of certificates that represent an entitlement to certain Trust income (the "Certificateholders").  56.1 ¶¶ 26-34.

The Governing Agreements expressly limit Wells Fargo's duties as trustee.  Each provides (in identical or materially identical terms) that before a contractually-defined event of default ("EOD"), Wells Fargo "shall not be liable except for the performance of such duties and obligations as are *specifically* set forth in th[e] Agreement."  56.1 ¶¶ 35-37. (emphasis added). Most state (in identical or materially identical terms) that "the right of the Trustee to perform any discretionary act enumerated in th[e] Agreement shall not be construed as a duty."  56.1 ¶¶ 39-40.  And all provide (in identical or materially identical terms) that prior to an EOD Wells Fargo "shall not be bound to make any investigation" and may rely on "the facts or matters stated in any . . . statement, opinion, report, notice, request, consent, order . . . or other paper or document," absent direction and indemnification by a specified percentage of Certificateholders. 56.1 ¶¶ 46-48.  Courts have regularly recognized these contractual limits.  *See, e.g., NCUA v. U.S. Bank* (hereinafter "*NCUA/USB*"), 2020 WL 764249, at *4 (S.D.N.Y. Feb. 13, 2020).

The Governing Agreements also set forth the specific duties relevant to these actions. First, most state that "upon discovery" (or, for some Trusts, upon discovery or receipt of written notice) of an R&W breach that materially and adversely affects the Certificateholders' interests or the loan's value, Wells Fargo shall promptly notify the Responsible Party of the breach, and, if the Responsible Party fails to cure it, shall enforce the Responsible Party's duty to repurchase the loan.  56.1 ¶¶ 585-590.  Second, most state that upon "discovery or receipt of written notice" (or, for some Trusts, upon finding during a post-closing review) that a document that is part of a mortgage file is missing or defective in a material respect, Wells Fargo shall promptly notify the

Responsible Party of the defect, and, if the Responsible Party fails to cure it, shall enforce the Responsible Party's duty to repurchase the loan.  56.1 ¶¶ 341-349.  Third, each states that if Wells Fargo has actual knowledge or written notice of a contractually-defined EOD, then Wells Fargo shall exercise its rights as a prudent person would under the circumstances.  56.1 ¶ 634.

These three obligations are all loan- or Trust-specific.  Thus, to support their claims regarding Wells Fargo's R&W-related duties, Plaintiffs "must present evidence that proves a specific breach of a representation or warranty as to any loan . . . for which plaintiffs allege there was a breach."  *Phoenix Light SF Ltd. v. BNYM* (hereinafter "*PL/BNYM II*"), 2017 WL 3973951, at *8 (S.D.N.Y. Sept. 7, 2017).  Similarly, in connection with Plaintiffs' claims regarding missing and defective documents, determining "whether a loan's documentation was deficient requires looking at individual loans and documents."  *Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon* (hereinafter "*Ret. Bd.*"), 775 F.3d 154, 162 (2d Cir. 2014).  And Plaintiffs' claims regarding EODs require evidence of Wells Fargo's "actual knowledge or written notice of a particular EOD."  *NCUA/USB*, 2020 WL 764249, at *6.  Regarding all three obligations, "[a]t summary judgment, Plaintiffs must prove that they have evidence to support their claims 'loan-by-loan and trust-by-trust.'"  *PL/BNYM II*, 2017 WL 3973951, at *9 (quoting *Ret. Bd.*, 775 F.3d at 162).  But more than four years of fact and expert discovery have revealed that Plaintiffs cannot do so.

Most of Plaintiffs' claims fail for reasons that are specific to the type of allegation involved (R&W-related, document defect, or post-EOD).  For example, many of Plaintiffs' R&W-related claims fail because Plaintiffs have not adduced any evidence of the loan- and breach-specific "discovery" or "written notice" that triggers Wells Fargo's notice and enforcement obligations under the Governing Agreements.  Many of Plaintiffs' document-defect

enforcement claims fail because multiple Governing Agreements do not impose an enforcement

obligation on Wells Fargo.  And most of Plaintiffs' post-EOD claims fail because it is

indisputable that no post-EOD "prudent person" duty arose.  Again and again, Plaintiffs seek

damages based on the so-called breach of a nonexistent duty—and cannot prove their claims.

Summary judgment is also warranted for reasons that cut across the R&W, document

defect, and post-EOD claim categories.  For instance, Plaintiffs cannot show that they own many

of the claims at issue—and thus cannot establish standing to bring those claims.  Plaintiffs are

contractually barred from litigating many of their claims.  Plaintiffs' tort claims fail for

numerous reasons, including that they are barred by the economic loss doctrine.  And Plaintiffs

demand speculative damages and damages that are contractually barred.

Plaintiffs' attempt to extract damages based on nonexistent duties is particularly blatant

with respect to thousands of claims regarding loans across 13 Trusts.  Plaintiffs entirely ignore

that *prior to* the dates that Wells Fargo purportedly breached its repurchase-related obligations,

binding court orders had relieved Wells Fargo of those obligations (and reassigned them to

separate trustees).  For instance, with respect to the FFML 2006-FFA Trust, a Minnesota court

reassigned Wells Fargo's repurchase-related obligations to a separate trustee in 2012.  The court

expressly ordered that Wells Fargo "shall have no further duty or obligation to the Trusts'

beneficiaries with respect to the enforcement of Repurchase Claims."  Nonetheless, Phoenix

Light now claims that Wells Fargo is liable because Wells Fargo did not pursue repurchase

claims *two years after Wells Fargo was relieved of any such duty*.  And Phoenix Light not only

ignores the court order—it also ignores the fact that the separate trustee pursued and settled the

Trust's repurchase claims related to all at-issue loans in the Trust.  The FFML 2006-FFA Trust

has already been compensated for *every repurchase claim identified by Phoenix Light.*

The claims regarding the FFML 2006-FFA Trust are just the tip of the iceberg.  Every claim that Plaintiffs assert suffers from one or more fatal failures of proof.  Plaintiffs advance claims based on duties that do not exist.  They assert claims that they have no standing to advance.  And they demand so-called compensation despite their wholesale inability to prove damages.  In light of these failures, Wells Fargo is entitled to summary judgment.

## LEGAL STANDARD

The Court must grant summary judgment if Wells Fargo "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." *LuxSoma LLC v. Leg Resource, Inc.*, 289 F. Supp. 3d 514, 521 (S.D.N.Y. 2018) (citing Fed. R. Civ. P. 56(a)). Because Plaintiffs "bear the ultimate burden of proof at trial," Wells Fargo's "burden will be satisfied if [it] can point to an absence of evidence" to support Plaintiffs' claims. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).

## ARGUMENT

### I.   PLAINTIFFS LACK STANDING TO BRING MANY OF THEIR CLAIMS.

At the threshold, Plaintiffs cannot establish standing for many claims.  Commerzbank transferred most of its claims when it sold 21 at-issue certificates (out of 24 in that action).  And Phoenix Light cannot demonstrate that it owns several tranches of RMBS on which it now sues.

### A.   Commerzbank Lacks Standing to Bring Claims Based on the Certificates It Sold Without Reserving Its Claims.

Commerzbank lacks standing to bring claims based on 21 certificates that it sold before suing (the "Sold Certificates").[3]  This Court must "look to applicable state law to determine

---

[3] The Sold Certificates are: ABFC 2005-HE2 (all tranches), ABFC 2005-OPT1 (all tranches), ABFC 2006-OPT1 (M1 and M3 tranches only), ABSHE 2005-HE5 (all tranches), CMLTI 2005-OPT4 (all tranches), GPMF 2005-AR4 (all tranches), GPMF 2006-AR1 (all tranches), GPMF 2006-AR2 (all tranches), GPMF 2006-AR3 (all tranches), MSAC 2005-WMC2 (all tranches), MSAC 2005-WMC3 (all tranches), MSAC 2005-WMC5 (all tranches), MSAC 2006 HE1 (all tranches), OOMLT 2006-2 (2A4 tranche only).  56.1 ¶ 55.

whether [a plaintiff] properly possesses the right[s] of action that it asserts." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 49 (2d Cir. 2005).  To decide which state law is "applicable," the Court must apply "the choice of law rules of the forum state, in this case, New York."  *See Id.* at 49–50.  And the New York courts have recently addressed, for the first time, what choice-of-law rules apply.  The First Department held that under New York choice-of-law rules, whether a sale of a security carries with it the transferor's associated legal claims is "governed by the law of the forum state"—here, by New York law.  *Royal Park Invs. SA/NV v. Morgan Stanley*, 165 A.D.3d 460, 461 (1st Dep't 2018) (quoting *FIA Leveraged Fund Ltd. v. Grant Thornton LLP*, 150 A.D.3d 492, 496 (1st Dep't 2017)), *leave to appeal denied*, 116 N.E.3d 665 (N.Y. 2019).

Under New York law, when a security is transferred, any claim "for damages against [a] trustee" such as Wells Fargo "shall vest in the transferee."  N.Y. Gen. Oblig. L. § 13-107.  Thus, "litigation rights automatically accompany the sale of a certificate."  *Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.*, 2018 WL 1831850, at *6 (S.D.N.Y. Apr. 17, 2018).  This rule applies to both contract and tort claims.  *See Bluebird Partners, L.P. v. First Fid. Bank, N.A.*, 767 N.E.2d 672, 675 (N.Y. 2002) (breach of fiduciary duty); *Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n*, 986 F. Supp. 2d 412, 415-16 (S.D.N.Y. 2013) (breach of contract); *One William St. Capital Mgmt. L.P. v. U.S. Educ. Loan Trust IV, LLC*, 2017 WL 2152585, at *3-5 (N.Y. Sup. Ct. May 17, 2017) (tort and contract).  The only statutory exception is where the transferor has "expressly reserved" its litigation rights "in writing." N.Y. Gen. Oblig. L. § 13-107.

Here, Commerzbank sold the Sold Certificates prior to initiating this litigation.  56.1 ¶¶ 55-66.  It has no proof that it reserved its litigation rights in writing.  56.1 ¶¶ 67-72.  Thus, as a matter of New York law, Commerzbank sold away any associated claims against Wells Fargo

as trustee.  *See* N.Y. Gen. Oblig. L. § 13-107; *Royal Park*, 165 A.D.3d at 461.  And

Commerzbank cannot bring legal claims that it does not own.

> **B.     Phoenix Light Can Prove Ownership of Neither the M3 Tranche Nor a Portion of the M1 Tranche of the FFML 2006-FFA Trust.**

Phoenix Light also attempts to recover on claims for which it lacks standing.  Phoenix

Light has no evidence showing that it owns the following tranches in the FFML 2006-FFA Trust:

an M3 tranche (CUSIP 318340AH9) with an original face value of $14,957,000; a second M3

tranche (CUSIP 318340AH9) with an original face value of $5,000,000; and an M1 tranche

(CUSIP 318340AE6) with an original face value of $14,066,000 (collectively, the "Non-

Transferred Securities").  56.1 ¶¶ 73-79.

Phoenix Light claims that it acquired its interests in the FFML 2006-FFA Trust through

exercise notices executed in 2009.  56.1 ¶¶ 74-76.  However, the exercise notices *did not include*

the Non-Transferred Securities.  56.1 ¶ 77.  Even Phoenix Light admits that the Non-Transferred

Securities were "not reflected in the Exercise Notice[s]."  56.1 ¶¶ 80-82.  Thus, it has adduced no

evidence that it ever acquired any rights with respect to the Non-Transferred Securities.

Indeed, all evidence is to the contrary.  In connection with a prior settlement involving

the FFML 2006-FFA Trust, Phoenix Light's nominee provided a Certificate of Beneficial

Ownership listing Phoenix Light's holdings in the Trust.  56.1 ¶ 78.  Tellingly, the Non-

Transferred Securities were *not included* among Phoenix Light's holdings.  *Id*.  This correlates

with the absence of Certificateholder authorization to sue on the securities.  56.1 ¶ 79**;** *see infra*

Part II.A.  Both indicate that Phoenix Light never acquired the Non-Transferred Securities.

Regarding two of the Non-Transferred Securities, Phoenix Light attempts to overcome its

lack of evidence supporting standing by pointing to a document it identifies as an "Assignment

b[e]tw[ee]n Harrier Finance and Phoenix Light, dated February 13, 2012."  56.1 ¶ 84.  But the

document, which was *not executed by Harrier Finance*, does not show that Harrier Finance

transferred anything to Phoenix Light.  56.1 ¶ 85.

Phoenix Light has no evidence that it ever owned *any* of the Non-Transferred Securities.

Wells Fargo is entitled to summary judgment on all claims based on those securities.

## II.   PLAINTIFFS ARE CONTRACTUALLY BARRED FROM BRINGING MANY OF THEIR CLAIMS.

Plaintiffs also lack contractual authority to bring many of their claims.  Their breach-of-

contract claims relating to many securities are barred by negating clauses.  And Commerzbank's

claims relating to four Trusts are barred by no-action clauses.

### A.   Negating Clauses Bar Many of Plaintiffs' Breach-of-Contract Claims.

Plaintiffs' breach-of-contract claims based on the "Negating Clause Securities"[4]  are

barred by clauses that "limit the parties who may enforce the Agreement[s]."  *Royal Park Invs.*

*SA/NV v. HSBC Bank USA, Nat'l Ass'n* (hereinafter "*RP/HSBC*"), 109 F. Supp. 3d 587, 606

(S.D.N.Y. 2015).  "Under New York law, where a provision in a contract expressly negates

enforcement by third parties, that provision is controlling."  *Morse/Diesel, Inc. v. Trinity Indus.,*

*Inc.*, 859 F.2d 242, 249 (2d Cir. 1988).  "[E]ven where a contract expressly sets forth obligations

to specific individuals or categories of individuals, those individuals do not have standing to

enforce those obligations by suing as third-party beneficiaries when the contract contains a

negating clause."  *Wilson v. Dantas*, 746 F.3d 530, 537 (2d Cir. 2014) (quoting *In re Lehman*

---

[4] The Negating Clause Securities are: (i) all at-issue securities in the ABFC 2005-HE2 Trust; (ii) all at-issue securities in the ABFC 2005-OPT1 Trust; (iii) all at-issue securities in the ABFC 2006-OPT1 Trust; (iv) all at-issue securities in the ABFC 2006-OPT2 Trust (for Commerzbank only); (v) all at-issue securities in the ABSHE 2005-HE5 Trust; (vi) all at-issue securities in the CMLTI 2005-OPT4 Trust; (vii) all at-issue securities in the OOMLT 2006-2 Trust; (viii) the M3 tranche of the FFML 2006-FFA Trust; (ix) the certificate in the M1 tranche of the FFML 2006-FFA Trust that was allegedly acquired on February 13, 2012; (x) the M1 tranche of the IMM 2005-6 Trust; and (xi) the four certificates in the 1A1 tranche of the IMM 2005-6 Trust that were allegedly acquired on September 9, 2005.  56.1 ¶¶ 86-92, 139-162, 165-168.

*Bros. Holdings Inc.*, 479 B.R. 268, 275-76 (S.D.N.Y. 2012)).  Here, the Agreements governing

seven Trusts[5] contain materially identical negating clauses that provide:

> Nothing in this Agreement or in the Certificates, expressed or implied, shall give
> to any Person, other than the Certificateholders, the parties hereto and the NIMS
> Insurer and their successors hereunder, any benefit or any legal or equitable right,
> remedy or claim under this Agreement.

56.1 ¶¶ 86-92.  One Agreement identifies as additional beneficiaries the "Swap Counterparty and

its successors and assignees."  56.1 ¶ 90.

Application of these clauses is straightforward.  None of the Plaintiffs is the Swap

Counterparty, the NIMS Insurer, or a party to the Governing Agreement.  56.1 ¶¶ 93-106.  And

none has adduced any evidence that it is a "Certificateholder"—which the Agreements define (in

materially identical terms) as "[t]he Person in whose name a Certificate is registered in the

Certificate Register,"  56.1 ¶¶ 107-138—instead of a mere downstream beneficial owner.

Plaintiffs therefore lack "any legal or equitable right, remedy or claim under th[e] Agreements."

56.1 ¶¶ 86-92.  So Plaintiffs lack standing to bring breach-of-contract claims as to these seven

Trusts—except for claims assigned to them by Certificateholders.

Consistent with this analysis, courts uniformly apply similar negating clauses to bar

beneficial owners' breach-of-contract claims against RMBS trustees if the beneficial owners fail

to show that the registered owner (*i.e.*, the Certificateholder) has assigned them the right to assert

those claims.  *See*, *e.g.*, *NCUA/USB*, 2020 WL 764249, at *3 (dismissing breach-of-contract

claims on this ground); *Commerzbank AG v. Deutsche Bank Nat'l Trust Co.*, 234 F. Supp. 3d

462, 475–76 (S.D.N.Y. 2017) (same); *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Trust Co.*

(hereinafter, "*PL/DB*"), 172 F. Supp. 700, 711–12 (S.D.N.Y. 2016) (same); *RP/HSBC*, 109 F.

---

[5] The seven Trusts are: ABFC 2005-HE2, ABFC 2005-OPT1, ABFC 2006-OPT1, ABFC 2006-OPT2, FFML 2006-FFA, IMM 2005-6, and OOMLT 2006-2.  56.1 ¶¶ 86-92.

Supp. 3d at 606–07 (holding the beneficial owner had no "standing" unless it "obtain[ed] authorizations to sue from the registered Holder").  The same contractual language bars Plaintiffs' breach-of-contract claims regarding these seven Trusts, unless Plaintiffs can show that they obtained Certificateholder authorization.  And Plaintiffs have adduced no evidence that they obtained such authorization for the Negating Clause Securities.  56.1 ¶¶ 163-168.

The Governing Agreements for another two Trusts (ABSHE 2005-HE5 and CMLTI 2005-OPT4, both at issue in the Commerzbank action) contain slightly different terms that produce the same result.  These two Agreements classify Commerzbank's certificates as "Book-Entry Certificates," and provide that the "Certificateholder" of the Book Entry Certificates is a "Depository" known as the Depository Trust Company ("DTC").  56.1 ¶¶ 139-146, 151-158.  Under these two Agreements, Commerzbank—as beneficial owner—is a "Certificate Owner," not a "Certificateholder."  56.1 ¶¶ 142-148, 153-160.  Certificate Owners interact only with DTC or with intermediaries known as Depository Participants.  56.1 ¶¶ 149-150, 161-162.  Certificate Owners do *not* interact with the trustee; instead, their rights are sharply circumscribed.  The Agreements provide:

> The Trustee . . . may for all purposes . . . deal with the Depository as the authorized representative of the Certificate Owners with respect to the Book-Entry Certificates for the purposes of exercising the rights of Certificateholders hereunder.  The rights of Certificate Owners with respect to the Book-Entry Certificates shall be limited to those established by law and agreements between such Certificate Owners and the Depository Participants and brokerage firms representing such Certificate Owners.

