USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/6/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

PHOENIX LIGHT SF LIMITED, et al.,

                          **Plaintiffs,**

      -against-

WELLS FARGO BANK, N.A.,

                          **Defendant.**
-----------------------------------------------------------------X
-----------------------------------------------------------------X

COMMERZBANK AG,

                          **Plaintiff,**

      -against-

WELLS FARGO BANK, N.A.,

                          **Defendant.**
-----------------------------------------------------------------X

14-CV-10102 (KPF) (SN)

**OPINION & ORDER**

15-CV-10033 (KPF) (SN)

**SARAH NETBURN, United States Magistrate Judge:**

      The parties in these RMBS trustee actions cross-move to exclude the opinion testimony of the other party's experts in whole or in part pursuant to Rule 702 of the Federal Rules of Evidence and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and its progeny. The Honorable Katherine P. Failla referred the motions to me as a non-dispositive motion for an opinion and order. The Court assumes the parties' familiarity with the relevant facts and procedural background of the case.

On December 6, 2021, this Court issued a Report and Recommendation addressing several arguments raised in the parties' cross motions for summary judgment. The Court, however, declined to address all questions raised in those motions because other arguments are either case-dispositive or will significantly narrow the issues. To conserve judicial resources, at this time, the Court addresses only Wells Fargo's motion to exclude Plaintiffs' expert Ingrid Beckles because her opinion is the only one that required resolution to issue the Report and Recommendation. The motion is DENIED.

## DISCUSSION

I.  **Legal Standards for Admissibility of Expert Evidence**

Trial courts serve as gatekeepers for expert evidence and are responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993). Under Federal Rule of Evidence 702, expert testimony is admissible where: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"To determine whether a proposed expert's testimony passes muster under Rule 702, this Court must inquire into: (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based on reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact." S.E.C. v. Tourre, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) (citing Nimely v. City of New York, 414 F.3d 381, 396-97 (2d Cir. 2005)).

"Because the purpose of summary judgment is to weed out cases in which there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law, it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment," including the admissibility of expert evidence. Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) (cleaned up). Indeed, as the "gatekeeper for expert testimony," the court "performs the same role at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment." Id.

When evaluating the reliability of an expert's testimony, the court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). In conducting its analysis, the district court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." Id. at 266. Contentions that the expert's "assumptions are unfounded 'go to the weight, not the admissibility, of the testimony.'" Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) (quoting Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1188 (2d Cir. 1992)). Nevertheless, "conclusions and methodology are not entirely distinct from one another," and "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Accordingly, a district court may exclude expert testimony if it determines that "there is simply too great an analytical gap between the data and the opinion proffered." Id. "An expert's opinions that are without factual basis and are based on speculation or conjecture are similarly

3

inappropriate material for consideration on a motion for summary judgment." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008).

The court must also conclude that the proposed testimony will assist the trier of fact. In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004). "This 'helpfulness' standard . . . requires as a precondition to admissibility that the expert testimony possess a valid and specialized connection to the pertinent inquiries in the litigation." Krys v. Aaron, No. 14-cv-2098 (JBS), 2015 WL 3660332, at *3 (D.N.J. June 12, 2015) (citing Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003)) (internal quotation marks omitted). "Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own." United States v. Mejia, 545 F.3d 179, 194 (2d Cir. 2008).

In light of the liberal admissibility standards of the Federal Rules of Evidence, exclusion of expert testimony is warranted only when the district court finds "serious flaws in reasoning or methodology." In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009). Otherwise, if an expert's testimony falls within "the range where experts might reasonably differ," the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596. "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements under Rule 702 are satisfied." United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007) (citing Daubert, 509 U.S. at 593 n.10).

## II. Plaintiffs' Expert Ingrid Beckles

Plaintiffs' expert Ingrid Beckles has more than 32 years of experience in the mortgage banking and loan servicing industry. At the time of her report, she was the principal of The Beckles Collective, LLC, where she provided strategic, operative, compliance, and governance advisory services for mortgage operations. See ECF No. 556-3 ("Beckles CB Rep.") ¶ 6. Before that, she served as a Senior Vice President and head of the Default Asset Management division for Freddie Mac, responsible for Freddie Mac's $127 billion national delinquent loan portfolio, $21 billion national real estate owned inventory, and $15 billion credit enhancement portfolio. Id. ¶ 7. She has served as an expert in several other RMBS cases in this district, and this Court likewise finds her qualified to testify as an expert. See, e.g., Phoenix Light SF Ltd. v. Bank of N.Y. Mellon ("BNYM"), No. 14-cv-10104 (VEC), 2020 WL 1322856, at *8-9 (S.D.N.Y. Mar. 20, 2020); Pac. Life Ins. Co. v. Bank of New York Mellon ("Pac. Life"), No. 17-cv-01388 (KPF) (RWL), 2021 WL 673479, at *4 (S.D.N.Y. Feb. 22, 2021).

