UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHOENIX LIGHT SF LTD., *et al.*, | |
| Plaintiffs, | |
| -v.- | 14 Civ. 10102 (KPF) (SN) |
| WELLS FARGO BANK, N.A., | |
| Defendant. | |
| COMMERZBANK AG, | |
| Plaintiff, | |
| -v.- | 15 Civ. 10033 (KPF) (SN) |
| WELLS FARGO BANK, N.A., | **OPINION AND ORDER** |
| Defendant. | |

KATHERINE POLK FAILLA, District Judge:

Plaintiffs are investors in trusts that were created to facilitate transactions in financial instruments known as residential mortgage-backed securities, or "RMBS." Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is the trustee charged with administering the trusts for Plaintiffs' and other investors' benefit. Following the collapse of the real estate market more than a decade ago, Plaintiffs filed these related cases, alleging that Defendant failed to monitor and address underlying infirmities in the trusts and thereby caused Plaintiffs to suffer hundreds of millions of dollars in damages.

Now before the Court are the parties' consolidated cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. The Court referred the motions to Magistrate Judge Sarah Netburn, who issued a

thorough and well-reasoned report and recommendation on December 6, 2021 (the "Report"), recommending that the Court grant in part and deny in part the parties' motions.  More specifically, Judge Netburn recommends that the Court find that (i) Plaintiffs lack standing to pursue many of their claims; (ii) certain of Plaintiffs' claims are contractually barred; (iii) certain of Plaintiffs' claims are barred by judgments reached in prior state court litigation; and (iv) still other of Plaintiffs' claims are time-barred.  Judge Netburn declined to reach various other disputes raised by the parties in the interest of judicial economy, reasoning that the Court's adoption of her recommendations on these threshold issues would largely, if not entirely, dispose of the cases.

The Court has reviewed the Report, the parties' objections to the Report, and the parties' submissions before Judge Netburn.  For the reasons that follow, the Court adopts the Report's recommendation that Defendant's motion for summary judgment be granted as to all claims brought by Phoenix Light SF Limited ("Phoenix Light"); Blue Heron Funding II Ltd.; Blue Heron Funding V Ltd.; Blue Heron Funding IX Ltd.; Silver Elms CDO PLC; C-Bass CBO XVII Ltd.; C-Bass CBO XIV Ltd.; Kleros Preferred Funding V PLC; and Royal Park Investments SA/NV (together with Phoenix Light, the "Phoenix Light Plaintiffs"). By contrast, the Court adopts in part and rejects in part the Report's recommendations with respect to the claims brought by Commerzbank AG ("Commerzbank," and together with the Phoenix Light Plaintiffs, "Plaintiffs"), ultimately concluding that Commerzbank is foreclosed from pursuing some,

but not all, of its claims.  The Court refers Commerzbank's case back to Judge

Netburn for further proceedings addressing Commerzbank's surviving claims.

**BACKGROUND**[1]

## A.   Factual Background

The Court previously addressed the factual background of this case in its

March 30, 2017 Opinion and Order granting in part and denying in part

---

[1]   Unless otherwise noted, all record citations correspond to filings made in *Phoenix Light SF Ltd.* v. *Wells Fargo Bank, N.A.*, No. 14 Civ. 10102 (KPF) (SN).  Where the Court distinguishes between the Phoenix Light Plaintiffs' case and Commerzbank's case, it cites to the docket of the former action as "PL Dkt. #[]" and the latter as "CB Dkt. #[].

This Opinion draws its facts primarily from the parties' Local Rule 56.1 statements submitted in connection with their cross-motions for summary judgment.  The Court draws first from Defendant's consolidated Local Rule 56.1 Statement, which comprises: (i) Defendant's initial Rule 56.1 Statement in support of its motion for summary judgment; (ii) Plaintiffs' responses to each statement; and (iii) Defendant's replies to Plaintiffs' responses.  (Dkt. #607 ("Def. 56.1")).  The Court next takes additional facts from Plaintiffs' responses and objections to Defendant's supplemental Local Rule 56.1 Statement, which includes: (i) Defendant's supplemental statement of facts and (ii) Plaintiffs' responses to each statement.  (Dkt. #622 ("Pl. Resp. 56.1")).  The Court further sources facts from Defendant's responses to Plaintiffs' Rule 56.1 counterstatement.  (Dkt. #608 ("Def. Resp. 56.1")).  Lastly, the Court references the declarations submitted by the parties in support of and in opposition to their cross-motions for summary judgment and the exhibits thereto, which are cited using the convention "[Name] Decl."

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party.").  Additionally, to the extent that either side purports to dispute facts in the other's Rule 56.1 Statement with inadmissible evidence or with evidence that does not support the proposition for which it is advanced, the Court finds such facts to be true.  *See id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

For ease of reference, the Court refers to Defendant's memorandum of law in support of its objections to the Report as "Def. Br." (Dkt. #653); Plaintiffs' memorandum of law in support of their objections to the Report as "Pl. Br." (Dkt. #654); Defendant's opposition to Plaintiffs' objections as "Def. Opp." (Dkt. #655); Plaintiffs' opposition to Defendant's objections as "Pl. Opp." (Dkt. #656); Defendant's reply brief in further support of its

3

Defendant's motion to dismiss.  (Dkt. #305).  *BlackRock Allocation Target Shares: Series S. Portfolio* v. *Wells Fargo Bank, Nat'l Ass'n*, 247 F. Supp. 3d 377, 383 (S.D.N.Y. 2017) ("*BlackRock: Series S*"), *objections overruled*, No. 14 Civ. 10067 (KPF) (SN), 2017 WL 3610511 (S.D.N.Y. Aug. 21, 2017).[2]  As the Court stated in that Opinion, "[e]xplanations of the typical formation process and structure of RMBS trusts abound in this District[.]"  *Id.* (citing *BlackRock Allocation Target Shares* v. *Wells Fargo Bank, Nat'l Ass'n*, No. 14 Civ. 9371 (KPF) (SN), 2017 WL 953550, at *1-3 (S.D.N.Y. Mar. 10, 2017)).  The Court assumes familiarity with its prior Opinion, and provides here only a brief overview of RMBS trusts, the rights and responsibilities of the parties associated with the trusts, and the nature of Plaintiffs' claims.

### 1.    RMBS Trusts Generally

RMBS are created through a process known as mortgage loan securitization.  Broadly speaking, the mortgage loan securitization process

---

objections as "Def. Reply" (Dkt. #659); and Plaintiffs' reply brief in further support of their objections as "Pl. Reply" (Dkt. #660).

Similarly, the Court refers to Defendant's memorandum of law in support of its motion for summary judgment as "Def. SJ Br." (Dkt. #560); Plaintiffs' consolidated memorandum of law in support of their motion for summary judgment and in opposition to Defendant's motion for summary judgment as "Pl. SJ Br." (Dkt. #575); Defendant's consolidated memorandum of law in opposition to Plaintiffs' cross-motion for summary judgment and reply in further support of its motion for summary judgment as "Def. SJ Reply" (Dkt. #606); and Plaintiffs' consolidated motion in further support of their cross-motion for summary judgment as "Pl. SJ Reply" (Dkt. #619).

[2]    The Court's March 30, 2017 Opinion resolved Defendant's motion to dismiss five related cases brought against it, two of which were initiated by plaintiffs other than the Phoenix Light Plaintiffs and Commerzbank.  *See, e.g.*, *BlackRock Allocation Target Shares: Series S. Portfolio* v. *Wells Fargo Bank, Nat'l Ass'n*, 247 F. Supp. 3d 377, 383 n.1 (S.D.N.Y. Aug. 21, 2017) (listing the plaintiffs and providing the docket numbers associated with their related cases).  The other plaintiffs have since resolved their claims against Defendant and those claims are not addressed further in this Opinion.

begins with a "sponsor" or "seller" acquiring residential mortgage loans from an "originator." (Def. 56.1 ¶ 27).  Once the seller acquires enough loans, the seller pools the loans together and sells them to a "depositor," who then conveys the pooled loans to an RMBS trust.  (*Id.* at ¶ 28).  The trust operates by selling certificates that represent an interest in the payments made by the original borrowers on the mortgage loans to investors, or "certificateholders," such as, for example, Commerzbank and the Phoenix Light Plaintiffs.  (*Id.* at ¶¶ 29-30). The trust, acting through a trustee, ensures that borrowers make their required payments by engaging a "servicer," who is tasked with managing the collection of payments in return for a monthly fee.  (*Id.* at ¶ 32).

## 2.    The Governing Agreements

The rights and responsibilities of the parties associated with creating and administering RMBS trusts — including the originators, sponsors, depositors, trustees, and certificateholders — are set forth in the trusts' governing agreements. (Def. 56.1 ¶ 34).  In this case, the governing agreements primarily take the form of either pooling and service agreements ("PSAs") or indentures (together with PSAs, the "Governing Agreements" or "GAs").  (*Id.* at ¶ 33).[3]

The Governing Agreements impose a wide variety of duties on the RMBS trustees.  Of particular relevance to the present motions, the GAs require the trustee to review all loans provided to it by the depositor and certify that the

---

[3]     The Court addressed the differences between PSAs and indentures in its March 30, 2017 Opinion.  *See generally BlackRock: Series S*, 247 F. Supp. 3d at 384-85.  The distinctions between the two forms of GAs are not relevant to the parties' objections to the Report, and the Court will not distinguish between the two types of agreements, except when addressing the agreement applicable to a particular trust.

loans and associated documents comply with the GA's requirements.  (*See, e.g.*, Stanton Decl. (Dkt. #566), Ex. 5 at § 2.02).  If, in the process of reviewing the loan paperwork, the trustee discovers either that there are missing or deficient documents, or that an originator or seller breached a representation or warranty ("R&W"), the GAs obligate the trustee to notify certain contractually-defined parties of the issue and pursue certain specified enforcement measures.  (*See generally* Def. 56.1, App'x M).

While the precise language related to the trustee's notice and enforcement duties differs slightly from trust to trust, the PSA for trust ABFC 2006-OPT2 — one of the trusts implicated in these cases — is illustrative.  (*See* Stanton Decl., Ex. 5).  This PSA states that upon learning of either a missing or deficient loan document or a breach of a representation or warranty, the RMBS trustee "shall promptly notify" the contractually-defined parties "and request that" the deficiency be cured within 120 days (in the case of a defective or missing document) or 90 days (in the case of a breach of a representation or warranty) from the date the trustee provides notice of the issue.  (*Id.*, § 2.03(a)).  The PSA further provides that, if the responsible party does not cure the defect or breach within the specified cure period, the trustee "shall enforce the" party's obligation to repurchase the loan from the trust.  (*Id.*).[4]

In addition to these notice and enforcement duties, the GAs also impose certain "prudent person" responsibilities on the RMBS trustee in connection

---

[4]     The GAs for several other trusts provide that a non-compliant party can cure a defect or breach either by repurchasing the loan or substituting a compliant loan for the defective one.  (*See, e.g.*, Stanton Decl. (Dkt. #566), Ex. 8 (PSA for GPMF 2005-AR4)).

with so-called events of default ("EODs").  (Def. 56.1 ¶ 632).[5]  Most notably, the GAs provide that during and following an EOD, Defendant "shall exercise such of the rights and powers vested in it" by the GAs and "use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of its own affairs."  (*Id.*).[6]

### 3.    The Parties

Plaintiffs are certificateholders who invested in RMBS trusts for which Defendant served as the trustee.  (Def. 56.1 ¶ 12).  Commerzbank is an international commercial bank organized under the laws of Germany.  (*Id.* at ¶¶ 1-2).  As relevant here, Commerzbank acquired interests in 28 RMBS certificates that were issued by 19 RMBS trusts.  (*Id.* at ¶ 3).  Phoenix Light is a special purpose investment vehicle backed in part by RMBS.  (*Id.* at ¶ 7).  The remaining Phoenix Light Plaintiffs (*i.e.*, all but Phoenix Light itself) are issuers of financial instruments known as collateralized debt obligations ("CDOs") that are backed in part by RMBS (the "CDO Plaintiffs").  (*Id.* at ¶ 6).  Phoenix Light "holds more than 50% of the senior notes and, thus, is the Controlling Party" of the CDO Plaintiffs.  (*Id.* at ¶ 8).  The Phoenix Light Plaintiffs collectively acquired RMBS certificates issued by 11 RMBS trusts.  (*Id.* at ¶ 9).

---

[5]    EOD is a catch-all term for certain contractually-defined events that vary from trust to trust.  (*See* Keenan Decl. (Dkt. #594), Ex. 16 (providing a table of the relevant EOD provisions for each of the at-issue trusts)).

[6]    The GAs of several of the relevant RMBS trusts use the term "prudent man" (as opposed to "prudent person").  (*See* Def. 56.1 ¶ 632).  This difference is immaterial, and the Court will refer only to the "prudent person" standard.

### 4.     Plaintiffs' Claims

Generally speaking, the Report addresses three sets of Plaintiffs' claims. The first set of claims alleges that Defendant failed to discharge its notice and enforcement duties following its discovery of document defects in certain mortgage loans provided to the RMBS trusts.  (*See* Def. 56.1 ¶ 335).  The second set alleges that Defendant similarly failed to discharge its notice and enforcement duties after uncovering breaches of certain representations and warranties.  (*See, e.g.*, *id.* at ¶ 174).  And the third set alleges that Defendant failed to discharge its obligation to act as a "prudent person" following EODs. (*Id.* at ¶ 633).  All told, Plaintiffs assert that Defendant's failure to discharge its obligations under the GAs caused them to incur hundreds of millions of dollars in damages.  (PL Dkt. #80 at ¶ 159; CB Dkt. #1 at ¶ 15).

## B.     Procedural Background

The Phoenix Light Plaintiffs and Commerzbank initiated their cases on December 23, 2014, and December 24, 2015, respectively.  (PL Dkt. #1; CB Dkt. #1).  Following the Court's resolution of Defendant's motion to dismiss the related actions and the completion of discovery, the Court referred the cases to Magistrate Judge Sarah Netburn for a report and recommendation on the parties' anticipated summary judgment and *Daubert* motions.  (Dkt. #503). Defendant filed a consolidated motion for summary judgment on March 10, 2021 (Dkt. #559), and Plaintiffs filed a consolidated cross-motion for summary judgment on March 12, 2021 (Dkt. #569).  The parties' motions were fully briefed upon the filing of Plaintiffs' reply brief on March 15, 2021.  (Dkt. #619).