56.1 ¶¶ 149, 161.  Under these provisions, Certificate Owners like Commerzbank may not bring a breach-of-contract action to enforce the Governing Agreements.  Their rights are "limited to those established by law and agreements between such Certificate Owners and the Depository Participants and brokerage firms representing such Certificate Owners"—but the Governing

Agreements are neither "law" nor agreements between Certificate Owners and Depository

Participants or brokerage firms. Thus, they have no "rights" under the Governing Agreements.

Indeed, the definition of "Certificateholder" in both Governing Agreements confirms that

a Certificate Owner may not directly enforce the Agreements, but instead must act through DTC:

> All references herein to 'Holders' or 'Certificateholders' shall reflect the rights of
> Certificate Owners *as they may indirectly exercise such rights through the
> Depository and participating members thereof,* except as otherwise specified
> herein; provided, however, that the Trustee shall be required to recognize as a
> "Holder" or "Certificateholder" only the Person in whose name a Certificate is
> registered in the Certificate Register.

*See* 56.1 ¶¶ 144, 156. Commerzbank, which claims to be a Certificate Owner, may enforce the

contract only "indirectly" through DTC. But DTC is not involved in this action, and

Commerzbank has not offered evidence that DTC authorized it to bring suit as to these two

Trusts. 56.1 ¶¶ 165-166. Commerzbank is therefore barred from bringing breach-of-contract

claims for these two Trusts.

It is no answer for Plaintiffs to say that they can, in theory, pursue authorization at this

late juncture. Plaintiffs have been litigating these cases for more than four years. And Plaintiffs

have been aware of the need to obtain authorization from the Certificateholder since at least

February 2016, when Phoenix Light filed its Second Amended Complaint discussing

Certificateholder authorization, PL ECF 80, and February 2017, when Judge Koeltl dismissed

Commerzbank's claims against Deutsche Bank on exactly this ground, *see Commerzbank v.

Deutsche Bank*, 234 F. Supp. 3d at 475-76. Further, Wells Fargo requested any evidence of

Plaintiffs' standing to sue over 3.5 years ago. 56.1 ¶¶ 163-164. Yet Plaintiffs have never

demonstrated the required authorization to sue regarding any of the Negating Clause Securities.

56.1 ¶¶ 165-168. Plaintiffs have had *years* to cure this fatal defect, and the time has long since

passed for them to secure and provide evidence of authorization to sue. According to the plain

contractual language, Plaintiffs lack the authority to bring breach-of-contract claims against Wells Fargo related to the Negating Clause Securities.  Summary judgment is warranted on those claims.

### B.   No-Action Clauses Bar Commerzbank's Claims as to Four Trusts.

As for the four "No-Action Clause Trusts,"[6] no-action clauses in their Governing Agreements bar Commerzbank's claims.  No-action clauses require certificateholders to provide notice to the trustee and obtain the support of a specified percentage of other certificateholders, among other things, before bringing lawsuits related to the trust.  These clauses "'protect [RMBS trusts] from the expense involved in defending [individual] lawsuits that are either frivolous or otherwise not in the economic interest of the [trust] and its [certificateholders].'"  *Quadrant Structured Prods. Co. v. Vertin*, 16 N.E.3d 1165, 1176 (N.Y. 2014) (quoting *Feldbaum v. McCrory Corp.*, 1992 WL 119095, at *6 (Del. Ch. June 1, 1992)) (second alteration in original). The New York Court of Appeals has held that courts must "read a no-action clause to give effect to the *precise words and language used*, for the clause must be 'strictly construed.'"  *Id.* at 1172 (emphasis added) (quoting *Cruden v. Bank of N.Y.*, 957 F.2d 961, 968 (2d Cir 1992)).

The Governing Agreements for the four No-Action Clause Trusts contain identical no-action clauses, each of which expressly applies to suits "against . . . the Trustee":

> No Certificateholder shall have any right by virtue of any provision of this Agreement to institute any suit, action or proceeding in equity or at law upon, under or with respect to this Agreement against the Depositor, *the Trustee,* the Servicer or any successor to any such parties unless (i) such Certificateholder previously shall have given to the Trustee a written notice of a continuing default, as herein provided, (ii) the Holders of Certificates evidencing Fractional Undivided Interests aggregating not less than 51% of the Trust Fund shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as

---

[6] The No-Action Clause Trusts are: GPMF 2005-AR4, GPMF 2006-AR1, GPMF 2006-AR2, and GPMF 2006-AR3.

> Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs and expenses and liabilities to be incurred therein or thereby, and (iii) the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding.

56.1 ¶ 169 (emphasis added).  These clauses, which "according to [their] terms" expressly apply to Certificateholder suits against the trustee, must be "give[n] effect" by this Court.  *Quadrant Structured Prods.*, 16 N.E.3d at 1172.  Since it is undisputed that Commerzbank did not provide notice to Wells Fargo or obtain the approval of the requisite percentage of Certificateholders before filing this suit, 56.1 ¶¶ 170-172, Wells Fargo is entitled to summary judgment on the claims related to each of the No-Action Clause Trusts.

The Second Circuit's decision in *Cruden* and recent case law from this district are not to the contrary.  *Cruden* held that the no-action clause in that case did not require Certificateholders to provide notice to the indenture trustee before suing it.  *See Cruden*, 957 F.2d at 968.  Courts in this district have reached the same conclusion regarding no-action clauses that were materially identical to the clause at issue in *Cruden*.  *See, e.g.*, *Blackrock Core Bond Portfolio v. U.S. Bank N.A.*, 165 F. Supp. 3d 80, 92–99 (S.D.N.Y. 2016).  But those no-action clauses,[7] unlike the no-action clauses governing the No-Action Clause Trusts, *did not* specifically refer to suits against the trustee.  *See Cruden*, 957 F.2d at 967–68.  "[A]lternative structures" may be "drafted to lead

---

[7] The *Cruden* no-action clause provided in relevant part:

[n]o holder of any Debenture shall have any right by virtue or by availing of any provision of this Indenture to institute any action or proceedings at law or in equity or in bankruptcy or otherwise . . . , for any . . . remedy hereunder, unless such holder previously shall have given to the Trustee written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the holders of not less than twenty-five percent in aggregate principal amount of the Debentures then outstanding shall have made written request upon the Trustee to institute such action or proceedings in its own name as Trustee hereunder . . . .

957 F.2d at 967–68.

to . . . different result[s]." *Blackrock Core*, 165 F. Supp. 3d at 99.  And the No-Action Clause Trusts' Agreements contain such "alternative structures," which must be given effect.  *Id.*

Further, applying the clauses' written-request requirement is eminently sensible.  While a trustee cannot literally "sue itself," *Cruden*, 957 F.2d at 968, it can appoint a separate trustee to determine whether claims should be pursued.  *See* 56.1 ¶ 173.  If the trustee refuses to appoint such a separate trustee, or the separate trustee refuses to sue, the clause allows the Certificateholders to file suit.  But the Certificateholders may sue only if they have met the numerosity requirements that the Governing Agreements explicitly impose prior to suing a trustee.  And the numerosity requirements are significant:  They protect the trusts from the "exercise of poor judgment by a single bondholder or a small group of bondholders, who might otherwise bring a suit." *Feldbaum*, 1992 WL 119095, at *6; *see also Quadrant Structured Prods. Co.*, 16 N.E.3d at 1176 (no action clauses "make it more difficult for individual bondholders to bring suits that are unpopular with their fellow bondholders") (quoting *Feldbaum*, 1992 WL 119095, at *6).  It is undisputed that Commerzbank failed to comply with the notice and the numerosity requirements here.  The Governing Agreements thus prohibit Commerzbank from bringing claims relating to the No-Action Clause Trusts, and Wells Fargo is entitled to summary judgment on those claims.

## III.   COURT ORDERS BAR 5,103 CLAIMS.

Plaintiffs disregard not only contractual provisions, but also court orders.  Binding court orders relieving Wells Fargo of repurchase-related obligations for 13 Trusts bar 5,103 of Plaintiffs' repurchase-related claims (the "Separate Trustee Claims").  Phoenix Light's claims as to the FFML 2006-FFA Trust are also barred by a court order regarding the settlement of repurchase claims for all at-issue loans in that Trust.

A.    **A Minnesota Court Had Relieved Wells Fargo of Repurchase-Related Obligations Prior to Wells Fargo's Purported Breaches of Those Obligations.**

The Separate Trustee Claims—the claims that Wells Fargo breached R&W-related repurchase duties regarding 4,840 loans (listed in Exhibit C) and document-defect-related repurchase duties regarding 263 loans (listed in Exhibit D)—all fail for a fundamental reason: Prior to the purported breaches, Wells Fargo had been relieved of any such duties by court order.

First, with respect to the FFML 2006-FFA Trust (at issue in the Phoenix Light litigation), Phoenix Light claims that Wells Fargo "discover[ed]" 4,820 alleged R&W breaches in October, 2014. 56.1 ¶ 177. But a Minnesota state court order had relieved Wells Fargo of any repurchase-related duty over two years before that. On June 6, 2012, in an *in rem* trust instruction proceeding ("TIP"), a Minnesota court appointed Law Debenture Trust Company as the separate trustee for the FFML 2006-FFA Trust and obligated Law Debenture to satisfy any trustee obligations regarding repurchase. 56.1 ¶¶ 183-184**.** The court further ordered: "Upon appointment of the Separate Trustee, [Wells Fargo] *shall have no further duty or obligation to the Trusts' beneficiaries with respect to the enforcement of Repurchase Claims*." 56.1 ¶ 185 (emphasis added).

Similarly, with respect to 19 loans in the GPMF 2005-AR4 Trust and one loan in the OOMLT 2007-3 Trust, the Minnesota TIP court had appointed separate trustees to take over Wells Fargo's repurchase obligations for those Trusts *before* Wells Fargo first received notice of potential R&W breaches associated with those specific loans. 56.1 ¶¶ 259-263, 276-278, 287-290, 297. The court had likewise expressly relieved Wells Fargo of any repurchase-related obligations for those Trusts. 56.1 ¶¶ 232-234, 247-248.

Finally, the same sequence of events occurred with respect to Plaintiffs' document-defect claims regarding 263 loans across 12 Trusts (including the previously-mentioned

GPMF 2005-AR4 and OOMLT 2007-3 Trusts).[8]  The Minnesota TIP court had appointed separate trustees to undertake the repurchase-related obligations for those Trusts *before* the dates that Plaintiffs claim Wells Fargo was required to act with respect to the alleged document defects.  56.1 ¶¶ 253-298.  And the court had relieved Wells Fargo of repurchase-related obligations as to the Trusts.  56.1 ¶¶ 223-252.

Wells Fargo was entitled to rely on the court orders relieving it of repurchase obligations.  The Governing Agreements of all 13 Trusts provide (in identical or materially identical terms) that the trustee may rely "and shall be protected in acting or refraining from acting upon any . . . opinion, report, notice, request, consent, order . . . or other paper or document" that is "believed by it to be genuine and to have been signed or presented by the proper party or parties."  56.1 ¶¶ 192, 299-305.  Pursuant to that provision, Wells Fargo's actions and inactions based on that reliance are "protected."  *Id*.  Wells Fargo cannot be held liable for relying on a court order.

Indeed, even apart from the contractual provision, the Minnesota TIP court's orders bar liability here.  Under the Full Faith and Credit Act, 28 U.S.C. § 1738, courts must "give preclusive effect to [these Minnesota] judgments whenever the courts of [Minnesota] would do so."  *Allen v. McCurry*, 449 U.S. 90, 96 (1980); *see also Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 373 (1996) (federal courts must "treat a state court judgment with the same respect that it would receive in the courts of the rendering state").  Here, three different Minnesota rules preclude Plaintiffs from collaterally challenging the TIP court's determinations.

*First*, the Minnesota statute governing *in rem* TIPs expressly provides that a TIP court's order has preclusive effect on trust beneficiaries.  *See* Minn. Stat. § 501C.0204 (TIP orders are

---

[8] The 12 Trusts are: ABFC 2006-OPT2, ABSHE 2005-HE5, CMLTI 2005-OPT4, GPMF 2005-AR4, GPMF 2006-AR1, GPMF 2006-AR2, GPMF 2006-AR3, MSAC 2005-WMC2, MSAC 2006-HE1, OOMLT 2006-2, OOMLT 2007-3, and OWNIT 2006-2.

binding "upon the interests of all beneficiaries, vested or contingent, even though unascertained or not in being")[9]; *In re Estate and Trust of Anderson*, 654 N.W.2d 682, 686 (Minn. Ct. App. 2002) (a TIP order "may not be collaterally attacked but stands as a judgment on the matters determined by the order") (quoting *Trust Created by Warner*, 117 N.W.2d 224, 228 (Minn. 1962)); *Govern v. Hall*, 430 N.W.2d 874, 879 (Minn. Ct. App. 1988) ("Final orders in trust proceedings . . . bar the relitigation of decided issues.").

*Second*, any challenge to the state court's determinations is independently precluded by Minnesota's rule that "a facially valid judgment is not subject to collateral attack." *Popp Telcom v. Am. Sharecom., Inc.*, 210 F.3d 928, 941 (8th Cir. 2000). This rule prohibits a plaintiff from "essentially challeng[ing] the propriety of actions by [the defendant] that [a court] approved in its [prior] orders." *Greer v. Prof'l Fiduciary, Inc.*, 792 N.W.2d 120, 129 (Minn. Ct. App. 2011). Here, "the effect of" Plaintiffs' claims "would be to undermine the [prior Minnesota court] orders," rendering the claims an impermissible "collateral attack." *Id.* at 131.

*Third*, Plaintiffs' claims are separately precluded by Minnesota's rule of "collateral estoppel, or issue preclusion, [which] prevents relitigation of specific legal issues that have been adjudicated." *Reichel Invs., L.P. v. Reichel*, 2016 WL 3884552, at *2 (Minn. Ct. App. July 18, 2016) (internal quotation marks omitted). The doctrine bars the relitigation of an issue if "(1) the issue [is] identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue." *Ellis v. Minn. Comm'n on Civil Rights*, 319 N.W.2d 702, 704 (Minn. 1982) (quotation marks omitted).

---

[9] In 2015, the Minnesota Legislature amended and recodified the statutes regarding TIPs. But the rule at the time of the 2012 TIP was the same: "The order is . . . binding in rem upon the trust estate and upon the interests of all beneficiaries, vested or contingent, even though unascertained or not in being." Minn. Stat. § 501B.21 (2012).

All of those elements are satisfied here.  The issue is the same: whether Wells Fargo had a duty to enforce repurchase obligations regarding loans in the 13 Trusts after the issuance of the separate trustee orders.  *See Reichel Invs.*, 2016 WL 3884552, at *6 (stating that cases may involve "different theories of recovery" so long as the theories depend on the same underlying issue).  The TIP orders were final.  *See* Minn. Stat. § 501B.21 (2012) ("[An] order [in a TIP] is final as to all matters determined by it.").  And trust beneficiaries are considered to have been parties to, and to have had a full and fair opportunity to participate in, an *in rem* TIP where (as here, 56.1 ¶¶ 181-182, 223-252) they were given notice of the proceeding—regardless of whether they chose to participate.  *See Matter of Trusts Created by Hormel*, 504 N.W.2d 505, 508-09  (Minn. Ct. App. 1993) (holding that trust beneficiaries were collaterally estopped by an order in a TIP where they "had notice of the petition" and did not "appear or object"); *In re Trusteeship Created by Am. Home Mortg. Inv. Trust 2005-2*, 2014 WL 3858506, at *25 (S.D.N.Y July 24, 2014) (holding that trust beneficiaries—including those "that did not appear" in court—were bound by an order in a TIP where the trust gave them notice indirectly, through the certificates' registered owner); *cf.* Minn. Stat. § 501C.0203 (requiring that trust beneficiaries be given notice of *in rem* TIPs).

In short, the Separate Trustee Claims fail in light of both the Governing Agreements and the Full Faith and Credit Act.  Plaintiffs may not extract damages from Wells Fargo for the actions Wells Fargo took in reliance on court orders.

### B.     A Minnesota Court Ordered That the Actions Taken by the Separate Trustee on Behalf of the FFML 2006-FFA Trust Were Reasonable.

With respect to the FFML 2006-FFA Trust, Phoenix Light's claims also fail due to a separate court order.  After being appointed, the separate trustee settled the Trust's repurchase claims as to every specific loan identified by Phoenix Light as associated with an R&W breach.

56.1 ¶¶ 313-332.  The First Franklin Financial Corporation agreed to pay $53,450,000 to the

Trust in settlement of the claims arising out of the origination or transfer of a group of loans,

including all loans identified by Phoenix Light.  56.1 ¶ 330-332**.**  The agreement settled all

claims arising from "any alleged or actual breach of any . . . Representations and Warranties in

any of the Governing Agreements" and "any alleged or actual obligation to repurchase."  56.1

¶ 331.  Certificateholders holding interests that aggregated at least 25% of the classes of

certificates at issue notified the separate trustee that they "believe[d] the [s]ettlement [was] in

the best economic interests of the Trust and instructed the . . . Separate Trustee to accept the

[s]ettlement."  56.1 ¶ 321.  And in a TIP on August 23, 2018, a Minnesota court ordered that the

separate trustee was authorized to enter into the settlement and that its actions in doing so "were

within the bounds of [its] discretion, reasonable and made in good faith, comply with all

applicable duties and are fully authorized, permitted and protected by the Governing

Agreements."  56.1 ¶ 325.

Like the separate-trustee appointment order, the August 23, 2018, order must be "give[n]

preclusive effect . . . whenever the courts of [Minnesota] would" give it such effect, *Allen*, 449

U.S. at 96, and for the same reasons discussed above, collateral estoppel applies here.

Additionally, even assuming (incorrectly) that Wells Fargo retained some responsibility

regarding repurchase claims as to the at-issue loans, Wells Fargo was contractually exempted

from liability with respect to the claims' disposition.  The FFML 2006-FFA Trust's Governing

Agreement provides that "[t]he Trustee shall not be personally liable with respect to any action

taken, suffered or omitted to be taken by it in good faith in accordance with the direction of . . .

the Certificateholders of any Class holding Certificates which evidence, as to such Class,

Percentage Interests aggregating not less than 25%." 56.1 ¶ 333.  And the requisite amount of Certificateholders directed and approved the settlement here.  56.1 ¶ 307, 321.

Finally, the settlement also lays bare a failure of proof.  Phoenix Light has no evidence that Wells Fargo could have obtained more money in pursuit of repurchase claims than the separate trustee actually obtained, nor has Phoenix Light even alleged that the separate trustee acted unreasonably or breached any duties in connection with pursuing and settling the R&W breach claims for the FFML 2006-FFA Trust.  To the contrary, the undisputed record is that a binding percentage of Certificateholders directed the separate trustee to accept the settlement as reasonable, and a court approved the settlement in a final order.  56.1 ¶ 307, 321, 324-326.  Phoenix Light's damages claim therefore fails.  *See Fixed Income Shares: Series M v. Citibank N.A.*, 314 F. Supp. 3d 552, 560 (S.D.N.Y. 2018) ("[The trust beneficiaries'] claims fail for [this] reason:  Plaintiffs do not proffer any non-speculative evidence that [the trustee] could have obtained more than it did in the bankruptcy proceedings.  Notably, to prove that [the trustee] could have obtained a more favorable result is no easy task, as the amounts for which [the trustee] settled its claims were based on the liquidation plan approved by the Bankruptcy Court, and the Bankruptcy Court blessed the stipulation of settlement itself.").