### A. Beckles's Opinions Regarding Document Defects

Wells Fargo seeks to exclude Beckles's opinions regarding uncured document defects in the loans underlying the at-issue trusts. Under the governing agreements (the documents, exhibits, schedules, and appendices governing the at-issue Trusts, including the Pooling and Servicing Agreements, an indenture, and so on), the responsible parties were required to deliver mortgage files for each loan to the responsible trustee or trustee's designee. See, e.g., ECF No. 572-25 (ABFC 2006-OPT2 PSA) § 2.01. Certain material documents, such as the mortgage note, mortgage, assignments, etc., were required to be included in each mortgage file. Id. Wells Fargo prepared final certificates and exception reports that identified documents that were missing from

the mortgage file, or that were otherwise defective. Generally, the responsible parties were obligated to either cure the defects or, if they failed to do so, repurchase the defective loans. Id.

Beckles reviewed the Trusts' custodial records and identified 34,041 loans with at least one uncured material exception. See Beckles CB Rep. Table 1 (identifying 22,295 loans with uncured document exceptions); ECF No. 556-5 ("Beckles PL Rep.") Table 1 (identifying 11,746 loans with uncured document exceptions). Beckles opines that Wells Fargo should have put back these loans to their sponsors after the document defects remained uncured following expiration of the cure period. According to Beckles, "[w]hen exceptions had not been cured as late as March 2010 for the relevant at-issue Trusts . . . the parties should have ensured, at a minimum, repurchase claims relating to defaulted loans with material, uncured document defects were initiated and repurchased or 'made whole.'" ECF No. 556-4 ("Beckles CB Reply Rep.") ¶ 26.

Wells Fargo argues that Beckles's opinions regarding these defective loans should be excluded because the document defects she identified *could* have *potentially* been cured after the cure period. Therefore, it argues that her assertion that the Trustees were obligated to put back all the loans she identified as materially defective ignored her own real-world experience, her own customary practices, and the record evidence, to conclude that certain loans should have been repurchased despite a *possible* cure. This argument is unavailing.

First, Wells Fargo's contention that Beckles ignored evidence that the defects *could have been cured* does not mean that she mischaracterized evidence that the defects *were* cured. The mere possibility that certain documents could have been located did not obligate Beckles to find that they *would* be located. The governing agreements required Wells Fargo or its custodians to maintain the documents in their possession and provided a cure period to address defects. See, e.g., ABFC 2006-OPT2 PSA § 2.01. Indeed, Beckles's report identified only those records with

material defects at the time the records were produced—she gave Wells Fargo credit for all the cures that actually occurred, even if those cures occurred long after the cure periods had expired. See Beckles CB Rep. App'x A (listing documents relied upon); Beckles PL Rep. App'x A (same).

Second, Wells Fargo attacks Beckles's assumption that 100% of the loans with purported defects would need to be repurchased, and 0% would be cured, despite admitting that this was not consistent with her experience. See ECF No. 556-25 ("Beckles PL Dep.") 253:3-7; ECF No. 556-26 ("Beckles CB Dep.") 265:11-266:8. Because such findings are allegedly inconsistent with her real-world experience, where repurchases would not be made if they could be cured, Wells Fargo argues that her opinions "conflict with the very experience that purportedly qualifies Beckles as an expert." ECF No. 602 (Wells Fargo Reply) at 11. Similar arguments were recently made to and rejected by Judge Lehrburger in Pac. Life, 2021 WL 673479, at *3-4, and the Court finds no reason to depart from his conclusion. See id. ("It is up to the fact-finder, however, to resolve the dispute about what the evidence shows regarding document exception cures and to assess whether Beckles's assumption that none of the [at-issue loans with document defects] had document exception cures is reasonable.").

Furthermore, the expert testimony excluded in the cases cited by Wells Fargo is readily distinguishable and offers little support for the proposition that Beckles needed to include an assumption that document defects were *hypothetically* curable. See, e.g., Faivelet Transp. USA Inc. v. Wabtec Corp., 511 F. App'x 54, 56-57 (2d Cir. 2013) (finding that expert testimony contained "*sweeping statements* . . . detached from the actual evidence" (emphasis added)); Shatkin v. McDonnell Douglas Corp., 727 F. 2d 202, 208 (2d Cir. 1984) (finding that expert testimony was riddled with errors, contradictory, and had "a number of assumptions and

7

assertions . . . that were so unrealistic and contradictory as to suggest bad faith"). Wells Fargo's speculation that the responsible parties might have tried to cure more document defects if Wells Fargo had attempted to exercise its repurchase obligations are matters more appropriately directed to the weight of the evidence, and more appropriately addressed at cross-examination. Accordingly, Beckles's opinions regarding document defects are admissible.

### B. Beckles's Opinions Regarding Loan Servicing Standards

Phoenix Light's experts argue that Wells Fargo failed to conduct proper oversight of its loan servicers or address its loan servicers' imprudent servicing practices, leading to losses for the Plaintiffs. Specifically, Phoenix Light retained Beckles to explain the role of a loan servicer in an RMBS transaction, describe and identify benchmark RMBS industry standards regarding prudent servicing practices, and opine as to the quality of servicing of the loans underlying the at-issue trusts. See Beckles PL Rep. ¶¶ 1-4. Wells Fargo seeks to exclude most of Beckles's findings supporting Phoenix Light's assertion that Wells Fargo "fail[ed] to address the Servicers' failure to adhere to prudent servicing practices." ECF No. 80 (Second Am. Compl.) ¶ 161.