8

Judge Netburn issued the Report on December 6, 2021, recommending that the Court grant in part and deny in part the parties' cross-motions for summary judgment.  (Dkt. #644 ("Report")).[7]  As set forth in greater detail in the Report, Judge Netburn finds that Defendant should be granted summary judgment on several threshold issues that preclude Plaintiffs from maintaining their claims, including: (i) a lack of standing; (ii) provisions in the GAs limiting who can bring claims under the agreements; (iii) orders issued in certain Minnesota state court proceedings; and (iv) the applicable statutes of limitations.  (*See generally* Report).  "Because these recommendations may resolve one or both actions, or may significantly narrow the scope of the remaining claims," Judge Netburn declined to reach the parties' remaining arguments.  (*Id.* at 2).  Judge Netburn further requested that if this Court

---

[7]     Judge Netburn issued two versions of the Report on that date.  (Dkt. #644, 645).  The first version, which was filed under seal and viewable only to the parties and Court, referenced and quoted certain exhibits that had previously been filed under seal.  (Dkt. #644; *see also* Dkt. #646).  The second version, which was made publicly available, redacted all references to and quotations from sealed materials.  (Dkt. #645).  In response to Judge Netburn's order directing the parties to meet and confer as to whether there was an ongoing need to withhold the redacted material from the public version of the Report, the parties filed a joint letter on December 9, 2021, stating that they did not object to the unsealing of the redacted version of the Report.  (Dkt. #648).  Judge Netburn thereafter ordered the unsealing of the full Report.  (Dkt. #649).

In addition to the Report, Judge Netburn also issued an Opinion and Order on December 6, 2021, partially denying and partially reserving judgment on the parties' motions to exclude one another's experts under Federal Rule of Evidence 702 and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  (Dkt. #647).  Explaining her decision to resolve a limited portion of the parties' *Daubert* motions, Judge Netburn observed that only Defendant's challenge to the admissibility of Plaintiff's expert Ingrid Beckles required resolution to issue the Report and that the interest of judicial economy counseled against reaching the balance of the parties' motions.  (*Id.* at 2).  As to Ms. Beckles, Judge Netburn found that her opinions on uncured document defects and loan serving standards were sufficiently reliable and admissible.  Judge Netburn's resolution of Defendant's *Daubert* motion is not at issue here.

decided not to adopt certain of her recommendations, then the Court refer the case back to her for resolution of any remaining issues not addressed in the Report. (*Id.* at 56).

Following the filing of the Report, on December 15, 2021, this Court held a telephonic conference at which it stayed Plaintiffs' cases to allow the parties additional time to brief their objections to the Report. (*See* Dkt. #652). The parties submitted consolidated objections to the Report on January 14, 2022 (Dkt. #653 (Defendant), 654 (Plaintiffs)); briefs in opposition on February 22, 2022 (Dkt. #655 (Defendant), 656 (Plaintiffs)); and reply briefs on March 15, 2022 (Dkt. #659 (Defendant), 660 (Plaintiffs)). The parties also submitted several letters informing the Court of relevant decisions issued during and after the close of briefing. (Dkt. #658, 663, 664, 665, 666, 667). The parties' objections are now fully briefed and ripe for the Court's decision.

## DISCUSSION

### A. Applicable Law

### 1. Reports and Recommendations of a Magistrate Judge

When reviewing a magistrate judge's report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see generally United States* v. *Romano*, 794 F.3d 317, 340 (2d Cir. 2015). "To accept those portions of the report to which no timely objection has been made, ... a district court need only satisfy itself that there is no clear error on the face of the record." *Herrara* v. *12 Water St. Gourmet Cafe, Ltd.*, No. 13 Civ.

4370 (JMF), 2016 WL 1268266, at *1 (S.D.N.Y. Mar. 31, 2016). By contrast, a district court must review *de novo* "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3). In undertaking this review, "[i]t is sufficient that the Court 'arrive at its own independent conclusion regarding those portions of the report to which objections are made,' and the Court 'need not conduct a *de novo* hearing on the matter.'" *City of Almaty* v. *Sater*, No. 19 Civ. 2645 (JGK), 2022 WL 1555542, at *2 (S.D.N.Y. May 16, 2022) (quoting *In re Hulley Enters. Ltd.*, 400 F. Supp. 3d 62, 69 (S.D.N.Y. 2019)).

### 2. Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[8] A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

---

[8]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party failed to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" using affidavits or otherwise but cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248; *see also Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the

movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  In considering "what may reasonably be inferred" from witness testimony, however, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (citing *Cty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).  "Put another way, summary judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-movant." *Borley* v. *United States*, 22 F.4th 75, 78 (2d Cir. 2021) (internal alterations omitted).

**B.   Analysis**

Plaintiffs and Defendant object to different findings and recommendations made in the Report.  Defendant objects only to the Report's interpretation of a contractual provision that bears on Commerzbank's ability to pursue a subset of its claims against it, and does so only to the extent that the Court does not find that Commerzbank lacks standing to pursue its claims for other, independent reasons identified in the Report.  By contrast, Plaintiffs object to the balance of the Report's findings and recommendations.

Upon *de novo* review of the challenged portions of the Report, the Court finds that the Phoenix Light Plaintiffs are collaterally estopped from relitigating the issues of champerty and prudential standing that were resolved in a prior case.  The Court therefore grants summary judgment in favor of Defendant as to all of the Phoenix Light Plaintiffs' claims.  The Court further finds that

Commerzbank (i) lacks prudential standing to bring claims related to certificates it sold prior to initiating its action; (ii) lacks contractual standing to bring certain other claims; (iii) is barred from asserting additional claims by orders issued in prior state court litigation; and (iv) is time-barred from bringing a final set of claims.  The Court thus grants summary judgment in part to Defendant as to Commerzbank's claims and refers the case back to Judge Netburn for further motion practice and a report and recommendation on all surviving claims.

### 1.    Standing

In the Report, Judge Netburn makes several findings and recommendations related to Plaintiffs' standing to pursue their actions.  With respect to the Phoenix Light Plaintiffs, the Report finds that these plaintiffs lack prudential standing and, alternatively, that they are collaterally estopped from relitigating a previous finding that they lack prudential standing.  And with respect to Commerzbank, the Report finds that the bank lacks standing to pursue its claims based on certain RMBS certificates that it sold prior to initiating the instant litigation.  Unsurprisingly, Plaintiffs object to both sets of findings and recommendations.  The Court addresses the Report's findings and Plaintiffs' corresponding objections in turn.

### a.    Collateral Estoppel

While the Report opens by finding that the Phoenix Light Plaintiffs lack prudential standing, the Court begins with Judge Netburn's alternative finding that these plaintiffs are collaterally estopped from relitigating the issues of

champerty and prudential standing, which issues were resolved against them in a recent case involving many of the same plaintiffs. (Report 16). As the Court will explain, it agrees with Judge Netburn that the Phoenix Light Plaintiffs are collaterally estopped from relitigating these issues. The Court therefore grants Defendant summary judgment with respect to the Phoenix Light Plaintiffs' claims.

As Judge Netburn explains in the Report, "[c]ollateral estoppel applies 'where [i] the identical issue was raised in a previous proceeding; [ii] the issue was actually litigated and decided in the previous proceeding; [iii] the party had a full and fair opportunity to litigate the issue; and [iv] the resolution of the issue was necessary to support a valid and final judgment on the merits.'" (Report 13 (quoting *Marvel Characters, Inc.* v. *Simon*, 310 F.3d 280, 288-89 (2d Cir. 2002))). Based on her review of the record, Judge Netburn recommends that the Phoenix Light Plaintiffs be collaterally estopped from relitigating the issues of champerty and prudential standing based on Judge Vernon S. Broderick's decision in *Phoenix Light SF Ltd.* v. *U.S. Bank Nat'l Ass'n*, No. 14 Civ. 10116 (VSB), — F. Supp. 3d —, 2020 WL 1285783, at *1 (S.D.N.Y. Mar. 18, 2020) ("*PL/USB III*"), *reconsideration denied*, No. 14 Civ. 10116 (VSB), 2020 WL 4699043 (S.D.N.Y. Aug. 12, 2020), which the Second Circuit later affirmed in *Phoenix Light SF DAC* v. *U.S. Bank Nat'l Ass'n*, No. 20-1312-cv, 2021 WL 4515256 (2d Cir. Oct. 4, 2021) (summary order) ("*PL/USB IV*"). (Report 13-16).

*PL/USB* is an RMBS action that involves the same basic factual circumstances, and many of the same parties, as the Phoenix Light Plaintiffs' present case.  *See PL/USB III*, 2020 WL 1285783, at *1.  Prior to being assigned to Judge Broderick, the case was assigned to then-District Judge Katherine B. Forrest.  *Id.* at *2.  In a pair of opinions resolving the defendants' motions to dismiss, Judge Forrest set the stage for Judge Broderick's and the Second Circuit's subsequent decisions.  *See Phoenix Light SF Ltd.* v. *U.S. Bank Nat. Ass'n*, No. 14 Civ. 10116 (KBF), 2015 WL 2359358, at *1 (S.D.N.Y. May 18, 2015) ("*PL/USB I*"); *Phoenix Light SF Ltd.* v. *U.S. Bank Nat'l Ass'n*, No. 14 Civ. 10116 (KBF), 2016 WL 1169515, at *1 (S.D.N.Y. Mar. 22, 2016) ("*PL/USB II*").

Briefly stated, Judge Forrest's decisions in *PL/USB* address the transactions through which Phoenix Light and the other plaintiffs in that case acquired their interests in the relevant RMBS certificates.  In *PL/USB I*, Judge Forrest found that the plaintiffs had assigned their interests in the relevant RMBS certificates to certain RMBS trustees and thus granted the defendants' motion to dismiss for lack of standing.  2015 WL 2359358, at *1-2.  In consequence, "[f]rom April to July of 2015, Plaintiffs sought from" the relevant RMBS trustees "assignments of the rights to bring these claims in light of" Judge Forrest's opinion in *PL/USB I*.  *PL/USB III*, 2020 WL 1285783, at *3.  The plaintiffs then filed an amended complaint and the defendants again moved to dismiss the claims, this time arguing that the assignments granting the plaintiffs rights in the RMBS certificates were champertous and thus void

under New York law.[9]   In *PL/USB II*, Judge Forrest denied the defendants'
motion to dismiss, finding that the record was insufficiently developed to
resolve these arguments.  *See* 2016 WL 1169515, at *1.

As relevant here, Judge Broderick's decision in *PL/USB III* picks up
where Judge Forrest left off.  Observing that "[b]oth Supreme Court and Second
Circuit precedent indicate that the lack of valid assignments from [certain
RMBS trustees] would in fact deprive [the plaintiffs] of both Article III and
prudential standing," *PL/USB III*, 2020 WL 1285783, at *10, Judge Broderick
set out to determine "whether the assignments to [the] [p]laintiffs of the right to
bring [the] suit were valid," *id.* at *11.  Judge Broderick ultimately held that the
assignments were invalid because they were made for the sole purpose of
pursuing the litigation and, as such, were champertous under New York law.
*Id.* at *12-15.  Based on this finding, Judge Broderick concluded that Phoenix
Light and the other plaintiffs lacked prudential standing because they were
seeking to assert the relevant RMBS trustees' — rather than their own — legal
interests in the RMBS certificates.  *Id.* at *16.  On appeal, the Second Circuit
affirmed Judge Broderick's finding, holding that the plaintiffs lacked prudential

---

[9]     Under New York's champerty law, "no corporation or association, directly or indirectly,
itself or by or through its officers, agents or employees, shall solicit, buy or take an
assignment of, or be in any manner interested in buying or taking an assignment of a
bond, promissory note, bill of exchange, book debt, or other thing in action, or any
claim or demand, with the intent and for the purpose of bringing an action or
proceeding thereon[.]" N.Y. Jud. Law § 489(1).  As Judge Broderick observed, this law
"restricts individuals and companies from purchasing or taking an assignment of notes
or other securities with the intent and for the purpose of bringing an action or
proceeding thereon." *PL/USB III*, 2020 WL 1285783, at *11 (quoting *Justinian Cap. SPC*
v. *WestLB AG*, 28 N.Y.3d 160, 166 (2016)).

17

standing because "it is clear that the assignments made were indeed champertous" and "therefore invalid." *PL/USB IV*, 2021 WL 4515256, at *1.

Turning to the present case, the Court observes that the Report does not address the basis for the application of collateral estoppel at length, but ultimately finds that Judge Netburn's recommendation is both supported by the record and consistent with several recent decisions addressing nearly identical factual circumstances. The Court's application of the relevant test demonstrates that the Phoenix Light Plaintiffs are collaterally estopped from asserting their claims against Defendant in this action. *See Simon*, 310 F.3d at 288-89 (stating the applicable legal framework).

*First*, the facts bearing on the issues of champerty and prudential standing in this proceeding and *PL/USB* are identical. Indeed, the assignments at issue in this case are either the same or materially same assignments that Judge Broderick and the Second Circuit deemed to be champertous in *PL/USB*. *Compare PL/USB III*, 2020 WL 1285783, at *4, *and PL/USB IV*, 2021 WL 4515256, at *1, *with* Def. 56.1 ¶¶ 905-11 (listing the assignments).

*Second*, the issues of champerty and prudential standing were both litigated and decided in the *PL/USB* action. *See PL/USB III*, 2020 WL 1285783, at *16 (concluding that "the assignments at issue [are] void under New York champerty law" and, "[a]ccordingly," that "Plaintiffs lack both constitutional and prudential standing to bring this breach of contract action"); *PL/USB IV*, 2021 WL 4515256, at *1 (holding that the assignments were champertous and

thus that the Phoenix Light Plaintiffs lacked prudential standing "[f]or substantially the reasons given by Judge Broderick").

*Third*, the Phoenix Light Plaintiffs had a full and fair opportunity to litigate the issues of champerty and prudential standing in *PL/USB*. Six of the nine Phoenix Light Plaintiffs in this action were also plaintiffs in *PL/USB*, and all parties in that action "took full advantage of the opportunity to pursue vigorously their claims before the district court and court of appeals." *Phoenix Light SF Ltd.* v. *Deutsche Bank Nat'l Tr. Co.*, — F. Supp. 3d —, No. 14 Civ. 10103 (JGK), 2022 WL 384748, at *9 (S.D.N.Y. Feb. 8, 2022) ("*PL/DB*") (finding this factor to be satisfied in a case involving many of the same Phoenix Light Plaintiffs); *see also Phoenix Light SF Ltd.* v. *HSBC Bank USA, Nat'l Ass'n*, No. 14 Civ. 10101 (LGS), 2022 WL 1266632, at *4 (S.D.N.Y. Apr. 28, 2022) ("*PL/HSBC*") (stating in a similar action that "Plaintiffs have had a full and fair opportunity to litigate the issue of standing and champerty").