In all events, Phoenix Light has utterly failed to account for the settlement proceeds in its damages claim, *see* 56.1 ¶ 334, and "[a] plaintiff may not recover twice for the same injury." *Phelan v. Local 305 of United Ass'n of Journeymen*, 973 F.2d 1050, 1063 (2d Cir. 1992). Phoenix Light seeks to collect damages for the same injury from both the Responsible Party and Wells Fargo.  If Phoenix Light is to recover, its damages should be limited to reflect the simple rule "that the courts can and should preclude double recovery."  *People ex rel. Spitzer v. Applied Card Sys., Inc.*, 894 N.E.2d 1, 14 (N.Y. 2008) (quotation marks omitted).

## IV.     MANY OF PLAINTIFFS' CLAIMS ARE UNTIMELY.

Another large group of Plaintiffs' claims fail at the threshold because they are untimely. Under New York's borrowing statute, CPLR 202, Plaintiffs' claims are subject to both the New York statute of limitations and the statute of limitations of the jurisdiction where the cause of action accrued.  *Global Fin. Corp. v. Triarc Corp.*, 715 N.E.2d 482, 484 (N.Y. 1999).  Many of Plaintiffs' claims are time-barred under New York law, and all of Commerzbank's claims that accrued in Germany are time-barred under German law.

### A.     The New York Statute of Limitations Bars Many of Plaintiffs' Claims.

#### 1.     Plaintiffs' Document-Defect Claims Regarding Loans in the Eight Exception Report Trusts Are Untimely Under New York Law.

Plaintiffs' document-defect claims regarding loans in eight of the Trusts (the "Exception Report Trusts")[10] are untimely under the New York statute of limitations.  Under New York law, claims for breach of contract are subject to a six-year statute of limitations and accrue when the contract is breached.  *ACE Sec. Corp. v. DB Structured Prods.*, 36 N.E.3d 623, 628-30 (N.Y. 2015); N.Y. C.P.L.R. § 213(2).  Where a contract requires action upon some event, a claim for failure to take that action accrues upon the occurrence of that triggering event, when the defendant fails to take the required action.  *See Bank of N.Y. Mellon v. WMC Mortg., LLC*, 151 A.D.3d 72, 80 (1st Dep't 2017) (claim for failure to repurchase "accrued after [defendant] failed to meet its backstop obligation following [another party's] failure to repurchase the loans"); *FHFA v. Morgan Stanley ABS Capital I Inc.*, 59 Misc. 3d 754, 772 (N.Y. Sup. Ct. N.Y. Cty. 2018) (breach of duty to notify claim accrues when defendant "discovers a breach of representations and warranties and fails to give prompt written notice").

---

[10] The Exception Report Trusts are: ABFC 2006-OPT2, CMLTI 2005-OPT4, GPMF 2005-AR4, GPMF 2006-AR1, GPMF 2006-AR3, MSAC 2005-WMC5, OOMLT 2007-3, and OWNIT 2006-2.

Here, Plaintiffs' document-defect claims accrued, if at all, when Wells Fargo's notice and enforcement duties related to document defects were triggered and Wells Fargo failed to satisfy those duties. The Exception Report Trusts' Governing Agreements provide that those duties, where they exist,[11] are triggered upon Wells Fargo's "discovery or receipt of written notice" (or, for some Trusts, upon Wells Fargo's "discovery or receipt of notice," or upon Wells Fargo's or a custodian's finding during a post-closing review of mortgage files) that a document constituting part of a mortgage file is missing or defective in a material respect. 56.1 ¶¶ 341-349.

Plaintiffs do not identify the specific events that they claim constituted "discovery" of the alleged document defects. But every at-issue loan in the "Exception Report Trusts" is included in the "final exception report" (which lists missing or defective documents identified during a post-closing review of the mortgage files) for the applicable Trust. 56.1 ¶¶ 338-340. And Plaintiffs identify no events, other than the issuance of the final exception reports, upon which they could base their claims that Wells Fargo "discovered" (or found, or received written notice of) document defects associated with the at-issue loans. Thus, for each Exception Report Trust, on Plaintiffs' theory, the event that triggered Wells Fargo's notice and enforcement duties must have been Wells Fargo's issuance of the final exception report. [12]

The final exception reports for the Exception Report Trusts were all prepared between August 2005 and March 2008. 56.1 ¶¶ 350-382. Wells Fargo's alleged notice duties as to document defects in the Exception Report Trusts were therefore triggered (if at all) no later than

---

[11] One Exception Report Trust—MSAC 2005-WMC5—imposes no notice or enforcement duties on Wells Fargo with respect to document defects. 56.1 ¶¶ 347-348. For that Trust, Wells Fargo's only related duty is to deliver an exception report within 90 days of the Trust's closing. 56.1 ¶ 370. Nonetheless, *assuming* that there was an at-issue duty, under Plaintiffs' theory the duty would have been breached when the exception report was issued.

[12] Wells Fargo disputes that the final exception reports could have a triggering effect, because the reports listed many non-material document defects and Wells Fargo had no duty under the Governing Agreements to investigate defects and determine whether they were or were not material. 56.1 ¶¶ 46-48.

March 2008.  And Wells Fargo's alleged enforcement duties were triggered (if at all) no later than October 2008, after the Responsible Parties failed to cure any defects despite the passage of the contractually-specified number of days.  56.1 ¶¶ 342, 378.  Further, Plaintiffs assert that Wells Fargo did not seek repurchase of the loans.  *See* 56.1 ¶¶ 335-337.  The New York statute of limitations therefore expired six years later, before Plaintiffs commenced these actions in December 2014 and December 2015, respectively.  PL ECF 1; CB ECF 1; *see* N.Y. C.P.L.R. § 213(2); *FHFA v. Morgan Stanley ABS Capital I Inc.*, 59 Misc. 3d at 772.

Plaintiffs assert that their claims accrued on later dates, when it supposedly should have been "apparent" to Wells Fargo that Responsible Parties would not cure the defects.  56.1 ¶¶ 383-384.  But the Governing Agreements do not tie any duties to a subjective time when it is "apparent" that there will be no cure.  Instead, the Governing Agreements set forth specific time periods during which a Responsible Party must cure or repurchase.  56.1 ¶¶ 341-349.  And Plaintiffs' proposed accrual dates do not correspond to those time periods.  *See supra*.

Plaintiffs' expert attempts to support still other, later accrual dates by contending that Wells Fargo became obligated to seek repurchase of loans with document defects only when the loans became seriously delinquent (90+ days delinquent), were liquidated, foreclosed, or were converted to REO.  56.1 ¶¶ 388-389.  But there is no language in the Governing Agreements that permits such delayed efforts on the part of Wells Fargo.  To the contrary, the Agreements require the provision of "prompt[]" notice regarding claimed document defects.  56.1 341-349.  In any event, Plaintiffs do not even consistently apply their own theory.  Of the 7,509 loans regarding which Commerzbank alleges document defects, 2,040 loans (listed in Exhibit E) were listed on final exception reports (with cure periods having expired) and were seriously delinquent, liquidated, foreclosed, or converted to REO more than six years before Commerzbank filed suit.

56.1 ¶ 390.  And of the 2,114 loans regarding which Phoenix Light alleges document defects, 1,288 loans (listed in Exhibit F) were listed on final exception reports (with cure periods having expired) and were seriously delinquent, liquidated, foreclosed, or converted to REO more than six years before Phoenix Light filed suit.  56.1 ¶ 391.  At a minimum, Plaintiffs' document-defect claims are time-barred for those loans.  But summary judgment should be granted with respect to *all* of the document-defect claims as to the Exception Report Trusts, because in no event could those claims have arisen less than six years before Plaintiffs filed suit.

> 2. Plaintiffs' Document-Defect Claims Regarding Many Liquidated Loans Are Untimely Under New York Law.

With respect to 17 Trusts, many document-defect claims related to liquidated loans also fail.  Plaintiffs claim that the Servicers breached their contracts by "liquidat[ing] [some] loans . . . that could have been tendered to the seller for repurchase" due to uncured material document defects.  56.1 ¶¶ 392-393.  Moreover, with respect to thousands of those loans, Plaintiffs claim that Wells Fargo was *aware* of the alleged Servicer breaches more than six years prior to Plaintiffs' respective initial pleadings.  56.1 ¶¶ 394-397.  In other words, Plaintiffs claim that more than six years before they initiated their respective lawsuits, Wells Fargo had discovered that the Servicers had liquidated thousands of loans *and Wells Fargo had discovered that those loans had associated document defects.*  Commerzbank claims that Wells Fargo discovered document defects (and did not provide notice or enforce repurchase) as to 3,377 loans (listed in Exhibit G) more than six years prior to the date that Commerzbank filed its action. 56.1 ¶ 396.  And Phoenix Light claims that Wells Fargo discovered document defects (and did not provide notice or enforce repurchase) as to 526 loans (listed in Exhibit H) more than six years prior to the date that Phoenix Light filed its action.  56.1 ¶ 397.  All of those document-defect claims are time-barred by New York's six-year statute of limitations.

-24-

3.     Plaintiffs' Post-EOD Claims Regarding the Five Early EOD Trusts Are Untimely Under New York Law.

Finally, the New York statute of limitations bars Plaintiffs' post-EOD claims regarding five Trusts (the "Early EOD Trusts").[13]  Plaintiffs claim that "upon the occurrence of an Event of Default," Wells Fargo became obligated to act prudently—and that "[a] prudent trustee would have taken appropriate steps to ensure all . . . loan documentation was completely and accurately transferred to the trusts" and "would have ensured that the appropriate parties were receiving notification of breaches of representations and warranties from servicers and master servicers and enforced the Responsible Parties' obligations with respect to breaching mortgage loans."  PL ECF 80 at ¶ 77; CB ECF 1 at ¶ 52.  Plaintiffs further claim that "Wells Fargo failed to exercise [those] duties . . . after the occurrence of . . . Events of Default."  PL ECF 80 at ¶ 198; CB ECF 1 at ¶ 52.

Wells Fargo disputes that the obligation to act prudently "under the circumstances" requires a trustee to undertake an investigation to discover all document defects, all R&W breaches, or all R&W breaches known by a Servicer or master servicer, regardless of the actual "circumstances" of the EOD.  But even assuming *arguendo* that Wells Fargo was obligated to launch such investigations after each EOD, the EODs in the five Early EOD Trusts occurred more than six years prior to the filing of Commerzbank's complaint.  56.1 ¶¶ 398-401.

Indeed, for each of the five Trusts, Wells Fargo sent a notice (more than six years before Commerzbank filed its complaint) informing the Certificateholders that an EOD had occurred. 56.1 ¶¶ 402-410.  And for four of the Trusts, the notice expressly "advised" the Certificateholders that "the Trustee w[ould] take no action . . . unless appropriately directed in

---

[13] The Early EOD Trusts are: ABFC 2005-HE2, ABFC 2005-OPT1, ABFC 2006-OPT1, ABFC 2006-OPT2, and OOMLT 2006-2.

writing pursuant to the terms of the Agreement" by the requisite number of Certificateholders (or, for one Trust, by the requisite number of Certificateholders or the NIMS Insurer).  56.1 ¶¶ 403, 405, 407, 409.  Despite these notices, Plaintiffs have no evidence that a single Certificateholder provided Wells Fargo with direction regarding these five EODs.  Plaintiffs certainly did not provide Wells Fargo with direction.  56.1 ¶ 411-413.  Instead, Plaintiffs waited until over six years had passed, and then sued, 56.1 ¶¶ 402-410—after the New York statute of limitations had already run.

> **B.    Commerzbank's Claims That Accrued in Germany Are Untimely Under German Law.**

Commerzbank's claims with respect to 11 Trusts and certificates in two additional Trusts (collectively, the "German SOL Trusts")[14] accrued in Germany and must satisfy Germany's three-year statute of limitations.  *See* CB ECF 227 at 75-76.  The German limitations period "begins to run at the end of the calendar year in which (i) the claim arose and (ii) the plaintiff either has knowledge of the circumstances giving rise to the claim and the identity of the defendant, or would have had such knowledge but for gross negligence."  ECF 227 at 77; *see also* Rohe Aff. ¶ 18.  Both of those requirements were satisfied by the end of 2011, rendering untimely Commerzbank's German SOL Trusts claims (which were filed in December 2015).

> 1.    Commerzbank's Claims "Arose" Before the End of 2011.

A claim "arises" under German law when a defendant breaches a duty, *and* the breach results in the plaintiff's financial injury.  Rohe Aff. ¶ 19.  Commerzbank and its experts claim that Wells Fargo breached its duties to enforce R&W breaches by no later than March 2010, to

---

[14] The German SOL Trusts are: ABFC 2005-HE2, ABFC 2005-OPT1, ABFC 2006-OPT1 Trust (M3 tranche only), ABSHE 2005-HE5, CMLTI 2005-OPT4, GPMF 2005-AR4, GPMF 2006-AR1, GPMF 2006-AR2, GPMF 2006-AR3, MSAC 2005-WMC3, MSAC 2005-WMC5, MSAC 2006-HE1, and OOMLT 2006-2 Trust (A4 tranche only).

cure loan-level document defects by no later than January 2010, and to act prudently post-EOD between 2008 and 2011.  56.1 ¶¶ 415-422.  In addition, Commerzbank incurred its alleged financial injuries—reductions in the certificates' "market value" and decreased principal and interest payments—well before the end of 2011, a point Commerzbank concedes in its complaint.  *See* CB ECF 1 at ¶¶ 131-132; 56.1 ¶¶ 423-424.  Whether Commerzbank later suffered additional financial injury is of no moment under the German law principle of "unity of damages," which provides that once a breach and financial injury occurs, additional damages from the same type of conduct do not restart the limitations period.  Rohe Aff. ¶ 20.

> 2.    By the End of 2011, Commerzbank Knew the Facts Surrounding Its Claims or was Grossly Negligent in Failing to Know Them.

Before 2011's end, Commerzbank also had "knowledge of the factual circumstances underlying [its] claim" or, at the very least, "would have had such knowledge but for gross negligence," ECF 227 at 77—that is, its failure to consider "obvious, readily accessible facts that required its attention and further investigation."  Rohe Aff. ¶¶ 39-40; *see* 56.1 ¶¶ 437-578 ; CB ECF 1 at ¶ 128.  Indeed, as a large, sophisticated investor, 56.1 ¶¶ 425-430, Commerzbank was expected to expend "more efforts to monitor and investigate" than is customary.  Rohe Aff. ¶¶ 41-42, 60; *see also Deutsche Zentral-Genossenschaftsbank AG v. HSBC N. Am. Holdings, Inc.,* 2013 WL 6667601 at *10-11 (S.D.N.Y. Dec. 17, 2013).

The best evidence of what Commerzbank needed to know (or what it should have known) to seek relief with a reasonable expectation of success are the allegations in its actually-filed 2015 complaint.  *See* Rohe Aff. ¶¶ 66-69, 74-77.  The complaint survived Wells Fargo's motion to dismiss, *see* CB ECF 227, and the facts alleged therein would be viewed by German courts as "consistent and coherent enough to trigger the statute of limitations."  Rohe Aff ¶ 77.  The vast majority of the complaint's allegations concerned information known or knowable to

Commerzbank in 2009, 2010, and 2011.[15]  Indeed, as demonstrated in Stanton Exhibit 144,

redacting the complaint's post-2012 information has no material impact on it.  Thus,

Commerzbank alleged that *by 2011* (when it began selling its certificates in the Trusts), "it was

apparent" to it "that Wells Fargo had breached its duties."  CB ECF 1 at ¶ 132.

Discovery has revealed no new facts coming into Commerzbank's possession between

2012 and 2015 that would have informed its knowledge or caused it to investigate its potential

claims further.  Rather, discovery proves that Commerzbank and its predecessors in interest

(Eurohypo and Dresdner) knew or should have known by 2011's end the facts Commerzbank

ultimately alleged in 2015—an outcome this Court foreshadowed.  *See* CB ECF 227 at ¶ 79

("Discovery may prove Defendant's timeliness challenge meritorious"); Rohe Aff. at ¶¶ 44-58

(knowledge).  As early as February 2007, senior Eurohypo employees recognized that

"[f]raudulent activity would be deemed a breach of a rep or warranty provided by a loan

originator to the buyer of loan."  56.1 ¶ 442.  But one senior employee, John Reid, rejected the

idea of doing anything to investigate R&W breaches because it would have required "hir[ing]

100 individuals to review loans and also pursue litigation," with "no guarantee of success." 56.1

¶ 443 ("I doubt going this route is a real solution.").  That is, knowing of potential R&W

breaches and claims, Reid decided not to investigate them.  *Id*.  In December 2008, PIMCO,

Dresdner's investment advisor, expressly advised Dresdner that it could seek "recovery on

violations of contractual representations and warranties made to note holders."  56.1 ¶¶ 450-451.

---

[15] *See, e.g.,* CB ECF 1 at ¶¶ 71 ("Beginning in 2009 or 2010, facts began to emerge publicly demonstrating that the Sponsors and Originators had violated the representations and warranties."); *id.* at ¶ 83 ("As detailed in Exhibit F, in 2009 and 2010 facts began to emerge" demonstrating R&W breaches); *id.* at ¶ 84 (listing three lawsuits filed in 2010 and 2011 that "contain ample evidence" of R&W breaches); *id.* at ¶ 85 (describing 2011 lawsuit involving misrepresentations of loan value); *id.* at ¶ 105 (citing July 21, 2011 Association of Mortgage Investors letter discussing "widespread evidence" of "breached representations and warranties").

No later than October 2007, Commerzbank began formally monitoring Eurohypo's RMBS portfolio.  56.1 ¶ 445.  In July 2009, Commerzbank received and analyzed PIMCO's report to Dresdner that addressed potential R&W claims.  56.1 ¶¶ 447-456.  By September 2010, John Reid had become a senior executive at Commerzbank and knew of "investors pooling information so they can sue servicers for non-performance and banks for misrepresentations."  56.1 ¶ 467.   Instead of immediately joining with these investors and pursuing claims, Commerzbank took a "wait and see" approach.  56.1 ¶ 469.  In October 2010, Commerzbank considered joining a particular case with other investors "to force mortgage lenders to buy back improperly made loans," and it eventually joined a case that alleged "lending improprieties."  56.1 ¶¶ 465-475; *see also* 56.1 ¶¶ 519-522 (Abu Dhabi Seventh Amended Complaint at ¶ 83).