Beckles's contributions to these "servicing damages" opinions include identifying loans held by government-sponsored enterprises ("GSEs") Fannie Mae and Freddie Mac as the appropriate control-group. Beckles suggests that GSE loans are an appropriate control group to establish prudent servicing practices and identifies nine loan and borrower characteristics that impact "loss severity outcomes." Subsequent experts rely upon these characteristics to "match" GSE control group loans with the at-issue loans and to calculate a "loss differential" between the matched loans.

Wells Fargo attacks Beckles's selection of the GSE loans as the appropriate control group against which other experts compare the at-issue loans, saying that it represents an apples-to-

oranges comparison.[1] First, Wells Fargo contends that the at-issue loans were riskier than the GSE loans by design and quotes Beckles as stating that the GSE loans were of a "generally higher quality" than the at-issue loans. See Beckles PL Dep. at 286:13-18. Second, Wells Fargo claims that the at-issue trusts were not required to have servicer oversight equivalent to the heightened oversight of GSE loans, and that therefore calculating any differential between the two imputes a standard on the at-issue loans that was not present in the governing agreements.

Similar arguments were made before Judge Caproni by the Bank of New York Mellon defendant trustees, who sought to have excluded the plaintiff's expert testimony that compared the loans at issue in that case to GSE loans. See BNYM, 2020 WL 1322856, at *8-9. There, Judge Caproni found the defendant's argument to be a "non sequitur" because nothing prevented the plaintiffs from claiming that "GSE servicing requirements represent[] prudent and industry standard practices." Id. at *9. She explicitly ruled that although the governing agreements in the at-issue loans incorporated no reference to GSE servicing standards, they did include "the normal and usual standards of practice of prudent mortgage servicers," and that such language "invites external benchmarks to determine what 'prudent' mortgage servicers did during the time frame at issue in this case. It does not contradict Beckles's opinion that parts of the GSE guidelines are a relevant benchmark." Id.

Wells Fargo argues that Phoenix Light's reliance on BNYM is misplaced because in that case no party raised the fundamental differences between the at-issue and GSE loans. See, e.g.,

---

[1] Instead of contesting any individual expert's opinions in its "apples are not oranges" section of its brief, Wells Fargo challenges all of the experts' reliance upon the GSE loans as a "control group" of loans that were subject to prudent servicing oversight. Because Beckles selected the GSE loans as the comparator, and Spencer and Snow relied upon her findings, Wells Fargo's challenge to the comparison is addressed as a challenge to her testimony.

9

ECF No. 556-34 (CARR 2006-NC3 Prospectus Supplement) at S-19 (explicitly disclosing that the at-issue loans were provided "to borrowers who do not qualify to [GSEs] Fannie Mae and Freddie Mac credit guidelines"). But those fundamental differences between the at-issue and GSE loans' underlying *loan characteristics*—including lower credit standards, higher interest rates, higher rates of delinquencies and foreclosures, and higher risk of loss—are of little relevance in determining what an industry standard for prudent *servicing* of those loans might be. Indeed, one might expect that the investors of particularly risky RMBS, such as so-called subprime loans, would be even more attuned to the need to prudently oversee the servicing of those riskier loans.

Lastly, Wells Fargo stresses that the GSE loans were subject to oversight that was not required or even possible under the governing agreements, given that GSEs "have different tools for compelling servicer compliance that were not available to Wells Fargo." ECF No. 602 at 2. For example, it claims that under some of the governing agreements a separate Master Servicer was responsible for servicer oversight—not Wells Fargo. But those agreements also required the Master Servicers to "conform to the standards of an institution prudently servicing mortgage loans for its own account," and delegation of servicing duties to a subservicer did not "release[] [the servicer] from any of its responsibilities." See ECF No. 572-29 (IMM 2005-6 SA) § 3.01; ECF No. 572-30 (IMSA 2005-2 PSA) § 3.01. The Plaintiffs are entitled to argue that Wells Fargo should have engaged their Master Servicers following loan defaults to ensure that the Master Servicers were mitigating losses. Moreover, although Wells Fargo claims generally that the GSEs had more tools available to them to compel servicer compliance, it fails to identify any specific portion of Beckles's opinions where she would have required Wells Fargo to use such tools.

Accordingly, Beckles's selection of the GSE servicing standards as a stand-in for prudent servicing standards is not the mismatch that Wells Fargo claims it to be. Its arguments that there are other, more appropriate comparators, or challenges to Beckles's selection of the GSE servicing standards as a "prudent" baseline, are better addressed through competing expert testimony and cross-examination for the jury to weigh. Beckles's opinions regarding loan servicing standards are admissible.

## CONCLUSION

Accordingly, Wells Fargo's motion to exclude Ingrid Beckles is DENIED. The Court reserves a decision with respect to the Rule 702 motions for all other experts.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

Dated:   December 6, 2021
         New York, New York