Moreover, while three of the Phoenix Light Plaintiffs in this action (Blue Heron II, Blue Heron V, and Blue Heron IX) were not parties to *PL/USB*, "the opportunity-to-litigate factor can be satisfied where, as here, the parties in question are controlled by a party in a related action." *PL/DB*, 2022 WL 384748, at *9 (quoting *Phoenix Light SF Ltd.* v. *Bank of N.Y. Mellon*, No. 14 Civ. 10104 (VEC), 2022 WL 92213, at *4-5 (S.D.N.Y. Jan. 7, 2022) ("*PL/BNY*")); *see also Buechel* v. *Bain*, 97 N.Y.2d 295, 304 (2001) (explaining that privity "includes ... those who control an action although not formal parties to it"). "The Second Circuit applies the doctrine of privity with flexibility when it comes

19

to issue preclusion; so long as the interests of the nonparties were adequately represented, the application of collateral estoppel is permissible." *Id.* (internal quotation marks and alterations omitted). In this case, Phoenix Light is the majority noteholder of Blue Heron II, Blue Heron V, and Blue Heron IX and exercises control over them (Def. 56.1 ¶ 8); the Blue Heron entities were "parties to the same assignments held champertous by Judge Broderick and the Court of Appeals" in *PL/USB* (Report 16); and the Blue Heron entities and the plaintiffs in the *PL/USB* action are represented by the same counsel and have advanced substantially the same arguments with respect to the issues of champerty and prudential standing in both cases.

On this record, the Court agrees with Judge Netburn's finding that Blue Heron II, Blue Heron V, and Blue Heron IX are in privity with and were adequately represented by the plaintiffs in *PL/USB* such that they may be collaterally estopped from relitigating the court's findings in that prior action. (*See* Report 16); *See also PL/DB*, 2022 WL 384748, at *9 (concluding for similar reasons that Blue Heron V and Blue Heron IX's interests "were adequately protected in" *PL/USB* and that "there is 'sufficient privity' between the Blue Heron Plaintiffs and the eight other Phoenix Light Plaintiffs" to collaterally estop the plaintiffs from relitigating findings made in *PL/USB*); *PL/BNY*, 2022 WL 92213, at *5 (finding that Blue Heron V was collaterally estopped from relitigating champerty and prudential standing by *PL/USB*).

*Fourth* and finally, the resolution of the champerty and prudential standing issues was necessary to (and, in fact, dispositive of) both Judge

Broderick's and the Second Circuit's decisions in *PL/USB*.  *See PL/USB III*,
2020 WL 1285783, at *16 (holding "that Plaintiffs lack both constitutional and
prudential standing to bring this breach of contract action"); *PL/USB IV*, 2021
WL 4515256, at *1 (finding, "[f]or substantially the reasons given by Judge
Broderick," that the Phoenix Light Plaintiffs lack prudential standing); *see also*
*PL/DB*, 2022 WL 384748, at *10 (stating that "the issues decided by the court
of appeals relating to champerty and prudential standing are dispositive of the
present action"); *PL/BNY*, 2022 WL 92213, at *5 (observing that "[t]here is no
room to argue whether prudential standing guided the Second Circuit's
decision in *U.S. Bank IV*; indeed, it was the entire decision").

The Phoenix Light Plaintiffs' objections to the Report's collateral estoppel
analysis, many of which were presented to and rejected by Judge Netburn, are
unavailing.  The Phoenix Light Plaintiffs first suggest that Judge Netburn made
both factual and legal errors in rejecting their argument that Defendant is not
entitled to invoke the defense of collateral estoppel because it was a party to
certain of the assignments at issue and therefore has unclean hands.  (Pl. Br.
13).  This assertion is based on Judge Netburn's observation that "Wells Fargo
is not a party to the challenged transactions, and Plaintiffs have not offered
evidence that Wells Fargo acted 'fraudulently, or … by deceit or any unfair
means has gained an advantage.'"  (Report 14 (quoting *CBF Indústria de Gusa
S/A* v. *AMCI Holdings, Inc.*, 850 F.3d 58, 78 (2d Cir. 2017))).

The Phoenix Light Plaintiffs contend that Judge Netburn's statement is
erroneous for two reasons.  *First*, they point to the fact that Defendant is, in

21

fact, "the CDO trustee for two plaintiffs (Silver Elms II and Blue Heron VII) named in the initial complaint in this action and was a party to the challenged transactions." (Pl. Br. 13). This observation does not undermine Judge Netburn's finding that collateral estoppel is appropriate here. Neither Silver Elms II nor Blue Heron VII is being collaterally estopped in this case, because both parties voluntarily dismissed their claims in this case. (*See* Dkt. #80, 490). The Phoenix Light Plaintiffs fail to explain why Defendant's participation in two transactions not at issue here should prevent it from invoking collateral estoppel with respect to several distinct transactions, and the Court is unaware of any authority that would compel such a counterintuitive result.

*Second*, the Phoenix Light Plaintiffs separately argue that the Report incorrectly read "a showing of fraudulent intent" into the applicable legal standard. (Pl. Br. 13). But the Report did no such thing. Judge Netburn adopted the precise formulation of the legal standard that the Phoenix Light Plaintiffs advance in their briefing and concluded that the Phoenix Light Plaintiffs had not offered any evidence that Defendant had, by "any unfair means … gained an advantage." (*Compare* Report 14, *with* Pl. Br. 13 (arguing that "the doctrine of *in pari delicto* applies when the party 'gained an advantage' through 'any unfair means'")). Because the Phoenix Light Plaintiffs have failed to point to evidence of Defendant's supposed malfeasance — either to Judge

Netburn or to this Court — the Court adopts Judge Netburn's finding that there is no equitable barrier to the application of collateral estoppel.[10]

Next, the Phoenix Light Plaintiffs contend that *PL/USB* passed on only a "purely legal question" that is not subject to collateral estoppel.  (Pl. Br. 13-14).  The Phoenix Light Plaintiffs have unsuccessfully advanced the same argument before Judge Netburn and several other courts in this District.  (Report 15-16).  *See, e.g.*, *PL/DB*, 2022 WL 384748, at *10 (rejecting the Phoenix Light Plaintiffs' argument that "because Judge Broderick explained that the question of champertous intent, an essential element of champerty, is a 'factual question' and discussed the record evidence before him at length before finally concluding that the assignments were void").  As Judge Caproni explained in *PL/BNY*, the Phoenix Light Plaintiffs' argument "misstates both what the Second Circuit decided and the record before the court."  2022 WL 92213, at *6.  Far from resolving a "purely legal question," both Judge Broderick and the Second Circuit made critical factual findings supporting their conclusion that the Phoenix Light Plaintiffs' assignments were champertous.  As Judge

---

[10]   The Phoenix Light Plaintiffs also suggest that the Report failed to hold Defendant to its burden of "demonstrat[ing] it would be fair to apply collateral estoppel under the circumstances."  (Pl. Br. 13).  In the Phoenix Light Plaintiffs' view, it would be "grossly unfair to allow [Defendant] to benefit from the voiding of transactions entered into in order to address its own conflicts of interest."  (*Id.*).  This argument misses the mark.  Neither Judge Netburn nor this Court is being called on to decide whether the end result of this litigation is fair.  Rather, the issue before the Court is whether Defendant may fairly invoke the doctrine of collateral estoppel.  As recounted above, the Phoenix Light Plaintiffs have not identified any malfeasance that would preclude Defendant from invoking and benefiting from collateral estoppel.  Further, prior to this case, Phoenix Light and several of the other Phoenix Light Plaintiffs had ample opportunity to brief their standing arguments before several district courts, the Second Circuit, and, in a recent petition for *certiorari* that was denied, the Supreme Court.  (*See* Dkt. #663).

Broderick observed in *PL/USB III*, whether an assignment is champertous "is usually a factual question that cannot be decided on summary judgment," except where "a plaintiff fails to rebut evidence that its purpose in seeking an assignment was to commence suit[.]"  2020 WL 1285783, at *11.  After reviewing the record before him, Judge Broderick concluded "that there is no genuine material factual dispute as to" whether "Plaintiffs sought these assignments for the sole purpose of pursuing this litigation, and for no other reason."  *Id.* at *12.  "Based on the factual findings of the District Court," the Second Circuit likewise held that "it is clear that the assignments made were indeed champertous, as they were made 'with the intent and for the primary purpose of bringing a lawsuit.'"  *PL/USB IV*, 2021 WL 4515256, at *1.[11]

Lastly, the Phoenix Light Plaintiffs contend that there has been a "material occurrence" since *PL/USB* was decided that relieves them from the case's preclusive effect: the Second Circuit's decision in *Fund Liquidation Holdings LLC* v. *Bank of Am. Corp.*, 991 F.3d 370, 375 (2d Cir. 2021) ("*Fund Liquidation*").  (Pl. Br. 15).  In Plaintiffs' words, *Fund Liquidation* "rejected prior Circuit precedent to the extent it suggests that a ratification cannot cure a standing defect."  (*Id.*).  The Phoenix Light Plaintiffs contend that "[i]t is now

---

[11]   The Phoenix Light Plaintiffs' argument is also legally unsupported.  "While the Supreme Court has recognized an 'exception to the applicability of the principles of collateral estoppel for unmixed questions of law,' that exception only applies to 'successive actions involving *unrelated* subject matter.'"  *FCA US, LLC* v. *Spitzer Autoworld Akron, LLC*, 887 F.3d 278, 289 (6th Cir. 2018) (internal quotation marks omitted) (quoting *United States* v. *Stauffer Chem. Co.*, 464 U.S. 165, 171 (1984)).  Here, as discussed earlier, the subject matter in *PL/USB* and the Phoenix Light Plaintiffs' case before this Court are the same.  Thus, even if the Phoenix Light Plaintiffs' argument were factually supported, the Court would reject it for this independent reason.

clear" from *Fund Liquidation* that the Phoenix Light Plaintiffs "can rely on a ratification [to confer standing] even assuming *arguendo* they could not rely on an assignment that is functionally equivalent to a ratification." (*Id.*).  In other words, the Phoenix Light Plaintiffs suggest that any standing issues identified in Judge Broderick's opinion in *PL/USB III* are moot in light of ratifications the plaintiffs received from the certificateholders to pursue their claims.

*Fund Liquidation* is not the white knight that the Phoenix Light Plaintiffs wish it to be.  While an intervening material change in the law may warrant cutting short the preclusive effect of a factual finding or judgment in some circumstances, *see Bouchard Transp. Co.* v. *Long Island Lighting Co.*, 807 F. App'x 40, 42 (2d Cir. 2020) (summary order), there has been no intervening change in law in this case.  *Fund Liquidation* was decided while *PL/USB* was pending before the Second Circuit, and the plaintiffs in *PL/USB* submitted arguments to the Court of Appeals based on the decision in a letter filed pursuant to Federal Rule of Appellate Procedure 28(j).  *See PL/USB*, No. 20-1312, Dkt. #133 (2d Cir. Mar. 22, 2021).  As this timeline demonstrates, the Second Circuit's decision in *Fund Liquidation predates* its decision in *PL/USB IV*.  "Because the court of appeals rendered its decision in [*PL/USB*] despite being made aware of the plaintiffs' *Fund Liquidation* arguments, that case does not strip [*PL/USB*] of its preclusive effect."  *PL/DB*, 2022 WL 384748, at *11.

*     *     *

For all of these reasons, the Court agrees with Judge Netburn that the Phoenix Light Plaintiffs are collaterally estopped from relitigating the findings

made as to champerty and prudential standing in *PL/USB*.  As a result, the Court finds that the Phoenix Light Plaintiffs lack a legal interest in their claims and thus are prudentially barred from pursuing their case.  Because the resolution of this threshold issue is dispositive of the Phoenix Light Plaintiffs' claims, the Court declines to address their remaining objections and grants Defendant's motion for summary judgment as to their claims.[12]

### b.   The Sold Certificates

Having found that the Phoenix Light Plaintiffs are collaterally estopped from relitigating their lack of prudential standing, the Court now turns to the second standing issue addressed by Judge Netburn, namely, her finding that Commerzbank lacks Article III standing to bring a subset of its claims arising out of certain RMBS certificates that the bank sold prior to initiating its case (the "Sold Certificates").  (Report 22).[13]

Judge Netburn recommends dismissing Commerzbank's claims predicated on the Sold Certificates on the basis that New York law governs Commerzbank's sale of the Sold Certificates, and that under New York General

---

[12]   While the Court will not address any remaining objections made solely by the Phoenix Light Plaintiffs, the remainder of this Opinion addresses several objections raised by both the Phoenix Light Plaintiffs and Commerzbank.  To the extent the Court's resolution of these objections applies to the Phoenix Light Plaintiffs, the Court views such analysis as providing an independent basis for its decision.

[13]   Commerzbank sold the certificates between November 3, 2011, and February 12, 2015. (Def. 56.1 ¶¶ 57-66).  The Sold Certificates include: (i) ABFC 2005-HE2 (all tranches); (ii) ABFC 2005-OPT1 (all tranches); (iii) ABFC 2006-OPT1 (M1 and M3 tranches only); (iv) ABSHE 2005-HE5 (all tranches); (v) CMLTI 2005-OPT4 (all tranches); (vi) GPMF 2005-AR4 (all tranches); (vii) GPMF 2006-AR1 (all tranches); (viii) GPMF 2006-AR2 (all tranches); (ix) GPMF 2006-AR3 (all tranches); (x) MSAC 2005-WMC2 (all tranches); (xi) MSAC 2005-WMC3 (all tranches); (xii) MSAC 2005-WMC5 (all tranches); (xiii) MSAC 2006 HE1 (all tranches); and (xiv) OOMLT 2006-2 (2A4 tranche only).  (*See* Report 17 n.4 (citing Def. 56.1 ¶ 55)); *see also* Pl. Br. xv).

Obligations Law § 13-107, "the transfer of Commerzbank's Sold Certificates automatically vested in the transferees all of Commerzbank's claims related to the Sold Certificates." (Report 22). "Because it is undisputed that Commerzbank did not expressly reserve its litigation rights," Judge Netburn concluded, "it does not have standing to bring claims related to the Sold Certificates." (*Id.*).

Commerzbank raises several objections to the Report's findings with respect to the Sold Certificates. The Court addresses each challenge in turn. While the Court does not agree with Judge Netburn that Commerzbank's sale of the Sold Certificates raises an issue of Article III standing rather than prudential standing, the Court ultimately agrees that Commerzbank is barred from asserting claims arising out of the Sold Certificates.