In November 2010, Commerzbank received a newsletter analyzing how "robo-signing" and "missing and defective loan documents" would likely impact RMBS.  56.1 ¶¶ 482-486.  In January 2011, Commerzbank created a "Litigation Tracker" to monitor RMBS-related lawsuits, including those against "US RMBS Originators and Trustees."  56.1 ¶¶ 492-495.  In the same time period, numerous lawsuits were publicly filed against the originators and underwriters alleging "systemic abandonment of underwriting guidelines."  CB ECF 1 at ¶ 84.  And reports of fraud, document defects, and other misconduct in loan origination and underwriting were widely publicized in both the U.S. and Germany.  56.1 ¶¶ 538-548; Rohe Aff ¶¶ 70-72 (collecting articles published between 2007 and 2010 in prominent German business periodicals); Compl. Exs. F, G, H.

By November 2011, Commerzbank had engaged the law firm Gibbs & Bruns to pursue RMBS-related claims on its behalf.  56.1 ¶¶ 509-511, 524-528.  But, by late 2011/early 2012, Commerzbank decided to sell the majority of its RMBS certificates and abandon that litigation

strategy, having made no investigation of its potential claims against Wells Fargo as trustee. 56.1 ¶¶ 503-515.  And in 2013, Commerzbank filed a different lawsuit citing evidence that, by *2010*, there was a "systemic and fraudulent scheme" to include deficient loans in RMBS securitizations.  56.1 ¶ 529.  (*Commerzbank AG London Branch v. UBS AG* Complaint at ¶ 4). Thus, without question, Commerzbank and its predecessors in interest *knew* that they had grounds to require loan repurchases and litigate R&W breaches, or at the very least, they knew enough that they were grossly negligent for failing to investigate further.

Commerzbank also knew or should have known that Wells Fargo would *not* investigate potential R&W breaches or commence R&W-related litigation without direction from the requisite percentage of Certificateholders.  Indeed, by 2008, Wells Fargo had notified investors that it was not going to undertake the kinds of unilateral efforts Commerzbank claims it should have after EODs occurred.  56.1 ¶¶ 457-461 ("Please be advised that the Trustee will take no action . . . unless appropriately directed in writing pursuant to the terms of Agreement.").  And later in 2008, Dresdner (and subsequently Commerzbank) received the PIMCO report, which advised that investors would have to "partner up with other investors" to obtain "controlling voting rights" sufficient to "direct the trustee to examine the deal documents for fraud or other misrepresentation in the loan origination process."  56.1 ¶ 451.

Thus, by the end of 2011, Commerzbank *knew* or *should have known* of the need for investigations into potential, specific R&W breaches and the need for a certain percentage of Certificateholders to direct Wells Fargo to investigate them, commence litigation, or act in the face of EODs.  *See* Rohe Aff. ¶¶ 75-80.  Wells Fargo's inaction in the face of potential R&W breaches and EODs is exactly what Commerzbank alleged in 2015 and exactly what gives rise to

its claims.  And it was well within Commerzbank's ability to know and understand these

allegations by the end of 2011.

## V.      WELLS FARGO IS ENTITLED TO SUMMARY JUDGMENT ON ALL OF PLAINTIFFS' PRE-EVENT OF DEFAULT R&W-RELATED CLAIMS.

Turning to the Plaintiffs' pre-EOD R&W-related claims, Plaintiffs generally allege that

Wells Fargo discovered material R&W breaches regarding a total of 5,984 loans (the "R&W

Claim Loans") (listed in Exhibit A; *see also* Exhibit B) and then failed to provide required notice

or to enforce repurchase obligations.  *See, e.g.,* PL ECF 80 at ¶¶ 6, 88-115; CB ECF 1 at  ¶¶ 6,

62-89; 56.1 ¶¶ 579-582.  But "by summary judgment . . . plaintiffs must present evidence that

proves a specific breach of a representation or warranty . . . on an individualized loan-by-loan

basis." *PL/BNYM II*, 2017 WL 3973951, at *8 (internal quotation marks omitted).  And, too,

"[the trustee's] alleged misconduct must be proved loan-by-loan and trust-by-trust." *Ret. Bd.*,

775 F.3d at 162.  Plaintiffs cannot do so for *any* of the 5,984 R&W Claim Loans.

*First*, Plaintiffs' claims as to 957 loans (the "No-Discovery Loans") fail because

Plaintiffs cannot prove that Wells Fargo's notice and enforcement duties were triggered by

discovery (or written notice) of an R&W breach.  *Second*, as described above, Plaintiffs' claims

as to 4,840 loans fail because in each instance a court had reassigned Wells Fargo's repurchase-

related obligations to a separate trustee before the date that Wells Fargo purportedly breached

those obligations.  *Third*, Plaintiffs' claims regarding the remaining 187 loans (the "R&W

Compliance Loans") fail because Wells Fargo indisputably complied with any notice and

enforcement obligations.  In sum, *every one* of Plaintiffs' R&W-related claims is fatally flawed.

### A.      Plaintiffs Have No Evidence That Wells Fargo Discovered R&W Breaches Regarding the 957 No-Discovery Loans.

Under the Governing Agreements, Wells Fargo has no notice or enforcement duties

relating to R&Ws except "[u]pon discovery" (or, for some Trusts, upon discovery or receipt of

written notice) of an R&W breach.  56.1 ¶¶ 585, 587, 589.  But as to the 957 No-Discovery

Loans (listed in Exhibit I), Plaintiffs have entirely failed to adduce evidence of discovery or

written notice.

 RMBS trustees and investors have recently disputed the meaning of "discovery" and

whether it entails the acquisition of actual knowledge, willful blindness, or something else.  But

"this Court need not resolve which of the 'discovery' standards governs"—whatever standard

applies, discovery (and written notice) must be construed to require some knowledge of a

"*specific* breach of [a] representation or warranty relative to [a] *particular* loan."  *PL/BNYM II*,

2017 WL 3973951, at *7 (emphases added).  That is because "[a] trustee cannot provide notice

without knowing [of] . . . the specific breach."  *Royal Park Invs. SA/NV v. HSBC Bank USA Nat'l*

*Ass'n*, 2017 WL 945099, at *6 (S.D.N.Y. Mar. 10, 2017) (hereinafter, "*RP/HSBC II*").  And

enforcing a Responsible Party's repurchase obligation likewise "rests on the ability of an RMBS

trustee to undertake defined, concrete measures . . . with respect to a specific defect, in a specific

loan, in a specific trust."  *Id.*  So to sustain their claims, Plaintiffs must present evidence that

Wells Fargo had "knowledge of specific breaches on the requisite loan-by-loan basis."  *Id.* at *8.

 With respect to each of the 957 No-Discovery Loans, Plaintiffs have entirely failed to

adduce evidence of Wells Fargo's alleged discovery (or written notice) relating to a *specific*

R&W breach as to the *specific* loan.  Plaintiffs instead rely on Wells Fargo's acquisition of

information that does not relate to a particular loan, does not relate to a particular R&W, or does

not relate to either a particular loan or a particular R&W.  That is insufficient, and the R&W-

related claims regarding those loans cannot survive.  *See NCUA/USB*, 2020 WL 764249, at *5-6

(dismissing R&W-related claims because allegations of RMBS trustee's receipt of "monthly

reports of defaults and delinquencies," together with evidence that the trustee "knew of systemic

issues with RMBS trusts," were insufficient to "raise a plausible inference . . . that [the trustee] discovered or received written notice of specified . . . warranty breaches"); *PL/BNYM II*, 2017 WL 3973951, at *7 (granting summary judgment where plaintiffs "adduce[d] no evidence of [the RMBS trustee's] knowledge of any specific breach of any representation or warranty relative to any particular loan"); *cf. Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.* (hereinafter "*RP/DB*"), 2018 WL 4682220, at *5 (S.D.N.Y. Sept. 28, 2018) ("Loan-by-loan proof is required to establish the Trustee's liability to the Certificate-holders because, under . . . the PSAs, the Trustee has neither the obligation nor the ability to demand cure, substitution, or repurchase of a nonconforming loan unless—among other things—it can identify an R&W breach . . . that 'materially and adversely' affects the value of that particular loan.").

In the alternative, should this Court prefer to address the precise interpretation of the term "discovery," it should hold that "discovery" means "the acquisition of actual knowledge." As a practical matter, it was possible for Wells Fargo to "discover" a breach in only two ways: (i) by learning about the breach from others or (ii) by performing an investigation to uncover the breach itself. For instance, Wells Fargo could not have known whether "pervasive" problems with an originator resulted in the breach of a particular R&W regarding a particular loan—absent particularized notice from others or its own investigation. And Wells Fargo could not have known whether any individual loan default was caused by a specific R&W breach or by other factors (such as unforeseen circumstances particular to an individual homeowner during the Great Recession)—absent particularized notice from others or its own investigation. This is because a default could be caused by any number of factors, separate from the R&Ws made when the loan was deposited in the trust. To ascertain whether a default is actually associated with a R&W breach, *someone* has to conduct an investigation, assessing the accuracy of a

particular loan's specific R&Ws based on scrutiny of materials contained in the loan origination file and collection and review of extrinsic data sources.  Such an investigation can be made by an investor or other third party (and then presented to the trustee), or by the trustee itself.

But Wells Fargo *had no duty to investigate.*  Wells Fargo's duties as trustee are "strictly defined and limited to the terms of" the contracts, *Elliot Assocs.*, 838 F.2d at 71, and cannot include an investigatory duty that was not "specifically set forth" in the Governing Agreements, 56.1 ¶¶ 35, 37.  Indeed, the Agreements explicitly state that before an EOD, Wells Fargo is not required to "make any investigation" absent direction and indemnification by a specified percentage of Certificateholders (which Wells Fargo never received for any of the Trusts).  56.1 ¶ 46.  This provision protects the Certificateholders, because investigations can quickly deplete trust resources—Phoenix Light, for instance, paid its expert and his team over $690,000 to reunderwrite just 557 loans here—with no guaranteed benefit for anyone.  56.1 ¶ 591.  Given the plain language of the provision and the absence of Certificateholder direction, Wells Fargo "cannot [have] be[en] required to investigate under the parties' contracts."  PL ECF 381 at 24.

In light of the express contractual language that Wells Fargo has no duty to investigate, Wells Fargo is obligated to provide notice and pursue repurchase only if it *acquires actual knowledge* of an R&W breach.  *See Nacional Financiera, S.N.C. v. Bankers Trustee Co. Ltd.*, 2000 WL 36564710, at *7 (N.Y. Sup. Ct. Nov. 17, 2000) ("The fact that . . . an investigation might have been an 'inordinately simple' one to perform . . . is irrelevant, since [the] trustee ha[s] no express or implied duty to investigate.").  Courts that have appropriately reconciled the "discovery" requirement with the contracts' directive that trustees have no duty to investigate have concluded that discovery means the acquisition of actual knowledge.  *See, e.g.*, *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2018 WL 1088020, at *2 (S.D.N.Y. Feb. 12, 2018);

*RP/HSBC II*, 2017 WL 945099, at *6; *W. & S. Life Ins. Co. v. Bank of N.Y. Mellon*, 2017 WL 3392855, at *9 (Ohio Com. Pl. Aug 4, 2017).  This Court should do the same.

Applying the "acquisition of actual knowledge" standard to the No-Discovery Loans here is straightforward.  Plaintiffs have adduced no evidence that Wells Fargo had actual knowledge of any R&W breach as to any of the 957 No-Discovery Loans.  56.1 ¶¶ 583-584.  Accordingly, summary judgment is warranted on Plaintiffs' R&W-related claims with respect to all of those loans.

Further, *even if* this Court determines, as suggested in its prior decisions, that a trustee may "discover" an R&W breach through scienter akin to willful blindness, conscious avoidance, or implied actual knowledge, these claims still fail.  Willful blindness, conscious avoidance, or implied actual knowledge is an exceptionally high standard that Plaintiffs cannot meet.  "[A] willfully blind defendant is one who takes *deliberate actions* to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Scher Law Firm, LLC v. DB Partners I, LLP*, 97 A.D.3d 590, 592 (2d Dep't 2012) (emphasis added) (quoting *Global-Tech Appliances, Inc. v. SEB, S.A.,* 563 U.S. 754, 769 (2011)). "Conscious avoidance," similarly, "involves a culpable state of mind."  *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007).

Plaintiffs have no evidence that Wells Fargo took "deliberate actions" to avoid confirming knowledge of a specific breach or acted with a "culpable state of mind."  They have no evidence that, for instance, Wells Fargo refused to open an appraisal made at the same time as a loan application, after being informed that it contained evidence of a misrepresentation of collateral value.  To the contrary, Wells Fargo had too little information for conscious avoidance or willful blindness even to be possible.  *See U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*,

-35-

205 F. Supp. 3d 386, 425-27 (S.D.N.Y. 2016) (after a bench trial, holding that UBS was not willfully blind to widespread R&W breaches where the evidence showed that UBS actively monitored loan performance and learned of breaches in certain loans, yet abruptly shut down its loan monitoring and failed to look for additional breaches in the rest of the pool).

Measured by any "discovery" standard that is consistent with the text of the Governing Agreements, Plaintiffs' claims fail.  Plaintiffs cannot show that Wells Fargo discovered or received written notice of any R&W breach regarding any No-Discovery Loan.  Accordingly, summary judgment is warranted on Plaintiffs' R&W-related claims on those 957 loans.

Plaintiffs' claims regarding 124 of the No-Discovery Loans (listed in Exhibit J), all held by the "Morgan Stanley Trusts,"[16] 56.1 ¶ 592, also fail for another reason.  The Governing Agreements for the Morgan Stanley Trusts require the Responsible Party to repurchase loans under certain circumstances, but they do not require the trustee to enforce the Responsible Party's obligation to repurchase.  56.1 ¶¶ 593-594.  Because the trustee's duties are limited to those expressly set forth in the Governing Agreements, 56.1 ¶¶ 595-597, Wells Fargo has no enforcement duty for the Morgan Stanley Trusts.  Those claims doubly fail.

**B.** **Plaintiffs Cannot Prove That Wells Fargo Breached Any R&W-Related Duties Regarding the 4,840 Loans for Which Repurchase Duties Had Been Reassigned to Separate Trustees.**

1.    At the Relevant Times, Wells Fargo Had No R&W-Related Duties Regarding the 4,840 Loans.

As discussed above, *see supra* Part III, summary judgment is also warranted on Plaintiffs' R&W-related claims as to an additional 4,840 loans, because a court order had

---

[16] The Morgan Stanley Trusts are: MSAC 2005-WMC2, MSAC 2005-WMC3, MSAC 2005-WMC5, and MSAC 2006-HE1.

relieved Wells Fargo of any repurchase-related duties as to those loans prior to the dates of Wells Fargo's purported breaches of those duties.

> 2. <u>Phoenix Light Impermissibly Relies on Sampling to Prove Liability and Damages for 4,759 of the 4,840 Loans.</u>

Claims regarding 4,759 of those 4,840 loans (listed in Exhibit K)—all within the FFML 2006-FFA Trust, and all at issue in the Phoenix Light litigation—fail for an additional reason, as well:  With respect to the FFML 2006-FFA Trust, Phoenix Light does not even attempt to prove breach or resulting damage on a loan-specific basis.  56.1 ¶¶ 598-600.  For a plaintiff to prevail, the trustee's "alleged misconduct must be proved loan-by-loan and trust-by-trust."  *Ret. Bd.*, 775 F.3d at 162.  For example, "whether [a Responsible Party] was obligated to repurchase a given loan requires examining which loans . . . were in breach of the representations and warranties." *Id.*  And whether the trustee had "knowledge of specific breaches" must also be proven "on the requisite loan-by-loan basis."  *RP/HSBC II*, 2017 WL 945099, at *8.  But Phoenix Light ignored those well-established rules and produced loan-specific evidence of alleged breaches with respect to only 61 loans in the FFML 2006-FFA Trust.  56.1 ¶ 599.  Phoenix Light nonetheless demands damages with respect to *thousands* of other loans that it did not review at all—and does so based only on extrapolation from the examination of a 100-loan sample.  56.1 ¶ 600.

Phoenix Light has conducted this sampling analysis in contravention of a discovery order denying "plaintiffs' motion to re-underwrite a sampling of loans for the purpose of proving Wells Fargo's liability or damages beyond the loans in the sample."  PL ECF 282 at 20.  This should not be countenanced.  And in any event, Plaintiffs cannot win "[w]ithout specific proof that the trustee knew of [a] particular breach."  PL ECF 381 at 23-24 (quoting, and approving of, analysis in discovery order).  Extrapolation from a 100-loan sample cannot meet that burden.

Summary judgment is therefore warranted with respect to 4,759 (all but 61) of the at-issue loans in the FFML 2006-FFA Trust.

3.   At the Relevant Times, Commerzbank Did Not Own Certificates in the Trust Holding 19 of the 4,840 Loans.

Claims regarding 19 of the 4,840 loans (at issue in the Commerzbank litigation and listed in Exhibit L)—also fail for a separate reason.  Commerzbank sold its certificates in the Trust containing those 19 loans in 2011, yet Wells Fargo did not allegedly discover R&W breaches regarding the loans until March 2013.  56.1 ¶¶ 601-606.  Any claims based on the discovery of those alleged R&W breaches therefore accrued to and belong to the new owners of the certificates, not to Commerzbank.  *See Semi-Tech Litig., LLC v. Bankers Trust Co.*, 272 F. Supp. 2d 319, 328 (S.D.N.Y. 2003) (explaining that to have standing, plaintiffs must have "owned the notes . . . at the times when [the] alleged breaches occurred").

**C.   Wells Fargo Satisfied Any Notice and Enforcement Duties as to the 187 R&W Compliance Loans.**

As to each of the remaining R&W Claim Loans (the 187 R&W Compliance Loans, listed in Exhibit M), there may, at best, be a dispute of fact as to whether Wells Fargo discovered an R&W breach that materially and adversely impacted the loan's value or the Certificateholders' interests.  But even assuming that Wells Fargo discovered such breaches, there is no dispute concerning what it did in response—and what it did satisfied any notice and enforcement duties regarding those loans.

1.   Wells Fargo Satisfied Any Notice Duties as to 187 Loans.

Regarding all 187 R&W Compliance Loans, Wells Fargo provided written notice to the relevant Responsible Party of the alleged R&W breach.  56.1 ¶¶ 614-616, 621-623.

2.      Wells Fargo Satisfied Any Enforcement Duties as to 187 Loans.

Wells Fargo also complied with any enforcement duties it had regarding the R&W

Compliance Loans, all of which are in the ABFC 2006-OPT2 Trust.  Plaintiffs' enforcement

claims regarding those 187 loans fail for three reasons.

*First*, Wells Fargo complied with any enforcement duties regarding all 187 R&W

Compliance Loans by demanding repurchase of those loans.  56.1 ¶¶ 614-617, ¶¶ 620-624.

Wells Fargo was not required to take further, potentially expensive, extra-contractual actions.  In

particular, and contrary to Plaintiffs' position, Wells Fargo was not required to bring litigation

regarding each and every loan that was not repurchased.  Before an EOD, Wells Fargo was

obligated "to perform such duties and *only* such duties as are *specifically* set forth" in the

contract.  56.1 ¶ 35 (emphases added).  And the ABFC 2006-OPT2 Trust's Governing

Agreement does not specifically require Wells Fargo to enforce repurchase obligations *through

litigation*.  56.1 ¶ 611.