### i.  Standing and Waiver

Preliminarily, Commerzbank argues that Judge Netburn improperly relied on an overturned Second Circuit summary order when she rejected its arguments that waiver, judicial estoppel, and law of the case precluded Defendant from raising the issue of Commerzbank's standing. (Pl. Br. 15-16). In relevant part, Judge Netburn rejected Commerzbank's arguments with respect to these issues based on her observations that (i) subject matter jurisdiction cannot be waived and (ii) "a Court cannot exercise subject matter jurisdiction over claims for which the plaintiffs lack standing." (Report 17). As Commerzbank observes, the Report cites *Valdin Invs. Corp.* v. *Oxbridge Cap. Mgmt., LLC*, 651 F. App'x 5, 7 (2d Cir. 2016) (summary order), for the latter

proposition.  (*Id.*).  But *Valdin*'s holding that an "assignment can result in a loss of [Article III] standing" is no longer good law, as it was subsequently overruled by the Second Circuit in *Fund Liquidation*.  *See Fund Liquidation*, 991 F.3d at 381 n.5 (stating that "*Valdin* does not represent the law of our Circuit" on this issue).  Commerzbank asserts that *Fund Liquidation* establishes that its pre-suit sales of the Sold Certificates do not divest it of Article III standing or the Court of subject matter jurisdiction, and that Judge Netburn erred by finding otherwise.  (Pl. Br. 16).

The Court agrees with Commerzbank, but only to a point.  Defendant challenges Commerzbank's standing to pursue claims based on the Sold Certificates.  (*See* Def. Opp. 9-10).  Contrary to the Report's finding, the Second Circuit held in *Fund Liquidation* that a party's pre-litigation assignment of a claim does not divest the party of Article III standing or the Court of subject matter jurisdiction.  *See Fund Liquidation*, 991 F.3d at 380 (explaining that a pre-litigation assignment of a claim does not implicate Article III); *see also Nastasi & Assocs., Inc.* v. *Bloomberg, L.P.*, No. 18 Civ. 12361 (JMF), 2021 WL 3541153, at *2 (S.D.N.Y. Aug. 11, 2021) (describing *Fund Liquidation* as "holding that a party's pre-filing assignment of its claim does not deprive that party of Article III standing").  The Court therefore views Defendant's challenge to Commerzbank's ability to pursue claims based on the Sold Certificates as raising an issue of *prudential*, rather than Article III, standing.  *See Fund Liquidation*, 991 F.3d at 381-82 (noting that a lack of "legal title to, or a proprietary interest in, the claim" may implicate the prohibition on raising

28

another's legal rights).  And because a challenge to a party's prudential standing does not implicate the Court's subject matter jurisdiction, it can be waived.  *See June Med. Servs. L.L.C.* v. *Russo*, 140 S. Ct. 2103, 2117 (2020) (explaining that prudential standing "does not involve the Constitution's 'case-or-controversy requirement'" and thus "can be forfeited or waived").  Thus, the Court finds it appropriate to address Commerzbank's waiver, judicial estoppel, and law of the case arguments as part of the Court's inquiry into Commerzbank's ability to maintain its claims based on the Sold Certificates.[14]

While Commerzbank's arguments as to judicial estoppel and law of the case are more appropriately analyzed alongside Judge Netburn's choice-of-law analysis, its waiver argument is best addressed at the outset of the Court's analysis.  Commerzbank contends that Defendant waived its argument that Commerzbank lacks standing by failing to raise it as an affirmative defense in its answer.  (Pl. Br. 5).  The Court is unpersuaded by this argument.  To begin,

---

[14]  Defendant cites *PL/BNY* for the proposition that "prudential standing is a matter of subject-matter jurisdiction[.]"  (Def. Br. 11 (quoting *PL/BNY*, 2022 WL 92213, at *2)).  *PL/BNY*, in turn, cites to *Thompson* v. *Cnty. of Franklin*, 15 F.3d 245, 248 (2d Cir. 1994), in which the Second Circuit found that its "independent obligation to examine subject matter jurisdiction" extended "to the prudential rules of standing that, apart from Art. III's minimum requirements, serve to limit the role of the courts in resolving public disputes."  The Court does not read *Thompson* to hold that prudential standing is a prerequisite to a court's exercise of subject matter jurisdiction.  Indeed, such a reading would be contrary to the Supreme Court's observation that "unlike Article III standing, prudential standing 'does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case.'"  *Partner Reinsurance Co. Ltd.* v. *RPM Mortg., Inc.*, No. 18 Civ. 5831 (PAE), 2020 WL 2904862, at *2 (S.D.N.Y. June 3, 2020) (quoting *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014)).  Instead, *Thompson* is more appropriately read to stand for the narrower proposition that federal courts may raise the issue of a party's prudential standing *sua sponte*.  *See Keepers, Inc.* v. *City of Milford*, 807 F.3d 24, 39 (2d Cir. 2015) ("The party invoking federal jurisdiction bears the burden of establishing prudential and constitutional standing, but courts may raise the issue *sua sponte*, including for the first time on appeal." (internal footnotes omitted)).

while Defendant's challenge to Commerzbank's ability to pursue claims related to the Sold Certificates does not draw this Court's subject matter jurisdiction into question, the Court retains the ability to raise and consider the issue of Commerzbank's prudential standing *sua sponte*. *See Keepers, Inc.* v. *City of Milford*, 807 F.3d 24, 39 (2d Cir. 2015) ("The party invoking federal jurisdiction bears the burden of establishing prudential and constitutional standing, but courts may raise the issue *sua sponte*, including for the first time on appeal." (internal footnotes omitted)); *see also MainStreet Org. of Realtors* v. *Calumet City*, 505 F.3d 742, 749 (7th Cir. 2007) (rejecting a reading of prior precedent that would preclude courts from raising prudential standing *sua sponte*). Thus, even if Defendant had waived the argument, Judge Netburn would not have erred in addressing the issue.  Moreover, as Defendant identifies in its briefing, Commerzbank's ability to pursue claims based on the Sold Certificates has been a contested issue in this case since at least Defendant's filing of its motion to dismiss in 2017, and has continued through Defendant's second motion to dismiss, discovery, and summary judgment briefing.  (*See* Def. Opp. 10 (collecting cites)).  On this record, the Court finds that Defendant has preserved its challenge to Commerzbank's standing.

### ii.      Choice of Law and Prudential Standing

Commerzbank's more substantive challenge concerns the Report's finding that New York law governs its sale of the Sold Certificates.  The Report's choice of law analysis is determinative of whether Commerzbank may assert claims under the Sold Certificates.  If New York law applies, as Defendant

urges and the Report finds, then Commerzbank's sale of the Sold Certificates transferred not only the certificates themselves, but also all claims related to them.  (*See* Report 22 (citing N.Y. Gen. Oblig. Law § 13-107)).[15]  In that event, Commerzbank would lack prudential standing to pursue claims based on the Sold Certificates, because these claims were transferred to the assignees of the certificates.  *See W.R. Huff Asset Mgmt. Co., LLC* v. *Deloitte & Touche LLP*, 549 F.3d 100, 108 (2d Cir. 2008) (stating that a "plaintiff [must] have legal title to, or a proprietary interest in, the claim" to have standing); *Fund Liquidation*, 991 F.3d at 182 (explaining that *W.R. Huff* is "best interpreted as limited to" the context of prudential standing"); *cf. PL/USB IV*, 2021 WL 4515256, at *1 (concluding that many of the Phoenix Light Plaintiffs lacked prudential standing to raise claims based on RMBS certificates that they had assigned to third parties).  By contrast, if another jurisdiction's law applies (such as, for example, English law), then Commerzbank would have retained its litigation rights in the Sold Certificates even after selling the certificates themselves.  *See PL/DB*, 2022 WL 384748, at *12 (making a similar observation); *see also Royal Park Invs. SA/NV* v. *Wells Fargo Bank, N.A.*, No. 14 Civ. 9764 (KPF) (SN), 2018

---

[15]     The relevant provision of New York's General Obligations Law provides:

> Unless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands of the transferrer, whether or not such claims or demands are known to exist, (a) for damages or rescission against the obligor on such bond, (b) for damages against the trustee or depositary under any indenture under which such bond was issued or outstanding, and (c) for damages against any guarantor of the obligation of such obligor, trustee or depositary.

N.Y. Gen. Oblig. Law § 13-107(1).

WL 1831850, at *6 (S.D.N.Y. Apr. 17, 2018) (observing that "in most states, assignors must manifest an intent to transfer litigation rights, while New York law applies a minority rule under which litigation rights automatically accompany the sale of a certificate" (internal quotation marks omitted)).

The parties agree, with one caveat not relevant here, that Judge Netburn appropriately used New York's center of gravity test to determine the substantive law that applies in this case.  (Pl. Br. 17; Def. Opp. 12).[16]  As Judge Netburn explained, "[u]nder New York's center of gravity test, courts consider: (i) the places of contracting, negotiation, and performance; (ii) the location of the subject matter of the contract; and (iii) the domicile or place of business of contracting parties."  (Report 20 (quoting, *inter alia*, *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 317 (1994))).  "The place of contracting and the place of performance are given the heaviest weight in this analysis."  (*Id.* (citing *Brink's Ltd.* v. *S. Afr. Airways*, 93 F.3d 1022, 1031 (2d Cir. 1996))).

---

[16]    Defendant maintains, as it did before Judge Netburn (*see* Report 18-19), that standing is a procedural (rather than a substantive) issue, and that because "procedural matters are governed by the forum's law[,]" New York law applies to Commerzbank's sale of the Sold Certificates (Def. Opp. 15-16).  Defendant's argument is based primarily on the First Department's decision in *Royal Park Invs. SA/NV* v. *Morgan Stanley*, in which the state appellate court held that "[t]he question of whether a plaintiff has standing is a procedural matter."  86 N.Y.S.3d 14, 16 (1st Dep't 2018) (internal quotation marks omitted).  Judge Netburn rejected Defendant's argument based, in part, on her observation that "*Royal Park* appears to be an outlier[.]"  (Report 18).  As Defendants state in their opposition brief, however, the First Department has since reaffirmed *Royal Park*'s holding in a case entitled *Zachariou* v. *Manios*, 130 N.Y.S.3d 448 (1st Dep't. 2020).  (Def. Opp. 16).  Nonetheless, the Court declines to resolve Defendant's argument with respect to this issue because it finds that New York law applies irrespective of whether standing is considered a procedural or substantive matter.

After considering each of the center of gravity test's three factors, Judge Netburn concluded that New York law applies to Commerzbank's sale of the Sold Certificates.  (Report 20-22).  "In summary," Judge Netburn observed, "the actual certificates are located in New York and the transactions occurred in New York; although the London Commerzbank branch conducted the sales, Commerzbank itself is incorporated under German law; and there is insufficient information to conclude that the buyers were domiciled or had their principal place of business in England."  (*Id.* at 22).  Based on these factual findings, and "[w]ith heavy weight accorded to the place of transaction and the latter two considerations in equipoise," Judge Netburn found that "New York has the most significant relationship to the transactions at issue, and New York law thus governs the question of whether Commerzbank sold its right to bring claims associated with the Sold Certificates."  (*Id.*).

Commerzbank raises several objections to Judge Netburn's analysis, none of which is persuasive.  *First*, Commerzbank argues that Judge Netburn improperly declined to factor into her analysis the fact that the bank's sales of the Sold Certificates took place in its London office.  (Pl. Br. 17-18).  The Court disagrees.  As Judge Netburn observed, while the transactions took place in Commerzbank's London office, Commerzbank itself is a German bank, and "courts in this district have rejected the concept that branches of a bank are separate entities[.]"  (Report 20 (quoting *Commerzbank AG* v. *U.S. Bank Nat'l Ass'n*, 457 F. Supp. 3d 233, 243 (S.D.N.Y. 2020) ("*CB/USB*"))).  *See also PL/DB*, 2022 WL 384748, at *13 (stating in response to the same argument that

33

"courts in this district have consistently rejected arguments that a branch should be treated as a separate entity for choice of law analysis").

*Second*, Commerzbank asserts that Judge Netburn ignored the supposed fact that the buyers of the Sold Certificates were also based in London. (Pl. Br. 18). Again, the Court finds no error in Judge Netburn's analysis. Plaintiffs' evidence on this point consists of a supporting declaration that "lists no fewer than seven buyers for the Sold Certificates." (Report 22 (citing Boelstler Decl. (Dkt. #587) at ¶ 10)). But this list establishes only the identity of certain buyers and the place of "negotiations and execution"; it does not identify the domicile or place of business of the ultimate purchasers. Thus, Judge Netburn appropriately found that this evidence was insufficient to establish "that the certificate buyers were located in England for purposes of the 'center of gravity' test." (*Id.*). *See also PL/DB*, 2022 WL 384748, at *13 (finding plaintiffs' failure "to produce evidence regarding the identity and location of the ultimate purchasers" of sold RMBS certificates to preclude them from meeting their burden of establishing standing to bring claims related to the certificates).

*Third*, Commerzbank disputes Judge Netburn's finding that the actual sale of the Sold Certificates took place in New York via the Depository Trust Company ("DTC"). The "DTC is a securities depository based in New York City that is organized as a limited purpose trust company and provides safekeeping through electronic record-keeping of securities balances. It also acts as a clearinghouse to process and settle trades." (Report 20 (internal citations omitted)). Echoing Judge Pauley's findings in *CB/USB*, Judge Netburn found

that "[t]he fact that DTC actually holds the certificates and effectuates the transactions means that the transactions actually occurred in New York and are governed by New York law." (*Id.* at 21 (quoting *CB/USB*, 457 F. Supp. 3d at 243)).  Commerzbank contends that Judge Netburn and Judge Pauley both conflate the "trade execution date (when parties enter into a contract) and the later settlement date (when a depository [like DTC] completes the back-office mechanics." (Pl. Br. 18).  According to Commerzbank, only the former of these dates is relevant to the present choice-of-law analysis.  (*Id.*).