Indeed, the Agreement forecloses Plaintiffs' theory.  It obligates Wells Fargo to litigate

*only* if directed to do so by Certificateholders and indemnified for costs.  56.1 ¶ 50.  This protects

Certificateholders from a single investor forcing a trustee to pursue risky or expensive litigation

at the expense of trust assets.  *See In the Matter of Merrill Lynch First Franklin Mortgage Loan

Trust, Mortgage Loan Asset-Backed Certificates, Series 2007-5*, No. 62-TR-CV-19-30 (Minn.

Dist. Ct. Oct. 4, 2019) (56.1 ¶ 613) ("Petitioner's extremely limited interest in the trust is

insufficient to justify mandating that the Trustee utilize the Trust funds to pursue the expensive

and potentially risky requested litigation."); *In the Matter of Merrill Lynch First Franklin

Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2007-4,* No. 62-TR-CV-

19-11 (Minn. Dist. Ct. June 4, 2019) (56.1 ¶ 612) ("[I]f the reward of successful recovery

outweighed the risk of potential expenditures or failure, it seems logical that other

certificateholders would have supported [litigation].").  The contractual protection is particularly important because the Agreement apportions the costs and benefits of litigation differently to different tranches of certificates, 56.1 ¶ 30, so investors have varying—and sometimes conflicting—interests.  56.1 ¶ 31.  Wells Fargo thus complied with the provision by demanding repurchase but refraining from initiating litigation where it lacked direction from Certificateholders.[17]

*Second*, for 34 of the 187 R&W Compliance Loans (listed in Exhibit N), the Responsible Party responded to Wells Fargo's repurchase demand with a document disputing the existence or materiality of a breach.  56.1 ¶¶ 617-619, 624-626**.**  The ABFC 2006-OPT2 Trust's Agreement expressly permits Wells Fargo to accept as true the statements in such a document.  56.1 ¶ 299.  Indeed, under the Agreement Wells Fargo "shall not be bound to make any investigation" into such documents to determine if the contents are correct.  56.1 ¶ 46.  For those 34 loans, Wells Fargo properly relied on the Responsible Parties' correspondence indicating that repurchase was unwarranted.  Plaintiffs' R&W-related claims regarding those loans fail for this reason, too.

*Third*, for all 187 of the R&W Compliance Loans (listed in Exhibit O), the longest-possible (6-year) statute of limitations for repurchase litigation had expired *before* Wells Fargo first received notice of potential R&W breaches associated with those specific loans.  56.1 ¶¶ 607-610.  Any repurchase litigation effort, after the date Plaintiffs claim Wells Fargo discovered or received notice of an alleged underlying R&W breach, would thus have been futile.  *See U.S. Bank, Nat'l Ass'n v. Citigroup Global Markets Realty Corp.*, 2015 WL 1222075, at *2 (S.D.N.Y. Mar. 13, 2015) (holding that a trustee cannot pursue an R&W claim where "a

---

[17] Plaintiffs have no evidence that they (or any other party) directed Wells Fargo, in accordance with the Governing Agreement for the ABFC 2006-OPT2, to litigate regarding any at-issue loan in that Trust.

breach of [the Responsible Party's] cure or repurchase obligation relating to the[] loans could only occur, at the earliest . . . after the limitations period concluded").  Plaintiffs therefore cannot show that Wells Fargo's alleged inaction caused their asserted damages—and summary judgment is warranted.

## VI.     WELLS FARGO IS ENTITLED TO SUMMARY JUDGMENT ON MANY OF PLAINTIFFS' PRE-EVENT OF DEFAULT DOCUMENT-DEFECT CLAIMS.

Summary judgment is also warranted with respect to many of Plaintiffs' pre-EOD document-defect claims.  Plaintiffs generally allege that Wells Fargo discovered "document defects" in mortgage files—the files containing mortgages, assignments, title insurance policies, and the like—yet failed to give notice of them or enforce repurchase rights.  *See* PL ECF 80 at ¶¶ 58-77, 88-106; CB ECF 1 at ¶¶ 567-77.  But, as discussed above, *see supra* Part IV, those document-defect claims are indisputably time-barred as to the Exception Report Trusts, the German SOL Trusts, and the liquidated loans regarding which Plaintiffs admit a "discovery" date more than six years before this lawsuit was filed.  Further, as discussed above, *see supra* Part III, some document-defect claims fail because Plaintiffs claim that Wells Fargo should have enforced repurchase *after* the date that enforcement obligations were transferred to a separate trustee.  Finally, and additionally, with respect to the Morgan Stanley Trusts, Wells Fargo was not obligated to enforce repurchase claims related to document defects, just as it was not required to enforce repurchase claims relating to R&W breaches.  *See supra* Part V.A; 56.1 ¶¶ 630-631.

## VII.    WELLS FARGO IS ENTITLED TO SUMMARY JUDGMENT ON THE VAST MAJORITY OF PLAINTIFFS' POST-EVENT OF DEFAULT CLAIMS.

Most of Plaintiffs' post-EOD claims also fail as a matter of law.  The Agreements provide that in certain situations Wells Fargo shall use the same degree of care and skill in exercising its rights as a prudent person would use under the circumstances.  56.1 ¶ 632.  Plaintiffs claim that Wells Fargo violated its "prudent person" duty with respect to 24 Trusts.

But their claims as to 17 Trusts fail entirely, and their claims as to the remaining seven trusts fail in part.

### A.      Regarding 13 Trusts, Plaintiffs Have No Evidence That a "Prudent Person" Duty Was Triggered.

Under the Governing Agreements, a "prudent person" duty does not arise unless (i) a contractually-defined EOD occurs, and (ii) Wells Fargo has written notice (or, for some Trusts, actual knowledge, or either written notice or actual knowledge) of the EOD.  For 13 Trusts,[18] as a matter of law no "prudent person" duty ever arose.

#### 1.      There Is No Evidence an EOD Occurred With Respect to the 13 Trusts.

Under the 13 Trusts' Governing Agreements, an EOD occurs if a Servicer (i) materially breaches its obligations, (ii) receives written notice (or, for some Trusts, receives written notice or acquires actual knowledge) of the material breach, and (iii) fails to cure within a specified period (a "Servicer-Breach EOD").  56.1 ¶¶ 637-640.  Plaintiffs claim that a "Servicer-Breach EOD" occurred as to each of the 13 Trusts.  56.1 ¶ 637.  But Plaintiffs are wrong as a matter of law.  For the six Trusts[19] that require that a Servicer receive written notice of a material breach, 56.1 ¶ 639, Plaintiffs have no evidence of such written notice.  And for the seven Trusts[20] that require that a Servicer receive written notice or acquire actual knowledge of a material breach, 56.1 ¶ 640, Plaintiffs have no evidence of such written notice or actual knowledge.  The Court should therefore grant summary judgment on Plaintiffs' post-EOD claims for all 13 Trusts.  *See Bakal v. U.S. Bank Nat'l Ass'n*, 747 F. App'x 32, 35-36 (2d Cir. 2019) (dismissing post-EOD

---

[18] The 13 Trusts are: ABSHE 2005-HE5, CARR 2007-FRE1, CMLTI 2005-OPT4, GPMF 2005-AR4, GPMF 2006-AR1, GPMF 2006-AR2, GPMF 2006-AR3, IMSA 2005-2, MSAC 2005-WMC2, MSAC 2005-WMC3, MSAC 2005-WMC5, OWNIT 2006-2, and PPSI 2005- WLL1.

[19] The six Trusts are: GPMF 2005-AR4, GPMF 2006-AR1, GPMF 2006-AR2, GPMF 2006-AR3, IMSA 2005-2, and OWNIT 2006-2.

[20] The seven Trusts are:  ABSHE 2005-HE5, CARR 2007-FRE1, CMLTI 2005-OPT4, MSAC 2005-WMC2, MSAC 2005-WMC3, MSAC 2005-WMC5, and PPSI 2005-WLL1.

claim based on purported servicer-breach EOD where Servicer did not receive requisite notice of breach).

Summary judgment may not be defeated by reliance on the so-called "prevention doctrine." The First Department has expressly rejected the "argument that, since . . . the PSA imposes additional duties on [the trustee] after an Event of Default," an EOD will be deemed to have occurred where the trustee "fail[s] to give the notice to cure that would cause the servicers' failure to perform to ripen into an Event of Default." *Fixed Income Shares: Series M v. Citibank, N.A.*, 157 A.D.3d 541, 542 (1st Dep't 2018). The First Department explained that the prevention doctrine did not apply for three reasons: (i) the trustee had no contractual duty to give notice; (ii) the prevention doctrine applies where a defendant actively prevents a condition precedent from occurring, and a trustee's "failure to send a notice to cure to servicers is not 'active conduct'"; and (iii) "[i]n any event, under the PSA, 'the Holders of Certificates entitled to at least 25% of the Voting Rights' could have sent notice of the servicers' failure." *Id.* at 542-43. *See also Blackrock Balanced Capital Portfolio (FI) v. U.S. Bank N.A.*, 165 A.D.3d 526, 527 (1st Dep't 2018) (rejecting "prevention doctrine" argument because "[a] defendant's failure to send a notice to cure to the servicers is not 'active conduct'"); *W. & S. Life Ins. Co. v. Bank of N.Y. Mellon*, 129 N.E.3d 1085, 1094 (Ohio Ct. App. 2019) (rejecting "prevention doctrine" argument for the same three reasons as *Fixed Income Shares*).

The same analysis pertains here. *First*, none of the Governing Agreements imposes on Wells Fargo a duty to give the notice preceding an EOD. 56.1 ¶ 642. And, under the Agreements' express terms, no such duty may be implied. 56.1 ¶ 38; *Fixed Income Shares*, 157 A.D.3d at 542. Further, the provision stating that an EOD occurs after notice "shall have been given" to the Servicer "does not require [the trustee] to give notice to cure; it merely defines

'Event of Default.'"  56.1 ¶¶ 639-640; *see also Blackrock Balanced Capital Portfolio*, 165 A.D.3d at 527 (holding that a trustee has no "obligation to send notices to cure to servicers" where the governing agreements state that notices "shall have been given").  *Second*, Plaintiffs have no evidence that Wells Fargo engaged in active conduct to prevent others from giving notice to Servicers for any Trust.  *Finally*, under the terms of all but one Governing Agreement, Certificateholders could have provided the required notice.  56.1 ¶ 641.  The prevention doctrine is therefore inapplicable to Plaintiffs' servicer-breach EOD claims and cannot shield those claims from summary judgment.

Certain of the Servicer-Breach EOD claims fail for other reasons, too.  Regarding all 13 Trusts, Plaintiffs claim an alleged Servicer breach underlying the purported Servicer-Breach EODs was the "failure to prudently service the loans as was required" (leading to a "Prudent Servicing EOD").  56.1 ¶ 637.  But Plaintiffs have no evidence that a breach occurred in the servicing of *even a single loan*.  56.1 ¶ 644.  And regarding three Trusts,[21] Commerzbank claims an alleged Servicer breach underlying the purported Servicer-Breach EODs was the Servicer's failure to meet a deadline to deliver its Annual Statement of Compliance under Regulation AB (leading to a "Reg AB EOD").  56.1 ¶ 645.  But Commerzbank has no evidence the Servicer failed to cure for the specified number of days—indeed, the Servicer cured by delivering the required materials, dated only two days after the deadline.  56.1 ¶¶ 646-656.  Together, these flaws warrant summary judgment (a second time over) on the post-EOD claims regarding 12[22] of the 13 Trusts.

---

[21] The three Trusts (at issue only in the Commerzbank action) are: GPMF 2006-AR1, GPMF 2006-AR2, and GPMF 2006-AR3.

[22] The 12 Trusts are: ABSHE 2005-HE5, CARR 2007-FRE1, CMLTI 2005-OPT4, GPMF 2005-AR4, GPMF 2006-AR1, GPMF 2006-AR2, GPMF 2006-AR3, IMSA 2005-2, MSAC 2005-WMC2, MSAC 2005-WMC3, MSAC 2005-WMC5, and PPSI 2005- WLL1.

2.      There Is No Evidence That Wells Fargo Had Actual Knowledge or
Received Written Notice of an EOD With Respect to the 13 Trusts.

Plaintiffs' post-EOD claims regarding the 13 Trusts fail for another reason:  Plaintiffs

cannot show Wells Fargo had the requisite written notice or actual knowledge of any EODs.

The Governing Agreements for four of the Trusts[23] provide that the trustee "shall not be

deemed to have knowledge of an Event of Default until a Responsible Officer of the Trustee

shall have *received written notice* thereof."  56.1 ¶ 635 (emphasis added).  For those trusts, "in

the absence of written notice of an Event of Default, the Trustee lacks 'knowledge' and is not

subject to a prudent person duty."  *PL/BNYM II*, 2017 WL 3973951, at *16; *see also Commerce

Bank*, 141 A.D.3d at 415 (rejecting claim that trustee knew of an EOD where same provision

governed, and trustee had received a "letter [that] was not a notice of an Event of Default; rather,

it was a notice of events that, with time, might ripen into events of default").  Written notice of

an EOD is what matters, and "[the trustee's] actual knowledge is irrelevant."  *PL/BNYM II*, 2017

WL 3973951, at *17.  But Plaintiffs have no evidence that Wells Fargo received written notice of

an EOD with respect to any of these four Trusts.

The Governing Agreements for the other nine Trusts[24] impose "prudent person" duties

only if Wells Fargo had actual knowledge (or, for some Trusts, had actual knowledge or received

written notice) of an EOD.  56.1 ¶ 636.  But Plaintiffs have no evidence that Wells Fargo had

actual knowledge or received written notice of any EOD for these Trusts.  "Because there is no

evidence that [the trustee] received written notice or had actual knowledge of any Event of

Default relative to these . . . Trusts, [the trustee] was not subject to a prudent person duty."

---

[23] The four Trusts are: MSAC 2005-WMC2, MSAC 2005-WMC3, MSAC 2005-WMC5, and
OWNIT 2006-2.

[24] The nine Trusts are: ABSHE 2005-HE5, CARR 2007-FRE1, CMLTI 2005-OPT4, GPMF 2005-AR4,
GPMF 2006-AR1, GPMF 2006-AR2, GPMF 2006-AR3, IMSA 2005-2, and PPSI 2005-WLL1.

*PL/BNYM II*, 2017 WL 3973951, at *18.  And because, for each of the 13 Trusts, Plaintiffs

cannot show that Wells Fargo was subject to a prudent person duty, summary judgment is

warranted on Plaintiffs' post-EOD claims.

> **B.     Regarding Another Trust, There Is No Evidence That Wells Fargo Owed a
>           Post-EOD Duty to Commerzbank.**

For a fourteenth Trust (the MSAC 2006-HE1 Trust, at issue in the Commerzbank action),

Commerzbank fails to demonstrate that Wells Fargo owed it any post-EOD duties.

Commerzbank claims Wells Fargo's "prudent person" duty arose after (i) a Prudent-Servicing

EOD and (ii) "Servicer-Downgrade EODs" (based on rating downgrades for the Trust's Servicer

on October 21, 2014, and February 4, 2015).  56.1 ¶¶ 657-659.  But Commerzbank's claim

regarding the alleged Prudent-Servicing EOD fails for the reasons discussed above, *see supra*

Part VII.A: Commerzbank cannot prove, in accordance with the terms of the Trust's Governing

Agreement, that there was a material breach, that the Servicer had actual knowledge or written

notice of a material breach, or that Wells Fargo had actual knowledge or written notice of an

EOD.  56.1 ¶¶ 660-661.  And Commerzbank's claim regarding the alleged Servicer-Downgrade

EODs fails too.  Commerzbank sold its certificates in the Trust in 2011.  56.1 ¶ 59.  Any claim

based on rating downgrades in 2014 or 2015 would have accrued to the new owner, and

Commerzbank has no standing to assert them.  *See Semi-Tech Litig., LLC*, 272 F. Supp. 2d at

328.  Summary judgment should therefore be granted on the post-EOD claims as to the MSAC

2006-HE1 Trust as well.

> **C.     Regarding One More Trust, Plaintiffs Do Not Point to an EOD.**

The post-EOD claims regarding a fifteenth Trust (the IMM 2005-6 Trust, at issue in the

Phoenix Light action) fail because Phoenix Light does not identify, much less possess evidence

of, an EOD.  The IMM 2005-6 Trust's indenture defines the defaults leading to EODs to include

only certain failures by the *issuer* to comply with its obligations to defend the Trust's ownership of the Trust corpus.  56.1 ¶ 662.  Phoenix Light has no evidence demonstrating such a failure. And, in enumerating its post-EOD claims regarding the IMM 2005-6 Trust, Phoenix Light sets forth only alleged failures by the Servicer.  56.1 ¶¶ 733-735.

In any event, even assuming Servicer conduct could lead to an EOD for the IMM 2005-6 Trust, Phoenix Light cannot prove its post-EOD claim here, for the reasons discussed above.  *See supra* Part VII.A.  Phoenix Light cannot prove, in accordance with the terms of the indenture, that the Servicer had written notice of a material breach or that Wells Fargo had written notice or actual knowledge of an EOD.  56.1 ¶¶ 663-664.  Wells Fargo is entitled to summary judgment on Phoenix Light's post-EOD claims regarding the IMM 2005-6 Trust.

### D.   Regarding Two Additional Trusts, Wells Fargo Indisputably Complied With Any "Prudent Person" Duty.

For an additional two Trusts[25] (at issue in the Phoenix Light action), Wells Fargo indisputably complied with any "prudent person" duty.  Phoenix Light claims two types of EODs relating to these two Trusts: Prudent Servicing EODs and "Servicer-Bankruptcy EODs."  **56.1 ¶¶ 665-666.**  Claims based on either type fail.

First, Phoenix Light's claims based on alleged Prudent Servicing EODs fail for the same reasons as are discussed above.  *See supra* Part VII.A.  Phoenix Light cannot prove, in accordance with the terms of the Trusts' Governing Agreements, that there was a material breach, that the Servicer had actual knowledge or written notice of a material breach, or that Wells Fargo had actual knowledge or written notice of an EOD.  56.1 ¶¶ 667-668.

---

[25] The two Trusts are: CARR 2006-NC3 and CARR 2006-NC4.

Phoenix Light's claims based on Servicer-Bankruptcy EODs fail too.  After New Century went into bankruptcy on April 2, 2007, Wells Fargo declared Servicer-Bankruptcy EODs as to the two Trusts on April 4, 2007.  56.1 ¶¶ 669-672.  On May 23, 2007, the bankruptcy court approved Carrington's purchase of New Century's servicing rights.  56.1 ¶ 674.  Carrington took over the servicing of the two Trusts, and the EOD was resolved.  56.1 ¶¶ 673-674.  Phoenix Light does not identify any action that Wells Fargo failed to take that a "prudent person" would have taken under the circumstances during the pendency of the EOD.