To be sure, decisions addressing the significance of the DTC's role in securities-related cases are not perfectly consistent.  *Compare, e.g.*, *PL/DB*, 2022 WL 384748, at *14 (finding that evidence suggested "that New York law governed the Sold Certificates transactions because each Sold Certificate was registered in the [DTC] at the time of sale"), *with In re: Petrobras Sec. Litig.*, 152 F. Supp. 3d 186, 193 (S.D.N.Y. 2016) (rejecting argument that DTC's involvement in settling securities purchases was sufficient to establish that purchases were domestic for federal securities law purposes).  Notably, in a report and recommendation now pending before this Court, Magistrate Judge Robert W. Lehrburger declined to find that the involvement of the DTC in a transaction was itself sufficient to compel the application of New York law.  (Pl. Br. 17-19).  *See Pac. Life Ins. Co.* v. *Bank of N.Y. Mellon*, No. 17 Civ. 1388 (KPF) (RWL), 2022 WL 1446552, at *9-12 (S.D.N.Y. Feb. 22, 2022) ("*PacLife*").

Despite Commerzbank's repeated assertion that *PacLife* and this case are mirrors of one another, the factual record in *PacLife* differs in several critical

respects, as was recognized by Judge Lehrburger in *PacLife* itself.  To begin,
"PacLife's principal place of business is California, the buyers operated out of
California, and all of the pertinent components of contract formation took place
in California." *PacLife*, 2022 WL 1446552, at *11.  By contrast, Commerzbank
is located in Germany and there is insufficient evidence of where the Sold
Certificates' ultimate purchasers reside.  (*See* Report 22).  Furthermore, Judge
Lehrburger deemed relevant the fact that PacLife (unlike Commerzbank) does
not "trade through any subsidiary entities that were DTC participants."
*PacLife*, 2022 WL 1446552, at *11.  (*Cf.* Report 21 (noting that "Commerzbank
trades through a wholly-owned subsidiary that is a DTC participant" (internal
quotation marks omitted)).  "Due to the[se] discernable differences," Judge
Lehrburger "decline[d] to reach the same conclusion as" *CB/USB* or the Report.
*Id.* at *12.

After careful review of the decisions discussed above and noted in
Commerzbank's briefing, the Court agrees with Judge Netburn that the
involvement of the DTC in this case is relevant to the choice-of-law analysis.
Judge Lehrburger's decision in *PacLife* does not suggest that it is improper to
consider the DTC's involvement in a transaction as one factor in a broader
constellation of considerations.  Instead, *PacLife* suggests that where the
remaining considerations, including the location of the ultimate buyers and
sellers, all point toward one jurisdiction, the DTC's involvement will be

insufficient to overcome their pull.  On this reading, *PacLife* does not undermine Judge Netburn's choice-of-law analysis.[17]

Given Commerzbank's failure to identify any error in Judge Netburn's choice-of-law analysis, the Court adopts the Report's finding that New York law governed Commerzbank's sales of the Sold Certificates.  Under New York law, Commerzbank sold both the Sold Certificates and any claims it held based on the certificates at the time of the transactions.  Therefore, Commerzbank lacks "legal title to, or a proprietary interest in," its claims based on the Sold Certificates, and cannot pursue those claims in federal court.  *See W.R. Huff Asset Mgmt. Co., LLC*, 549 F.3d at 108.  The Court thus grants Defendant's motion for summary judgment as to Commerzbank's Sold Certificate claims.

### 2.    Contractual Bars to Plaintiffs' Claims

The Report's next set of findings and recommendations address provisions in certain of the trusts' GAs that limit who can bring a claim under

---

17    For similar reasons, the Court also rejects Commerzbank's law of the case and judicial estoppel arguments.  Commerzbank objects to Judge Netburn's analysis based on an argument Defendant raised in opposing class certification in another RMBS case before this Court "that settlement through DTC does not turn transactions into New York transactions."  (Pl. Br. 16).  In Commerzbank's view, the fact that class certification was ultimately denied in that case means that Defendant "is now estopped under judicial estoppel and the law of the case" from arguing otherwise.  (*Id.* (citing *Royal Park Invs. SA/NV* v. *Wells Fargo Bank, N.A.*, No. 14 Civ. 9764 (KPF) (SN), 2018 WL 1831850, at *7 (S.D.N.Y. Apr. 17, 2018))).  The Court takes a different view.  In the case discussed in Commerzbank's objections, the Court found that individualized issues of standing would likely predominate over issues common to the proposed class, in part because choice-of-law issues would require individualized inquiries into "the chain of ownership necessary to determine whether a given certificateholder owns the litigation rights associated with their certificates."  *Royal Park Invs. SA/NV*, 2018 WL 1831850, at *7.  Even assuming Judge Netburn was bound by the Court's holding in that case, the Court finds no error in Judge Netburn's choice-of-law analysis here.  Indeed, Judge Netburn's individualized inquiry into the chain of ownership implicated by the Sold Certificates led her to conclude that Commerzbank had not adequately demonstrated that the ultimate purchasers were domiciled in England.  (*See* Report 22).

the agreements (the "Negating Clauses").[18]   Negating clauses "limit the parties who may pursue actions to enforce contractual rights."  (Report 26 (citing *Royal Park Invs. SA/NV* v. *HSBC Bank USA, Nat'l Ass'n*, 109 F. Supp. 3d 587, 606 (S.D.N.Y. 2015) ("*RP/HSBC*"))).  Seven of the trusts at issue in this case contain GAs with Negating Clauses (the "Negating Clause Securities").[19]   The GAs for the Negating Clause Securities contain nearly identical provisions, which state: "'Nothing in this Agreement or in the Certificates, expressed or implied, shall give to any Person, other than the Certificateholders, the parties hereto and the NIMS Insurer and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under this Agreement.'"  (*Id.*).[20]

---

[18]    The Report also addresses separate provisions of GAs for four trusts that prescribe under what circumstances a claim can be brought (the "No-Action Clauses"). Specifically, the Report recommends rejecting Defendant's argument that the No-Action Clauses bar certain of Plaintiffs' claims.  (Report 31-33).  Defendant objects to this recommendation.  (*See* Def. Br. 3-7).  As Defendant observes, however, the Court need not resolve Defendant's objection because the Court's finding that Commerzbank lacks prudential standing to bring claims related to the Sold Certificates moots the issue.  (*Id.* at 1-2 (stating that, if the Court were to find that Commerzbank lacks standing to bring claims under the Sold Certificates, "there is no need to reach a decision on the issue of the applicability of the" No-Action Clauses)).

[19]    The Negating Clause Securities comprise: (i) all at-issue securities in the ABFC 2005-HE2 Trust; (ii) all at-issue securities in the ABFC 2005-OPT1 Trust; (iii) all at-issue securities in the ABFC 2006-OPT1 Trust; (iv) all at-issue securities in the ABFC 2006-OPT2 Trust (for Commerzbank only); (v) all at-issue securities in the ABSHE 2005-HE5 Trust; (vi) all at-issue securities in the CMLTI 2005-OPT4 Trust; (vii) all at-issue securities in the OOMLT 2006-2 Trust; (viii) the M3 tranche of the FFML 2006-FFA Trust; (ix) the certificate in the M1 tranche of the FFML 2006-FFA Trust that was allegedly acquired on February 13, 2012; (x) the M1 tranche of the IMM 2005-6 Trust; and (xi) the three certificates in the 1A1 tranche of the IMM 2005-6 Trust that were allegedly acquired on September 9, 2005.  (Report 26 n.6; *see also* Pl. Br. 20 n.29 (explaining that the Report references a fourth certificate in the 1A1 tranche of the IMM 2005-6 Trust, but that this certificate is not subject to Defendant's Negating Securities argument); Def. Opp. i (agreeing with Plaintiffs' statement with respect to the 1A1 tranche of the IMM 2005-6 Trust)).

[20]    "One agreement also identifies the 'Swap Counterparty and its successors and assignees' as beneficiaries."  (Report 27 (quoting Stanton Decl., Ex. 20 at § 11.11)).

Judge Netburn recommends finding that the Negating Clauses bar most of Plaintiffs' claims related to the Negating Clause Securities.[21]  Preliminarily, Judge Netburn observed that Plaintiffs are not parties to the GAs, nor is any the NIMS Insurer or Swap Counterparty, leaving only "Certificateholders" as a possible source of enforcement rights under the GAs.  (Report 27).  While Plaintiffs suggest that the term "Certificateholders" is self-defining, the GAs in fact differentiate between the "Certificateholder" — which the GAs define as the "[p]erson in whose name a Certificate is registered in the Certificate Register" — and the "Certificate Owner[.]"  (*Id.*).  Judge Netburn concluded that Plaintiffs had not offered proof that they are Certificateholders as opposed to Certificate Owners, and thus were barred from bringing their claims by the Negating Clauses.  (*Id.*).

Plaintiffs raise several objections to the Report's recommendation.  *First*, Plaintiffs assert that Defendant waived its defense based on the Negating Clauses "by not including a 'specific denial' in its answer as required to raise a lack of capacity defense."  (Pl. Br. 19 (quoting Fed. R. Civ. P. 9(a)(2))).  Judge Netburn considered and rejected this argument, reasoning that Defendant had preserved the issue in a series of filings made between 2015 and 2020.  (Report 27).  This Court agrees.  Of note, Defendant raised the issue more than seven years ago, in a motion to dismiss in which it argued that Plaintiffs lacked

---

[21]    Judge Netburn deferred ruling on the effect of the Negating Clauses on "four loans whose claimed enforcement dates were determined by reviewing Dr. [Karl N.] Snow's report," requesting that the issue be remanded to her if the Court were to disagree with "the rest of the [Report.]"  (Report 26 n.6).  The Court expresses no opinion as to these loans.

standing under the Negating Clauses.  (Dkt. #28 at 20-22).  Defendant then raised the issue again in several additional filings, including in its present motion for summary judgment.  (*See* Def. SJ Br. 10 (collecting filings)).  Lastly, Defendant's answers to the operative complaints in the present cases assert Plaintiffs' lack of standing as an affirmative defense.  (PL Dkt. #343 at third affirmative defense; CB Dkt. #264 at third affirmative defense).

The Court agrees with Judge Netburn that Defendant preserved its argument based on the Negating Clauses by including it in its motion to dismiss and, at least plausibly, in its answers.  *See Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 169 (S.D.N.Y. 2015) (stating that "[u]nder both federal and New York state law, challenges to standing must be raised in a party's answer or pre-answer motion to dismiss"); *see also Fed. Deposit Ins. Corp.* v. *Murex LLC*, 500 F. Supp. 3d 76, 97 (S.D.N.Y. 2020) (applying the same standard of waiver to a defense that could be characterized as raising either an issue of "contractual standing" or "legal capacity").

Next, Plaintiffs effectively ask the Court to reinterpret the GAs' definition of "Certificateholders."  With a nod to the nebulous concept of "commercial realities," Commerzbank contends that the term "Certificateholder" is "commonly understood to refer to the individual investor that holds a certificate" (Pl. Br. 20), making Commerzbank the Certificateholder within the meaning of the Negating Clauses.  "Under New York law," however, "where a provision in a contract expressly negates enforcement by third parties, that provision is controlling."  *Morse/Diesel, Inc.* v. *Trinity Indus., Inc.*, 859 F.2d

242, 249 (2d Cir. 1988). Commerzbank's argument, which does not even attempt to address the GAs' definition of the contractual term "Certificateholder," fails to identify any error in Judge Netburn's analysis.

Lastly, Commerzbank argues that it received a ratification to pursue its claims from the Negating Clause Securities' nominal owner, and that its claims therefore relate back to the date the case was filed pursuant to Federal Rule of Civil Procedure 17(a)(3). (Pl. Br. 20-21).[22] As before, Commerzbank made this argument before Judge Netburn, who considered and rejected it for reasons the Court now adopts. (*See* Report 27-29). Specifically, Judge Netburn noted that Rule 17 "permits 'the real party in interest to ratify, join, or be substituted into the action' so long as such substitut[ion] occurs within 'a reasonable time' after objection." (*Id.* at 28 (quoting Fed. R. Civ. P. 17(a)(3))). Here, as just discussed, Defendant raised the issue of Commerzbank's contractual standing beginning in 2015 and continuing through the present. (*Id.*). Yet Commerzbank did not receive authorization to pursue this action until April and May 2020. (*Id.*). "Plaintiffs' authorizations are therefore untimely and ineffective." (*Id.* at 29). Accordingly, the Court grants Defendant's motion for summary judgment as to Commerzbank's claims relating to the Negating Clause Securities.

---

[22]  While Plaintiffs' other arguments apply equally to both the Phoenix Light Plaintiffs and Commerzbank, this argument is relevant only to Commerzbank because the Phoenix Light Plaintiffs have not received authorizations to date. Specifically, Commerzbank asserts that it obtained authorizations from "an entity called Cede & Co., which is the nominee of DTC." (Pl. Br. 19 n.27; *see also id.* at 20-21).

### 3.     The Trust Instruction Proceedings

The Report's third set of findings and recommendations relate to the preclusive effect *vel non* of orders rendered in Minnesota state court. (Report 33-41).  These orders arise from trust instruction proceedings ("TIPs") that Defendant initiated before Plaintiffs filed the present cases.  (*See* Def. 56.1 ¶¶ 166-194).

"Trust instruction proceedings are a well-established procedure by which trustees (and other affected parties) can seek judicial guidance from the court about how to resolve immediate and difficult issues of interpretation of governing documents."  *Wrights Mill Holdings, LLC*, 127 F. Supp. 3d at 176 (quoting *In re Trusteeship Created by Am. Home Mortg. Inv. Tr. 2005-2*, No. 14 Civ. 2494 (AKH), 2014 WL 3858506, at *12 (S.D.N.Y. July 24, 2014)); *see also* RESTATEMENT (THIRD) OF TRUSTS § 71 (2007) (explaining that "[t]o avoid undue risk of liability when reasonable doubt exists in these matters, a trustee may seek protection by applying for instructions from an appropriate court").

Under Minnesota's statutes governing TIPs, "[a]n interested person may petition the [state] district court and invoke its jurisdiction[.]"  Minn. Stat. § 501C.0201.  Once the state court's jurisdiction is invoked, the interested person may ask the court to, among other things, "construe, interpret, or reform the terms of a trust" or "confirm the appointment of a trustee[.]"  *Id.*, § 501C.0202.  Any TIP order issued in such a proceeding "is binding *in rem* upon the trust estate and upon the interests of all beneficiaries, vested or contingent, even though unascertained or not in being."  *Id.*, § 501C.0204.

Between 2012 and 2014, Defendant initiated a series of TIPs in Minnesota, seeking guidance with respect to its repurchase enforcement obligations under several trusts' GAs as well as the appointment of separate trustees for those trusts. (Def. 56.1 ¶¶ 174-222). The Minnesota courts ruled, in substance, that Defendant would be relieved of its obligation to enforce sponsors' and depositors' obligations to repurchase certain deficient loans under the GAs following the appointment of a separate trustee. (*See id.* at ¶¶ 181-182, 223-252). After Defendant provided notice of the courts' orders to the trusts' certificateholders, separate trustees were appointed. (*Id.*).