Phoenix Light complains that Wells Fargo did not initiate a review of defaulted mortgage loans, demand repurchase of those loans that have uncured document exceptions or breaches of R&Ws, and then sue regarding any un-repurchased loans.  56.1 ¶¶ 675-679.  But the Governing Agreements obligate Wells Fargo only to use the care and skill that a prudent person would use "under the circumstances."  56.1 ¶ 632.  Phoenix Light's proposed detailed investigation of R&Ws, loans, and mortgage files is entirely divorced from "the circumstances" at issue here (Servicer bankruptcy) and is far beyond the scope of Wells Fargo's contractual obligations.

Additionally, Phoenix Light cannot prove that a "prudent person" in those circumstances would do what it suggests.  Courts have rejected claims that a trustee "should (or would) have taken it upon itself to force . . . repurchase [of] any defective or deficient Mortgage Loans" as "simply too distant a leap . . . to make without" showing "that other MBS trusts' trustees have taken similar action in similar circumstances (bolstering the actions a 'prudent person' would have taken)."  *Policemen's Annuity & Benefit Fund of City of Chicago v. Bank of Am., N.A.*, 907 F. Supp. 2d 536, 555 (S.D.N.Y. 2012).  *See also RP/DB*, 2018 WL 4682220, at *14 (rejecting the "assertion that a prudent Trustee, faced with a [Servicer default], is obligated by this event to investigate the quality of the loans throughout the relevant Trust to determine whether or not [it]

could make valid repurchase claims") (internal quotation marks omitted); *RP/HSBC II*, 2017 WL 945099, at *9 (rejecting "[t]he argument that [the trustee] should have performed an extensive sampling review of the loans at issue" where "plaintiffs have cited no evidence, such as industry standards or customs at the time, showing that . . . identifying and investigating loan breaches, and subsequently enforcing repurchase was 'what a prudent person would have done' following an EOD"). Phoenix Light has no evidence that after a Servicer-Bankruptcy EOD other trustees undertook the review and litigation they propose. (And for good reason: Phoenix Light has identified no realistic link between a Servicer bankruptcy and loan underwriting.) Phoenix Light's unsubstantiated theory should be rejected.

Phoenix Light also complains that Wells Fargo did not "demand that the servicer improve its servicing practices," "terminat[e] the servicer and replac[e] it with a successor," or "sue the original servicer for damages resulting from its failure to perform its obligations." 56.1 ¶ 680. But New Century was in bankruptcy, and Phoenix Light has no evidence that a "demand" for damages would have been successful or resulted in the damages that they seek. Nor does Phoenix Light have any evidence that terminating the Servicer, instead of awaiting replacement via the bankruptcy court's order, would have been possible (*i.e.,* with bankruptcy court approval), "prudent," or eliminated any losses. 56.1 ¶¶ 632, 672.

In short, Phoenix Light has no evidence that Wells Fargo failed to satisfy its obligations after the Servicer-Bankruptcy EODs. Thus, the post-EOD claims as to those two Trusts fail.

### E.       Regarding the Remaining Seven Trusts, Plaintiffs Cannot Prove a Prudent Person Duty Was Triggered by a Prudent Servicing EOD.

Beyond the 17 above-discussed Trusts, this Court should also grant summary judgment on Plaintiffs' post-EOD claims regarding the seven remaining Trusts to the extent the claims

are based on alleged Prudent Servicing EODs. [26]  Plaintiffs' claims regarding the alleged Prudent

Servicing EODs fail for the reasons discussed above, *see supra* Part VII.A: Plaintiffs cannot

prove, in accordance with the terms of the Agreements, that there was a material prudent-

servicing breach, that the Servicers had actual knowledge or written notice of such a breach, or

that Wells Fargo had actual knowledge or written notice of a Prudent Servicing EOD.  56.1 634-

636, 639-640.

### F.     Wells Fargo Is Entitled to Summary Judgment on All of Phoenix Light's Post-EOD Claims Regarding Alleged Servicing-Oversight Failures.

Summary judgment is also warranted with respect to Phoenix Light's theory of post-EOD

failure to provide servicing oversight.  Phoenix Light claims that with respect to ten Trusts[27]

Wells Fargo breached a purported post-EOD "prudent person" duty to respond in supposedly

required ways when Servicers failed to provide prudent loan servicing.  56.1 ¶ 681.  Phoenix

Light's experts separately calculate damages allegedly associated with such breaches.  *Id.*  But

these claims fail for multiple reasons.  First, Phoenix Light has no evidence showing that Wells

Fargo failed to respond appropriately to a Servicer's failure to service properly even a *single* loan

in any of the ten Trusts—or that such a failure caused Phoenix Light damages.  Second, Phoenix

Light's servicing-oversight claims cannot survive if its experts' testimony regarding associated

damages is excluded (as it should be).  And finally, at the very least, judgment is warranted on

Phoenix Light's claims for so-called "catch-up servicing" damages.

---

[26] The seven Trusts are: ABFC 2005-HE2, ABFC 2005-OPT1, ABFC 2006-OPT1, ABFC 2006-OPT2, OOMLT 2006-2, OOMLT 2007-3, and SABR 2006-FR2.

[27] The ten Trusts are: ABFC 2006-OPT2, CARR 2006-NC3, CARR 2006-NC4, CARR 2007-FRE1, IMM 2005-6, IMSA 2005-2, OOMLT 2007-3, OWNIT 2006-2, PPSI 2005-WLL1, and SABR 2006-FR2.

1.    <u>Phoenix Light Has No Evidence of "Servicing Oversight" Breaches by Wells Fargo.</u>

Phoenix Light has no evidence that Wells Fargo responded improperly to the deficient servicing of even a single loan across the ten Trusts. Phoenix Light's proposed servicing expert looked only at "outcomes" (metrics such as foreclosure timelines and loss severities) of the Trusts' Servicers' conduct—and she then *assumed* that the Servicers must have been breaching their obligations and that Wells Fargo must have been responding improperly to such breaches. 56.1 ¶¶ 682-691. But she did not identify, and Phoenix Light has no evidence of, even a *single breach* on the part of Wells Fargo. Phoenix Light also lacks evidence that if Wells Fargo had responded differently to the servicing of any loan, the loan would have produced more income and losses would have been averted. The servicing-oversight damages demands therefore fail.

Further, as to eight of the Trusts,[28] Phoenix Light does not even have evidence that the *Servicers* breached their obligations when servicing any loan. Phoenix Light's proposed expert admitted that she did not examine how any Servicer conducted itself while servicing any loan in the Trusts. 56.1 ¶ 682, 686. She admitted that she did not even consider the Trusts' Servicers' policies and procedures. 56.1 ¶ 683. She generally observed that some Servicers filed Regulation AB statements indicating material non-compliance with certain contractual obligations, but she did not claim that any Servicer filed a statement that addressed servicing breaches with respect to *any* particular loans in *any* of the Trusts. 56.1 ¶ 684. She also noted that general regulatory or enforcement actions were taken against some Servicers but, again, did not claim that any action was taken with respect to *any at-issue Trust or loan*. 56.1 ¶ 685. Phoenix Light thus cannot prove that the Servicers breached their duties to service prudently the

---

[28] The eight Trusts are: ABFC 2006-OPT2, CARR 2007-FRE1, IMM 2005-6, IMSA 2005-2, OOMLT 2007-3, OWNIT 2006-2, PPSI 2005-WLL1, and SABR 2006-FR2.

loans in the Trusts.  And without such proof, Phoenix Light cannot show that Wells Fargo responded improperly to such a breach.

Phoenix Light's failure of proof is particularly acute with respect to two Trusts.[29]  Those Trusts have third parties—master servicers—who are required by the Agreements to "supervise, or take such actions as necessary to ensure" proper servicing.  56.1 ¶¶ 692-693, 695.  Phoenix Light simply ignores these master servicers, wrongly claims that Wells Fargo was responsible for Servicer oversight, and attributes all claimed servicing oversight "damages" to Wells Fargo.  56.1 ¶¶ 697-699.  But the Agreements provide that the master servicer shall enforce the Sub-Servicer's obligations.  56.1 ¶¶ 694, 696. They further provide that the "Trustee. . . shall have no claims, rights, obligations . . . or liabilities with respect to the Sub-Servicer."  56.1 ¶ 700.  Thus, for these two Trusts, Wells Fargo does not have the duties that Phoenix Light claims it has breached.  Phoenix Light's servicing-oversight claims fail for lack of proof.

> ### 2.     <u>Phoenix Light Has No Admissible Evidence Regarding Damages Associated with Alleged Servicing-Oversight Breaches.</u>

Separately, Phoenix Light cannot show any damages from alleged servicing-oversight breaches.  As Wells Fargo's separate *Daubert* motion explains, Phoenix Light's expert testimony relating to alleged servicing-oversight damages must be excluded.  Without evidence of damages, summary judgment is warranted on all of Phoenix Light's servicing-oversight claims.  *See Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 448 (S.D.N.Y. 2018).

> ### 3.     <u>Phoenix Light's Claims for "Catch-Up Servicing Damages" Fail.</u>

At the very least, Phoenix Light's claims for one of two categories of servicing-oversight damages fail as a matter of law.  Phoenix Light claims two types of servicing-oversight damages:

---

[29] The two Trusts are: IMSA 2005-2 and IMM 2005-6.

"Post-Enforcement Servicing Damages" and "Catch-Up Servicing Damages."  56.1 ¶ 701.  The dividing line between the two is the "Servicing Enforcement Date"—the date on which Phoenix Light claims Wells Fargo should have acted on alleged servicing breaches (*i.e.*, six months after the alleged EOD or theoretical "equivalent" date).  56.1 ¶¶ 702-705, 708-709**.**  "In the [P]ost [E]nforcement [D]ate [Damages] scenario[,] servicing losses are only calculated from that date forward."  56.1 ¶ 705.  Catch-Up Servicing Damages, by contrast, are based on losses the Trusts incurred *prior to* the Servicing Enforcement Date.  56.1 ¶ 708.  The claims for Catch-Up Servicing Damages fail.

None of the Governing Agreements obligates Wells Fargo to monitor, oversee, or otherwise be responsible for Servicer conduct prior to an EOD.  *See BlackRock Allocation Target Shares: Series S Portfolio v. U.S. Bank Nat'l Ass'n*, 2015 WL 2359319, at *2 (S.D.N.Y. May 18, 2015) ("[T]he trustee has no contractual obligation to monitor or oversee servicers.").  Instead, the Agreements provide that the Trustee shall not have any liability for the actions or omissions of the Servicer.  56.1 ¶ 710.  Because the contracts do not impose any pre-EOD servicing oversight duty on Wells Fargo, neither does the law.  *See Phoenix Light SF Ltd. v. Bank of N.Y. Mellon* (hereinafter "*PL/BNYM*"), 2015 WL 5710645, at *9 (S.D.N.Y. Sept. 29, 2015) ("[T]he Trustee ha[s] *no* duties other than its contractual duties").

Further, Wells Fargo had no post-EOD duty the violation of which could result in Catch-Up Servicing Damages, either.  Phoenix Light appears to suggest that *after* an EOD, a trustee can fulfill its prudent-person duties only by (i) investigating every single action a Servicer has taken *prior* to the EOD, (ii) calculating any losses attributable to improper actions, (iii) requesting that the Servicer pay the trust for those losses, and (iv) suing (successfully) to recover such losses upon the Servicer's refusal.  But Phoenix Light cannot prove that a "prudent person" in those

circumstances would take this unprecedented course of action. And Phoenix Light certainly

cannot prove that a "prudent person" in those circumstances would calculate damages, as

Phoenix Light proposes, based on a comparison of average loss severities in at-issue Trusts and

average loss severities in certain portfolios held by government-sponsored enterprises. **56.1**

**¶¶** 711-715.

Phoenix Light has no evidence that any trustee ever requested such damages, initiated

such litigation, or obtained such a sum. Indeed, the undisputed evidence is that these things

never happened. 56.1 ¶¶ 716-720. And absent evidence that other trustees took similar actions,

or that industry standards or custom required such actions, a theory of prudent-person RMBS

trustee obligations fails as a matter of law. *RP/DB*, 2018 WL 4682220, at *14; *RP/HSBC II*,

2017 WL 945099, at *9; *Policemen's Annuity & Benefit Fund,* 907 F. Supp. 2d at 555.

Summary judgment is thus warranted on the claims for Catch-Up Servicing Damages.

## VIII.   PLAINTIFFS' TORT CLAIMS FAIL.

With respect to each type of allegation discussed above (R&W, document defect, and

post-EOD), Plaintiffs assert parallel claims in both contract and tort. Plaintiffs' tort claims,

however, are independently barred for a number of reasons.

### A.   The Tort Claims Are Impermissibly Duplicative of the Contract Claims.

A tort claim cannot survive summary judgment if the tort "cause of action is duplicative

of the . . . cause of action for breach of contract." *N.Y. Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763,

770 (N.Y. 1995). "To determine whether a tort claim lies," a court must "evaluate the nature of

the injury, how the injury occurred and the harm it caused" as compared to the plaintiff's

contract claim. *Dormitory Auth. of N.Y. v. Samson Constr. Co.*, 94 N.E.3d 456, 460-61 (N.Y.

2018). In *Dormitory Authority*, the Court of Appeals recently applied that test to a negligence

claim. It set out the following considerations: (i) although "the negligence claim [was] framed

in terms of [a] failure to comply with . . . standards of care," the factual "allegations [were] merely a restatement, albeit in slightly different language, of the . . . contractual obligations"; (ii) the complaint "fail[ed] to include a single allegation that contain[ed] any distinction between the damages applicable to either claim"; and (iii) "during discovery, the total amount of damages was detailed by [the plaintiff], with no distinction between the [loss] incurred based on one claim or the other." *Id.* (internal quotation marks omitted). The court barred the claim. *Id.*

The same considerations bar Plaintiffs' tort claims here. Plaintiffs' negligence and fiduciary-duty claims, though framed as "extra-contractual duties," are identical to the duties (allegedly) imposed by the contracts. *See* PL ECF 80 at ¶¶ 180, 186, 190; CB ECF 1 at ¶¶ 149, 155, 159. Plaintiffs' complaints did not distinguish between the damages applicable to the tort and contract claims, but rather alleged the same economic injury for both: the diminishment of the value of Plaintiffs' certificates. *See* PL ECF 80 at ¶¶ 182, 184, 188, 192; CB ECF 1 at ¶¶ 151, 153, 157, 160. And during expert discovery, Plaintiffs and their proposed expert took the position that tort damages are "equivalent to Repurchase Damages," *i.e.*, contract damages, except that tort damages are adjusted downward to reflect that Plaintiffs paid less than par for some certificates. 56.1 ¶¶ 721-728. As a result of this approach, the tort damages calculated by Plaintiffs are either identical to, or a subset of, the contract damages, not a separate class of harm. *See* 56.1 ¶¶ 729. *Dormitory Authority* squarely forecloses all of Plaintiffs' tort claims.

**B.      The Economic Loss Doctrine Bars Plaintiffs' Tort Claims.**

Plaintiffs' tort claims are also all barred by New York's economic loss rule, under which "a contracting party seeking only a benefit of the bargain recovery, viz., economic loss under the contract, may not sue in tort notwithstanding the use of familiar tort language in its pleadings." *17 Vista Fee Assocs. v. Teachers Ins. & Annuity Ass'n of Am.*, 259 A.D.2d 75, 83 (1st Dep't 1999). At the motion-to-dismiss stage, this Court determined that "the economic loss doctrine

bars plaintiffs' claims insofar as they seek only the benefit of plaintiffs' contract." PL ECF 305 at 36. Discovery has confirmed that Plaintiffs, through their tort claims, seek only what they claim to be the benefit bestowed by the Governing Agreements. 56.1 ¶¶ 723-729. In accordance with this Court's previous ruling, summary judgment should be granted on all of the tort claims. And two recent appellate decisions confirm that the economic loss doctrine bars those claims.

First, in 2018 the Second Circuit held that the economic loss doctrine bars claims that are materially identical to Plaintiffs' tort claims. Several investment vehicles had sued RMBS trustees for failing to enforce R&W breaches and to act prudently post-EOD. *Triaxx Prime CDO 2006-1, Ltd. v. Bank of N.Y. Mellon*, 2018 WL 1417850, at *1-2 (S.D.N.Y. Mar. 8, 2018). The district court held that plaintiffs' fiduciary duty claims were "barred by the economic loss doctrine." *Id.* at *7. It explained: "Plaintiffs' fiduciary duty claims are based on defendants' alleged violations of their post-EOD contractual obligations, and their damages therefore lie in the enforcement of those contractual obligations." *Id.* The Second Circuit affirmed "[f]or the reasons stated by [the district court] in [its] thorough and thoughtful opinion." *Triaxx CDO 2006-1, Ltd. v. U.S. Bank Nat'l Ass'n*, 741 F. App'x 857 (2d Cir. 2018). *See also NCUA v. Deutsche Bank Nat'l Trust Co.* (hereinafter "*NCUA/DBNTC*"), 410 F. Supp. 3d 662, 688 (S.D.N.Y. 2019) (applying *Triaxx* to dismiss investor's negligence and fiduciary duty claims against trustee).

The First Department came to the same conclusion under similar circumstances. In *BlackRock Balanced Capital Portfolio (FI) v. U.S. Bank National Association*, certificateholders sued an RMBS trustee for, *inter alia*, breach of post-EOD fiduciary duty and conflicts of interest. 2018 WL 452001, at *1-2 (N.Y. Sup. Ct. Jan. 17, 2018). The trial court observed that "[t]he damages that plaintiffs s[ought] on the breach of fiduciary duty claims flow[ed] from [the

trustee's] obligations under the PSAs" and that "the damages that plaintiffs allege[d] on [their conflict-of-interest] claim ar[o]se entirely from [the trustee's] contractual obligations." *Id.* at *11-12.  It concluded that both claims were "barred by the economic loss doctrine." *Id.* at *10, *12.  The First Department affirmed on the same basis. *See BlackRock Balanced Capital Portfolio*, 165 A.D.3d 526, 528 (1st Dep't 2018).

The same analysis bars Plaintiffs' tort claims, which are indistinguishable from the investors' claims in *Triaxx* and *Blackrock Balanced Capital*.  Plaintiffs seek, in tort, nothing more than benefit-of-the-bargain damages for actions that they claim violated the Governing Agreements. 56.1 ¶¶ 723-729.  Consequently, Plaintiffs' tort claims fail. *See NCUA/DBNTC*, 410 F. Supp.3d at 688 (applying economic loss doctrine to dismiss negligence and fiduciary duty claims in similar litigation against trustee).

### C.   Plaintiffs' Conflict-of-Interest Claims Fail For Lack of Evidence.

Plaintiffs' tort claims based on purported conflicts of interest fail for an additional reason: There is no evidence that Wells Fargo labored under an actual conflict.  "[T]he existence of a conflict of interest cannot be inferred solely from a relationship between [an RMBS deal participant] and an indenture trustee that is mutually beneficial and increasingly lucrative." *Commerce Bank v. Bank of New N.Y. Mellon*, 141 A.D.3d 413, 416 (1st Dep't 2016) (quotation marks omitted).  But Plaintiffs have adduced evidence of nothing more.  Plaintiffs "[can]not provide any concrete evidence that the Trustee's actions were influenced in any way by a conflict of interest." *Fixed Income Shares: Series M v. Citibank N.A.*, 314 F. Supp. 3d 552, 562 (S.D.N.Y. 2018).  They have no evidence of "a quid pro quo situation." *Commerce Bank*, 141 AD.3d at 416.  In short, Plaintiffs' "conclusory assertions" are insufficient for their conflict-of-interest claim to survive. *Fixed Income Shares*, 314 F. Supp. 3d at 562.