The Report finds that the Minnesota TIPs orders bar Plaintiffs' repurchase-related claims arising out of 13 separate trusts (the "Separate Trustee Claims"). (Report 34, 41).[23] Judge Netburn based this finding on the fact that the Separate Trustee Claims seek to relitigate the same issue that was resolved by the TIPs orders: whether Defendant owed a duty under the relevant trusts' GAs to enforce other parties' loan repurchase obligations following the appointment of a separate trustee. (*Id.* at 38-49). Citing the federal courts' obligation to afford preclusive effect to state court judgments, Judge Netburn concluded that Plaintiffs were bound by the Minnesota courts' finding that

---

[23]   The 13 trusts implicated by the Separate Trustee Claims are: (i) ABFC 2006-OPT2; (ii) ABSHE 2005-HE5; (iii) CMLTI 2005-OPT4; (iv) FFML 2006-FFA; (v) GPMF 2005-AR4; (vi) GPMF 2006-AR1; (vii) GPMF 2006-AR2; (viii) GPMF 2006-AR3; (ix) MSAC 2005-WMC2; (x) MSAC 2006-HE1; (xi) OOMLT 2006-2; (xii) OOMLT 2007-3; and (xiii) OWNIT 2006-2. (*See* Def. Opp. i; *see also* Andreoli Decl. (Dkt. #564), Ex. C, D; Report 33). As she did with respect to the Negating Clause Securities (*see supra* n.21), Judge Netburn reserved decision on "eight loans whose claimed enforcement dates were determined by reviewing Dr. Snow's report and the twenty loans with R&W breaches in the OOMLT 2007-3 and GPMF 2005-AR4 trusts." (Report 34). The Court likewise declines to address these loans in the first instance.

Defendant owed no repurchase-related enforcement duties following the appointment of separate trustees.  (*Id.*).

In a reprise of their arguments before Judge Netburn, Plaintiffs assert that the TIPs orders are not preclusive for both constitutional and more prosaic reasons.  None of these arguments persuades the Court.

### a.    Scope

Plaintiffs first argue that the Separate Trustee Claims are outside the scope of the TIPs orders.  (Pl. Br. 21-22).  In so arguing, Plaintiffs challenge the Report's finding that "those loans whose 'enforcement dates' *postdate* the separate trustee appointment" were barred by the TIPs orders.  (Report 41).  Judge Netburn's reliance on the so-called "enforcement dates" is premised on the view that Plaintiffs cannot recover for alleged breaches of duties that occurred after the Minnesota courts had relieved Defendant of those duties.  (*See id.* (explaining that the "TIP[s] orders relieved Wells Fargo of its repurchase obligations as to these loans")).  Plaintiffs contend that this view misunderstands the significance of an enforcement date.  (Pl. Br. 22).  According to Plaintiffs, the enforcement date is "the estimate of the date the obligated party actually *repurchased* the loan or otherwise compensated the trust that was used for damages modeling, not the date [Defendant] should have commenced enforcement."  (*Id.*).  Plaintiffs assert that, contrary to the Report's finding, Defendant should have undertaken enforcement efforts prior to the enforcement dates.  (Pl. Reply 10-11).  On this understanding, Defendant could have breached its duties prior to the enforcement dates.

Plaintiffs' argument is belied by their own evidence. In their brief before this Court, Plaintiffs point to a report prepared by their expert, Dr. Karl N. Snow, that defines the so-called "enforcement date." (Pl. Br. 22 (citing Def. 56.1 ¶¶ 749-751); *see also* Stanton Decl. (Dkt. #566), Ex. 175 ("Snow Report")). But Dr. Snow's report only serves to strengthen Judge Netburn's conclusion. As Dr. Snow explains in his report, the enforcement date is "the date on which Wells Fargo should have started to enforce the obligation to repurchase Defective Loans[.]" (Snow Report 11). Dr. Snow contrasts the enforcement date with the "purchase date," which he defines as "the date that each of the Responsible Parties would have repurchased the relevant Defective Loans … had Wells Fargo fulfilled its obligations." (*Id.*). In reply, Plaintiffs seek to conflate the two dates discussed in Dr. Snow's report, asserting that the enforcement date is "*not* the date of [Defendant's] breach," but rather an "'estimate' of when the seller would have been compelled to repurchase if" Defendant had discharged its obligations under the GAs. (Pl. Reply 11). In doing so, Plaintiffs fail to identify any evidence that would support their reformulation of their own expert's report. On this record, Judge Netburn did not err in finding that the TIPs orders preclude all claims premised on enforcement dates postdating the appointment of the separate trustees.[24]

---

[24]     The Court notes that Plaintiffs' argument with respect to the enforcement dates is also at odds with an argument made elsewhere in their briefing. As will be discussed in the following section, Plaintiffs vigorously contest the Report's finding that certain of their repurchase-related claims are untimely under the relevant statutes of limitations. (*See* Pl. Br. 26). Plaintiffs' argument on this score relies on their contention that "the fact that the seller is obligated to repurchase [a defective loan] does not mean that the trustee breached its duties to take action to enforce the obligation." (*Id.* at 28). Yet, in an about-face meant to avoid the preclusive effect of the TIPs orders, Plaintiffs contend

### b.   Jurisdiction

Next, Plaintiffs argue that the TIPs orders are void because the Minnesota state courts lacked *in rem* jurisdiction over the property that was the subject of the proceedings.  (Pl. Br. 22-24).  In Plaintiffs' view, Maryland, not Minnesota, was the appropriate state in which to bring the TIPs.  (*Id.*). Plaintiffs base this view on their assertion that Defendant "administered the intangible property at issue — *i.e.*, the repurchase claims and appointment of a separate trustee — from Maryland, not Minnesota." (*Id.* at 23).  "The only connection to Minnesota identified in the [Report,]" according to Plaintiffs, "is a corporate trust office located in Minnesota[,]" and "there is no suggestion in the record of the Minnesota actions that this office had any connection to the repurchase claims or the appointment of a separate trustee." (*Id.*).

The standards governing Plaintiffs' jurisdictional challenge are supplied by Minnesota law.  "Under the Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts give preclusive effect to state-court judgments 'whenever the courts of the State from which the judgments emerged would do so' and 'insofar as doing so is consistent with constitutionally protected due process[.]'" (Report 34 (quoting *Allen* v. *McCurry*, 449 U.S. 90, 96 (1980), and *Johnston* v. *Arbitrium (Cayman Islands) Handels AG*, 198 F.3d 342, 347 (2d Cir. 1999))).

---

that Defendant breached its enforcement-related duties on the date it "discovered a seller's failure to cure breaches." (Pl. Reply 10).  Plaintiffs cannot have it both ways.  As it will explain later in this Opinion, the Court finds that Plaintiffs' better argument is that Defendant was permitted a reasonable time after discovering missing or defective loan documents or breaches of warranties and representations to either bring the loan into compliance or seek repurchase of the loan.

"Federal courts may not employ their own rules in determining the effect of state judgments, but must accept the rules chosen by the State from which the judgment is taken."  *Matsushita Elec. Indus. Co.* v. *Epstein*, 516 U.S. 367, 373 (1996) (internal quotation marks, alterations, and citation omitted).

As Judge Netburn explains in the Report, Minnesota law permits collateral attacks under limited circumstances.  Specifically, "judgments may be challenged for lack of jurisdiction where 'the lack of jurisdiction affirmatively appears on the face of the record[.]'" (Report 24 (quoting *Hanson* v. *Woolston*, 701 N.W.2d 257, 265 (Minn. Ct. App. 2005))).  "For collateral-attack purposes the record includes, among other things, the pleadings and the judgment." *Hanson*, 701 N.W.2d at 265-66.  But "a 'mere absence' from the record of facts 'essential' to jurisdiction 'does not render an order' subject to collateral attack." (Report 34 (quoting *In re Hudson's Guardianship*, 226 Minn. 532, 536 (1948))).

The Report relies on *Matter of HarborView Mortg. Loan Tr. 2005-10*, No. A18-0043, 2018 WL 4201211 (Minn. Ct. App. 2018), to articulate the applicable jurisdictional principles for *in rem* proceedings under Minnesota law. (Report 35).  The parties do not dispute that this case provides an accurate statement of that law.  In *HarborView*, the Minnesota Court of Appeals explained that it had "identified seven factors to be considered when determining whether a [state court] has jurisdiction over a multi-state trust[.]" *Id.* at *4.  These factors include:

> [i] the location of the trust property (the situs of the trust assets), [ii] the domicile of the trust beneficiaries, [iii] the domicile of the trustees, [iv] the location of the

> trust administrator, [v] the extent to which the litigation
> has been resolved, [vi] the applicable law, and [vii] an
> analysis of *forum non conveniens* principles.

*Id.*

Here, the Court finds that Judge Netburn appropriately concluded that "the TIP[s] orders are not subject to collateral attack for lack of jurisdiction." (Report 34). Plaintiffs have not identified a "jurisdictional defect" that "appears on the face of the record" in the TIPs. *See Hanson*, 701 N.W.2d at 262-63. In fact, Plaintiffs do not address the record in the TIPs whatsoever. (*Cf.* Pl. Reply 11 (asserting that Defendant's "own cited authority shows that Minnesota courts consider the full trial record when assessing a collateral attack")). Instead, Plaintiffs seek to expand the record by pointing to facts that, in their view, demonstrate that Maryland, not Minnesota, possessed jurisdiction over the repurchase claims. (*See id.* at 11-12). Even if the Court were to consider this evidence, it cannot find that the TIPs orders are void for lack of jurisdiction. Several facts elicited in this case, including that (i) Defendant had a corporate trust office in Minnesota; (ii) the domiciles of the beneficiaries were unknown at the time of the TIPs orders; (iii) Defendant administered aspects of the trusts in Minnesota; and (iv) the TIPs have been completed, suggest that the Minnesota courts properly exercised jurisdiction over the TIPs. (Report 34; Def. Opp. 21). More broadly, given Plaintiffs' failure to grapple with the records made in the TIPs, the Court cannot find that the Minnesota courts would not afford preclusive effect to the judgments reached in those proceedings.

### c. Due Process

Lastly, Plaintiffs raise a pair of due process challenges to the TIPs orders. Echoing their argument before Judge Netburn, Plaintiffs first contend that the TIPs orders do not preclude their claims here because Defendant has failed to show that "Plaintiffs had minimum contacts with Minnesota[.]" (Pl. Br. 24). Separately, Plaintiffs further suggest that due process dictates that the TIPs orders, which were premised on the Minnesota courts' *in rem* jurisdiction, cannot be issue preclusive in this *in personam* litigation. (*Id.* at 24-25).

Plaintiffs' first argument can be swiftly rejected. Contrary to Plaintiffs' suggestion, the Minnesota courts were not required to possess *in personam* jurisdiction over Plaintiffs to resolve issues concerning property in which they possessed an interest. "If an *in rem* action is brought involving an out-of-state party's rights with respect to property in the forum state, … the forum court ordinarily has the power to decide the case insofar as it affects those rights, irrespective of whether there are sufficient contacts to confer on the court *in personam* jurisdiction over the party." *Johnston*, 198 F.3d at 348-49; *see also Bloom* v. *Emden*, No. 19 Civ. 10155 (RA), 2022 WL 799096, at *6 (S.D.N.Y. Mar. 16, 2022) (citing *Johnston* for the proposition that "a court's judgment affecting the property will be binding on all persons who have an interest in the property"). Thus, the Minnesota courts' exercise of *in rem* jurisdiction over the trusts' repurchase claims did not violate Plaintiffs' due process rights.

Plaintiffs' second argument is also unavailing. To be sure, a party who does not appear in an *in rem* action is bound only by the court's resolution of

49

"his or her interest in the property in question," and will *not* be bound by "decisions on other issues" implicated in subsequent *in personam* litigation. *Johnston*, 198 F.3d at 349. But Plaintiffs have failed to explain how the Report's findings transgress these constitutional limits. The Report found only that Plaintiffs were bound to the TIPs orders' resolution of "Wells Fargo's duty to enforce repurchase obligations" (Report 37), which is the exact "intangible property at issue" that Plaintiffs identify in their briefing before this Court. (*See* Pl. Br. 23 (describing the "intangible property at issue" as "the repurchase claims and appointment of a separate trustee")). Accordingly, Judge Netburn found — and this Court agrees — that giving full faith and credit to the TIPs orders is consistent with constitutionally protected due process.

*     *     *

The Court is bound by the Full Faith and Credit Act to "give state-court judgments the same preclusive effect as they would receive in courts of the same state." *Burkybile* v. *Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 310 (2d Cir. 2005) (citing 28 U.S.C. § 1738). In this case, Minnesota state courts held that Defendant would have no repurchase-related duties following the appointment of separate trustees. Because Plaintiff has not identified a reason why the Minnesota courts would not accept these judgments or why this Court should not do the same, the Court adopts Judge Netburn's finding that the TIPs orders preclude claims based on loans whose

enforcement dates' postdate the appointment of the separate trustees.[25]  The Court grants Defendant's motion for summary judgment as to these claims.[26]

### 4.     Statutes of Limitations

The Report's final set of findings and recommendations that will be addressed in this Opinion concern the timeliness of Commerzbank's claims.  As Judge Netburn observes in the Report, where, as here, a "nonresident [such as Commerzbank] sues on a cause of action accruing outside New York, [N.Y. C.P.L.R. §] 202 requires the cause of action to be timely under the limitation periods of both New York and the jurisdiction where the cause of action accrued."  (Report 41 (quoting *Glob. Fin. Corp.* v. *Triarc Corp.*, 93 N.Y.2d 525, 528 (1999) (internal quotation marks omitted))).  Consistent with New York law, the Report divides its analysis between New York's and Germany's statutes of limitations.  (*See id.* at 41-55).  The Court addresses Commerzbank's challenges to the Report's statutes of limitations analysis below.[27]

---

[25]     As noted above, the Court expresses no opinion as to the loans upon which Judge Netburn reserved decision.  *See supra* n.23.

[26]     In addition to the challenges discussed above, Plaintiffs argue in passing that the Report effectively negates certain provisions in the relevant PSAs governing the appointment of a separate trustee. (Pl. Br. 25).  In Plaintiffs' view, "the fatal flaw in the [Report's] reasoning is assuming that the PSAs can be amended to allow appointment of a separate trustee in a manner not permitted by the PSAs."  (*Id.*).  In point of fact, however, the flaw is in Plaintiffs' argument, in that it fails to address Judge Netburn's review and analysis of the PSAs.  (*See* Report 38-39).  Given Plaintiffs' failure to mount a more robust challenge, the Court reviews this portion of the Report for clear error and finds none.