### D.      Plaintiffs' Tort Claims Based on Ministerial Duties Also Fail.

Plaintiffs' claims based on "ministerial duties" fail, too.  The supposedly "ministerial"

acts that Plaintiffs say Wells Fargo performed negligently are: (i) providing notice regarding

R&W breaches and servicing breaches and (ii) providing accurate annual certifications under

Regulation AB.  *See* PL ECF 80 at ¶¶ 13, 86; CB ECF 1 at ¶ 60.  But the duty to perform

ministerial acts with due care applies only to "basic, non-discretionary" functions, *Commerce*

*Bank*, 141 A.D.3d at 415 (quoting *AG Capital Funding Partners, L.P. v. State St. Bank & Trust*

*Co.*, 11 N.Y.3d 141, 157 (2008)), like posting remittance reports.  Providing "noti[ce] . . . that

other parties to the PSA ha[ve] failed to perform their obligations" is not a "ministerial task."

*Id.*; *see also BlackRock Balanced Capital*, 2018 WL 452001, at *4 (holding that a claim that an

RMBS trustee failed to provide notice of servicing breaches "do[es] not involve the performance

of basic non-discretionary ministerial tasks").  Nor is reviewing certifications for accuracy.  *See*

*Racepoint Partners, LLC v. JPMorgan Chase Bank, N.A.*, 928 N.E.2d 396, 399 (N.Y. 2010)

(explaining that reading an indenture provision so that it does not require "the trustee to assure

the filing of accurate reports . . . is consistent with the limited, 'ministerial' functions of

indenture trustees").  Plaintiffs' ministerial-duties claims fail for this independent reason.

## IX.     PHOENIX LIGHT'S TRUST INDENTURE ACT CLAIMS FAIL.

In addition to claims sounding in contract and tort, Phoenix Light also brings claims

pursuant to the Trust Indenture Act ("TIA"), solely regarding the IMM 2005-6 Trust.  56.1

¶ 730.[30]  All three TIA claims regarding that Trust fail.

---

[30] Plaintiffs nominally assert TIA claims regarding the other Trusts, but they acknowledge that the TIA does not apply under existing Second Circuit precedent, and they state these claims primarily "for the purposes of preserving any rights on appeal."  56.1 ¶ 731; *see Ret. Bd.*, 775 F.3d at 163-70.

First, Phoenix Light claims that Wells Fargo failed to notify Certificateholders of a "default[] known to the trustee," in violation of 15 U.S.C. § 77ooo(b).  PL ECF 80 at ¶ 170.  But Phoenix Light cannot show that if Wells Fargo *had* provided Certificateholders with notice of a default, the Certificateholders would have reacted in a way that would have reduced damages. This is particularly apparent when considering what possible evidence of a "default" Phoenix Light might have.  Phoenix Light has no evidence of R&W breaches regarding the IMM 2005-6 Trust.  56.1 ¶ 732.  Nor does Phoenix Light have any evidence that the Servicer failed to service any of the loans in the Trust prudently.  At the most, Phoenix Light has some evidence sufficient to raise an issue of material fact as to whether the Servicer submitted its Reg AB statement late. 56.1 ¶ 733-734.  But Phoenix Light cannot show that Wells Fargo's alleged failure to provide notice of a late Reg AB statement caused Phoenix Light any damages.  Wells Fargo is entitled to summary judgment on that claim.  *See Semi-Tech Litig., LLC v. Bankers Trust Co.*, 353 F. Supp. 2d 460, 482-84, 487 (S.D.N.Y. 2005) (granting summary judgment on TIA claim for failure to show causation of damages); *cf.* 15 U.S.C. § 77www ("[N]o person permitted to maintain a suit for damages under the provisions of this subchapter shall recover . . . a total amount in excess of his actual damages on account of the act complained of.")

Phoenix Light next claims that "in [a] case of default (as such term is defined in [the] indenture)," Wells Fargo failed to exercise its rights "as a prudent man would . . . under the circumstances," in violation of 15 U.S.C. § 77ooo(c).  PL ECF 80 at ¶ 171.  But Phoenix Light has no evidence that any default (as that term is defined in the indenture) occurred.  As explained above, *see supra* Part VII.C, under the indenture governing the IMM 2005-6 Trust, defaults all involve failures by the *issuer* to comply with its obligations to defend the Trust's ownership of the Trust corpus.  56.1 ¶ 662.  Phoenix Light has no evidence demonstrating such a failure.

Finally, Phoenix Light claims that Wells Fargo has "impair[ed]" the Certificateholders'

"right . . . to receive payment of the principal of and interest on [the] indenture security," in

violation of 15 U.S.C. § 77ppp(b).  PL ECF 80 at ¶ 172. But this provision "prohibits only non-

consensual amendments to an indenture's core payment terms."  *Marblegate Asset Mgmt., LLC*

*v. Educ. Mgmt. Fin. Corp.*, 846 F.3d 1, 3 (2d Cir. 2017).  Phoenix Light does not claim that

Wells Fargo has enacted such amendments.  56.1 ¶ 736.  Wells Fargo is therefore entitled to

summary judgment on this claim.  *See PL/BNYM*, 2015 WL 5710645, at *10 (rejecting Phoenix

Light's attempt to invoke non-consensual-amendment provision under similar circumstances);

*PL/DB*, 172 F. Supp. 3d at 722 (same).

## X.    ALL OF PLAINTIFFS' ALLEGED DAMAGES ARE BARRED.

For the aforementioned reasons, Wells Fargo is entitled to summary judgment on almost

every one of Plaintiffs' claims.  With respect to the few remaining claims—and also with respect

to the claims already discussed—Plaintiffs fail to prove legally cognizable damages.

### A.    Damages Limitation Clauses Governing Five Trusts Bar the Damages Plaintiffs Seek.

The Governing Agreements for the five "Damages Limitation Clause Trusts"[31] contain

damages limitation clauses that bar the damages Plaintiffs seek.  Under New York law, "courts

must honor contractual provisions that limit liability or damages."  *Nomura Home Equity Loan,*

*Inc., Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, 92 N.E.3d 743, 748 (N.Y. 2017).  And

contracting parties are "free to . . . prohibit[] consequential damages."  *Optima Media Grp. Ltd.*

*v. Bloomberg L.P.*, 2018 WL 1587074, at *7 (S.D.N.Y. Mar. 28, 2018).  Here, the Governing

Agreements for the Damages Limitation Clause Trusts provide that Wells Fargo shall not "be

---

[31] The Damages Limitation Clause Trusts are: FFML 2006-FFA, GPMF 2005-AR4, GPMF 2006-AR1, GPMF 2006-AR2, and GPMF 2006-AR3.

liable for special, indirect or consequential loss or damages of any kind whatsoever." 56.1 ¶ 737.
But *all* of the damages Plaintiffs seek—namely, investment losses—are consequential damages.

Consequential damages are defined in contradistinction to "general" damages. "General
damages seek to compensate the plaintiff for the value of the very performance promised, often
determined by the market value of the good or service to be provided." *Carco Grp., Inc. v.
Maconachy*, 383 F. App'x 73, 75 (2d Cir. 2010). Consequential damages, by contrast, "seek to
compensate a plaintiff for additional losses (other than the value of the promised performance)
that are incurred as a result of the defendant's breach." *Schonfeld v. Hilliard*, 218 F.3d 164, 176
(2d Cir. 2000). "[C]onsequential damages measure . . . not the very thing the plaintiff was
entitled to but [the] income it can produce or losses it can avoid." *MVP Health Plan, Inc. v.
Optuminsight, Inc.*, 2017 WL 3669558, at *15 (N.D.N.Y. Aug. 24, 2017), *aff'd,* 765 F. App'x
615 (2d Cir. 2019) (internal quotation marks omitted).

When a service contract is at issue, "general damages refer to damages based upon the
value of performance, not on the value of the consequences of that performance, or the failure to
perform." *MMS USA Holdings, Inc. v. PricewaterhouseCoopers LLP*, 2013 WL 1154932, at *5
(N.Y. Sup. Ct. Mar. 19, 2013). This distinction applies even where "[t]he purpose of the
[service] was precisely to" prevent the adverse consequence. *Int'l Ore & Fertilizer Corp. v. SGS
Control Servs., Inc.*, 38 F.3d 1279, 1285 (2d Cir. 1994). Thus, while payments to a service-
provider defendant "are undoubtedly general damages," the losses from the defendant's failure to
perform are not. *N. Indus. Holdings, LLC v. E. Envt'l Grp. Inc.*, 2016 WL 8541049, at *5, 7
(N.D.N.Y. Feb. 23, 2016). Courts have regularly applied this distinction under New York law.[32]

---

[32] *See Carco Grp., Inc. v. Maconachy*, 718 F.3d 72, 81-82 (2d Cir. 2013) & 383 F. App'x at 75 (business
losses caused by breach of employment agreement were consequential damages, whereas employee's salary
constituted general damages); *Int'l Ore & Fertilizer Corp.*, 38 F. 3d at 1281-82, 1285 (cargo-contamination losses
due to faulty inspection were consequential damages); *MVP Health Plan*, 2017 WL 3669558, at *15-17 ("lost

The same rule applies here.  Plaintiffs and their expert define repurchase damages as "the difference between (1) the principal and interest that the Plaintiff[s] ha[ve] actually received [] and [are] projected to receive in the future and (2) the principal and interest [] that [] Plaintiff[s] would have received [] and would be projected to receive in the future had Wells Fargo taken steps to ensure that loans eligible for repurchase were repurchased."  56.1 ¶ 738-740.  Plaintiffs' expert also calculates what he calls "tort damages," but these are the same as repurchase damages, reduced to reflect discounted purchase prices.  56.1 ¶¶ 721-723, 726-728.  So all of Plaintiffs' damages are based on the contention that *if* Wells Fargo had performed its contractual obligations, the Responsible Parties *would have* repurchased noncompliant loans, which *would have* resulted in Plaintiffs receiving more investment income.  All the damages are based on multiple hypothetical, speculative steps and actions not only by Wells Fargo, but also by Responsible Parties, and even courts (to the extent Plaintiffs claim litigation wins were required). 56.1 ¶¶ 739-741**.**  These alleged losses are several "step[s] removed from the naked performance promised by [Wells Fargo]."  *Schonfeld*, 218 F.3d at 177.[33]  They do not constitute "damages based upon the value of performance," but rather "the value of the consequences of that performance."  *MMS USA Holdings*, 2013 WL 1154932, at *5.  As such, for the Damages Limitation Clause Trusts, they are barred by the damages limitation provisions.

---

income" due to faulty actuarial services was consequential damages, while "the contract price for [the actuary's] services constitute[d] general damages"); *N. Indus. Holdings*, 2016 WL 8541049, at *1, 5-7 (cross-contamination costs incurred due to inspection company's failure to identify asbestos-containing material were consequential damages, while payments made to company were general damages); *FDIC v. Drysdale*, 2013 WL 5695723, at *4 (E.D.N.Y. Nov. 7. 2013) (loss on mortgage loan incurred due to closing attorney's error was consequential damages); *Phoenix Warehouse of California, LLC v. Townley, Inc.*, 2011 WL 1345134, at *8 (S.D.N.Y. Mar. 29, 2011) (losses from chargebacks and cancelled orders caused by distribution center's breach of contract were consequential damages, while overpayment for distribution center's services was general damages); *MMS USA Holdings*, 2013 WL 1154932, at *4-5 (taxes owed due to faulty tax advice were consequential damages, whereas the "fees paid for the allegedly improper service" were general damages).

[33] Plaintiffs have asserted that they also seek to recover "reinvestment losses" due to their inability to reinvest "missed payments and earn a rate of return on the money."  56.1 ¶ 742**.**  Plaintiffs' expert has not calculated those damages, which are also impermissible consequential damages.

### B.    Plaintiffs Cannot Prove Damages With the Requisite Reasonable Certainty.

Summary judgment is independently warranted on *all* damages claims for *all* Trusts,

because the requested damages are consequential, lost-profit damages that cannot be proved with

reasonable certainty.  Where, as here, *see supra*, a plaintiff seeks lost profits that constitute

consequential damages, "the alleged loss must be capable of proof with reasonable certainty."

*Kenford Co. v. Cty. of Erie*, 493 N.E.2d 234, 235 (N.Y. 1986).  *See Tractebel Energy Marketing,*

*Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 109 (2d Cir. 2007) (a plaintiff may recover

consequential, lost-profit damages only if "the extent of the loss is capable of proof with

reasonable certainty"); *Schonfeld*, 218 F.3d at 177 ("[A]ll consequential damages should be

proven with reasonable certainty."); *MVP Health Plan, Inc*., 2017 WL 3669558, at \*16 (same for

consequential, lost-income damages); *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola*

*Co*., 650 F. Supp. 2d 314, 322 (S.D.N.Y. 2009) (same, granting summary judgment).

The standard that damages must be reasonably certain "requires that such damages be

capable of measurement based on known reliable factors without undue speculation."  *Levy v.*

*Bessemer Trust Co*., 1999 WL 199027, at \*4 (S.D.N.Y. Apr. 8, 1999) (internal quotation marks

omitted).  "[A] claimant cannot establish [damages] with the law's requisite [reasonable]

certainty where its calculation is dependent on a host of assumptions concerning uncertain

contingencies, and applies numerous variables about which only an expert can surmise."  *Kidder,*

*Peabody & Co. v. IAG Int'l Acceptance Grp.*, 28 F. Supp. 2d 126, 134 (S.D.N.Y. 1998).

In *Levy*, on summary judgment the court rejected as unduly speculative a damages

"model . . . which can take a number of forms (based on different assumptions which ha[d] been

carefully laid out in the supplement to [the] expert's report) and which range[d] in damages from

$4.1 million to $8.58 million."  1999 WL 199027, at \*4.  Plaintiffs' requested damages are even

less certain.  Their damages expert, Karl Snow, uses "a host of assumptions," "uncertain

contingencies," and "variables" based on "surmise."  *Kidder*, 28 F. Supp. 2d at 134.

Snow calculates what he calls "repurchase damages" by hypothesizing various "but-for"

scenarios in which he posits Wells Fargo's pursuit of repurchase claims against Responsible

Parties on various "Purchase Dates."  56.1 ¶¶ 743-745.  He assumes the dates Wells Fargo was

allegedly obligated to enforce repurchases; the length of time necessary to pursue enforcement

and obtain repurchase; the date of hypothetical repurchase; and the amounts that would have

hypothetically been recovered by the trustee.  56.1 ¶¶ 749-753, 763-785, 804-805.  He assumes

away numerous real-life contingencies such as the costs of repurchase enforcement, whether

Wells Fargo would have been directed and indemnified by investors, and Responsible Parties'

financial conditions.  56.1 ¶¶ 770-773, 785-792, 819-828.  He assumes 100% success on all

repurchase claims at his calculated purchase prices (and no substitution or cure).  56.1 ¶¶ 804-

805.  And he projects damages forward by 22 years (for Commerzbank) or 23 years (for Phoenix

Light), through maturity of the certificates—until 2041 for certain Trusts.  56.1 ¶¶ 747-748.

Snow provides different damages numbers based on different timing assumptions (for

starting enforcement dates, time periods for enforcement activities, and the dates on which

hypothetical repurchases would occur).  56.1 ¶¶ 834-843.  The assumptions shift damages by

tens of millions of dollars.  *Id.*  For example, delaying the hypothetical repurchase dates by two,

four, or six years (all of which are delays that Snow has observed as an expert in repurchase

litigation) results in *no repurchase damages at all* for certain Trusts and significant reductions in

damages for others.  56.1 ¶¶ 795-801, 837-843.  And, for Commerzbank, Snow provides

different damages numbers based on diametrically opposed assumptions that if Wells Fargo had

complied with its purported duties (i) Plaintiff would have held all at-issue certificates to

maturity or (ii) Plaintiff would have sold the certificates when it actually sold them, but for a different price—and the contrasting assumptions result in damages calculations more than $92 million apart.  56.1 ¶¶ 844-852**.**

Snow also uses different starting enforcement dates for the same Trust in the Phoenix Light and Commerzbank actions, with no investigation or explanation other than instruction of counsel.  56.1 ¶¶ 757-762.  He likewise assumes conflicting enforcement time periods in the two cases, despite nearly identical claims—again, without knowing why.  56.1 ¶¶ 780-784.

At his deposition, Snow conceded he did not substantiate the many assumptions built into his calculations.  He did not, for example, investigate whether settlement or alternative negotiated outcomes might result from a trustee's repurchase enforcement efforts (instead of 100% successful repurchase claims).  56.1 ¶¶ 806-818, 829.  He did not investigate his many timing assumptions (which, at six months for document-defect claims and seven, 12, or 24 months for R&W breach claims, are far too short to account for actual repurchase litigation).  56.1 ¶¶ 754-757, 760-762, 772-779, 791-803, 829.  He did not investigate and has no opinion on how an originator or seller would react to the volumes of repurchase demands theorized in this case.  56.1 ¶¶ 790, 810-812**.**  He has no experience with voluntary repurchases at this volume, and has no opinion on whether litigation would be necessary.  56.1 ¶¶ 785-789.  He does not know if Commerzbank would have held the certificates to maturity or sold them, and admits the factual basis for either scenario is outside his expertise.  56.1 ¶¶ 853-858.  Fittingly, he reserved the right to change any and all of his myriad assumptions.  56.1 ¶¶ 829-833.

With this testimony, Plaintiffs cannot prove either the existence or the amount of their damages with reasonable certainty.  This is unsurprising—in similar litigation, this Court concluded that "calculating the damages award will be far from reasonably certain" and that

"benefit-of-the-bargain damages" (the only type of damages requested here) "cannot be calculated with reasonable certainty." *BlackRock Balanced Capital Portfolio (FI) v. Deutsche Bank Nat'l Trust Co.*, 2018 WL 5619957, at *5-6 (S.D.N.Y. Aug. 7, 2018). Accordingly, summary judgment should be granted on Plaintiffs' damages requests.

### C.   Regarding the Four Morgan Stanley Trusts, Commerzbank Cannot Prove the Existence of Pre-Event of Default Damages With Reasonable Certainty.

In any event, with respect to all pre-EOD claims regarding the loans in the four Morgan Stanley Trusts (at issue in the Commerzbank action), Commerzbank cannot prove the existence of damages with reasonable certainty. As described above, *see supra* Part V.F, the Agreements for those Trusts do not require Wells Fargo to enforce the Responsible Parties' repurchase obligations. 56.1 ¶¶ 593-594, 630-631. And Commerzbank has no evidence that notice, alone, would have been sufficient to cause the Responsible Parties to repurchase even a single at-issue loan. Thus, Commerzbank cannot "prov[e] that the existence of damage is reasonably certain," *Tractebel*, 487 F.3d at 111, as to any claim regarding any at-issue loan in the Morgan Stanley Trusts.