[27]     The Report briefly touches upon the application of so-called "*American Pipe* tolling" to Plaintiffs' claims.  *See Am. Pipe & Constr. Co.* v. *Utah*, 414 U.S. 538 (1974).  (Report 47-48).  "Under the *American Pipe* doctrine, 'the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties,' even where the suit ultimately is not permitted to continue as a class action."  *Pac. Life Ins. Co.* v. *Bank of N.Y. Mellon*, No. 17 Civ. 1388 (KPF), 2018 WL 1382105, at *8 (S.D.N.Y. Mar. 16, 2018) (quoting *In re Initial Pub. Offering Secs. Litig.*, 617 F. Supp. 2d 195, 198 (S.D.N.Y. 2007)).  Applying the *American Pipe* standard,

### a.    Equitable Estoppel

At the outset, the Court considers Commerzbank's threshold objection to
Judge Netburn's finding that equitable estoppel was inapplicable to its claims
under New York law.[28]  Judge Netburn articulated the applicable legal
standard as "a defendant is estopped from pleading a statute of limitations
defense if the plaintiff was induced by fraud, misrepresentations or deception
to refrain from filing a timely action."  (Report 55 (quoting *Ross* v. *Louise Wise
Servs., Inc.*, 8 N.Y.3d 478, 491 (2007) (internal quotation marks omitted))).
Judge Netburn then found that Plaintiffs had failed to meet this standard
because they had not pointed "to sufficient instances of fraud,
misrepresentation, or deception that would satisfy the New York standard —
only failures to notify, which are not enough."  (*Id.*).

Commerzbank argues in its objections that the Report applied the wrong
legal standard.  Under New York law, Commerzbank explains, "'concealment
without actual misrepresentation' is sufficient to trigger equitable estoppel
when the defendant is a fiduciary[.]"  (Pl. Br. 31 (quoting *Zumpano* v. *Quinn*, 6
N.Y.3d 666, 675 (2006))).  Thus, on Commerzbank's view, the Report's finding

---

Judge Netburn found that a putative class action filed in New York state court "tolls
some of Plaintiffs' claims, by 29 days for Phoenix Light and 395 days for
Commerzbank[,]" but that its "application is limited" in three ways.  (Report 47).  *See
BlackRock Allocation Target Shares* v. *Wells Fargo Bank, Nat'l Ass'n*, No. 14 Civ. 9371
(S.D.N.Y. 2014) ("*BlackRock II*").  The Court need not address Plaintiffs' objections to
Judge Netburn's analysis on this issue, because any claims that may be tolled by
*BlackRock II* are barred by the balance of the Court's findings in this Opinion.  (*See* Def.
Opp. 39-40 (identifying the claims possibly subject to *American Pipe* tolling and the
independent reasons precluding Plaintiffs from pursuing those claims)).

28    Commerzbank does not object to Judge Netburn's finding that German law does not
recognize equitable tolling.  (*See* Report 55).  After reviewing it for clear error and
finding none, the Court adopts the finding.

that the bank failed to identify any instances of fraud, misrepresentation, or deception does not necessarily preclude the application of equitable estoppel.

The Court nonetheless finds that equitable estoppel is inappropriate here because Commerzbank has "failed to demonstrate how [any alleged] breach prevented them from bringing a timely action." *Zumpano*, 6 N.Y.3d at 675-76.  To be sure, Commerzbank has only been able to establish a complete record through the aid of discovery.  (*See* Pl. SJ Br. 33-34 (making this point in greater detail)).  But Commerzbank has not convincingly explained why the information it had available to it was insufficient to put the bank on notice of Defendant's alleged breaches and their need to bring an action prior to the expiration of the statute of limitations.  Accordingly, the Court declines to estop Defendant from challenging the timeliness of Commerzbank's claims.

### b. New York Statute of Limitations

"Under New York law, breach of contract claims are subject to a six-year statute of limitations and accrue when the contract is breached."  (Report 41 (citing, *inter alia*, N.Y. C.P.L.R. § 213(2))).  The Report finds that three sets of Commerzbank's claims accrued more than six years prior to the initiation of this litigation and recommends that the Court enter summary judgment for Defendant as to these claims.  As discussed below, the Court adopts the Report's findings in part with respect to these sets of claims.

### i.    Exception Report Trusts

Commerzbank alleges that Defendant breached certain of its enforcement obligations provided for in the GAs of eight trusts (the "Exception Report Trusts").[29]  (*See* Def. 56.1 ¶ 335 (summarizing Plaintiffs' allegations)).

As discussed earlier in this Opinion, the GAs for the RMBS trusts in this case imposed two duties on Defendant that are of significance here.  *First*, the GAs provided that "[u]pon discovery or receipt of written notice of any materially defective document in, or that a document is missing from," Defendant's files, Defendant "shall promptly notify" Plaintiffs and several other interested parties of the defect or missing document and "request that ... the Seller cure such defect or deliver such missing document within [30-120] days from" when Defendant alerted it to the issue.  (*See generally* Def. 56.1 App'x M (collating the relevant portions of the PSAs for the Exception Report Trusts)).  *Second*, the GAs further provided that if the seller does not cure the defect or supply the missing document, Defendant "shall enforce" the obligation and "cause the Originator or the Seller, as applicable, to repurchase" the mortgage at the purchase price "following the expiration" of the cure period.  (*Id.*).[30]

---

[29]    The Exception Report Trusts are: (i) ABFC 2006-OPT2; (ii) CMLTI 2005-OPT4; (iii) GPMF 2005-AR4; (iv) GPMF 2006-AR1; (v) GPMF 2006-AR3; (vi) MSAC 2005-WMC5; (vii) OOMLT 2007-3; and (viii) OWNIT 2006-2.  (*See* Report 42 n.9).

[30]    The Report finds that two of the Exception Report Trusts (MSAC 2005-WMC5 and OWNIT 2006-2) do not impose a mandatory repurchase duty on Defendant.  (*See* Report 42 n.11).  In contrast with the language quoted above, the PSAs for these trusts provide that the "Trustee shall request ... that the Sponsor purchase such Mortgage Loan from the Trust Fund[.]"  (*Id.*).  Plaintiffs dispute this finding, arguing that the "PSAs for both Trusts, however, require [Defendant] to 'exercise the rights referred to above,' including the right to compel the responsible party to cure, repurchase or substitute any Mortgage Loan."  (Pl. Br. 30).  The Court is unpersuaded by this

The Report recommends that the Court dismiss Commerzbank's claims arising out of Defendant's alleged breach of the GAs as untimely under New York's six-year statute of limitations.  (Report 41-45).  In arriving at this recommendation, Judge Netburn first found that, under the relevant GAs, Defendant's duty to notify interested parties of document defects or missing documents was triggered when Defendant prepared a final exception report — "which lists missing or defective documents identified by Wells Fargo during its post-closing review of the trust's mortgage files" (*id.* at 42) — for the trusts (*id.* at 44).  Judge Netburn then found that Defendant's related duty to enforce the GAs repurchase provision kicked in upon the expiration of the time to cure the issue (whether it be a deficient document or a missing one) provided for in the PSAs.  (*Id.*).  Observing that Defendant prepared the final exception reports for the Exception Report trusts no later than March 2008, Judge Netburn held that Defendant's enforcement duties were "triggered no later than October 2008."  (*Id.* at 45).  Because "[m]ore than six years passed before Plaintiffs commenced their actions in December 2014 and December 2015," Judge Netburn concluded that Plaintiffs' claims were untimely.  (*Id.*).

Commerzbank raises a forceful challenge to the Report's finding.  As Commerzbank observes, "the fact that the seller is obligated to repurchase" noncompliant loans under the PSAs "does not mean that the trustee breached its duties to take action to enforce the obligation."  (Pl. Br. 28).  Put differently,

---

argument, which fails to overcome the plain text of the PSAs, and therefore adopts Judge Netburn's finding.

the Report's finding that Defendant had a duty to enforce the repurchase

provisions upon the expiration of the sellers' time to cure does *not* establish the

date by which Defendant was obligated to discharge that enforcement duty or,

relatedly, the date on which Defendant ultimately breached the duty.  Indeed,

as Commerzbank discusses in its objections, the PSAs provide that Defendant

"shall enforce" the seller's obligation to repurchase the loan, but (with three

exceptions) do not identify a deadline for Defendant to discharge that

obligation.  (*Id.*).[31]  While the Report does not address this distinction, the

Court finds it pertinent to its statute of limitations analysis.

Where, as here, "a contract does not specify a date or time for

performance, New York law implies a reasonable time period."  *PL/DB*, 2022

WL 384748, at *26 (quoting *Guilbert* v. *Gardner*, 480 F.3d 140, 149 (2d Cir.

2007) (internal quotation marks omitted)).  "The question of what is a

reasonable period of time for performance of a particular contract is a question

of fact for a jury, unless the facts are undisputed, in which case the question

becomes one appropriate for summary judgment."  *BLD Prods., LLC* v. *Remote

Prods., Inc.*, 509 F. App'x 81, 81 (2d Cir. 2013) (summary order); *see also

Tedeschi* v. *Northland Builders, LLC*, 904 N.Y.S.2d 786, 788 (3d Dep't 2010)

---

[31]    The exceptions are (i) ABFC 2006-OPT2; (ii) OOMLT 2007-3; and (iii) CMLTI 2005-OPT4 (Def. 56.1 ¶¶ 342, 344).  The PSAs for ABFC 2006-OPT2 and OOMLT 2007-3 provide that "if the responsible party does not deliver the missing document or cure the material defect within 120 days, the Trustee 'shall enforce' the responsible party's obligation to repurchase the loan before the 15th day of the following month."  (*Id.* at ¶ 342).  Similarly, the PSA for CMLTI 2005-OPT4 provides that "the Trustee 'shall enforce' the responsible party's repurchase obligation within 90 days after the responsible party was notified."  (*Id.* at ¶ 344).  As to these trusts, Commerzbank was aware of Defendant's alleged breaches upon the expiration of the period provided for in the PSAs.

(observing that what constitutes a reasonable time "turns on the particular circumstances of the case and, thus, is ordinarily a question for the jury").

Here, the Court finds that there is a genuine dispute as to what constituted a reasonable time for Defendant's performance under the GAs for the five Exception Report Trusts that did not provide a deadline for Defendant's performance of its enforcement duties.  Commerzbank has identified several pieces of evidence that, in its view, demonstrates that Defendant's breach of its enforcement duties occurred in 2010.  (*See* Pl. Br. 29 & n.38 (collecting cites)). This evidence includes: (i) expert testimony indicating that it was common practice to allow sellers additional time beyond the specified cure period to address the defective or missing documents and (ii) data indicating that, by 2010, it was "clear that there was no longer a reasonable likelihood that still-existing document defects would be cured." (*Id.*).  Defendant disputes the significance of Commerzbank's evidence, challenging the basis for Commerzbank's experts' opinions and the appropriate interpretation of its data.  (Def. Opp. 28).  On this latter point, Defendant argues that Commerzbank's evidence "shows that more than 90% of the Exception Report Trusts' cures occurred by the end of 2007; the cures slowed long before 2010." (*Id.* (italics omitted)).  From this, Defendant reasons that, even assuming Defendant was under a duty to enforce the GAs' repurchase provisions within a reasonable time, a reasonable time came and went more than six years before Commerzbank filed suit.  (*Id.*).

Given the parties' disagreement as to what constituted a reasonable time for Defendant to discharge its enforcement duties, the Court cannot conclude as a matter of law that a reasonable time for performance had expired under the five relevant Exception Report Trusts' GAs more than six years before Commerzbank filed this action. *See PL/DB*, 2022 WL 384748, at *26 (denying summary judgment where the defendant failed to "point to any evidence in the record that supports its argument that waiting a year or more to enforce repurchase obligations is unreasonable as a matter of law in view of the relevant facts and circumstances"). Accordingly, the Court denies Defendant's motion for summary judgment as to the claims arising under (i) GPMF 2005-AR4; (ii) GPMF 2006-AR1; (iii) GPMF 2006-AR3; (iv) MSAC 2005-WMC5; and (v) OWNIT 2006-2. By contrast, the Court grants the motion as to claims under (i) ABFC 2006-OPT2; (ii) OOMLT 2007-3; and (iii) CMLTI 2005-OPT4.

### ii.    Liquidated Loans Trusts

Commerzbank also brings claims based on Defendant's alleged failure to act upon learning that loan servicers for 17 trusts had liquidated 3,377 loans with document defects that should have been tendered to the sellers for repurchase (the "Liquidated Loans Trusts"). (Report 45-46). Specifically, Commerzbank alleges that Defendant was aware of the servicers' breaches by December 1, 2009. (Def. 56.1 ¶ 396; *see also* Stanton Decl., Ex. 151 at App'x C). The Report recommends dismissing Commerzbank's Liquidated Loans Trusts claims on a similar basis as the Exception Report Trust claims, reasoning that Defendant's notice and repurchase duties were triggered at the

time of the servicers' alleged breaches (*i.e.*, by at least December 1, 2009) and that Commerzbank did not initiate its claims based on Defendant's breaches until more than six years after that date. (Report 45-46).

The Court's analysis with respect to the Exception Report Trusts applies with the same force here. Commerzbank alleges that Defendant knew by December 1, 2009, that loan servicers had improperly liquidated several thousand loans. (Def. 56.1 ¶ 396). Defendant suggests that "[a]ny enforcement duty [it] may have had with respect to those loans would have been triggered" at that time. (Def. Opp. 29). But Defendant does not identify any provision of the GAs that required it to act immediately or else be deemed in breach of the agreements. Nor does Defendant demonstrate that its alleged breaches occurred prior to the passage of a "reasonable time," and the Court cannot rule as a matter of law as to what constituted a reasonable time on this record. Accordingly, the Court denies Defendant's motion as to these claims.

### iii.       Early EOD Trusts

Commerzbank's final set of claims relevant to the Report's analysis of New York's statute of limitations concerns Defendant's alleged failure to discharge its duties under the GAs for five trusts following EODs (the "Early EOD Trusts").[32] The Report found that these claims accrued when Defendant notified Commerzbank and other certificateholders of the EODs. (Report 46).