### D.   There Is No Basis in Fact for Commerzbank's "Held-to-Maturity" Damages Scenario.

Commerzbank's damages claims based on one of its assumptions independently fail for lack of any basis in fact. Commerzbank's expert calculates some of his alternative damages numbers assuming that "had Wells Fargo performed its obligations," Commerzbank would not have sold 21 securities (as it did in reality) but instead would have "held the Certificates through bond maturity." 56.1 ¶¶ 55, 844-846. But Commerzbank has adduced no evidence supporting the assumption that it would have held the certificates for more than 27 years but for Wells Fargo's alleged inaction. Indeed, Commerzbank's damages expert is aware of no factual support

for this "Held-to-Maturity Scenario."  56.1 ¶¶ 853-858.  Nor do its other experts support the

counterfactual.  56.1 ¶¶ 859-861.

Instead, the evidence shows that after acquiring the 21 securities, Commerzbank

transferred them to its Portfolio Restructuring Unit.  56.1 ¶ 862.  The head of the Portfolio

Restructuring Unit testified that the Unit's "aspiration" was to "get out well before maturity, and

at the earliest possible time."  56.1 ¶ 863.  The Unit's mission was to "exit[] those assets in as

efficient way as possible."  56.1 ¶ 864.  And when Commerzbank sold the at-issue certificates

beginning in 2011, it did so in response to new regulatory capital requirements, not in response

to any action or inaction by Wells Fargo.  56.1 ¶¶ 865-869.  Commerzbank, in fact, considered

but expressly rejected holding certificates to maturity in order to free up capital.  56.1 ¶ 870.

Commerzbank sold certificates even if it had no historic or future projected losses and at prices

below its internal valuations.  56.1 ¶¶ 871-872.

Commerzbank's Held-to-Maturity Scenario is therefore entirely unsupported, violating

the stalwart principle that "an expert's opinion is not a substitute for plaintiff's obligation to

provide evidence of facts that support the applicability of the expert's opinion to the case."

*Virgin Atl. Airways, Ltd. v. British Airways PLC*, 69 F. Supp. 2d 571, 579 (S.D.N.Y. 1999), *aff'd*

257 F.3d 256, 268-69 (2d Cir. 2001); *see also Buckley v. Deloitte & Touche USA LLP*, 888 F.

Supp. 2d 404, 413-14 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 62, 64 (2d Cir. 2013).  On summary

judgment, courts routinely reject damages models built from counterfactual assumptions that

lack support in the record.[34]  This Court should as well.

---

[34] *See, e.g.*, *Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 358-60 (S.D.N.Y. 2013)
(rejecting damages model because assumptions were speculative and had no factual support); *The Upper Deck Co.
v. Breakey Int'l, BV*, 390 F. Supp. 2d 355, 361-62 (S.D.N.Y. 2005) (same); *Levy*, 1999 WL 199027, at **3-5 (same);
*see also In re Moody's Corp. Sec. Litig.*, No. 07-8375, 2013 WL 4516788, at *12 (S.D.N.Y. Aug. 23, 2015)
(granting summary judgment due in part to expert's unsupported assumptions); *Intimate Bookshop v. Barnes &
Noble, Inc.*, 2003 WL 22251312, at *8 (S.D.N.Y. Sept. 30, 2003) (same).

### E.   The Governing Agreements for the Eight Liquidated Loan Trusts Limit Plaintiffs' Damages With Respect to Certain Liquidated Loans.

Plaintiffs' damages calculations are flawed in yet another way.  The Agreements for the eight "Liquidated Loan Trusts"[35] limit Plaintiffs' recovery on their claims regarding certain liquidated loans.  Plaintiffs purport to calculate damages based on the sums that the Responsible Parties allegedly would have paid the Trusts to repurchase the loans at issue.  56.1 ¶ 739.  But the repurchase price is contractually defined, and the Agreements for these Trusts specify a *limited* repurchase price for loans that were liquidated before the repurchase obligation arose.  Plaintiffs' damages should (but do not) reflect the contractual repurchase prices for those liquidated loans.

Under the Governing Agreements for the Liquidated Loan Trusts, if the Responsible Party refuses to cure certain specified breaches or defects (and, for some Trusts, if the deadline for loan substitution has passed), then the "sole remed[y]" is for the Responsible Party to "repurchase" the loan at the repurchase price set forth in the contract.[36]  56.1 ¶ 873.  When a loan has been liquidated and repurchase of the loan is impossible (because the loan no longer exists), damages are still limited to "the benefit of [the Trust's] bargain."  *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-HE3 ex rel. HSBC Bank USA, Nat'l Ass'n v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543, 555 (S.D.N.Y. 2014).  And the benefit of the trustee's bargain is, at most, "the total 'repurchase price'" specified in the contract.  *Bear Stearns v. EMC Mortg.*, 2015 WL 139731, at *17 n.20 (Del. Ch. Jan. 12, 2015).  Again and again, courts have said that, for

---

[35] The Liquidated Loan Trusts are:  ABFC 2005-HE2, ABFC 2005-OPT1, ABFC 2006-OPT1, ABFC 2006-OPT2, ABSHE 2005-HE5, CMLTI 2005-OPT4, OOMLT 2006-2, and OOMLT 2007-3.

[36] For ABFC 2005-HE2, ABFC 2005-OPT1, ABFC 2006-OPT1, and ABFC 2006-OPT2,  the "sole remedy" clause sets forth the "sole remedy" only for R&W breaches.  56.1 ¶ 873**.**  But for ABFC 2006-OPT1 and ABFC 2006-OPT2, this "sole remedy" clause covers document defects, too, because one R&W warrants an absence of document defects.  56.1 ¶¶ 874-879**.**  And for all four Trusts, Plaintiffs' damages theory and calculations are based only on theoretical repurchases, 56.1 ¶ 739, so the repurchase provision provides the sole *relevant* remedy. (While Phoenix Light also seeks so-called "servicing damages" for the ABFC 2006-OPT2 Trust, this argument does not apply to those requested damages.)

liquidated loans, "any recovery . . . must be limited to the formula set forth in the PSA." *ACE Sec. Corp. v. DB Structured Prod., Inc.*, 965 N.Y.S.2d 844, 851 (N.Y. Sup. Ct. 2013).[37]

Here, the Liquidated Loan Trusts' Agreements define the repurchase price as the sum of (i) the "Principal Balance" or "Stated Principal Balance" as of the repurchase date; (ii) accrued interest on that Principal Balance or Stated Principal Balance; and (iii) miscellaneous advances, withdrawals, fees, and/or expenses.  56.1 ¶¶ 880-887.  The Agreements then expressly define the "Principal Balance" or "Stated Principal Balance" of a liquidated loan to be *zero*.  56.1 ¶¶ 888-889.  Thus, "[a]fter liquidation . . . the Purchase Price starts at zero." *Bank of N.Y. Mellon v. WMC Mortg., LLC,* No. 1:12-cv-7096, Dkt. 323, at *16.  That defined purchase price controls, because "there is no reason for the parties not to follow the formula to which they agreed and that dictates in detail the terms of reimbursement with respect to liquidated loans." *Id.* at *17.

Plaintiffs inexplicably disregard those contractual provisions and calculate the repurchase price for liquidated loans based on "the unpaid principal balance and accrued unpaid interest (if any) that remains after liquidation proceeds have been applied." 56.1 ¶¶ 891-893.  Plaintiffs' expert tries to justify this methodology by claiming that, "from an economic perspective, the realized loss on a liquidated loan is equivalent to the outstanding principal balance described in the Purchase Price definition." 56.1 ¶ 894.  But the Agreements specifically provide that the Purchase Price is based on the Principal Balance (a defined term), and that the Principal Balance is defined to be *zero* after liquidation.  Plaintiffs' damages for loans that were liquidated before

---

[37] *See also Bank of N.Y. Mellon v. WMC Mortgage, LLC,* No. 1:12-cv-7096, Dkt. 323, at *15 (S.D.N.Y. Aug. 18, 2015) (holding that its calculation of damages would not "depart[] from the Purchase Price formula"); *Wells Fargo Bank, N.A. v. Bank of America, N.A.*, 2014 WL 476299, at *4 (S.D.N.Y. Feb. 6, 2014), *vacated on other grounds*, 627 Fed. App'x 27 (2d Cir. 2015) ("The correct calculation of damages" turns on "the deal [the trustee] bargained for: the purchase price as a remedy for [the Responsible Party's] breach."); *MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Sec. Inc.,* 2013 WL 4399210, at *4 (S.D.N.Y. Aug. 15, 2013) (holding that damages are "limited to 'the Purchase Price' under the PSAs");  *Bank of N.Y. Mellon,* 2013 WL 6153207, at *1 (N.Y. Sup. Ct. Nov. 21, 2013) (same).

the alleged repurchase obligation arose—at least 617 for Phoenix Light, and at least 1,844 for Commerzbank, 56.1 ¶¶ 895-896—should be limited to that contractually defined amount.

## XI.     PHOENIX LIGHT'S ASSIGNMENTS ARE CHAMPERTOUS AND VOID.

Wells Fargo is entitled to summary judgment, because as Judge Broderick recently found in a materially identical case, the assignments authorizing Phoenix Light—all *Phoenix Light* Plaintiffs—to commence this suit are champertous, *see* N.Y. Jud. Law § 489(1), and Phoenix Light lacks standing to sue. *Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, 2020 WL 1285783, at *4, *12 (S.D.N.Y. Mar. 18, 2020).  The court found, beyond any genuine factual dispute, that Phoenix Light had transferred all rights in the at-issue RMBS to indenture trustees under granting clauses, and deposition testimony proved that Phoenix Light sought assignments from the trustees "for the sole purpose of pursuing this litigation"—champerty. *Id.*  The "preexisting proprietary interest" exception to champerty failed, because Phoenix Light lacked the requisite interest in the claims at the time of assignment. *Id.* at *13-16.  The assignments were thus void, and Phoenix Light lacked constitutional and prudential standing. *Id.* at *16.

The same analysis applies here, as the facts here and in Judge Broderick's case are fundamentally identical:  both cases involve the same granting clauses and (literally the same) assignments—each assignment has both case captions—the deposition testimony of the assignments' champertous purpose is applicable here; and the factual records regarding Phoenix Light's interest and the assignments' purpose are materially the same. *See* Amended 56.1 ¶¶ 897-943.  Thus, summary judgment is required for all the reasons stated by Judge Broderick, and in light of the decision and identity of factual and legal issues, on collateral estoppel grounds. *See Yu v. Knighted LLC*, 2017 WL 666118, at *7 (S.D.N.Y. Feb. 16, 2017).

## CONCLUSION

Wells Fargo's Motion for Summary Judgment should be granted.

Dated:  March 31, 2020

JONES DAY

By:   *Andrew R. Stanton*

Jayant W. Tambe
Traci L. Lovitt
Howard F. Sidman
Ryan J. Andreoli
Joseph J. Boylan
Amanda L. Dollinger
Kurt M. Gosselin
JONES DAY
250 Vesey Street
New York, New York 10281
Tel:     (212) 326-3939
Fax:     (212) 755-7306
jtambe@jonesday.com
tlovitt@jonesday.com
hfsidman@jonesday.com
randreoli@jonesday.com
jboylan@jonesday.com
adollinger@jonesday.com
kgosselin@jonesday.com

Andrew R. Stanton (*pro hac vice*)
Courtney Lyons Snyder (*pro hac vice*)
JONES DAY
500 Grant Street
Pittsburgh, Pennsylvania 15219
Tel:     (412) 391-3939
Fax:     (412) 394-7959
astanton@jonesday.com
clsnyder@jonesday.com

Ilana B. Gelfman (*pro hac vice*)
JONES DAY
100 High Street
Boston, Massachusetts 02110
Tel:     (617) 960-3939
Fax:     (617) 449-6999
igelfman@jonesday.com

*Attorneys for Defendant*
*Wells Fargo Bank, N.A.*

## Appendix A1

## Arguments Regarding Pre-EOD R&W-Related Claims

The following chart summarizes the trust- and loan-level impact of arguments contained in Part V of the Memorandum of Law in Support of Defendant's Consolidated Motions for Summary Judgment.  Plaintiffs' pre-EOD R&W-related claims should also be dismissed in their entirety for the reasons described in Parts I, II, VII, and X.

| Trust | | Action | R&W Claim Loans | | | | |
|---|---|---|---|---|---|---|---|
| | | | Total Loans | No-Discovery Loans | Separate Trustee R&W Claim Loans | R&W Compliance Loans | R&W Claim Loans Remaining |
| ABFC 2005-HE2 | | CZB | 165 | 165 | - | - | 0 |
| ABFC 2005-OPT1 | | CZB | 46 | 46 | - | - | 0 |
| ABFC 2006-OPT1 | | CZB | 111 | 111 | - | - | 0 |
| ABFC 2006-OPT2 | CZB Only | | 217 | 37 | 0 | 180 | 0 |
| | PL Only | | 171 | 0 | 0 | 171 | 0 |
| | Total Unique | | 224 | 37 | 0 | 187 | 0 |
| ABSHE 2005-HE5 | | CZB | 50 | 50 | - | - | 0 |
| CMLTI 2005-OPT4 | | CZB | 29 | 29 | - | - | 0 |
| GPMF 2005-AR4 | | CZB | 64 | 45 | 19 | 0 | 0 |
| GPMF 2006-AR1 | | CZB | 79 | 79 | - | - | 0 |
| GPMF 2006-AR2 | | CZB | 24 | 24 | - | - | 0 |
| GPMF 2006-AR3 | | CZB | 25 | 25 | - | - | 0 |
| MSAC 2005-WMC2 | | CZB | 38 | 38 | - | - | 0 |
| MSAC 2005-WMC3 | | CZB | 42 | 42 | - | - | 0 |
| MSAC 2005-WMC5 | | CZB | 44 | 44 | - | - | 0 |
| MSAC 2006-HE1 | | CZB | 0 | - | - | - | 0 |
| OOMLT 2006-2 | | CZB | 0 | - | - | - | 0 |
| CARR 2006-NC3 | | PL | 0 | - | - | - | 0 |
| CARR 2006-NC4 | | PL | 0 | - | - | - | 0 |
| CARR 2007-FRE1 | | PL | 0 | - | - | - | 0 |
| FFML 2006-FFA | Reunderwritten | PL | 61 | 0 | 61 | 0 | 0 |
| | Extrapolated | | 4759 | 0 | 4759 | 0 | 0 |
| IMM 2005-6 | | PL | 0 | - | - | - | 0 |
| IMSA 2005-2 | | PL | 0 | - | - | - | 0 |
| OOMLT 2007-3 | | PL | 178 | 177 | 1 | 0 | 0 |
| OWNIT 2006-2 | | PL | 45 | 45 | - | - | 0 |
| PPSI 2005-WLL1 | | PL | 0 | - | - | - | 0 |
| SABR 2006-FR2 | | PL | 0 | - | - | - | 0 |
| **Total** | | | **5984** | **957** | **4840** | **187** | **0** |

**Appendix A2**

**Arguments Regarding Pre-EOD Document-Defect Claims**

The following chart summarizes the trust- and loan-level impact of arguments contained in Parts III, IV, and VI of the Memorandum of Law in Support of Wells Fargo Bank N.A.'s Motion for Summary Judgment, to the extent that they address Plaintiffs' pre-EOD document-defect claims. Plaintiffs' pre-EOD document-defect claims should also be dismissed in their entirety for the reasons described in Parts I, II, VII, and X.

| Trust | Action | Total Loans | Separate Trustee Doc Defect Claim Loans | Exception Report & 90+ Delq., REO, Foreclosure or Liquidated 6+ Years Pre-Filing | Liquidated Loan Claims Untimely[1] | Exception Report or German SOL Trust | Document Defect Claims Remaining |
|---|---|---|---|---|---|---|---|
| ABFC 2005-HE2 | CZB | 741 | 0 | 0 | 314 | 741 | 0 |
| ABFC 2005-OPT1 | CZB | 227 | 0 | 0 | 48 | 227 | 0 |
| ABFC 2006-OPT1 | CZB | 380 | 0 | 0 | 232 | 0 | 151 |
| ABFC 2006-OPT2 | CZB Only | 439 | 9 | 359 | 213 | 439 | 0 |
| | PL Only | 433 | 9 | 278 | 109 | 433 | 0 |
| | Total Unique | 439 | 9 | 366 | 213 | 439 | 0 |
| ABSHE 2005-HE5 | CZB | 334 | 4 | 0 | 14 | 334 | 0 |
| CMLTI 2005-OPT4 | CZB | 143 | 2 | 131 | 87 | 143 | 0 |
| GPMF 2005-AR4 | CZB | 566 | 11 | 537 | 490 | 566 | 0 |
| GPMF 2006-AR1 | CZB | 308 | 5 | 287 | 314 | 308 | 0 |
| GPMF 2006-AR2 | CZB | 269 | 1 | 0 | 224 | 269 | 0 |
| GPMF 2006-AR3 | CZB | 499 | 6 | 447 | 382 | 499 | 0 |
| MSAC 2005-WMC2 | CZB | 423 | 12 | 0 | 80 | 0 | 331 |
| MSAC 2005-WMC3 | CZB | 379 | - | 0 | 42 | 379 | 0 |
| MSAC 2005-WMC5 | CZB | 303 | - | 279 | 132 | 303 | 0 |
| MSAC 2006-HE1 | CZB | 744 | 38 | 0 | 226 | 744 | 0 |
| OOMLT 2006-2 | CZB | 1754 | 124 | 0 | 579 | 0 | 1051 |
| CARR 2006-NC3 | PL | 0 | - | - | - | - | 0 |
| CARR 2006-NC4 | PL | 0 | - | - | - | - | 0 |
| CARR 2007-FRE1 | PL | 0 | - | - | - | - | 0 |
| FFML 2006-FFA | PL | 0 | - | - | - | - | 0 |
| IMM 2005-6 | PL | 0 | - | - | - | - | 0 |
| IMSA 2005-2 | PL | 0 | - | - | - | - | 0 |
| OOMLT 2007-3 | PL | 481 | 16 | 308 | 122 | 481 | 0 |
| OWNIT 2006-2 | PL | 1200 | 35 | 702 | 295 | 1200 | 0 |
| PPSI 2005-WLL1 | PL | 0 | - | - | - | - | 0 |
| SABR 2006-FR2 | PL | 0 | - | - | - | - | 0 |
| **Total** | | **9190** | **263** | **3050** | **3794** | **6633** | **1533** |

The table's header spans "Document Defect R&W Loans" over the last six columns.

[1] "Total Loans" includes any loan with alleged document defects for which Plaintiffs' experts have calculated damages. "Liquidated Loan Claims Untimely" includes loans for which Plaintiffs' experts have calculated damages, as well as a small number of loans for which damages have not been calculated.