---

[32]     The Early EOD Trusts are: (i) ABFC 2005-HE2; (ii) ABFC 2005-OPT1; (iii) ABFC 2006-OPT1; (iv) ABFC 2006-OPT2; and (v) OOMLT 2006-2. (*See* Report 42 n.10).

Because Defendant had sent all such notices by August 2008, the Report recommended dismissing Commerzbank's claims as untimely.  (*Id.*).

Commerzbank argues that Judge Netburn's recommendation is flawed because it overlooks the fact that Defendant's duties under the Early EOD Trusts' GAs were continuous.  (Pl. Br. 26-27).  In Commerzbank's view, the "PSAs' requirement that [Defendant] must take action when an EOD 'has occurred and remains uncured' creates a continuing duty that is breached every day that [Defendant] fails to exercise its rights in the same manner that a prudent person would."  (*Id.* at 27).  This position, if adopted, would render Commerzbank's claims timely, because "[r]egardless of whether [Defendant] should have acted prior to 2010, it indisputably did not act in 2010 or thereafter" despite the fact that it "would have been prudent to do so."  (*Id.*).

The Court rejects Commerzbank's argument for substantially the same reasons articulated in *PL/DB*.  *See* 2022 WL 384748, at *25.  As Judge Koeltl explained in that decision, "New York contract law distinguishes between 'a single wrong that has continuing effects and a series of independent, distinct wrongs,' and allows an exception to the typical accrual rules only in the latter case."  *Id.* (quoting *Maloul* v. *New Columbia Res., Inc.*, No. 15 Civ. 8710 (KPF), 2017 WL 2992202, at *5 (S.D.N.Y. July 13, 2017)).  Here, as in *PL/DB*, Defendant committed its alleged breach upon learning of the EODs and, with one exception addressed below, informing investors that it would not take action to address them.  (*See* Def. 56.1 ¶¶ 403, 405, 407, 409).  The harm Commerzbank alleges that it suffered as a result is traceable to that single

breach.  "To hold otherwise would eviscerate the statute of limitations in these circumstances by allowing the clock to perpetually restart even though any alleged injury is traceable to a decision, that [Defendant] announced to investors, to do nothing."  *PL/DB*, 2022 WL 384748, at *25.

Commerzbank's claims arising out of the OOMLT 2006-2 Trust provide the exception to the Court's foregoing analysis.  In contrast with the four notices discussed above, Defendant's notice with respect to this trust did not inform investors that Defendant would not act in response to the EOD absent certificateholder direction.  (*See* Def. 56.1 ¶ 410; *see also* Def. Opp. 30 (stating that Defendant "specifically informed investors in four of [the five] notices that it would take no action unless it was directed to do so" (internal quotation marks omitted)).  Thus, the record does not establish that certificateholders (such as Commerzbank) in the OOMLT 2006-2 Trust knew or should have known that Defendant was, in effect, "disclaiming [its] duty to act as a prudent person" at the time the notices were distributed.  *PL/DB*, 2022 WL 384748, at *24 (finding under analogous circumstances that certificateholders were put on notice of their claims against the RMBS trustee upon receiving notices stating that there had been an EOD and that the trustee would not act absent direction from the certificateholders).  As Defendant has not identified any other evidence bearing on this issue, the Court cannot conclude on the record before it that Commerzbank's claims arose outside the limitations period.

Accordingly, the Court adopts the Report's finding that Commerzbank's claims arising out of four of the five Early EOD Trusts (ABFC 2005-HE2; ABFC

2005-OPT1; ABFC 2006-OPT1; ABFC 2006-OPT2) are untimely and grants Defendant's motion for summary judgment as to these claims.  By contrast, the Court declines to adopt the Report's finding that Commerzbank's claims arising out of the OOMLT 2006-2 Trust are untimely and denies Defendant's motion for summary judgment as to Commerzbank's claims arising out of this trust.[33]

### c.   German Statute of Limitations

The Report finds that several of Commerzbank's claims are also untimely under German law and recommends dismissing them on that basis. (Report 48-54).  Judge Netburn begins this section of the Report by observing that under Rule 44.1 of the Federal Rules of Civil Procedure, "questions of foreign law are treated as questions of law, and the Court 'may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." (*Id.* at 49 (quoting Fed. R. Civ. P. 44.1)).  Judge Netburn then found that for timeliness purposes, "[i]n the context of RMBS litigation, 'the relevant provision of German law is Section 195 of the German Civil Code, which has a three-year limitations period.'" (*Id.* (quoting *IKB Deutsche Industriebank AG* v. *McGraw Hill Fin., Inc.*, 634 F. App'x 19, 22 (2d Cir. 2015) (summary order))).  "That period begins to

---

[33]   Plaintiffs suggest that the Report is "unclear because it does not indicate whether its recommendation concerning the" Early EOD Trusts "is limited to claims relating to the EODs" identified in the notices Defendant sent to certificateholders, or whether the Report also embraces "other EODs not referenced in that notice." (Pl. Br. 27).  In response, Defendant argues that "Plaintiffs' decision to plead that 'all' document defects and alleged R&W breaches should have been discovered and enforced after the very first EOD means that *all* claims arising from them accrued when the first EODs were declared in the Early EOD Trusts." (Def. Opp. 31).  The logic articulated above leads the Court to conclude that Plaintiffs' claims based on the EODs either predating Defendant's notices to certificateholders or described in those notices are untimely.

run at the end of the calendar year in which [i] the claim arose and [ii] the plaintiff either has knowledge of the circumstances giving rise to the claim and the identity of the defendant, or would have had such knowledge but for gross negligence." (*Id.*).

Judge Netburn applied these legal precepts to Commerzbank's claims arising out of 11 trusts and certificates in two other trusts (the "German SOL Trusts"). (Report 51).[34]  Beginning with the first element of the German statute of limitations, Judge Netburn found that, on Commerzbank's own allegations, its claims against Defendant arose no later than 2011. (*Id.*).  Turning to the second element, Judge Netburn found that "[t]here is plenty of evidence that, by 2011, Commerzbank was not only monitoring news articles and investigations relevant to potential R&W breaches and document defects but was also considering RMBS-related litigation." (*Id.* at 53).  As more fully set forth in the Report, this evidence included (i) Commerzbank's receipt of Defendant's notices informing certificateholders of EODs; (ii) its receipt of an investment advisor's report suggesting "partnering up with other investors to pursue recovery for violations of contractual representation and warranties" and to "direct the trustee to examine the deal documents for fraud or other misrepresentations in the loan origination process"; (iii) the filing of three similar RMBS lawsuits against trustees; and (iv) Commerzbank's maintenance

---

[34]    The German SOL Trusts include: (i) ABFC 2005-HE2; (ii) ABFC 2005-OPT1; (iii) ABFC 2006-OPT1 (M3 tranche only); (iv) ABSHE 2005-HE5; (v) CMLTI 2005-OPT4; (vi) GPMF 2005-AR4; (vii) GPMF 2006-AR1; (viii) GMPF 2006-AR2; (ix) GPMF 2006-AR3; (x) MSAC 2005-WMC3; (xi) MSAC 2005-WMC5; (xii) MSAC 2006-HE1; and (xiii) OOMLT 2006-2 (A4 tranche only).  (*See* Report 48 n.15).

of a spreadsheet tracking active RMBS-related litigation.  "Taken together,"

Judge Netburn concluded, "Commerzbank knew or was grossly negligent in not

knowing of the circumstances underlying its claims against Wells Fargo."  (*Id.*).

Commerzbank asserts that Judge Netburn's recommendation should be

rejected for four reasons.  *First*, Commerzbank argues that the Report

disregarded German law mandating the application of a separate limitations

period for each breach in favor of a "unity of damages" theory of liability.  (Pl.

Br. 33-34).  Courts in this District have repeatedly rejected this argument.  *See*

*PL/DB*, 2022 WL 384748, at *23 (stating that "[i]t is clear that German law

applies the [principle] of 'unit of damages,' pursuant to which ongoing breaches

do not restart or toll the Plaintiffs' statute of limitations period"); *Commerzbank*

*AG* v. *U.S. Bank Nat'l Ass'n*, No. 16 Civ. 4569 (WHP), 2021 WL 603045, at *5

(S.D.N.Y. Feb. 16, 2021) (similarly rejecting Commerzbank's argument).

Because Commerzbank merely rehashes the arguments that were correctly

rejected in those prior cases, the Court does not address the issue further here.

*Second*, Commerzbank contends that Judge Netburn erred by using a

three-year, rather than a ten-year, limitations period.  (Pl. Br. 35).  In broad

strokes, Commerzbank argues that (i) the three-year limitations period Judge

Netburn adopted is applicable only where Defendant shows that Commerzbank

had sufficient knowledge of Defendant's alleged wrongdoing to bring an action

in Germany with an expectation of success and (ii) Defendant has not shown,

on a trust-by-trust, claim-by-claim basis that Commerzbank had sufficient

knowledge by 2011 of Defendant's alleged breaches to have an expectation that a suit against Defendant would succeed.  (*Id.* at 35-38).

Once again, Commerzbank's argument has been presented to and rejected by several courts in this District.  As Judge Koeltl explained in *PL/DB*, Commerzbank's argument "confuses the Plaintiffs' burden at summary judgment or trial with the level of knowledge sufficient to commence the German statute of limitations period and is unsupported by federal court precedent applying Germany's statute of limitations."  *PL/DB*, 2022 WL 384748, at *22; *see also CB/USB*, 457 F. Supp. 3d at 247 (rejecting identical argument from Commerzbank); *IKB*, 634 F. App'x at 22 ("[A] plaintiff need not know all the relevant details or have conclusive proof available" to trigger the German statute of limitations; rather, "knowledge of the factual circumstances underlying the claim is sufficient.").  The Court joins the chorus of decisions rejecting Commerzbank's argument on this point.

*Third*, Commerzbank contends that the Report's "gross negligence findings are contrary to German law."  (Pl. Br. 38).  According to Commerzbank, the evidence shows that it was "proactive and diligent, actively investigating potential claims before 2012," but that, despite such diligence, "Commerzbank did not uncover any claims against [Defendant] before 2012[.]" (*Id.* at 39).  Notably, Commerzbank fails to engage with the evidence upon which Judge Netburn based her findings, which the Court has already described above.  This evidence includes the fact that Commerzbank had received several notices, including from Defendant itself, alerting it to issues

with loans held by the RMBS trusts and Defendant's decision not to pursue any recourse by 2011.  The Court agrees with the Report's finding that given that "[s]ophisticated plaintiffs [like Commerzbank] have a heightened duty to investigate possible claims[,]" the record evidence should have put Commerzbank on notice that it was under a duty to investigate whether it held any claims against Defendant.  (*See* Report 52 (quoting *Deutsche Zentral-Genossenchaftsbank AG* v. *HSBC N. Am. Holdings, Inc.*, No. 12 Civ. 4025 (AT), 2013 WL 6667601, at *10 (S.D.N.Y. Dec. 17, 2013) (internal quotation marks omitted))).  *See also PL/DB*, 2022 WL 384748, at *22 (observing that "German law contemplates that plaintiffs, particularly those as sophisticated as [Phoenix Light and several of the other Phoenix Light Plaintiffs], exercise reasonable care in investigating potential claims").

*Fourth* and finally, Commerzbank faults Judge Netburn for supposedly resolving disputed issues of fact at the summary judgment stage.  (Pl. Br. 39-40).  On this score, Commerzbank asserts that Judge Netburn impermissibly found, over its objection, that Commerzbank knew of three lawsuits against other RMBS trustees before 2012.  (*Id.* at 39).  Commerzbank's argument misstates the record.  Judge Netburn found that the three lawsuits had been filed; that Commerzbank maintained a spreadsheet that tracked active RMBS litigation; and that Commerzbank's spreadsheet stated that Commerzbank "was investigating taking legal action against 'US RMBS Originators and Trustees[.]'" (Report 54).  While these findings suggest that Commerzbank may

have been aware of the lawsuits, Judge Netburn did not find that Commerzbank had actual notice of these specific lawsuits prior to 2012.

Commerzbank next asserts that Judge Netburn's recommendation improperly relies on a 2007 news article referencing a lawsuit against another RMBS trustee that had "nothing to do with Commerzbank's claims here." (Pl. Br. 40). Setting aside that Commerzbank's point does not suggest that Judge Netburn resolved a dispute of fact, the Court observes that this argument is emblematic of the larger shortcoming in Commerzbank's objections to this section of the Report. Rather than address the evidence Judge Netburn relied on to support her findings, Commerzbank points time and time again to subsidiary issues in the record that cannot overcome the evidence indicating that Commerzbank knew or should have known that its claims against Commerzbank had accrued by 2011. The Court is unpersuaded by these evidentiary sleights of hand. Accordingly, the Court adopts Judge Netburn's finding that Commerzbank's claims related to the eleven trusts and certificates in two others are barred by Germany's applicable statute of limitations and grants Defendant's motion for summary judgment as to these claims.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion for summary judgment as to the Phoenix Light Plaintiffs' claims in their entirety. Further, the Court GRANTS in part and DENIES in part the parties' cross-motions for summary judgment as to Commerzbank's claims. More specifically, the Court:

- GRANTS Defendant's motion for summary judgment as to Commerzbank's claims arising out of the Sold Certificates;

- GRANTS Defendant's motion for summary judgment as to Commerzbank's claims arising out of the Negating Clause Securities, except with respect to the four loans upon which Judge Netburn reserved judgment;

- GRANTS Defendant's motion for summary judgment as to Commerzbank's claims arising out of the Separate Trustee Claims, except with respect to the eight loans upon which Judge Netburn reserved judgment;

- GRANTS Defendant's motion for summary judgment as to the Early EOD Trusts, with the exception of Commerzbank's claims arising out of the OOMLT 2006-2 Trust;

- GRANTS Defendant's motion for summary judgment as to the German SOL Trusts;

- GRANTS Defendant's motion for summary judgment as to the Exception Report Trusts, with the exception of claims under trusts (i) GPMF 2005-AR4; (ii) GPMF 2006-AR1; (iii) GPMF 2006-AR3; (iv) MSAC 2005-WMC5; and (v) OWNIT 2006-2; and

- DENIES Defendant's motion for summary judgment as to the Liquidated Loans Trusts.

The Court refers Commerzbank's case back to Judge Netburn for further proceedings addressing Commerzbank's surviving claims.

The Clerk of Court is directed to enter judgment for Defendant in case number 14 Civ. 10102 and to close that case. The Clerk of Court is further directed to terminate the motion at docket entry 520 in case number 15 Civ. 10033 and to lift the stay in that case.

SO ORDERED.

Dated:      July 12, 2022
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge